# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**LINDA TOMONIA, *et al.*,**              )
                                          )
    **On behalf of R.T., minor,**     )
                                          )
       **Plaintiffs,**               )
                                          )
       **v.**                        )    **Civil Action No. 07-0882 (JR)**
                                          )
**DISTRICT OF COLUMBIA, *et al*.,**       )
                                          )
       **Defendants.**               )
_____)

## DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT

Defendants, District of Columbia, Mary Grant, Marcia Parker, Dennis Homesley, Clifford Janey, and William Wilhoyte, by and through undersigned counsel, move this Honorable Court, pursuant to Fed R. Civ. P 12(c) for judgment on the pleadings or in the alternative, under Fed. R. Civ. P. 56, for summary judgment. These defendants are entitled to judgment as a matter of law for the following reasons

(1) Plaintiff Linda Tomonia is a non- custodial parent and lacks the requisite standing to bring suit on behalf of the minor plaintiff;

(2) there is no individual liability under either the American With Disabilities Act or Title VII,

(3) the individually named defendants are entitled to qualified immunity;

(4) Plaintiffs have failed to demonstrate that the defendants violated Title II of the America with Disabilities Act, Section 504 of the Rehabilitation Act or the D.C. Human Rights Act; and

(5) Plaintiffs have failed to establish that their Fifth Amendment Rights violated in violation of 42 U.S.C § 1983.

More detailed grounds for the requested relief are set forth in the attached memorandum of points and authorities.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/Patricia A. Jones
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

_/s/Eric S. Glover
ERIC S. GLOVER [978841]
Assistant Attorney General
441 Fourth St., N.W., 6th Floor North
Washington, D.C.  20001
(202) 442-9754; (202) 727-6295

## LCvR 7(m) CERTIFICATION

I hereby certify that on February 28, 2008, I contacted plaintiffs' counsel to obtain his consent to this motion; however, plaintiff does not consent.

/s/ Eric S. Glover
Eric S. Glover
Assistant Attorney General, D.C

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                )
**LINDA TOMONIA,** *et al.,*                    )
                                                )
                                                )
                                                )
                **Plaintiffs,**                 )
                                                )
                **v.**                          )          **Civil Action No. 07-0882 (JR)**
                                                )
**DISTRICT OF COLUMBIA,** *et al.,*             )
                                                )
                **Defendants.**                 )
_____)

### <u>Preliminary Statement</u>

Plaintiff Linda Tomonia, individually and on behalf of R.T., a minor, filed suit

against the District of Columbia, Mary Grant, Marcia Parker, Dennis Homesley, Clifford

Janey, and William Wilhoyte under Title II of the American with Disabilities Act (ADA),

Section 504 of the Rehabilitation Act, and the D.C. Human Rights Act (DCHRA).

Plaintiffs aver that the minor plaintiff has attention deficit hyperactivity disorder

(ADHD) and a history of psychological and behavioral difficulties. Amended Complaint,

¶ 1. Plaintiffs allege that the principals of all three District of Columbia Public Schools

(DCPS) which the minor child attended, Tacoma EC, Turner ES and Payne ES, violated

Title II of the ADA, Section 504 of the Rehabilitation Act, The DCHRA, and the Fifth

Amendment in violation of 42 U.S.C. § 1983, by excluding him from educational

programs, services, and activities that it provided to other students.  According to

plaintiffs,  defendants Janey and Wilhoyte ratified the actions of defendant principals

Grant, Turner and Homesley. See Amended Complaint, Generally.  Plaintiffs seek

compensatory damages and punitive damages, permanent injunctive and declaratory relief from all defendants, and an order requiring defendants to pay for educational services for the minor child.  Id.

On October 19, 2007, the Court granted in part and denied in part the defendants' motion to dismiss this action.  The Court dismissed this case against defendant Clifford Janey in his official capacity, and dismissed the case without prejudice as to the remaining individually named defendants.  On December 3, 2007, the plaintiff moved this court for leave to file an amended complaint.  The proposed amended complaint renames the defendants previously dismissed by this Court, and includes a Fifth Amendment claim against the named defendants.  The defendants opposed said motion.

As set forth below, plaintiff Linda Tomonia has failed to establish that she has the requisite standing to bring this case against these defendants.  Further, there is no individual liability under the ADA.  Also, the individually named defendants are entitled to qualified immunity.  Lastly, plaintiffs has failed to establish their  claims under Title II of the ADA, Section 504 of the Rehabilitation Act, the DCHRA or 42 U.S.C. § 1983.  As such, these defendants should be granted summary judgment.

## ARGUMENT

**A.      Standard of Review for Judgment on the Pleadings**

Under Fed. R. Civ. P. 12 (c), after the pleadings are closed, any party may move for judgment on the pleadings. Should the arguments and evidence relied on be limited to the allegations and responses in the pleadings, then the Court must apply the same standard as applied for a motion to dismiss. *Nixon v. Sampson,* 580 F.2d 514 (D.C. Cir. 1978); *Dale v. Executive Office of the President,* 164 F. Supp.2d 22 (D.D.C. 2001).

Should the court be presented with and accepts any matters beyond, or "outside the pleadings", then the court shall treat the motion as if filed under R. Civ. P. 56. *Dale,* 164 F. Supp.2d 22. The court, however, may consider or take judicial notice of matters in the general public record, including records and reports of administrative bodies and records of prior litigation. *Haynesworth v. Miller,* 820 F.2d 1245 (D.C. Cir. 1987); *Jane Does I v. District of Columbia and MRDDA,* 2002 U.S. Dist. LEXIS 24171 (D.D.C. 2002), *citing Cinel v. Connick,* 15 F.3d 1338 (5th Cir. 1994).

The Complaint must be liberally construed in favor of the plaintiff, and the plaintiff should receive the benefit of all reasonable inferences that can be drawn from these facts. *E.E.O.C. v. St. Francis Xavier Parochial School,* 117 F.3d 621 (D.C. Cir. 1997).

**B.      Summary Judgment Standard**

Fed R. Civ. P.56 provides that summary judgment:

> [S]hall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law.

The moving party in a motion for summary judgment bears the initial burden of identifying evidence that demonstrates there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). Once a movant has made the required showing under the rule, the burden shifts to the opposing party to "come forward with 'specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986). In other words, "once the movant has supported a summary judgment motion by evidence of particular events, the court may properly look to the nonmovant for rebuttal evidence

either 'from persons familiar with the events,' or expect the nonmovant to 'otherwise

cast more than metaphysical doubt on the credibility of the testimony.'" *Doe v. Gates*,

981 F.2d 1316, 1323 (D.C.Cir. 1993).

**C.    The Plaintiff Linda Tomonia, a Non Custodial Parent, Lacks the
       Requisite Standing to Bring this Action against the Defendants**

In every federal case, the party bringing the suit must establish standing to

prosecute the action. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (U.S. 2004)

Under the laws of the District of Columbia, a custodial parent has standing to bring a next

friend suit on behalf of a minor.  *See Harmatz v. Harmatz* 457 A.2d 399, 401 (D.C.

1983).  However, courts in the District have denied standing to non-custodial parents who

seek to bring next friend suits on the behalf of minors.  In *Foretich v. Glamour*, the

plaintiff, a non-custodial parent, sought to amend his complaint to add his minor child as

a plaintiff, to sue as her father and next friend.  741 F. Supp. 247, 248, (D.D.C. 1990).

However, the court denied the plaintiff's request as the defendants in the action produced

Superior Court records indicating that he was not the child's custodian and the plaintiff

failed to produce any authority indicting that he, as a non-custodial parent, may sue as a

next friend.  *Id.*

Recently, the Supreme Court addressed the issue of the standing of non- custodial

parent to bring a suit on behalf of a minor child.  *Elk Grove*, 542 U.S. at 1.   In *Elk Grove,*

the plaintiff, an atheist, sued numerous defendants, including the school district in which

his daughter, whom he had joint custody of , attended school, alleging that the school

district's policy requiring the recitation of the Pledge of Allegiance, violated the

Establishment and Fee Exercise Clause of the First Amendment.  *Id* at 4- 5.   The Court

held that the non-custodial father lacked the prudential standing  to litigate on behalf of

his daughter as a next friend noting that it was improper for the federal courts to entertain a claim of a father whose standing to sue was found on family law rights that were in dispute. *Id* at 15.

In the instant matter, on January 23, 2007, the plaintiffs appeared for a deposition in this action. During said deposition, plaintiff Linda Tomonia testified that on or about May 13, 2006, she lost custody of her son, the minor plaintiff, due to allegations of abuse. See Exhibit A, Pl. Linda Tomonia's dep. at 111:19-22, 129:14-16. She temporarily regained custody of the minor plaintiff on or about October 2007, but no longer has custody of the minor plaintiff. By Court order, dated November 30, 2007, Magistrate Judge Julie Breslow, Superior Court for the District of Columbia, revoked a July 5, 2007, order of protective supervision that had been granted to plaintiff Linda Tomonia and removed the minor plaintiff from her custody. See Annexed as Exhibit B. Judge Breslow further ordered that the minor plaintiff be committed to the custody of the Child and Family Services, noting that "it would be contrary to the welfare of the child to be in the home with the mother because the mother is not able to care for the respondent and control the respondent's behavior…" Id. Because Plaintiff Tomonia no longer has any custodial right with regard to the infant plaintiff, she lacks the requisite standing to bring a next friend claim on behalf of the infant plaintiff. Therefore, dismissal of this action on behalf of the minor child is appropriate.

**D.    There is no individual liability under Title II of the ADA or under Section 504 of the Rehabilitation Act**

The plaintiffs have sued defendants Janey, Grant, Parker, Homesley, and Wilhoyte under Title II of the ADA and Section 504 of the Rehabilitation Act in their individual capacities.  However, individuals cannot be sued in their personal capacity for alleged violations of Title II of the ADA, 52 U.S.C. §12131(1) (2000), or under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a).   In a recent decision, *Sindram v. Meriwether,* _ F. Supp 2d, 2007 WL 2660258 (D.D.C. September 12, 2007), this Court found that "it is abundantly clear that [the individual plaintiff] cannot be held liable in her personal capacity under Title II of the ADA." Therefore, it held that plaintiff had failed to state an ADA claim for which relief can be granted. The Court noted that the statutory language of the ADA is directed and limited to a "public entity" which is defined as "any State or local government or any department, agency, special purpose district or other instrumentality of a state of states, or local government." *Id.* at 2, *citing,* 42 U.S.C. §12131(1)(A)-(B). The Court also noted that existing case law holds that neither the ADA nor Section 504 of the Rehabilitation Act allows for personal capacity suits *Id. See also, Williams v. McLemore, 2007 WL 1748146* at 6 (6th Cir. June 19, 2007) (ADA does not provide for personal liability for defendants sued in their individual capacities); *Garcia v. S. U.N.Y. Health Sciences Center of Brooklyn,* 280 F. 3d 98, 107 (2d Circ. 2001) (neither Title II of the ADA nor Section 504 of the Rehabilitation Act permit individual capacity suits against State officials); *Alsbrook v.City of Maumelle,* 184 F. 3d 999, 1005 n. 8 (8th cir. 1999) (commissioners could not be sued in their individual capacities under Title II of the ADA because it affords disabled individuals redress for discrimination by a "public

entity"); *Shebby v. Adams,* 2007 WL 1302744 at 8 (E.D. Cal. May 2, 2007) (individuals cannot be personally sued under Title II of the ADA); *Calloway v. Boro. of Glassboro Dept' of Police,* 89 F. Supp. 2d 543, 557 (D.N.J. 2000) (individual liability is not contemplated under Title II of the Disability Act and Section 504 of the Rehabilitation Act); *Monte v. Roomer,* 32 F. Supp. 2d 1235, 140-41 (D. Colo. 1999) (defendants in their individual capacities are not properly subject to suit under Title II of the ADA). Moreover, in *Calloway, supra,* the Court was also persuaded by the Eighth Circuit's reasoning in employment discrimination cases in which individuals are personally sued. The Court held there was no liability under Title II (2) of the ADA against individuals who do not otherwise qualify as "employers" under the statutory definition. *See Calloway, 89* F. Supp 2d at 557.

It is clear, therefore, that under existing law, relief cannot be granted against the individual defendants in their personal capacities. Plaintiffs' redress under Title II of the ADA and Section 504 of the Rehabilitation Act is limited to claims against the District of Columbia.

**E.    The Plaintiffs' Claims Under Title II of the ADA, Section 504 of the Rehabilitation Action, and the D.C. Human Rights Act Should be Dismissed as Plaintiffs Have Failed to Demonstrate that the Infant Plaintiff was Discriminated Against due to his Alleged Disability.**

The plaintiffs in the instant action alleged that the defendants discriminated against the minor plaintiff under Title II of the ADA, Section 504 of the Rehabilitation Act, the D.C. Human Rights Act, and 42 U.S.C. § 1983. They allege that the defendants Grant, principal of Tacoma EC, Parker, principal of Turner ES and Homesley, principal of Payne ES intentionally excluded plaintiff R.T. from participating in, and denied him from the benefits of and programs solely on account of his disability. See Amended

Complaint, at ¶¶ 96, 101, 107 and 113.. More specifically, they allege that the defendants suspended the infant plaintiff from the subject schools based on his alleged disability. See Amended Complaint at ¶¶ 10, 17 and 22.

To prove that that the defendants violated Title II of the ADA, the plaintiffs must demonstrate that (1) the infant plaintiff is a qualified individual with a disability, (2) that he was excluded from participation in or denied the benefits of a public entity's services, programs or activities or subject to discrimination by such entity and (3) that the exclusion, denial or was based on his disability.  42 U.S.C. § 12132.  Under Section 504 of the Rehabilitation Act, plaintiffs must prove (1) that the infant plaintiff is an individual with a disability as defined by the Section 504, (2) that the infant plaintiff was otherwise qualified for the program or activity and (3) he was excluded from participation in or denied the benefits of the program or subject to discrimination because of his disability. 29 U.S.C §794(a).   Similarly, under the D.C. Human Rights Act, it unlawful for an educational institution:

> "[ t]o deny, restrict, or to abridge or condition the use of, or access
> to, any of its facilities, services, programs, or benefits of any
> program or activity to any person otherwise qualified, wholly or
> partially, for a discriminatory reason, based upon actual or
> perceived…or disability of any individual."

See  § 2-1402.41.

At deposition, plaintiffs testified about the minor plaintiff's suspensions by defendants Grant, Parker and Homesley from several DC Public Schools.  When asked about his suspension from Tacoma EC, the minor plaintiff testified that he was suspended for "fighting or disrupting the class."  See Exhibit C, Pl. R.T.'s dep. at 27:20-22, 28:1-9. The plaintiff Linda Tomonia testified that the minor plaintiff had been removed from

Tacoma EC's after school program for fighting and not following directions. See Exhibit A, at 53:19-22, 54:1-22.

The plaintiffs were then asked about the minor plaintiff's suspension while attending Turner ES. Plaintiff Linda Tomonia testified that she recalled that the minor plaintiff had been suspended approximately seven days while attending Turner Elementary for "inappropriate behavior", more specifically "talking back, walking out of class and roaming the halls." See Exhibit A at 169:16-19; 170:1-5. The minor plaintiff confirmed that he had been suspended from Turner ES for walking the halls and added that he had been suspended from Turner ES for bringing a toy gun to school. See Exhibit C. at 67:1-19.

Finally with regards to minor plaintiff's suspensions from Payne ES, Plaintiff Linda Tomonia testified that she recalled her son being suspended three times. She recalled that the first two suspensions were for roaming the halls and not going to class. See Exhibit A at 196:2-15, 199:11- 15. The infant plaintiff confirmed the testimony of Ms. Tomonia, testifying that during his first two weeks at Payne ES, he didn't go to class and that he would roam the halls. See Exhibit C at 80:16-21. Plaintiff Linda Tomonia testified that the infant plaintiff's third suspension from Payne ES was for assaulting another student which resulted in the infant plaintiff being arrested and a criminal complaint being filed against him. Exhibit A at 199: 17-22, 200:1-13.

In reviewing the plaintiffs testimony regarding the infant plaintiff's suspensions by defendant Grant, Parker and Homesely, it is evident that the plaintiffs have failed to establish that the defendants violated their constitutional rights because of the minor plaintiff's disability under either Title II of the ADA, Section 504 of the Rehabilitation

Act, the D.C. Human Rights Act, or 42 U.S.C. § 1983. The defendants submit that the plaintiff's testimony reveals that the infant plaintiff was suspended from DCPS schools because of behavioral issues including fighting, roaming the hallways, walking out of class and bringing a toy gun to school. The defendants would further submit that the plaintiffs have proffered no evidence to suggest that the minor plaintiff was ever removed from a DCPS facility or program based on his alleged disability. Thus, the defendants are entitled to judgment as a matter of law on all asserted constitutional claims.

**F.      The Defendants Janey, Grant, Parker Homesley  and  Wilhoyte are Protected by Qualified Immunity and are Entitled to Summary Judgment**

Defendants Janey, Grant, Parker, Homesley and Wilhoyte are entitled to qualified immunity in this action as they did not violate any plaintiffs' constitutional or statutory rights  The undisputed facts show that defendants acted reasonably in suspending and removing the infant plaintiff from class due to his behavioral issues.

Government officials performing discretionary functions are generally shielded from personal liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known. *Hunter v. District of Columbia*, 943 F.2d 69, 75 (D.C. Cir. l99l); *Crawford-El v. Britton*, 523 U.S. 574, 588, 11 S.Ct. 1584, 140 L. Ed. 759 (1998). The purpose of qualified immunity is to protect governmental employees against insubstantial lawsuits which have the following societal costs: l) expenses of litigation; 2) diversion of official energy from pressing public issues; 3) deterrence of able citizens from acceptance of public office; and 4) the possibility that the fear of being sued will dampen the ardor of all but the most resolute individuals. *Harlow v. Fitzgerald*, 457 U.S. 800, 8l4 (l982).

The first step in determining whether the individually named defendants are entitled to qualified immunity is to determine whether their conduct was discretionary. The next step in determining they are entitled to qualified immunity requires an analysis of whether their conduct violated a clearly established statutory or constitutional right of which a reasonable person would have known. *Crawford El,* 523 U.S. at 588. However, it is not simply enough to allege a violation of a clearly established but conceptually broad right, rather, the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 639-40, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987). As the D.C. Circuit Court of Appeal has held "[g]overnment officials who violate a plaintiff's civil liberties are entitled to qualified immunity if the officials reasonably could have believed that their actions were lawful in light of clearly established federal law and the information available to them at the time the actions took place. *Samaritan Inns, Inc. v. Dist. of Columbia*, 325 U.S. App. D.C. 19, 114 F.3d 1227, 1238-1239 (D.C. Cir. 1997).

Applying the above standards to the facts of the instant matter, it is clear the defendants are entitled to a qualified immunity defense. As the evidence has shown in this litigation, the minor child was suspended from school because of his behavioral problems. See Exhibits A and C. In fact, plaintiff Linda Tomonia testified that the minor plaintiff was sent to the principal's office for not following directions, hitting the other kids, not staying seated in his seat and talking back to the teachers, and fighting. See Exhibit A 27:16-22. Any reasonable school official would believe that they had a right to suspend a student who disrupted class, roamed the hallways, and brought a gun (albeit a

toy gun) to school.  As such, the individually named defendants submit that they are entitled to qualified immunity in this action.

With regard, to the defendants Janey and Wilhoyte, plaintiffs claim against them should be dismissed as plaintiffs have failed to demonstrate that they engaged in activities that violated their rights.  While they alleged in their pleadings that defendants Janey and Wilhoyte were personally involved in excluding the minor plaintiff from education programs and activities, the plaintiffs have failed to support their claim with evidentiary support.  In fact, during plaintiff Linda Tomonia's deposition, she testified that she had never spoken to either defendant Janey or defendant Wilhoyte about her son. See Exhibit A at 180:13-15, 226:22, and 227:1-3.

**G.    The Plaintiffs have failed to establish these defendants' liability under the' Fifth Amendment.**

    **1.    The Minor Plaintiff's Rights Were Not Violated**

The plaintiffs have alleged that the defendants violated their Fifth Amendment rights in violation of 42 U.S.C. § 1983.  To determine municipal liability under 42 U.S.C. § 1983, the district court must conduct a two-step inquiry. *Baker v. District of Columbia,* 3326 F.3d 1302, 1306 (D.C. Cir. 2003). First, the court determines whether the plaintiff establishes a predicate constitutional violation. *Id*. If so, the court then determines whether the complaint states a claim that a custom or policy of the municipality caused the violation. *Id*.; *Monell v. Department of Social Services of N.Y.*, 436 U.S. 658, 694 (1978). The second prong requires a determination of whether "a policy or custom of the District of Columbia caused the constitutional violation alleged under the first prong." *Bake*r, 326 F.3d at 1306; *Monell*, 436 U.S. at 694.

Plaintiffs have failed to meet their burden to establish municipal liability under §

1983.  Plaintiffs allege that the defendants intentionally deprived the infant plaintiff of his property interests in his education,  liberty interest in his reputation and his liberty interest in receiving the care and protection of his mother guaranteed by the Fifth Amendment, without due processes of law in violation of 42 U.S.C. § 1983.   Plaintiff Linda Tomonia claims that she filed two separate Due Process Complaints with DCPS with respect to her son.    As a result of said complaints, plaintiff Linda Tomonia testified that she recalled appearing before a hearing officer.  See Exhibit A at 221: 17-22.

        In *Hinson v. Merritt Educ. Ctr.*, the plaintiff's claimed that the defendants deprived them of their due process rights by failing to comply with the requirements of the Individuals with Disabilities Education Act.  521 F. Supp. 2d 22, 24 (D.D.C. 2007).  However the defendants in their motion to dismiss noted that the plaintiff's requested and obtained a due process hearing.  *Id*. at 32.  The court noted that as the plaintiffs requested and received a due process hearing that they appeared to have received the process due to them.  *Id*. at 33.    As the plaintiffs in the instant matter had filed a due process complaint and received a due process hearing they have received the due process that they were entitled and their due process claim should be denied.

        With respect to the plaintiff Linda Tomonia's claims that the defendants deprived the minor plaintiff's liberty interest in receiving the care and protection of his mother, the evidence shows that the infant plaintiff was removed from the plaintiff Linda Tomonia's custody as a result of allegations of abuse.  See Exhibit A at 111:19-22, 129:14-16.  Plaintiffs have simply failed to present credible proof to support this claim against these defendants.

        Finally, the plaintiffs allege that the defendants deprived the infant plaintiff of a

property interest in his reputation.  The D.C. Circuit has held that, in order to satisfy a claim for deprivation of a liberty interest, a plaintiff must show that the government both altered his status and stigmatized his reputation without due process of law. *Ranger v. Tenet*, 274 F. Supp. 2d 1, 7 (D.D.C. 2003).  Again, plaintiffs have failed to present any proof  that the defendants altered the infant plaintiff's status.  The minor plaintiff had a history of fighting and misbehaving at the school.  The minor plaintiff testified that he was not embarrassed that he was suspended from Tacoma EC, Turner ES or Payne ES. See Exhibit C at 91: 1-5.

Applying the two pronged test outlined in  *Baker*, the plaintiffs have failed to establish that the defendants violated their Fifth Amendment Rights in violation of 42 U.S.C. § 1983.

The defendants submit that the plaintiff's have failed to establish a predicate constitutional violation.  Even assuming arguendo that the plaintiffs established the first prong of the test outlined in *Baker,* they have failed to establish a custom or policy on behalf of the defendants to which resulted in the violation the infant plaintiff's Fifth Amendment Rights.

### 2.      Linda Tomonia's Rights Were Not Violated

Plaintiff Linda Tomonia alleges that the defendants violated her due process rights by failing to provide her with the infant plaintiff's records, failing to allow her to hearings related to the infant plaintiff and failing to allow her access to the infant plaintiff records.   See Amended Complaint at ¶ 148.   Plaintiff has failed to meet her burden of proof to establish these defendants' liability.  Plaintiff Linda Tomonia testified that she was allowed to review the infant plaintiff's homework portfolio while he was attending

Tuner ES.  Exhibit A at 183:14- 22, 184: 1-9.  Further, she testified that while the infant plaintiff was attending Turner ES she never requested to view his records other than his home work portfolio.  Id. at 186:22, 187:5-6.   Additionally, Ms. Tomonia testified that she and her attorney were present via telephone conference when the infant plaintiff's "section 504 plan" was drafted when he attended Turner ES. Exhibit A, 158:1-18.  The plaintiff Linda Tomonia testified the she was initially denied permission to review infant plaintiff's record from Payne, EC, because defendant Homesley did not know who she was. Id at 16 through 22.  However, at the time that the minor plaintiff was enrolled at Panye EC, the plaintiff Linda Tomonia did not have custody of the minor plaintiff and did not enroll him at the school.  See Id at 197:22-198:1-3.  The Plaintiff Linda Tomonia did testify however, that she was eventually able to review the minor plaintiff's entire file at Payne EC.  Id at 205: 4-9.

Based on the plaintiff Linda Tomonia's testimony, the defendants are entitled to judgment as a matter of law on plaintiffs' Fifth Amendment claims filed pursuant to 42 U.S.C. § 1983.

Finally, the Plaintiff Linda Tomonia alleges that her Equal Protection Rights under the Fifth Amendment were violated pursuant to 42 U.S.C. § 1983.  The equal protection principles embodied in the Due Process Clause of the Fifth Amendment essentially directed "that all persons similarly situated should be treated alike."  Thus for a plaintiff to survive a motion for summary judgment, a plaintiff must show that they were treated differently" than a party who is similarly situated. *Islamic Am. Relief Agency v. Gonzales*, 375 U.S. App. D.C. 93, 477 F.3d 728, 736 (D.C. Cir. 2007).  Plaintiff Tomonia has failed to present any evidence in this record that she was treated differently than anyone, let

alone, someone similarly situated.  Accordingly, judgment must be granted to these defendants.

**H.    The Plaintiffs' Retaliation and Interference Claims Fail As A Mater of Law.**

Plaintiff Tomonia claims that the defendants retaliated against her in violation of Title II of the ADA, Section 504 of the Rehabilitation Act and the D.C. Human Rights Act.  To make out a prima facie case of retaliation under Title II of the ADA and the DCHA  the plaintiffs must show  (1)they were engaged in protected activity; (2), that they were subjected to adverse action by the defendants; and (3) that 'there existed a causal link between the adverse action and the protected activity'. *Mayers v. Laborers' Health & Safety Fund*, 375 U.S. App. D.C. 134 (D.C. Cir. 2007); *Mazloum v. District of Columbia*, 442 F. Supp. 2d 1, 11 (D.D.C. 2006).  To establish a prima facie case of retaliation under Section 504 the Rehabilitation Act, the plaintiffs must show that (1) they engaged in statutorily protected activity, (2) the defendant was aware of the activity; (3) the plaintiffs suffered an adverse action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Duncan v. Wash. Metro Area Trans. Auth.*, F.R.D. 43, 48 (D.D.C. 2003).

Plaintiff Linda Tomonia alleges that the defendants retaliated against her by filing a memorandum and a motion to dismiss the Due Process Complaint she filed against with the DCPS.  See Amended Complaint at ¶¶ 28 and 29.  As with any proceeding or hearing, parties are typically entitled to submit motions and pleadings in an effort to further their position.  In this instant matter the defendants submitted a motion to dismiss plaintiffs' claim.  The defendants submit that the filing of a memorandum and motion to dismiss to

a due process complaint is insufficient to establish they these defendants retaliated against plaintiffs.

Plaintiffs also allege that the defendants Parker or Homesley, acting alone or in concert retaliated against the Plaintiff Linda Tomonia because of her advocacy of the minor plaintiff's rights, by altering the minor plaintiff's records.  See Complaint at  ¶ 43. However, plaintiffs have failed to present any evidence, either in testimonial or evidential form, to prove these claims, thus these plaintiffs have failed to show that they were discriminated against, or that they suffered adverse action as a result thereto and their claims of retaliation should be dismissed.  .

**Conclusion**

On the basis of the foregoing, the Defendants respectfully request that this Court grant their Motion for Judgment on the Pleadings or in the alternative, grant them summary judgment.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/Patricia A. Jones_____
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

_/s/Eric S. Glover_____
ERIC S. GLOVER [978841]
Assistant Attorney General
441 Fourth St., N.W., 6th Floor North
Washington, D.C.  20001
(202) 424-9754; (202) 727-6295

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                            )
**LINDA TOMONIA,** *et al.,*                )
                                            )
    **On behalf of R.T., minor,**         )
                                            )
      **Plaintiffs,**               )
                                            )
        **v.**                )    **Civil Action No. 07-0882 (JR)**
                                            )
**DISTRICT OF COLUMBIA,** *et al.,*         )
                                            )
      **Defendants.**              )
_____)

## Statement of Undisputed Facts

In support of the defendants' Motion for Summary Judgment, these defendants submit their Statement of Undisputed Facts, and state as follows:

1.     That on or about May 13, 2006, the infant plaintiff was removed from the custody of the plaintiff Linda Tomonia. See Exhibit A at 111: 1-22.

2.     By Court order, dated November 30, 2007, Magistrate Judge Julie Breslow, Superior Court for the District of Columbia, revoked a July 5, 2007, order of protective supervision that had been granted to plaintiff Linda Tomonia and removed the infant plaintiff from her custody. See Annexed as Exhibit B.

3.     The plaintiff minor plaintiff did not reside with the Plaintiff Linda Tomonia while he was enrolled of at Turner ES and Payne ES and she is not sure who enrolled him at these schools. See Exhibit A at 151: 20-22,192: 6–8 ,197: 2 and 198: 1-3.

4.     The minor plaintiff was suspended for "fighting or disrupting the class." See Exhibit C at 27:20-22, 28:1-9.

5.    The minor plaintiff was removed from Tacoma EC's after school program for fighting and not following directions.  See Exhibit A at  53:19-22, 54:1-22.

6.    Plaintiff testified that the minor plaintiff was sent to the principal's office for not following directions, hitting the other kids, not staying seated in his seat and talking back to the teachers, and fighting.  See Exhibit A at 27:16-22.

7.    Plaintiff testified that while attending Turner EC, the infant plaintiff had a "section 504 plan" hearing to help establish a plan for the the infant plaintiff to succeed in school and a Manifest Determination Hearing to deter if the minor plaintiff would be eligible for special education services.  See Exhibit A at 158: 1-11, 188 19-22 and 1-7.

8.    During the middle of the spring 2007 semester, the minor plaintiff left Turner ES and was enrolled at Payne ES, where he was promoted to the sixth grade.  See Exhibit A   at 190: 6-9, 192: 18-22 and 193: 1-3.

9.    Infant plaintiff testified that while he attend Tacoma ES, Tuner ES and Payne ES, he was given extra time  for quizzes and test, allowed to take school work home to complete.   He further testified that he was provided counseling services and give a behavioral plan.  He also testified that he was given rewards for completing his work.  See Exhibit C at 35: 4-14, 682: 2-22, 77: 12-22 and 78: 1-5.

10.    The minor plaintiff was not embarrassed that he was suspended from Tacoma EC, Turner ES or Payne ES. See Exhibit C at 91: 6-16.

11.    While at deposition, plaintiff Linda Tomonia testified that she filed at least two due process complaints, but does not remember whether hearings were held because she attended so many, in her Amended Complaint, she avers that hearings were held.  See Exhibit A at  175: 9 -22 and 176: 1-3 and See Complaint at ¶¶ 28 and 51.

12.     Plaintiff Tomonia had to barricade the minor child in the house at least on one occasion.  See Exhibit A at 50:15-19.

13.     Plaintiff Linda Tomonia testified that when the minor plaintiff was in her custody "he was out of control."  He was "staying out late at night, leaving the house without permission, and denying all the rules.  See Exhibit A at 219:7-13

14.     Plaintiff testified that she remembers being in court in front of a hearing officer as a result of her filings of due process violations.  See Exhibit A at 221:13-22.

15.     Plaintiff testified that she had not heard of any students being discriminated against because of their disabilities.  See Exhibit A at 223:9-20.

16.     Plaintiff testified that from October 2005 to the time that he was removed from the home, the minor plaintiff would stay out past the time that she expected him home. See Exhibit A at 49: 17-22.

17.     Plaintiff testified that the minor plaintiff stole her debit card.  See Exhibit A at 85: 10-12.

18.     Plaintiff testified that the minor plaintiff threatened to beat her with a belt. Pl. See Exhibit A at 113: 1 -2.

19.     Plaintiff testified that the minor plaintiff took all of the house keys and locked her out of the home.  See Exhibit A at 124: 1-10.

Respectfully submitted,

PETER J. NICKLES
Interim Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

/s/Patricia A. Jones _____
PATRICIA A. JONES [428132]
Chief, General Litigation, Section IV

_/s/ Eric S. Glover _____
ERIC S. GLOVER [978841]
Assistant Attorney General
441 Fourth St., N.W., 6th Floor North
Washington, D.C.  20001
(202) 442-9754; (202) 727-6295

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
                                       )
**LINDA TOMONIA,** *et al.,*            )
                                       )
    **On behalf of R.T., minor,**   )
                                       )
    **Plaintiffs,**                 )
                                       )
    **v.**                          )     **Civil Action No. 07-0882 (JR)**
                                       )
**DISTRICT OF COLUMBIA,** *et al.,*     )
                                       )
    **Defendants.**                 )
_____ )

## ORDER

Upon consideration of the Defendants District of Columbia, Clifford Janey, Mary Grant, Marcia Parker, Dennis Homesley, and William Wilhoyte's Motion for Judgment on the Pleadings, the Memorandum of Points and Authorities filed in support thereof, and the entire record herein, and it appearing to the Court that the motion should be granted, it is by the Court this ____ day of _____, 2008,

ORDERED:   That defendants' motion for judgment on the pleadings is GRANTED for the reasons set forth in the defendants' motion.

 

_____
JUDGE JAMES ROBERTSON
District Court for the District of Columbia

cc:

Karen D. Alvarez, Esq.
1442 Foxhall Road, N.W.
Washington D.C. 20009

Eric S. Glover
Assistant Attorney General
441 Fourth St., N.W., 6th Floor North
Washington, D.C.  20001

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**LINDA TOMONIA**, *et al.,*                        )
                                                    )
    **On behalf of R.T., minor,**        )
        **Plaintiffs,**            )
                                                    )
    **v.**                               )          **Civil Action No. 07-0882 (JR)**
                                                    )
**DISTRICT OF COLUMBIA**, *et al.,*                 )
                                                    )
    **Defendants.**                      )
_____)

## <u>ORDER</u>

      Upon consideration of the Defendants District of Columbia, Clifford Janey, Mary

Grant, Marcia Parker, Dennis Homesley, and William Wilhoyte's Motion for Summary

Judgment, the Memorandum of Points and Authorities filed in support thereof, and the

entire record herein, and it appearing to the Court that the motion should be granted, it is

by the Court this ___ day of ___ _____, 2008,

      ORDERED:   That defendants' motion for summary judgment is GRANTED for

the reasons set forth in the defendants' motion.

                                        _____
                                        JUDGE JAMES ROBERTSON
                                        Distinct Court for the District of Columbia

cc:

Karen D. Alvarez, Esq.
1442 Foxhall Road, N.W.
Washington D.C. 20009

Eric S. Glover
Assistant Attorney General
441 Fourth St., N.W., 6th Floor North
Washington, D.C.  20001

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2                    Civil Division
3    - - - - - - - - - - - - - - - -+
                                    |
4    LINDA TOMONIA, in her own      |    **ORIGINAL**
     right, and as next friend of   |
5    her son, R.T., and R.T., a     |
     minor, by his mother and next  |
6    friend, Linda Tomonia,         |
                                    |
7              Plaintiffs,          |    Civil Action No.:
                                    |
8        vs.                        |    7-CV-0882(JR)
                                    |
9    THE DISTRICT OF COLUMBIA,      |
     et al,                         |
10                                  |
               Defendants.          |
11                                  |
     - - - - - - - - - - - - - - - -+
12                 (VOLUME I)
13        Deposition of Linda Fay Tomonia
14              Washington, D.C.
15          Wednesday, January 23, 2008
16               10:00 a.m.
17
18
19
20   Job No. 1-120866
21   Pages 1 - 144, Volume I
22   Reported by:  Laurie Bangart-Smith


L.A.D. REPORTING & DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

2

1                          Deposition of

2                       LINDA FAY TOMONIA

3

4    Held at the offices of:

5              OFFICE OF THE ATTORNEY GENERAL

6              6th Floor South

7              441 Fourth Street, Northwest

8              Washington, D.C. 20001

9              (202)727-6295

10

11

12

13

14

15

16             Taken pursuant to the Federal Rules of Civil

17    Procedure, by notice, before Laurie

18    Bangart-Smith, Registered Professional Reporter

19    and Notary Public in and for the District of

20    Columbia.

21

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

3

1                    A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFFS:

3            KAREN D. ALVAREZ, ESQUIRE

4            Law Office of Karen D. Alvarez, Esq.

5            1442 Foxhall Road, Northwest

6            Washington, D.C. 20007

7            (202)333-8553

8    ON BEHALF OF THE DEFENDANT:

9            ERIC GLOVER, ESQUIRE

10           PATRICIA JONES, ESQUIRE

11           Office of the Attorney General

12           6th Floor South

13           441 Fourth Street, Northwest

14           Washington, D.C. 20001

15           (202)727-6295

16

17

18   Also present:

19           Reginald Tomonia

20           Kamel Bekkali

21

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

4

1                         EXAMINATION INDEX

2                                                          PAGE

3    EXAMINATION BY MR. GLOVER . . . . . . . . . . . .    5

4

5

6

7

8                         E X H I B I T S

9                     (Retained by counsel)

10   DEPOSITION EXHIBIT                                   PAGE

11   Exhibit A    Notice of Taking Oral Deposition         8

12   Exhibit B    Court order regarding a hearing

13                held on November 30th, 2007             42

14   Exhibit C    First Amended Complaint                 66

15   Exhibit D    Magistrate's Order                      114

16

17

18

19

20

21

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

5

1               P R O C E E D I N G S

2               LINDA FAY TOMONIA,

3   having been first duly sworn, testified upon her oath

4   as follows:

5           EXAMINATION BY COUNSEL FOR DEFENDANTS

6   BY MR. GLOVER:

7       Q     Good morning, Ms. Tomonia.

8       A     Good morning.

9       Q     My name is Eric Glover.  I'm an attorney

10  with the Office of the Attorney General.  I am

11  representing the District of Columbia, Ms. Mary Grant,

12  Ms. Marcia Parker, Dennis Homesley and Mr. William

13  Wilhoyte in this action.  I'm going to be asking you

14  some questions today.  You are here today for a

15  deposition.

16           Have you ever been deposed before, ma'am?

17      A     No.

18      Q     Okay.  Well, straightforward, a deposition

19  is a fact-finding instrument.  I'm going to be asking

20  you questions today, and I'm just going to ask that

21  you respond as candidly as possible.  However, before

22  commencing my line of questioning, there are certain

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

6

1  ground rules that I lay in place I'm sure your

2  attorney has already advised you of.  I just have to

3  go over them with you.

4          First and foremost, as you can see here

5  today, we have a court reporter.  Now, as talented as

6  Ms. Court Reporter is, she can't take down both of us

7  speaking at the same time, so I ask that you allow me

8  to complete my entire question before you enter your

9  response.  I'm going to assure you, 99 percent of the

10  questions I'm going to ask you today, you're going to

11  know the answer to them before I complete them.

12  However, just afford me the entire time to get that

13  question out before you respond so that we can have a

14  clean record.  Okay?

15      A    Okay.

16      Q    Secondly, again, as talented as Ms. Court

17  Reporter is, she can't take down head shakes or head

18  nods or "uh-huh" or "huh-uh."  That does not translate

19  on a transcript, so I'm going to ask that all of your

20  responses be oral.  Is that okay with you?

21      A    That's fine.

22      Q    Fine with you.  Okay.  I'm going to be

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

7

1    asking you questions.  Again, I'm going to ask that if

2    at any time I ask you a question and you don't

3    understand the question, you just let me know.  I

4    don't want you to guess.  I don't want you to

5    speculate as to what I'm asking you.  I'm a big boy.

6    I can take it if you need me to rephrase it or just

7    reask the question for you.  Okay?

8         A    Okay.

9         Q    If at any time during this deposition you

10   need to use the ladies' room or you need to speak to

11   your attorney, please do not hesitate to let me know.

12   That is not going to be a problem as long as there

13   isn't an open question pending, meaning I've asked you

14   a question and you have yet to respond.  Okay?

15        A    Okay.

16             MS. ALVAREZ:  I have just a couple of

17        questions.

18             Are we on the record, ma'am?

19             THE REPORTER:  Oh, yes, we have been.

20             MS. ALVAREZ:  Perhaps we could have everyone

21        identify themselves for purposes of the record.

22             MR. GLOVER:  Well, I've already identified

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

8

1        myself, and to my right is Ms. Patricia Jones.

2        She is a supervisor, Section Chief of general

3        litigation for the Office of Attorney General.

4              THE WITNESS:  Linda Tomonia, biological

5        mother of Reginald Tomonia.

6              MS. ALVAREZ:  Karen Alvarez, attorney for

7        Ms. Tomonia.

8              Reginald, could you identify yourself.

9              REGINALD TOMONIA:  Reginald Tomonia.

10             (Exhibit A was marked for identification and

11        retained by counsel.)

12   BY MR. GLOVER:

13        Q    Handing you now what has been marked as

14   Defense Exhibit A for purposes of the deposition.  Do

15   you recognize the document that I've handed you?

16        A    Yes.

17        Q    And how do you recognize it?

18        A    It was sent to me from Attorney Alvarez.

19        Q    Okay, ma'am, and just so the record is

20   clear, Defendant's Exhibit A is a Notice of Taking

21   Oral Deposition; is that correct?

22        A    Yes.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

9

1      Q     And in this Notice it outlines the date that

2   you were to appear here for a deposition, correct?

3      A     Yes.

4      Q     And also in the Notice of Taking Oral

5   Deposition it outlines certain documents my office

6   requested that you bring pursuant to this deposition,

7   correct?

8      A     Yes.

9      Q     And prior to coming today -- well, did you

10  bring any documents with you here today pursuant to

11  this Notice of Taking Oral Deposition?

12     A     Yes.

13     Q     And can I see those documents?

14         MS. ALVAREZ:  We're just going through them

15     at the moment.  Ms. Tomonia just brought them.

16     Here, these are the ones we've found to be

17     orders, custody orders that you're requesting.

18         (Discussion was held off the record.)

19         MS. ALVAREZ:  Those are the ones you

20     reviewed.

21         MR. GLOVER:  These are the ones I reviewed,

22     yes.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

10

1          MS. ALVAREZ:  I want to start getting them

2     in some sort of order and make sure they remain

3     in some sort of order.

4          MR. GLOVER:  Okay.  When you say "in order,"

5     we're going to be making copies of these

6     documents.

7          MS. ALVAREZ:  Yeah, I understand, but I

8     would like to read them into the record.

9          MS. JONES:  No, this is his deposition.

10     He's going to take care of the deposition.  We

11     will get back to these.

12  BY MR. GLOVER:

13     Q    Now, ma'am, could you please state your full

14  name for the record.

15     A    Linda Fay Tomonia.

16     Q    And Ms. Tomonia, what's your date of birth?

17     A    April 21st, 1955.

18     Q    And your Social Security, ma'am?

19     A    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.

20     Q    And your current address, ma'am?

21     A    6817 Georgia Avenue, Northwest, apartment

22  407.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

11

1    Q    And how long have you resided at that

2  address?

3    A    Since April of last year.

4    Q    Prior to April of last year, where did you

5  reside, ma'am?

6    A    Same address.  Different apartment.

7  Apartment 421.

8    Q    And how long did you reside at that address,

9  ma'am?

10    A    Approximately maybe a year.

11    Q    And prior to that, where did you reside,

12  ma'am?

13    A    7721 Eastern Avenue I believe is the

14  address.

15    Q    Is that here in Washington, D.C.?

16    A    Northwest Washington, yes.

17    Q    And how long did you reside at that address,

18  ma'am?

19    A    One year.

20    Q    And prior to that where did you reside,

21  ma'am?

22    A    I can't remember the address, but it was

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

12

1    13th Street, Northwest.

2        Q    And how long did you reside at that 13th

3    Street address?

4        A    Seven years.

5        Q    Now, presently, ma'am, at the Georgia Avenue

6    address, who, if anyone, resides with you?

7        A    I live alone.

8        Q    And when you resided in the Georgia Avenue

9    address but at the 421 apartment number, who resided

10    with you, if anyone?

11        A    My son and his father, before he died.

12        Q    And when you say your "son," who are you

13    referring to, ma'am?

14        A    Reginald.  My son Reginald.

15        Q    And when, if at any point, did your son

16    cease residing with you at that address?

17        A    May 13th, 2005.

18        Q    And you stated that your husband resided

19    with you until he passed on; is that correct?

20        A    Not my husband.

21        MS. ALVAREZ:  I'm sorry.  What year did you

22        give?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

13

1          THE WITNESS:   At the 421 address?

2          MS. ALVAREZ:   For Reginald's leaving.

3          THE WITNESS:   Reginald left in 2006, I

4     believe.  I'm sorry.  May 13, 2006.

5  BY MR. GLOVER:

6          Q     Okay, Reginald's father.  I apologize.  When

7  did he pass on?

8          A     October the prior year, 2005.

9          Q     And at the 7721 Eastern Avenue address, who,

10  if anyone, resided with you?

11          A     My son Reginald.

12          Q     And at the 13th Street address?

13          A     For the first three years I lived alone, and

14  the years thereafter, Reginald, my son.

15          Q     And ma'am, what's your son's date of birth?

16          A     January 3rd, 1995.

17          Q     And his Social Security number, if you know

18  it?

19          A     I don't.

20          Q     And ma'am, if you know, where is your son

21  currently residing?

22          A     He's residing in Laurel, Maryland.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

14

1        Q    Do you know the street address?

2        A    I don't right off.

3        Q    Whom, if anyone, is your son residing with?

4        A    Foster parents.

5        Q    And do you know the name of the foster

6    parents your son is residing with?

7        A    Yes, Ivy McManus.

8        Q    And how long has your son resided with

9    Ms. McManus?

10       A    I believe approximately December 13th,

11    somewhere in that area.

12       Q    When you say "December 13th," are you

13    referring to December 13th of 2007?

14       A    2007, yes.

15       Q    And prior to December 13th, 2007, where was

16    your son residing?

17       A    With me.

18       Q    Now, ma'am, you filed a complaint against

19    the District of Columbia and several individual

20    parties, relating to claims you made, allegations

21    you've made against the District of Columbia, the

22    District of Columbia's Public Schools and various

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

15

1    principals of the District of Columbia schools,

2    correct?

3        A    Correct.

4        Q    And in these allegations you're alleging

5    that certain services were not rendered to your son,

6    violating both certain statutory and constitutional

7    rights, correct?

8        A    That's correct.

9        Q    And you're also alleging that due to the

10   acts of the District of Columbia and its agents, some

11   of your rights were, in fact, violated, correct?

12       A    That's correct.

13       Q    Now, ma'am, I just want to back up a little

14   bit.  Prior to enrolling your son in the D.C. Public

15   Schools, more specifically, Takoma Park Elementary

16   School, what school did your son attend?

17       A    The School for Arts In Learning, downtown

18   Washington, D.C.

19       Q    During what periods did your son reside at

20   that school?  Excuse me.  Attend that school.  I

21   apologize.

22       A    Okay, he was there for two years.  I don't

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

16

1    readily recall.

2        Q    What school, if any -- is that a public or

3    private school?

4        A    That's a private school.  It's a school for

5    kids with disabilities.  It's a chartered school.

6            MS. ALVAREZ:  We'll stipulate that it's a

7        public chartered school.

8    BY MR. GLOVER:

9        Q    Okay, when you say "school with

10   disabilities," has your son ever been diagnosed with

11   any disabilities?

12       A    Yes.

13       Q    And when was the very first time your son

14   was diagnosed with a disability?

15       A    I want to say 2001, I believe.

16       Q    Where was your son diagnosed?

17       A    Kaiser Permanente in Kensington, Maryland.

18       Q    And do you recall the name of the individual

19   that diagnosed your son?

20       A    Yes.  Dr. Jacqueline McKinney.

21       Q    And how did it come to be that your son was

22   referred to Dr. McKinney?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

17

1       A    From actually the daycare.  We would always

2    get complaints about his behavior, his hyperactivity.

3    Upon enrolling him for his first grade at -- I

4    enrolled him at a private school, Bridges Academy,

5    Washington, D.C., Georgia Avenue, Northwest, and the

6    first year there were lots of complaints from them

7    regarding Reginald's behavior.  They recommended at

8    the end of the school year that I not reenroll him

9    because of his behavior.  They could not control it.

10      Q    And when you say "complaints about his

11   behavior," specifically what type of complaints were

12   you receiving from the Bridges Academy?

13      A    Hitting other kids, not waiting his turn,

14   talking out of turn, talking back to the teachers,

15   those types of behaviors.

16      Q    Okay, and you stated that they recommended

17   that you not enroll your son again; is that correct?

18      A    Not reenroll him, correct.

19      Q    And did you reenroll your son at Bridges

20   Academy?

21      A    I did not.

22      Q    As a result of them recommending that you

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

18

1    not enroll your son in Bridges Academy, did any

2    litigation result from that?

3        A    No.

4        Q    So after you were -- after it was suggested

5    that you not enroll your son in Bridges Academy, where

6    was your son enrolled for that following school year?

7        A    For the following school year I enrolled him

8    in Community Academy Public Charter School.

9        Q    And what grades was he in when he attended

10   Community Academy Public Charter School?

11       A    Second and third.  I'm sorry.  Let me

12   correct that.  First and second, I believe, right.

13       Q    Backing up a little bit, what, if any,

14   disability did Dr. McKinney diagnose your son with?

15       A    AD/HD, Attention Deficit/Hyperactivity

16   Disorder, as well as ODD, Oppositional Defiant

17   Disorder.

18       Q    And specifically do you recall -- withdraw.

19   And what year was that when your son was enrolled at

20   Community Academy Public Charter School?

21       A    I believe it was for the 2001/2002 school

22   year.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

19

1      Q     And while enrolled at the public charter

2   school, were any special services presented or

3   designated for your son as a result of his disability?

4      A     Yes.  He had a section 504 plan written.

5      Q     And when you say "section 504 plan," explain

6   to me what you mean by "section 504 plan."

7      A     It was a plan to assist Reginald to actually

8   survive in the classroom setting.  For an example, he

9   was to sit in close proximity to the teacher since he

10   was said to be a constant distraction to the other

11   children.  He was to be in front of the line or in

12   close proximity with the teacher at all times.

13      Q     Okay.

14      A     And they had him in like a token economy.

15   For good behaviors he was rewarded.  It was like a

16   point system, and he could actually, if he earned so

17   many points, he could get -- he got to pick out of the

18   prize box.

19      Q     And how did this section 504 plan come to

20   be?  Is it something that you recommended to the

21   school, the school recommended to you, or something

22   else?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

20

1       A    No, it was recommended by Dr. Kaurbinder at

2    Kaiser Permanente.

3            MS. ALVAREZ:   Could you spell that.

4            THE WITNESS:   I believe it's

5       K-A-U-R-B-I-N-D-E-R.

6    BY MR. GLOVER:

7       Q    Was that a written recommendation, oral

8    recommendation or something else?

9       A    It was written, a written recommendation.

10      Q    Was that recommendation provided to you?

11      A    It was.

12      Q    And do you have a copy of that

13   recommendation?

14      A    There is a copy.  It was provided to the

15   school as well.

16      Q    When you say "provided to the school," are

17   you referring to Community Academy?

18      A    Community Academy, yes.

19           MR. GLOVER:  Counsel, at this time I'm going

20      to make a request for production of that

21      document, to the extent it's in your client's

22      possession.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

21

1           MS. ALVAREZ:  I don't know if it is or not.

2           MR. GLOVER:  Well, to the extent that it is,

3      we're calling for the production of it.

4           MS. ALVAREZ:  What are you asking for?

5           MR. GLOVER:  I'm asking for the letter she

6      articulated that was from Dr. Kaurbinder

7      recommending that her son be -- that the school

8      implement a 504 section plan.

9           MS. ALVAREZ:  Did you say it was a letter?

10          THE WITNESS:  I cannot say it was a letter,

11      but it was a document.

12  BY MR. GLOVER:

13      Q    Well, to the extent that document still

14  exists -- do you have a copy of that?

15      A    I do have a copy of that.

16          MR. GLOVER:  We call for production of that

17      document.

18  BY MR. GLOVER:

19      Q    When did you receive this document from the

20  doctor?

21      A    It was --

22          MS. ALVAREZ:  Pursuant to what rule are you

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

22

1      requesting that document?

2            MR. GLOVER:  The rules of discovery.

3            MS. ALVAREZ:  Which one?  Could you cite

4      one, please.

5            MS. JONES:  He doesn't have to cite one

6      right now.  Let's proceed with the deposition.

7  BY MR. GLOVER:

8      Q    And when did the doctor provide you with

9  this document?

10     A    The document was presented at the very

11  beginning of the school year, because I had taken him

12  to be diagnosed during the summer months, before he

13  entered Community Academy.

14     Q    And was that diagnosis with Dr. Jacqueline

15  McKinney?

16.    A    That's correct.

17     Q    And to your knowledge, was a section 504

18  plan actually implemented at the Community Academy

19  Public Charter School?

20     A    Absolutely.

21     Q    And was it implemented that entire year of

22  2001/2002?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

23

1      A     Absolutely.

2      Q     And what school, if any, did your son attend

3  for the 2002/2003 calendar year?

4      A     School for Arts In Learning.

5           MS. ALVAREZ:  Excuse me.  How many years was

6      he at the Community Academy?

7           THE WITNESS:  Two years.  I'm sorry.  Two

8      years.

9  BY MR. GLOVER:

10     Q     Okay.  So during the school year of 2002 and

11  2003, what, if any, school did your son attend?

12     A     Okay, he was at -- I'm not sure on my years,

13  but he was at Community Academy for two years, which

14  would have been the first and second grade.

15     Q     Okay.  So during the third grade --

16     A     Third grade, third and fourth grade he was

17  at School for Arts In Learning.

18     Q     Backing up a little bit, did your son

19  successfully matriculate the first and second grade at

20  the community charter school?

21     A     There were lots of problems.

22     Q     When you say "lots of problems," what

24

1    problems were there?

2        A    Behavior.

3        Q    For example?

4        A    Talking back.  Same behaviors that we

5    experienced in the private school.  Not waiting his

6    turn, aggressive behavior, pushing other kids.

7        Q    And was this before or after or during the

8    implementation of the section 504 plan?

9        A    It was during.

10        Q    How did you come to learn that your son was

11    having these behavioral problems?

12        A    We were having monthly team meetings, what

13    they call "section 504 team meetings."

14        Q    And who attended these meetings?

15        A    Myself, the counselor, the teachers, the --

16    I believe the head of -- I want to say she was a

17    psychiatrist or maybe a psychologist, for the first

18    year that worked with us.

19        Q    And did these problems carry over into your

20    son's second year at the Community Academy Charter

21    Public School?

22        A    They escalated.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

25

1      Q    And when you say "escalated," specifically

2  what occurred?

3      A    They occurred more frequently.  He began to

4  get suspended for the behaviors.  He spent more time

5  out of the classroom, and maybe I should note, the

6  psychologist was no longer there that actually

7  initiated the 504 plan, so it was being taken care of

8  by a Special Ed coordinator.

9      Q    And who was the psychologist at the time, if

10  you recall?

11      A    I can't recall her name.

12      Q    Do you recall the name of the Special Ed

13  coordinator?

14      A    I don't.  Let me take that back.  I believe

15  it was Rochelle Young.

16      Q    Was that the psychologist or the Special Ed

17  coordinator?

18      A    She was the Special Ed coordinator.

19      Q    And when you said that he was getting

20  suspended due to his behavior, during that second

21  school year, the second grade period, how many times

22  would you estimate your son was suspended?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

26

1       A    Gosh, an estimation, maybe about -- less

2   than ten.

3       Q    And at these meetings that you discussed,

4   these team meetings, was it ever articulated to you

5   the reasons for your son's suspensions?

6       A    Yes, and it was -- I mean I got, of course,

7   I got the documentation for each suspension and would

8   meet with the principal.  The school was very open and

9   very supportive of Reginald and his behaviors.

10      Q    And were these suspensions primarily based

11  on your son's behavior?

12      A    Yes.

13      Q    And you said that he would spend more time

14  out of the classroom than in the classroom?

15      A    Yes.

16      Q    And what do you mean by that?

17      A    He spent a lot of time in the office.  The

18  teachers were not as understanding of the AD/HD even

19  when I would speak to them.  I don't think they really

20  had a thorough understanding.  There was an

21  unwillingness to implement the 504 plan by the younger

22  teacher that year.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

27

1          Q      Okay, but -- let me start there.  When you

2    said he was spending more time in the office, was he

3    sent to the office or going to the office?

4          A      He was sent to the office.

5          Q      Why was he sent to the office?

6          A      Because of his behaviors again.

7          Q      I know you stated there was an unwillingness

8    for the teacher to implement the section 504 plan, and

9    my question to you is:  However, was a section 504

10   plan in place?

11         A      Yes.

12              MS. ALVAREZ:  This is the second year of the

13         Community Academy.

14              MR. GLOVER:  This is correct, counselor.

15   BY MR. GLOVER:

16         Q      And you said he was sent to the office due

17   to behaviors.  Can you articulate specifically what

18   behaviors he was sent to the principal's office for?

19         A      Not following directions, hitting the other

20   kids, not staying seated in his seat and talking back

21   to the teachers, fighting, and he's always to blame

22   for the fights.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

28

1    Q    And I guess the question that I initially

2  posed to you is:  Did your son successfully

3  matriculate the first grade to the second grade?  Was

4  he promoted?

5    A    He was the first grade.  Again, the teacher

6  was very willing, we had a very good rapport, the

7  teacher and I.  She was a little concerned about his

8  going to the second grade, and she said to me to watch

9  over him carefully, because she was concerned.

10    Q    And do you recall the name of that teacher?

11    A    Ms. Ahougataue.  That's Nigerian, I believe.

12  A-H-O-U-G-A-T-A-U-E, something to that effect.

13    Q    And did your son successfully matriculate

14  from the second grade to the third grade?

15    A    It was a struggle.

16    Q    But was he promoted?

17    A    He was, but again, he was recommended to go

18  to SAIL, School for Arts In Learning.

19    Q    And who recommended that your son go to

20  SAIL?

21    A    The principal made that recommendation.  He

22  asked that I go down and take a look at the school,

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

29

1    because they would be better suited dealing with

2    Reginald and his behaviors.

3         Q    And do you recall the name of the principal?

4         A    I don't.  My son may remember.

5         Q    Again, going back to your -- withdrawn.

6    Where did your son attend the third grade?

7         A    School for Arts In Learning.

8         Q    And do you recall what year that was, what

9    school year?

10         A    Gosh, I don't.  I don't.  I just don't

11    maintain dates very well.

12         Q    Okay.

13         A    Or years.

14         Q    And the School for Arts In Learning, is that

15    a public school, a private school or something else?

16         A    A public charter school, and I better let it

17    be known, for kids with disabilities or "special

18    needs" I think is how it's phrased.

19         Q    And while your -- withdrawn.  To your

20    understanding -- you know, I'm not from D.C. so you're

21    going to have to work with me -- a public charter

22    school.  What is your understanding of a public

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

30

1    charter school?

2         A    They are governed by their own bylaws.

3         Q    And when Reginald was enrolled in the SAIL

4    school, was a 504 plan implemented?

5         A    Yes.

6         Q    And prior to enrolling Reginald at the SAIL

7    school, did you ever discuss with any of the teaching

8    staff, the faculty, any of the employees of the SAIL

9    school your son's disability?

10        A    Absolutely.

11        Q    And do you recall who you spoke to?

12        A    I don't recall her name, no.

13        Q    Do you recall the individual's title?

14        A    I don't.

15        Q    Specifically what did you tell this person?

16        A    I explained to her about his disorder, that

17   he had been diagnosed and that he was under a 504

18   plan, the problems that we were having at Community

19   Academy, which she was very much aware, because

20   Reginald was referred there.  And she assured me that

21   they were the place for my son, and upon that I went

22   on with the enrollment.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

31

1    Q    How would you describe your son's behavior

2    during that third school year?

3    A    A little better.  Somewhat better, I think I

4    should say, somewhat better.

5    Q    Were there still disciplinary problems?

6    A    Yes.

7    Q    And what, if any, problems did he have

8    during that third grade school year?

9    A    The same problems that were prevalent

10   through all of his school years, so behavior, talking

11   back, not following instructions, not waiting his

12   turn, aggressive behavior.

13   Q    Was there any fighting?

14   A    Yes.

15   Q    Was he successfully able to matriculate that

16   third grade year to the fourth grade?

17   A    Yes, he was.

18   Q    What was your son's grades like during that

19   third grade school year?

20   A    Average.

21   Q    When you say "average," what do you mean by

22   that?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

32

1       A    No F's.  C's and B's, maybe.  No A's, but

2    pretty much average.

3       Q    And where did your son attend for the fourth

4    grade?

5       A    Same school, School for Arts In Learning.

6       Q    And when your son returned for his fourth

7    grade year, was a section 504 plan still in place?

8       A    Yes.

9       Q    And during that fourth grade year, how would

10    you describe your son's behavior?

11       A    Awful.

12       Q    And why would you say that?

13       A    He was constantly picked on by the other

14    children.  He was chronically blamed for everything

15    that occurred.

16       Q    When you say "blamed for everything that

17    occurred," what was he blamed for?

18       A    Fighting, starting the fights, no other --

19    he was disciplined at times when there were two

20    students involved, and the other student was not

21    disciplined.  He attended a picnic that another parent

22    was allowed to chastise him, and when I spoke out

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

33

1    about it, I felt like I was retaliated against.

2        Q    And how do you feel that, or why do you feel

3    that you were retaliated against?

4        A    When I asked her even to bring the parents

5    together to discuss the matter, I was told that they

6    had resolved the matter, according to my son, because

7    the parent was giving him little mean looks and the

8    kid was still picking on my son, and my son was just

9    being blamed for this entire thing.  I just felt like

10   the school did not support myself or my son, so my

11   decision had occurred early to remove him.

12       Q    During that fourth grade school year, was

13   your son suspended?

14       A    I believe so.  I just can't -- for some

15   reason it's pretty vague, but I'm inclined to say yes.

16       Q    And I forgot to ask you:  During the third

17   grade school year, was your son ever suspended?

18       A    I don't believe so.

19       Q    And during that fourth grade school year,

20   why was your son suspended?

21       A    I believe it was fighting or not following

22   instructions.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

34

1    Q    During the fourth grade school year, were

2    you ever contacted by the school and asked to come

3    pick your son up because of his behavior?

4    A    I don't believe so.  I believe the

5    suspension occurred at a holiday play that I was

6    present.

7    Q    What were your son's grades like during that

8    fourth grade year?

9    A    Not as good as they should have been.  His

10   grades were continuing to decline.  As opposed to, you

11   know, showing progress, I saw just a continuing

12   decline of his grades.

13   Q    And when you say "decline," specifically

14   what were his grades like?  Were they A's, were they

15   B's, were they C's, were they D's?

16   A    No, C's and D's.  More so than just the

17   grades, his motivation in terms of education began to

18   deteriorate.  Once he loved to read, all of a sudden

19   he doesn't want to read anymore, and it's just a

20   continuing opposition toward education.

21   Q    And did you ever speak to any of the staff

22   at the SAIL school about --

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

35

1    A    All the time, all the time.

2    Q    And what, if anything, did you tell them?

3    A    We went through it so much.  I explained to

4    them my views of what was going on with Reginald, that

5    he was chronically being picked on, that I think a lot

6    of the cases Reginald was being blamed for things

7    when, in essence, he wasn't the only one.  And given

8    what we know about those children, the students at

9    SAIL, I felt that there was a lack of supervision and

10   caring for these kids with the special needs.

11   Q    And when you told that to the staff, what,

12   if anything, did they do?

13   A    I -- it was like my entire relationship

14   changed with them.  I was black-marked from that point

15   on.

16   Q    What makes you say that?  What was said, or

17   what was done?

18   A    I was treated differently, I should say, and

19   the -- I want to say maybe the assistant principal,

20   and they may not have called him principal, but he was

21   a head, we had -- it was a constant battle between the

22   two of us.  He was very unprofessional in a lot of

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

36

1    cases with me, very short, just refused to listen.  In

2    meetings he would snicker and grin with this -- it was

3    an appearance of trying to agitate me or provoke.  It

4    was very difficult.

5        Q    During that fourth grade year at the SAIL

6    school, what was Reginald like at home?

7        A    Well, we had always had little problems with

8    Reginald.  I can say Reginald was always lovable,

9    would follow directions after being told.  I had to

10   stay on him.  We had to provide a lot of structure,

11   but I didn't experience any talking back from

12   Reginald.  It was always, Mommy, I love you, those

13   type of things.  Just a loving kid.

14       Q    You said there was some little problems.

15   What were those little problems?

16       A    Temper tantrums, want to have his way.  If

17   he wanted something new, he wanted it, those type of

18   things, but in terms of just outright devious, defiant

19   behavior, no.

20       Q    Was your son successfully able to

21   matriculate that fourth grade year to fifth grade?

22       A    He was.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

37

1      Q    And where, if anywhere, was your son

2    enrolled during the fifth grade year?

3      A    Takoma Elementary.

4      Q    Do you know where Takoma Elementary is

5    located?

6      A    I do.

7      Q    Where is that?

8      A    Piney Branch Road, Northwest D.C.

9      Q    And I apologize.  At that time, where were

10   you residing?

11     A    Eastern Avenue.  The address is 7720 Eastern

12   Avenue.

13     Q    Now, prior to enrolling your son at Takoma

14   Elementary school, did you provide any of the staff at

15   Takoma Elementary school with any of your son's

16   previous records?

17     A    Yes.  They did have his -- they knew he was

18   on the 504 plan.  I gave them the 504 plan.  I had to

19   give documentation, address, so forth and so on, but

20   in terms of -- what do you mean when you say

21   "records"?

22     Q    Any records, any records on behalf of your

38

1    son did you provide to the staff --

2         A    I filled out all of the documentation which

3    indicated that Reginald was a student covered by 504

4    plan.  I gave them a copy of the 504 plan.  The

5    records indicated he was on medication for AD/HD and

6    ODD.

7         Q    When you say you gave them a copy of the 504

8    plan, who specifically did you give a copy of the 504

9    plan to?

10        A    When he was enrolled, I had a copy of the

11   504 plan from Community Academy to show that he had a

12   504 plan, because I didn't get anything from SAIL, but

13   the 504 plan from Community Academy.  For some reason

14   I had Community Academy on file.

15        Q    But my question is:  Do you recall, do you

16   remember specifically who you gave that to?

17        A    I didn't know the staff there.  I was just

18   enrolling him.  It was the first time I had gone into

19   the school.

20        Q    And did you present any documents to the

21   staff at Takoma Park articulating that Takoma Park

22   was, in fact, your son's attendant zone school?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

39

1    A    Rephrase that for me.

2    Q    Did you present any documents to the staff

3    at Takoma Park demonstrating that this was the school

4    he was supposed to go to based on his home address?

5    A    Oh, actually, they told me -- I had checked

6    with the school, well, actually the Board of

7    Education, that prior summer to see what school the

8    child was to be enrolled in, and that's the school

9    they told me, and when going there, they further

10   stated.

11   Q    And when you say "they told me

12   specifically," do you recall who you spoke to?

13   A    The staff.  Again, I don't know the staff.

14   Q    Do you recall like what agent on the Board

15   of Education you called, what agent or what division?

16   A    I don't know.  Actually, I probably was

17   online and just picked out something that said

18   "education" and gave my address and asked what school

19   should this child attend.

20   Q    Do you have any notes or records of that

21   conversation?

22   A    No, I don't.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

40

1        (Whereupon, a short recess was taken.)

2   BY MR. GLOVER:

3        Q    I'm backing up a little bit.  I believe you

4   stated that during the enrollment process you provided

5   the staff at Takoma with a copy of Reginald's previous

6   504 plan, I think you said from Charter Public,

7   correct?

8        A    From Community Academy.

9        Q    Community Academy.  Do you have a copy of

10  that section 504 plan?

11       A    I don't here today.

12            MS. ALVAREZ:  We do.

13            MR. GLOVER:  Okay.

14            MS. ALVAREZ:  I think we do.  Let's see.

15  BY MR. GLOVER:

16       Q    And again, while your counsel is looking for

17  it, do you recall specifically who you gave that

18  report to?

19       A    Whoever their enrollment officials were, and

20  again.  I don't know.  That was the first time I had

21  ever gone in the school.

22       Q    Do you have any notes or records or journal

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

41

1    entry relating to that day when you provided them a

2    copy of the section 504 plan?

3        A    Rephrase that.

4        Q    Certainly.  Do you have -- I know you stated

5    that during the enrollment process you provided the

6    section 504 plan to whomever was doing the enrollment

7    for your son.  My question is:  Do you have any

8    written notes or journal or document of that event?

9        A    The only documents would be the documents,

10   the enrollment papers that DCPS would keep, or Takoma.

11       Q    But my question is:  Do you have any records

12   or journal entry or reports demonstrating that you

13   actually provided them with a copy of the section 504

14   report?

15       A    I don't, but I had to provide them with

16   something showing that Reginald was a D.C. student, a

17   prior D.C. student.  That was only thing that I had

18   handy.

19       Q    All right.

20       A    And because I didn't have his records from

21   his previous school.

22            MR. GLOVER:  I just got handed this.  Let's

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

42

1    have this marked as Defendant's B, please.

2           (Discussion was held off the record.)

3           (Exhibit B was marked for identification and

4    retained by counsel.)

5    BY MR. GLOVER:

6      Q    Ma'am, we're showing you what has been

7    marked as Defendant's Exhibit B for deposition

8    purposes.  This appears to be --

9           MS. ALVAREZ:  Mine hasn't been marked.  This

10   is Exhibit B?

11          MR. GLOVER:  Yes, for deposition purposes.

12   BY MR. GLOVER:

13     Q    This appears to be a court order regarding a

14   hearing that was held on November 30th, 2007.  Do you

15   recognize this document?

16     A    I do.

17     Q    Okay, and were you present when this order

18   came down?

19     A    Yes.

20     Q    And ma'am, just looking at this order,

21   looking at the second full paragraph, correct me if

22   I'm wrong, it reads, "Ordered that the Order of

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

43

1    Protective Supervision with the mother granted on

2    July 5th, 2007, is hereby revoked."

3        A    Where are you reading again?

4        Q    Starting from --

5        A    Okay, I have you.

6        Q    Is that correct, ma'am?

7        A    Rephrase that.

8        Q    I'm just asking -- correct me if I'm

9    wrong -- does it read, "Ordered that the Order of

10   Protective Supervision with the mother granted on

11   July 5th, 2007, is hereby revoked."

12           MS. ALVAREZ:  Yes, that's what it says.

13           THE WITNESS:  It says that.

14   BY MR. GLOVER:

15       Q    Does it say that?  "And it is further

16   ordered that the Respondent is hereby committed to the

17   Child and Family Services agency for a period not to

18   exceed two years;" is that correct?

19       A    It says that.

20       Q    All right, ma'am, so presently what, if any,

21   relationship -- what is your legal relationship with

22   your son?  Let me withdraw the question.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

44

1      A    Okay.

2      Q    To your knowledge, is this order still in

3   effect?

4      A    It is.

5      Q    Okay.  So presently, what is your legal

6   relationship with your son?

7      A    I would believe education and educational

8   rights, because I, as his biological mother, was

9   extended educational rights, and I believe, at this

10  point, that was not revoked.

11     Q    But the order is clear, this order that came

12  down on November 30th, 2007 does articulate that your

13  protective supervision is hereby revoked, correct?

14         MS. ALVAREZ:  We stipulated that that's the

15     case.

16         MR. GLOVER:  Okay.  Noted.

17  BY MR. GLOVER:

18     Q    Is that correct, ma'am?

19     A    Yes.

20     Q    All right, and ma'am, presently, to your

21  knowledge, I believe you stated that Reginald is

22  residing with a Ms. Ivy McManus; is that correct?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

45

1        A    That's correct.

2        Q    Does Ms. McManus know your son is here

3   today?

4        A    Yes.

5        Q    How do you know that Ms. McManus knows your

6   son is here today?

7        A    She and I have a very good relationship.

8   Very good.  She reports to me about Reginald.  She

9   calls me with questions, with attempts to get to know

10  Reginald better.  So we have a very good rapport.

11       Q    Is she aware that your son is missing a day

12  of school today?

13       A    She is very much aware.

14       Q    Is your son presently enrolled in school?

15       A    Yes, he is.

16       Q    And where is he enrolled in school?

17       A    Oak Valley in Fairfax, Virginia.

18       Q    When was the -- if you know, when was the

19  last time that Reginald attended school?

20       A    Probably Friday.  Monday was a holiday, he

21  had a doctor's appointment yesterday --

22            REGINALD TOMONIA:  I was in school

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

46

1       yesterday.

2              MR. GLOVER:  Counsel, I ask you instruct

3       your client that he can't talk during the

4       deposition of his mother.  He will have the

5       opportunity to answer any and all questions when

6       he is deposed.

7              MS. ALVAREZ:  You understood that, Reginald?

8              REGINALD TOMONIA:  Yes.

9              THE WITNESS:  Okay.

10  BY MR. GLOVER:

11      Q     Now, looking at this order, this order dated

12  November 30th, 2007, it notes that there was a --

13  under the Magistrate Judge Julie Breslow's name it

14  notes, "Next hearing date, December 10th, 2007."

15      A     That's correct.

16      Q     And ma'am, was there a hearing date in this

17  matter on December 10th, 2007?

18      A     Yes.

19      Q     And did you attend that hearing?

20      A     I did.

21      Q     What was the purpose of that hearing?

22      A     Actually, he was placed into foster care

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

47

1    with the goal -- reunification still the goal:  We

2    were all concerned with Reginald's safety.

3        Q    And other than your son being placed in

4    foster care with the goal of reunification, what else,

5    if anything, occurred at the hearing?

6        A    Clarify what you mean.

7        Q    What else was done?  Other than placed in

8    foster care, what else was done on that day?

9        A    Well, they actually stated what services

10   would be provided for the child, because he wasn't

11   attending any of the services while he was home, was

12   not participating and had no services while at home,

13   and this hearing was to set in motion those services

14   and to make sure that Reginald was a full participant.

15       Q    What prompted this action?

16           MS. ALVAREZ:  Which action?

17           MR. GLOVER:  The action that's pertaining to

18       the Order that is now marked as Defendant's

19       Exhibit B.

20   BY MR. GLOVER:

21       Q    What prompted there to be a hearing

22   altogether?  What are the underlying facts?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

48

1      A      The underlying facts?  Reginald's behavior

2  was totally out control.  I was very much concerned as

3  a parent.  His late staying out, never informing or

4  asking permission to leave the house, being brought

5  home by the police frequently, not attending school

6  for two months, not attending any of his doctor's

7  appointments and my attempts to stabilize him and to

8  get him back on his medication, which he had just

9  completely stopped taking.  So just overall out of

10  control behavior.

11      Q      Okay, and when did this behavior start?  Let

12  me withdraw the question.  Actually, no.  When did the

13  behavior start?

14      A      Actually, the behavior, from the time

15  Reginald entered Takoma, it was -- his behavior

16  just -- he became a person I did not know, roughly

17  around October/November.  I did not know this kid, and

18  it continued to escalate.

19      Q      And you said October/November.  Of what

20  year, ma'am?

21      A      Takoma, which he was at Takoma 2005/2006, so

22  2005 it would have been.  He became a person I no

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

49

1    longer knew.

2        Q    And specifically when you say "a person you

3    no longer knew," just give me examples of --

4        A    The first episode was I get home where he's

5    already been just denied the aftercare, he can no

6    longer attend aftercare because of his behavior, so he

7    is to go to a girlfriend of mine to watch him.  He

8    would not do that.  I'm looking for Reginald when I

9    get home.  I cannot find him anywhere.  And this

10   particular -- the first episode I think it was

11   11:00 p.m. on a school night, and it continued to do

12   this.  It continued on and on.

13       Q    Let's say during that calendar year, excuse

14   me, that school year that he was there at Takoma, from

15   2004 to 2005 --

16       A    2005/2006, I believe.

17       Q    Okay, 2005/2006.  I apologize, ma'am.  I

18   believe you are correct.  How many times would he stay

19   out late or past the time that you would expect him

20   home?

21       A    It started in October, and it continued

22   until Reginald was removed from the home.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

50

1      Q     Okay.

2      A     I mean every night.  It was every night,

3    every night.

4      Q     Did there come a time when you informed the

5    staff at Takoma Park that you would actually have to

6    try to barricade your door to keep him in the house?

7      A     No, I did not inform Takoma's staff.

8      Q     Did you ever inform anyone that you would

9    have to --

10     A     Yes.

11     Q     And who did you inform, ma'am?

12     A     When the police came, I informed the police

13   and CFSA and the social worker -- well, the social

14   worker, she would be CFSA -- the attorney, so forth.

15     Q     How often would you have to barricade your

16   door to try to keep your son from leaving?

17     A     It was just the one time that I recall doing

18   this other than standing in front of the door,

19   physically standing.

20     Q     Now, on those occasions where you physically

21   stood in front of the door to try to keep your son

22   from not leaving, what happened?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

51

1      A      He would eventually sit down until I moved

2   from the door.   Then he would just dart out anyway.

3      Q      You mentioned that at some point he was

4   denied aftercare.

5      A      He was.

6      Q      Where did this aftercare take place?

7      A      It was at Takoma.   Let me go back.

8   Ms. Blake was his counselor, and she and I did have a

9   talk about Reginald's behavior, because she was very

10  close with Reginald and very supportive, and she and I

11  talked, because she was really surprised when

12  Reginald -- I mean when things started to just go

13  haywire, so it was Ms. Blake and I did have a talk

14  about Reginald.

15          MS. ALVAREZ:   I'm sorry.   I'm confused now.

16      What are you referring to?   You're responding to

17      which question?

18          THE WITNESS:   When he asked me about did I

19      ever mention to a staff member at Takoma.

20  BY MR. GLOVER:

21      Q      Yes.

22      A      Yes, his counselor, Ms. Blake.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

52

1          MS. ALVAREZ:   Okay.

2    BY MR. GLOVER:

3          Q    Now, can you explain the Takoma Park

4    aftercare for me.   What was the purpose of that

5    aftercare?

6          A    It cared for the kids from school ending

7    until 6:00 p.m., and it was care provided to all of

8    the children that attended, all of the students.

9          Q    But was it a more voluntary program, or was

10   it really part of the regular school curriculum?

11         A    It was part of the school curriculum.   If

12   the child attended, he or she could go.

13         Q    And when did you initially enroll your son

14   in the school's aftercare program?

15         A    When school started and I found out about

16   the aftercare program.

17         Q    And did you ever receive any calls or

18   notifications from the staff at Takoma Elementary

19   school that your son had stopped going to the

20   aftercare or would leave the aftercare?

21         A    What happened, I did get -- I had gotten --

22   I had a call that Reginald was not to come to

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

53

1    aftercare -- I don't recall the period of time, maybe

2    two days or whatever that time period was -- and I got

3    that call from the front office staff, not the

4    aftercare coordinator.

5        Q    And did they tell you why they wanted him

6    not to come for those days?

7        A    Not following instructions or directions,

8    and they even stated that he had been given chance

9    after chance after chance, and they didn't want to do

10   it, but he wasn't, you know, still not following their

11   directives.

12           MS. ALVAREZ:   I'm not sure I understand.

13       Are you saying that he was told -- these two days

14       he was told not to come to school or told not to

15       come to aftercare?

16           THE WITNESS:   Aftercare specifically.

17           MS. ALVAREZ:   Okay.

18   BY MR. GLOVER:

19       Q    And were you ever called -- withdrawn.  Were

20   you ever notified by any staff at Takoma Elementary

21   school that your son was no longer -- asked to no

22   longer bring your son to the aftercare program because

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

54

1    of fighting?

2          A    I was.

3          Q    And how many times were you notified that

4    your son -- were you asked not to bring your son to

5    the aftercare because of fighting?

6          A    The first initial time when he was out of

7    the program -- like I said, I don't remember the time

8    period, a couple of days or whatever -- I was in the

9    office, because, of course, I would go by the school

10   and pick him up, and I asked to speak to the

11   coordinator.

12         Q    Okay.

13         A    And at that time she said to me that she's

14   having a lot of problems with Reginald and that if he

15   continued that he would be, "kicked out" were her

16   exact words, of the program.

17         Q    Did she describe the problems that she was

18   having?

19         A    Yes, fighting, not following directions, not

20   doing what he's told, and she stated just plainly she

21   was tired of it, and she was not going to continue to

22   have it.

55

1    Q    And did there come a time that your son was

2    removed from the aftercare program because of his

3    behavior?

4    A    My son was instructed not to return to the

5    aftercare program.  I was told that he could no longer

6    attend the aftercare program because they were not

7    going to tolerate his behavior.

8    Q    Now, you stated that during the enrollment

9    process, when your son was being enrolled in Takoma,

10   that you provided them with reports that showed that

11   he was on medication; is that correct?

12   A    Not reports that showed that he was on

13   medication.  I provided them with his 504 plan.  Among

14   the enrollment forms, it asks specifically if the

15   child is taking any medication.  If so, what and for

16   what.

17   Q    And what, if any, medication was your son

18   taking during the enroll -- withdrawn.  What, if any,

19   medication was your son taking at or around the time

20   you enrolled him in Takoma Park?

21   A    He was taking Adderall.

22   Q    Why was your son taking Adderall?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

56

1        A      For AD/HD and ODD.

2        Q      And who prescribed this Adderall?

3        A      Kaiser Permanente, Dr. Kaurbinder.

4        Q      And did he give you prescriptions for this

5    medication?

6        A      Yes.  His medication was being administered

7    by -- at home by me.

8        Q      And where did you get these prescriptions

9    filled?

10       A      Kaiser Permanente in Kensington.

11       Q      And after being prescribed this medication,

12   this Adderall, was your son taking the medication

13   consistently or as prescribed?

14       A      I had spoken to Dr. Kaurbinder because I, as

15   a parent, did not want to medicate my son, frankly,

16   and so I said to her -- but because of the behaviors

17   at school, it was virtually impossible that he can go

18   to school without the medication.  So I talked with

19   the doctor, and I said to her, what if -- because of

20   my opposition toward medication, what if I medicate

21   him for school purposes and school purposes only,

22   meaning not medicate him on weekends or days that he's

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

57

1    out of school or summer months, and she said to me

2    that was up to me, okay?  She said but if I notice he

3    gets a little fidgety or a little agitated, I might

4    want to give him half a pill just to take off the

5    edge.

6        Q    My initial question, however, was:  Was your

7    son medicated as initially prescribed by the doctors

8    at Kaiser Permanente?

9        A    Rephrase that.

10       Q    Certainly.  Was your son provided medication

11   that was prescribed to him by the medical staff at

12   Kaiser Permanente on a consistent basis?

13            MS. ALVAREZ:  What period are we talking

14       about?

15            MR. GLOVER:  During the initial enrollment

16       period.

17            MS. ALVAREZ:  Are we talking about just

18       Takoma?

19            MR. GLOVER:  Yes.

20            THE WITNESS:  He was prescribed the

21       medication by Kaiser Permanente, as I said,

22       again, with a discussion with the doctor to

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

58

1        medicate him for school purposes only, that it

2        was up to me as the parent to make that decision,

3        but if I notice that he gets a little agitated

4        over the weekend, that I could give him half a

5        pill to take off the edge.

6    BY MR. GLOVER:

7        Q    How often was your son supposed to take this

8    medication?

9        A    Every morning.

10        Q    And did you give him a pill every morning?

11        A    When you say "every morning," are you

12    referring to Monday through Friday?

13        Q    Monday through Friday, did your son get the

14    medication?

15        A    My son did get the medication every morning.

16    There were a couple of occasions that I did forget to

17    medicate him, and I remember specifically on one or

18    two occasions I was called by the school and, in turn,

19    went back and got the medication and actually took it

20    to school.

21        Q    Was there ever a time when the staff at

22    Takoma was to provide your son with the medication?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

59

1       A    That's correct.

2       Q    So what medication was the staff at Takoma

3  supposed to provide him?

4       A    What happened was Takoma mentioned that his

5  medication wasn't lasting long enough, and I would do

6  anything to get my son through the school day, I mean

7  seriously.  Well, they asked is it possible they could

8  administer the medication.

9            I explained to them I had had a problem with

10  previous schools administering medications to Reginald

11  because the dosages had been missed, but that I would

12  talk with his doctor, and if they would monitor his

13  behavior to see if there's progress, I didn't have a

14  problem with it.  So that's what we did.  I carried

15  him back to the doctor and had a second dosage of

16  medication at Takoma to administer dosage at lunch.

17      Q    Who at Takoma contacted you and asked

18  that -- who at Takoma told you that the medication

19  wasn't lasting?

20      A    Well, Reginald was getting -- by this time

21  Reginald is continuously getting suspended.  I'm

22  getting calls every day now, and this is progressing.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

60

1    I'm being called in for meetings, and then the

2    suspensions start.  Dr. Grant, the counselor and the

3    nurse said that they thought his medication was .not

4    holding him and that this was causing the problems.

5       Q    Okay.  And when did you first get the

6    medication -- well, specifically, who told you

7    specifically that he needed -- that the medication was

8    not lasting long enough?

9       A    Specifically, again, Dr. Grant, the

10   counselor, Ms. Blake, and the school nurse.  Her name

11   I can't remember.

12      Q    And what did they -- would they articulate

13   why they felt the medication wasn't lasting, or what,

14   with respect to his behavior, caused them to feel that

15   his medication wasn't lasting long enough?

16      A    His behavior.  They said, either he's on the

17   wrong medication or it's not lasting was their

18   statement to me.

19      Q    And more specifically, when you say "his

20   behavior," what was he doing that they decided to call

21   you about this?

22      A    Not standing at his seat, talking back, not

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

61

1    following directions, walking out of class, aggressive

2    behavior, fighting, the same typical behaviors that

3    were seen through his school years.

4         Q    And do you recall specifically who asked you

5    if they could administer the medications at Takoma?

6         A    Well, they didn't ask me if they could

7    administer the medication.  They made a recommendation

8    that I consult with his doctor, because his medication

9    is not holding him, and of course, with me knowing

10   that Reginald had had medication administered at

11   school and the problems that we were seeing at Takoma,

12   I was willing to try anything, okay?  So I called

13   Dr. Kaurbinder and explained to her and asked her if

14   she could see Reginald because of the problems.

15        Q    Around what time did the enrollment at

16   Takoma begin?  When was the enrollment date?

17        A    September, the very first day of school.

18        Q    And this behavior that you're talking about,

19   talking back in class, being aggressive, walking out

20   of class, when did this behavior start?

21        A    Well, maybe I should explain this.  The very

22   first week Reginald was enrolled at Takoma, I was

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

62

1    called about his behavior, and at that time I was

2    instructed that Takoma may not be the place for

3    Reginald because it's an open classroom.  They were

4    seeing then how -- I mean with the knowledge that

5    Reginald came with the 504 plan and the open

6    classroom, I was told that it would not be a suitable

7    setting.

8        Q    Who told you that?

9        A    Ms. Blake, and I tried to think of the

10    assistant principal's name, because I believe that --

11    Dr. Grant may have been there, but for a period of

12    time she did go out on sick leave, but I believe

13    Dr. Grant or the assistant principal -- it was

14    Dr. Grant.

15            I take that back.  I remember

16    specifically -- said to me that I may want to take

17    Reginald to another school, because the open classroom

18    would not be the thing for him because of Reginald's

19    disability or disorder, and she said that most of the

20    kids that were at Takoma had been there for years, and

21    they were accustomed to the open classroom type

22    situation.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

63

1          So I said -- I asked Dr. Grant and

2     Ms. Blake, well, what school should I take him to?

3     This is the school that is in his zone, and Ms. Blake

4     said to me, oh, there is Shepard Park, that is a

5     wonderful school.  I said, well, great, what do I do,

6     so she gives me the transfer papers.  Reginald was

7     withdrawn, and I called Shepard Park, and I went to

8     Shepard Park to enroll Reginald.

9          Q    Principal Grant, do you recall her first

10    name?

11         A    Not right off, I don't.

12         Q    Okay.  When did she articulate to you --

13         A    Mary Grant.

14         Q    Mary Grant.  Okay.  When, if ever, did

15    principal Grant first say to you that maybe Takoma is

16    not the school for Reginald?

17         A    The very first week when they actually had

18    to call me about Reginald's behavior.  That was week

19    one.

20         Q    So from the very first week the school had

21    been in contact with you regarding your son's

22    behavior, correct?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

64

1     A    Actually, they called me the very first week

2    about his behavior and saying that Takoma would not be

3    the place for him, yes.

4     Q    And did they ever contact you with regard to

5    them wanting to conduct an assessment for a 504 plan?

6     A    No.  Now, remember, we withdrew Reginald the

7    very first week.

8     Q    Why did you withdraw him?

9     A    Because it was said that it would not be the

10   appropriate place, and then I was told by the

11   counselor, I said, I don't know where to take him, you

12   know.  She said oh, Shepard Park is very close to you,

13   it's within walking distance.  I said, oh, the school

14   down the street.  She said yes.  Even though it's out

15   of your zone, we can support Reginald going there,

16   which is what they actually -- they withdrew Reginald,

17   and I don't remember if they actually called.  I can't

18   say they called, but we went -- I took the withdrawal

19   papers to Shepard Park, and Reginald was not with me

20   this particular day, but the principal pretty much

21   accepted Reginald for enrollment, and I was to bring

22   Reginald back the following week, which I did.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

65

1      When I carried Reginald back, the principal

2  told me, oh, no, we cannot enroll him because we are

3  told that Reginald is a problem, and we have trouble.

4  Takoma is having trouble with him, and I have very

5  good kids here, and I don't want -- I do not want a

6  problem, and especially he's out of my zone.  I just

7  cannot do it.  So I, in turn, took him back to Takoma.

8      Q    You stated that at some point you provided

9  withdrawal papers?

10      A    To -- I received, got the withdrawal papers

11  from Takoma.

12      Q    Do you still have those papers?

13      A    Gosh, no, I don't.  I would have presented

14  the papers to Shepard Park, so I wouldn't have them,

15  no.  I would have presented the papers to Shepard Park

16  because I filled out their enrollment papers and

17  everything for my son there.

18      Q    Did you have any copies of those papers?

19      A    I didn't have copies.  I submitted

20  everything.  I never got copies of papers when I

21  enrolled the child in school.

22      Q    So while your son was enrolled at Takoma

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

66

1    Park, would it be fair to say that the staff at Takoma

2    Park would contact you when there was disciplinary

3    problems with your son?

4        A    They would.  They would contact me, not in

5    all cases.

6        Q    Isn't it a fact that you actually requested

7    that they contact you when there was a disciplinary

8    problem?

9        A    Absolutely, absolutely, absolutely, because

10   I wanted to be involved with the school, and for the

11   reason being that a lot of times I could redirect his

12   behavior if that opportunity was extended to the

13   child.

14           MS. ALVAREZ:  When are we planning on taking

15       a break?

16           MR. GLOVER:  Do you want to go to 12:30,

17       finish up another 20 minutes, and then we'll take

18       a lunch break?

19           MS. ALVAREZ:  Okay.

20           (Exhibit C was marked for identification and

21       retained by counsel.)

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

67

1    BY MR. GLOVER:

2        Q    Ma'am, I'm showing you what has been marked

3    as Defendant's C for deposition purposes.  This is --

4    look at the second page.  It says the First Amended

5    Complaint in this action.  Do you recognize this

6    document?

7        A    I do.

8        Q    Okay, and I direct you more specifically to

9    the bottom of Page 9, and have you look at what is

10   Paragraph 12, more specifically the last line of

11   Paragraph 12.  In that last line, correct me if I'm

12   wrong, it reads, "During school year 2005/2006,

13   defendant Mary Grant intentionally took the following

14   actions to exclude R.T. from D.C.P.S. programs,

15   activities and services because of disabilities."

16   Section A reads, "Repeatedly excluded R.T. from

17   classroom because of his disabilities."

18           Can you articulate to me the first time that

19   your son was removed from the classroom?

20       A    The very first week of school.

21       Q    And how did you come to learn that your son

22   was removed from the classroom?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

68

1       A    I was called.

2       Q    And who called you?

3       A    To the best of my recollection, it was the

4   counselor, Ms. Blake.

5       Q    And what, if anything, did Ms. Blake tell

6   you?

7       A    This was the time Ms. Blake recommended that

8   Takoma may not be the best setting for Reginald and

9   that I may consider another school with closed

10  classrooms, because --

11      Q    Go ahead.

12      A    No, go ahead.

13      Q    I want to know specifically as per your

14  Amended Complaint, can you tell me the first time you

15  were notified that he was removed from a classroom

16  because of his disability?

17          MS. ALVAREZ:  Asked and answered.

18          MR. GLOVER:  It wasn't, Counselor.

19          MS. ALVAREZ:  She just said.

20          THE WITNESS:  The very first week.

21  BY MR. GLOVER:

22      Q    What were you told about his -- what were

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

69

1  you told as to why he was removed from the classroom?

2      A     Again, the open classroom would not be the

3  type of setting for Reginald because of his disorder,

4  and the kids at Takoma have been there since babies,

5  and they are accustomed to the open classroom and that

6  there was no way Reginald was going to survive.

7      Q     Okay.  When was the next time, the very next

8  time you were contacted by someone, staff at Takoma,

9  informing you that your son had been excluded from a

10  classroom?

11      A     Are you talking about after I re-enrolled

12  Reginald?

13      Q     Well, was there a time in between then?

14      A     Remember I removed him for a week trying to

15  get him in Shepard Park.

16      Q     I'm talking about before you re-enrolled

17  him.

18      A     The first week.

19      Q     Was it the first day that week, the second

20  day?

21      A     I don't remember, but it was the first week,

22  the very first week he was enrolled.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

70

1          MS. ALVAREZ:  Can we clarify that.  Are you

2     saying there were two times during the first week

3     when he was removed, or are you saying there was

4     one time?

5          THE WITNESS:  There was one time.  I removed

6     him to see if I could get -- in attempts to get a

7     closed classroom setting for him.

8  BY MR. GLOVER:

9     Q    And did Ms. Blake articulate specifically

10  what about Reginald caused them to believe that this

11  would not be the school for him with any specific

12  actions?

13     A    Because of his attention span.  She said he

14  was all over the place, he was in other classrooms,

15  and it wasn't going to work.  Specifically I was told

16  that.

17     Q    So he was leaving the classrooms?

18     A    Not at this point he wasn't leaving the

19  classrooms.  Being that it's open classrooms, you've

20  got the other kids over there, and he's all over the

21  place.  At that time there was only one teacher, and

22  there were I believe 25 of them.  It was very

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

71

1    difficult even for the teacher because I had spoken

2    with her.

3        Q    My question, when you say he's "all over the

4    place," what do you mean by that?

5        A    Talking over in other classrooms, yelling

6    names of kids that he knew from the community, and

7    they may have been, you know, in other classrooms.

8    Talking over the teacher.

9        Q    When you removed him from Takoma for that

10   first week, was he going to any school, or was he at

11   home?

12       A    I removed him I believe it was on a Friday,

13   if I recollect correctly, or a Wednesday, and I went

14   straight to Shepard Park.  I believe he may have

15   missed two or three days, because Shepard Park -- and

16   he may not have missed any time.  I'm just not sure

17   about that gap there, because Shepard Park would not

18   accept him, so I immediately carried him back to

19   Takoma, and this is where the time loss was, because

20   Takoma then recommended some school down the street,

21   the name again I don't remember.

22              Before re-enrolling him in Takoma, I went to

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

72

1    the school, so we got a day we're missing there.   I

2    went to the school only to find out that the principal

3    was not there.   They did say they could accept

4    Reginald.   I explained the situation that I was

5    experiencing with Takoma, what had happened at Shepard

6    Park, and I was just looking for a place.

7              Because of Reginald's disability, we needed

8    a closed classroom, and I was told that Takoma would

9    be the place.   She said, the receptionist, or the

10   clerk, the office clerk, said they couldn't do

11   anything, but there were cases that they had did this

12   before, but she could not do this without the approval

13   of the principal, who was not going to be there for a

14   couple of days, I don't recall exactly what, so I told

15   her at this point I could not wait, and I took him

16   back to Takoma the next day.

17       Q    Okay, so in total, if you recall, from the

18   time you first took him out of Takoma to the time he

19   was subsequently re-enrolled, approximately how many

20   days of school did he miss?

21       A    Maybe two or three, even if that.   It may

22   not have been any -- I can just remember taking him to

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

73

1   Shepard Park that Monday to enroll him, and then they

2   said, no, he couldn't come.  He was still at Takoma,

3   but I think the way they drew up the papers he was to

4   be removed or withdrawn that Friday and I was to take

5   him to Shepard Park, but in the meantime I think he

6   was still at Takoma.  But I went to Shepard Park and

7   handled all the preliminaries to start him I believe

8   on a Monday morning, and that's when I found out they

9   wouldn't take him.

10       Q    And who recommended to you that you try to

11   enroll him at the school down the street?

12       A    Again, Ms. Blake.

13            MS. ALVAREZ:  The school down the street;

14       Shepard Park or the other school?

15            THE WITNESS:  This is the other school, the

16       second school now, and the name I just don't

17       recall.

18            MS. ALVAREZ:  Was that the Taft School?

19            THE WITNESS:  No, that's not the Taft

20       School.  This is very early in the game.

21            MS. ALVAREZ:  Okay.

22            THE WITNESS:  It's a public school.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

74

1    BY MR. GLOVER:

2        Q    Going back to your son's medication, was

3    there ever a time when you provided the staff at

4    Takoma Park medication for your son to be administered

5    at school?

6        A    After their recommendation, and I had him

7    diagnosed at Kaiser Permanente, Dr. Kaurbinder

8    listened to everything that was going on, and she

9    said, well, I think he's a candidate to have that

10    administered at the school.

11        Q    And when did you first provide staff at

12    Takoma your son's medicine to be administered at

13    school?

14        A    I would have to go back through the

15    documents, because I don't remember.

16        Q    Was it the first month, the second month?

17        A    Oh, no, no, they did not -- it was somewhere

18    probably, I want to say end of 2000, maybe before

19    December, somewhere around December 2005, I'm not

20    sure, or early 2006.  It's somewhere right around in

21    there.  I'm not sure, but there are documents to that.

22        Q    Now, you stated that a section 504 plan, you

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

75

1    provided them with the documents from I believe one of

2    his previous schools, correct?

3        A    That's correct.

4        Q    Did you ever follow up with the staff at

5    Takoma Park regarding --

6        A    I did.

7        Q    Who did you follow up with?

8        A    I talked with Dr. Grant, and I said to her,

9    Dr. Grant, Reginald is covered by a section 504 plan,

10   and I think we really need to get together as a team

11   to provide Reginald with some guidelines in terms of

12   to help him.

13       Q    And when was that?

14       A    Let me think about it.  Maybe toward the end

15   of the first semester or the beginning of the second

16   semester.  I'm not sure.

17       Q    Who else was present when you say you had

18   this conversation with Dr. Grant?

19       A    Out in the open office, so other folks were

20   around, other staff members.

21       Q    When was the very next time you discussed

22   with Dr. Grant your desire -- if at any time you

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

76

1    discussed with Dr. Grant --

2        A    Well, I don't say -- from Dr. Grant's

3    reaction that very first time, it wasn't a very nice

4    one.

5        Q    Well, what was her reaction?

6        A    Her reaction was to me, first of all, we are

7    not a babysitter, we're not here to babysit your son,

8    and I said to her, Dr. Grant, I'm not looking for a

9    babysitter.  Reginald has needs, and he needs help in

10   some areas that the other kids probably don't.  She

11   said to me, no, Reginald is spoiled and Reginald needs

12   a good tail whooping, and if you need a space to

13   provide -- I can provide that space if you need it.

14       Q    Was anyone else present when this was said

15   to you by Dr. Grant?

16       A    I believe Reginald may have been standing in

17   the office at that time, because for some reason I can

18   remember her looking at Reginald and saying to him,

19   "You may be good looking, but your good looks are not

20   going to get you everything you need," something to

21   that effect.  So I want to believe that Reginald was

22   somewhere or was with me.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

77

1    Q    Okay.  I want to direct your attention to

2    Paragraph 8 of the Amended Complaint.

3    A    What page?

4    Q    Page 8, Paragraph 8.  I'll just read the

5    first sentence, and correct me if I'm incorrect.

6    "Defendant Mary Grant is the principal of Takoma EC.

7    On information and belief, she is notorious within the

8    DCPS community for discriminating against students

9    with disabilities."

10        Did I read that correctly?

11   A    You did.

12   Q    What do you base that allegation on?

13   A    I had contacted, and excuse me if I get

14   these agencies' names mixed up, I believe I contacted

15   the Board of Education, and I talked to, I believe, a

16   Ms. Hendricks, and she explained that she -- her son

17   was a student at Takoma and that she had had severe

18   problems with Dr. Grant, and her son was also a kid

19   with special needs, and Dr. Grant was just awful to

20   deal with.

21   Q    Any other statements that you may have heard

22   regarding Dr. Grant?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

78

1      A     No more than my dealings with my son with

2   Dr. Grant.

3      Q     Other than this lawsuit, have you ever filed

4   a complaint against Dr. Grant?

5      A     No.

6           MS. ALVAREZ:  By filing a complaint against

7      Dr. Grant, what do you mean?

8   BY MR. GLOVER:

9      Q     Have you ever contacted anyone at the DCPS,

10  have you ever contacted anyone who filed any

11  grievances or complaints against her?

12          MS. ALVAREZ:  We'll stipulate that we filed

13     a due process complaint on November 1, 2006.

14  BY MR. GLOVER:

15     Q     And do you know the full name, or do you

16  know the name of Ms. Hendricks?

17     A     I don't, and I had tried contacting her.

18  This woman was so supportive.  She continued to call

19  me at work, checking up on my son, because I was just

20  distraught with the things that I was facing with my

21  child, and I just don't remember her name, first name.

22     Q     Do you remember her address?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

79

1      A      All I know is she was at the Board of

2   Education, Department of Education.

3      Q      Do you recall the telephone number?

4      A      I did have the phone number listed and tried

5   to make contact with her some time ago and was unable

6   to do so.

7      Q      And for what other students is Dr. Grant

8   alleged, if you know, is Dr. Grant alleged to have

9   discriminated against?

10     A      As a matter of fact, there is a -- she was a

11  neighbor of mine or lived in my basic vicinity.  She

12  has had -- her daughter has -- she has problems with

13  her kids, special needs kids.  I ran across her this

14  past summer, and she was telling me the problems that

15  she has had with Dr. Grant.

16     Q      And what's that neighbor's name?

17     A      I'm going to have to actually get her name,

18  because she works at a McDonald's, as a matter of

19  fact, and I do run into her periodically.

20     Q      When you say she was a neighbor of yours,

21  where was that?

22     A      She was actually living a few blocks down.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

80

1    I'm not sure of the street, but she lives on the

2    corner now of Missouri and Georgia Avenue, as a matter

3    of fact, in that area.

4         Q    And do you recall which McDonald's she works

5    at?

6         A    Oh, yeah, the McDonald's on Georgia Avenue,

7    and that street is not -- it's right there where the

8    Fourth District Police Department is, directly across

9    the street.

10        MS. ALVAREZ:   I'm sorry.   I missed that.

11   What did you say?

12        THE WITNESS:   The Fourth District Police

13        Department, there's a McDonald's directly across

14        the street, and she works there.

15   BY MR. GLOVER:

16        Q    And what specifically did she allege that

17   Dr. Grant -- how did she allege, if any way, that

18   Dr. Grant discriminated against her daughter?

19        A    I believe she said that Dr. Grant was not

20   allowing her daughter to come back to the school, and

21   the child had been continuously suspended, repeatedly,

22   and I believe she is around Reginald's age or a little

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

81

1    older, and she just did not know what to do with

2    Dr. Grant.  She said she just had to go along with

3    everything Dr. Grant would state to her, because her

4    daughter has to have an education, and she didn't know

5    what else to do.

6         Q    To your knowledge, does your neighbor's

7    daughter have a disability?

8         A    Her daughter does.

9         Q    Do you know what disability her daughter

10   has?

11        A    I can't elaborate, because I'm uncertain.

12             MR. GLOVER:  It's 12:27.

13             MS. ALVAREZ:  Well, I'm beginning to be in

14        need of a break.

15             MR. GLOVER:  Just one question, and then

16        we'll take a break.

17   BY MR. GLOVER:

18        Q    Are you aware of any other student who was

19   suspended from Takoma by Dr. Grant?

20        A    No.

21             MR. GLOVER:  That's it for now.  We'll take

22        a lunch break, reconvene here at 1:30.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

82

1       (Whereupon, the lunch recess was taken.)

2       MR. GLOVER:  For the record, Ms. Jones is no

3   longer with me.  I'm now being joined with my

4   intern, Kamel Bekkali, and he's merely observing

5   here.

6       Could you read back my last question.

7       (Whereupon, reporter reads requested

8   material.)

9   BY MR. GLOVER:

10      Q    Are you aware of any students who were

11  suspended by Dr. Grant from Takoma Elementary school

12  that did not have any disabilities?

13      A    No.

14      Q    Now, you stated that in addition to some of

15  your son's disciplinary problems at home, he was being

16  brought home by the police; is that correct?

17      A    That was recently.

18      Q    Oh, that's recently?

19      A    Let me say when he was at Takoma and after

20  the suspension from the aftercare program, he was to

21  go to a friend of mine's house.  Lots of times he did

22  not, and when I would get home or go to pick him up, I

83

1    would have to have the police -- would have to file a

2    missing report, because at that time Reginald was 11.

3        Q    When was he first enrolled in the

4    after-school program?

5        A    When he started to school and I found out

6    about the program, so it had to be within the first

7    week.

8        Q    Okay, when was he no longer enrolled in the

9    after-school program?

10       A    I'm inclined to believe it was definitely

11   before the second semester.  I just don't remember

12   exactly when.

13       Q    During that time period between -- excuse

14   me.  Approximately how many times did you have to file

15   a missing report with the police with respect to your

16   son?

17       A    During which time period?

18       Q    Well, during the time period he was at

19   Takoma.

20       A    Maybe seven.  I'm not -- not filing a

21   missing report, but had to contact the police to

22   report that I, that Reginald was not home at a

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

84

1    suitable time.

2         Q    But how many specific times do you recall

3    having to file a missing person's report?

4         A    I had to file that report I believe twice.

5    Could have been more, but I readily recall at least

6    twice.

7         Q    And do you recall generally the date, the

8    month?

9         A    I don't, but I can definitely pinpoint the

10   time frame to between October and May of 2006,

11   October 2005, and prior to the time that he was

12   removed from the home.

13        Q    During period that your son was enrolled at

14   Takoma Park, did he ever run away from home for longer

15   than one night?

16        A    No.

17        Q    Was there ever a period of time when your

18   son left the home and resided with the Hawkings

19   family?

20        A    I don't know any Hawkings.

21             MS. ALVAREZ:  How is it spelled?

22             MR. GLOVER:  H-A-W-K-I-N-G-S.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

85

1          MS. ALVAREZ:  Who are they?

2          MR. GLOVER:  I'm just curious to know if --

3          THE WITNESS:  Unless this is when he was

4     first taken into care and it's someone that I did

5     not know.  The first person I remember was a girl

6     that I was introduced to was a Carolyn Curtis.

7     There may have been someone prior to Carolyn

8     Curtis that I don't know about.

9  BY MR. GLOVER:

10         Q     Did there ever come a time when your son

11  stole an ATM or debit card from you?

12         A     Absolutely.

13         Q     When was this ATM card -- was it an ATM card

14  or debit card or --

15         A     It was a debit card.

16         Q     Just so that we're clear as to what a debit

17  card is, it is a bank card that has either a

18  MasterCard or Visa logo on it, and it can be used to

19  make purchases like a credit card?

20         A     Yes, or withdraw money.

21         Q     Or withdraw money?

22         A     Yes.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

86

1      Q    And when did your son -- when did you first

2    realize that your son had taken your card?

3      A    It was April 21st, my birthday, 2006.  I had

4    gotten up that morning, so I said to Reginald, hey,

5    we're going to breakfast this morning.  It's my

6    birthday.  I can be a little late for work and we can

7    have breakfast.  When I went to look on the counter

8    where I always keep it and it had been there, I asked

9    him, Reginald, did you see my card?  He said, no, mom,

10   I didn't see it.

11         So I said, okay, we'll have to do it another

12   time.  But I know there's no one in the house but the

13   two of us, and I know specifically it was there.  So I

14   went on and I dropped him off at school, or he may

15   have gone off to school and I may have gone off to

16   work.  So he said prior to our departing, mom, aren't

17   you going to cancel that card?  I said, no, it may be

18   at work.

19         I got to work and it wasn't there, so I

20   immediately called the school and informed them that

21   Reginald may have a debit card, and if they see him

22   with one to let me know, and in the meantime I was on

87

1    the way there, because I was sure that he had it,

2    because I had called the bank and found out -- I

3    believe the first transaction was $200 withdrawn.  I

4    believe five to 15 minutes later there was another

5    hundred, or it could have been the reverse, and I did

6    cancel it at that point.

7         Q    Did you ever come to find out that your son

8    took your card?

9         A    I did.

10        Q    How did you come to find that out?

11        A    I actually went to school that same day, and

12   I asked the school not to discuss this, because I

13   didn't want Reginald to know.  Well, I walked into the

14   school, and there is Ms. Blake, who is the counselor,

15   discussing it with the entire office staff as I walked

16   in, and I had just asked that they not discuss this,

17   but they did have Reginald come down to the office.

18   Reginald denied taking the card, of course, because I

19   asked for a private area, and I talked with him.  He

20   said, mom, I didn't do it.  I said, okay, it will

21   surface.

22             I believe at the end of the school year when

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

88

1    I went to the school, I can't remember what my

2    reasoning was at that point, and Reginald may have

3    been removed from the home at that time, but the card

4    was found at the school, and they did return it to me.

5    And as they handed it to me, this was a little open

6    space in the counter and it dropped down through

7    there, so that's where it ended up beside there.

8         Q    You said Ms. Blake was discussing it with

9    the entire office staff.  Do you know who of the

10   office staff was there?

11        A    There was Ms. Blake, there was -- oh, my

12   goodness.  The names I do not remember, but I know the

13   faces.

14        Q    Was it more than one person?

15        A    It was two of them, a total of three with

16   Ms. Blake.

17        Q    Was there a time that you were contacted by

18   the school informing you that your son had been

19   observed throwing rocks at a taxi cab?

20        A    Indeed I was.

21        Q    And who contacted you?

22        A    I believe it may have been Ms. Blake again,

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

89

1    and she may have followed it up with some confirmation

2    from the security guard, I believe.

3        Q    Do you recall when this was?

4        A    Maybe spring of 2006.  I'm just not sure of

5    the date, but I do remember the contact, and I

6    remember the weather being warm, so it could have been

7    the fall or the spring, but I do remember warm

8    weather.

9        Q    During the time that your son was enrolled

10   at Takoma, in addition to contacting you about your

11   son's disciplinary problems while at the school, did

12   you ever go and visit the school?

13       A    Oh, my goodness.  I was very well-known at

14   the school.

15       Q    And how often would you go to the school?

16       A    Well, Reginald was being -- I mean he was

17   being suspended so frequently, I would say every other

18   week, I was probably a frequent visitor, and sometimes

19   I would even just stop to check in on Reginald.

20       Q    And those times when you went to go visit

21   the school, did anyone discuss with you why Reginald

22   was being suspended?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

90

1      A    When you say "did anyone discuss," do you

2    mean at the time Reginald was suspended or after the

3    suspension?  Clarify.

4      Q    Prior to the suspension, did anyone contact

5    you and say, Ms. Tomonia, your son is being suspended

6    for these reasons?

7      A    That may have been a couple of occasions,

8    but afterward Reginald was suspended, and I had no

9    knowledge that the child was even suspended.

10      Q    Okay.  On those times that you referred to,

11    how many times would you say that your son was

12    suspended while -- I'm limiting my questions to the

13    time he was at Takoma Park -- where you had no

14    knowledge of him being suspended?

15      A    Repeat that for me.

16      Q    The times you're alleging that your son was

17    suspended from Takoma Elementary school that you had

18    no knowledge of that suspension, approximately how

19    many times would you say that he was he suspended?

20      A    Geez, it had to start, I mean early -- well,

21    in 2005 when -- the first semester I was called

22    frequently to pick up Reginald, and I was told at some

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

91

1  points that we're not going to suspend him, we're just

2  doing you a favor, okay, so I was aware in the first

3  semester.  I believe there were maybe one or two

4  suspensions.

5       The second semester it picked up, and there

6  were so many suspensions, and I started to discuss

7  with them, I said, listen, we're not treating my child

8  fairly here.  Reginald is a child with a disability,

9  and he needs a little help, okay.  And this is during

10  that time that Dr. Grant said, you need to sit down

11  and just do his work, but there were times that the

12  child was not at school, and I just had no knowledge

13  that he was ever suspended.

14       Where I picked this up, it was one morning

15  we were going -- I stopped at the Safeway, and he

16  asked for lunch money, and I could see he was in a

17  really bad mood.  So I said to him, what's wrong with

18  you, and instead of saying, mom, I'm suspended, and I

19  have been suspended -- roughly around that time, maybe

20  three, four days without my knowledge.  What was he

21  doing, I don't know, so he just -- I called the school

22  after I got to work, because he walked off, and my

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

92

1    assumption is that he's going to go to school, because

2    this is a block from the school.

3            I get to my job and I call the school, and

4    they tell me at that time Reginald is not there,

5    Reginald will not be there, Reginald is suspended.  So

6    I leave my job looking for my son, and I don't know

7    where he is.  That's when I caught wind that the child

8    was being suspended without notification.

9       Q    My question is:  How many times did this

10   occur?  How many times?

11      A    That I know of, that I could definitely say

12   I know of, that one time, but there were several

13   others that I found out later that were suspensions.

14      Q    That's what I want to know.  How many times

15   do you specifically know that your son was suspended

16   that you weren't notified?

17           MS. ALVAREZ:  How would she know that?

18           THE WITNESS:  I don't know that.

19           MR. GLOVER:  She found out later.

20           THE WITNESS:  I did find out later.

21           MR. GLOVER:  Exactly.

22           THE WITNESS:  I just don't know because

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

93

1      again, they were saying, we're doing you a favor,

2      they were not documenting suspensions, or he may

3      not have had a suspension notice.

4  BY MR. GLOVER:

5      Q    Who told you that?

6      A    I was told by Dr. Grant and Ms. Blake that

7  they were doing me a favor, and at that time I

8  exploded.  You cannot possibly be doing me a favor.  I

9  have a son with special needs.  Every day needs to be

10 documented so that we can get the services that the

11 child needs.  Not just my child, but any child.

12     Q    Were there times that you were aware that

13 you sent your son off to school and he did not go to

14 school, that he was not suspended?

15     A    No.

16     Q    Knowing of your child's disabilities, did

17 you ever escort your child to school?

18     A    I did not have a problem with my child going

19 to school until Takoma, and that was later.

20     Q    My question is:  Knowing your child's

21 disabilities, did you ever escort him to school while

22 attending Takoma, yes or no?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

94

1      A    Sometimes, yes.

2      Q    Okay.  On a weekly basis, how often would

3    you walk your child to school?

4      A    I did not walk my child to school, I would

5    drive.

6      Q    On a weekly basis, how often would you drive

7    your child to school?

8      A    Maybe twice a week, if that.

9      Q    When you started receiving -- started to

10   learn that your son was being suspended and that he

11   was not going to school, did you increase those times

12   that you would take your child to school so that you

13   could assure that he got into the school?

14     A    I was not aware that my son was not going to

15   school.  Let me note for the record.

16     Q    Starting with that time you said he was at

17   Safeway, and he said that he told you he was suspended

18   and you had not known about it --

19     A    Right.

20     Q    From that point forward did you ever say,

21   well, I'm going to start taking him to school and

22   making sure he walks in the door?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

95

1      A    Well, I tell you that was right around the

2   end of April, and if I remember correctly, he was

3   suspended at that time and may have went back to

4   school for a week, but I did have a young man that I

5   asked to stop by and pick up my son.

6      Q    That's still not answering my question.  I

7   just wondered was there ever a time, based on your

8   knowledge of your son's suspensions from the school,

9   did you ever say, I'm going to take my son to school

10   every day to be sure that he gets into school?

11      A    No, because Reginald was only home for maybe

12   a couple of weeks.

13      Q    Okay.  When you stated that you were at

14   school almost every other week, did anyone discuss

15   with you these suspensions?

16      A    Not the suspensions I did not know about.

17      Q    When you went to the school those every two

18   weeks, who did you speak to?

19           MS. ALVAREZ:  I'm sorry.  I'm getting lost.

20   Can we slow down.

21           MR. GLOVER:  Certainly.

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

96

1    BY MR. GLOVER:

2        Q    I believe your testimony was because of your

3    child's disciplinary problems, you would go to the

4    school every two weeks?

5        A    In most cases -- it initially started, it

6    was the vice principal or the assistant principal,

7    because Dr. Grant was out for a period of time sick.

8    Then it was Dr. Grant and this other lady, I do not

9    know her name, but she's -- I want to say maybe a

10   special assistant to Dr. Grant.

11       Q    Do you recall that person's name?

12       A    I don't, and Ms. Blake would sit in on some

13   of the meetings.

14           MS. ALVAREZ:  Excuse me.  Could you tell me

15       what your question was.

16   BY MR. GLOVER:

17       Q    My question was -- I'll have her read back.

18           (Whereupon, reporter reads requested

19       material.)

20           MS. ALVAREZ:  I'm sorry.  Did I miss the

21       question?

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

97

1    BY MR. GLOVER:

2        Q    My question was:  Sum and substance, you

3    testified that you would go to the school every two

4    weeks.  When you went to the school, who would you

5    speak to?

6        A    I was at the school every other week,

7    roughly called to the school every other week.

8        Q    Okay, and why were you called to the school

9    every two weeks?

10       A    Because of Reginald's behavior.

11       Q    When you got to the school every two weeks

12   and you met with either the vice principal or

13   Ms. Blake was there, what did you discuss?

14       A    Okay, and sometimes -- let me clarify.  The

15   office staff as well, when Dr. Grant or Ms. Blake was

16   not present, the office staff would inform me of

17   Dr. Grant's actions against Reginald, which would be

18   to remove Reginald from school and to take him home,

19   and Reginald was to be home for the rest of the day or

20   it could be a couple of days.  So that was the office

21   staff that would give me -- and they would say -- I

22   would ask then for the suspension notice.  I was told

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

98

1    specifically, we're not suspending him, we're just

2    sending him home so that he can calm down.

3         Q    Well, who told you this?

4         A    The staff, the front staff.  I believe her

5    name was a Ms. -- I want to say Torry.  I could be

6    wrong, but there is a Ms. Torry.  She may have been

7    the person in aftercare, but the primary receptionist

8    in the office who actually would speak up in

9    Dr. Grant's absence.  Her name I just cannot remember.

10   It may not be Ms. Torry, but she told me on several

11   occasions those were Dr. Grant's actions.

12        Q    In total, how many times was your son

13   suspended while he was in the Takoma school, that

14   you're aware of?

15        A    Anywhere from -- over 44 days.

16        Q    And do you have any documentation to

17   demonstrate this?

18        A    I only have a few suspensions, as I stated

19   earlier.

20        Q    And when you say you "only have a few

21   suspensions," how many do you have?

22        A    Probably less than six.  That's a rough

1    estimate.

2        Q    So how did you come to this 44-day number?

3        A    At the end of the school year when I started

4    to gather up all the documentation about the child --

5    actually, what happened, I was called to the school

6    around the beginning of May, and there was a meeting

7    with Dr. Grant and the special assistant and the

8    nurse, and when I walked in, Dr. Grant's initial

9    words, what are you going to do with Reginald?  So I

10    said, Dr. Grant, what do you mean?  She said, because

11    we can no longer tolerate this behavior.

12            I said, well, Dr. Grant, are you saying that

13    you can no longer teach Reginald?  She said, what I'm

14    saying is Reginald is not going to continue to come

15    here.  So I asked her, what do you propose that I do?

16    She says to me, well, he's not coming back here.  You

17    can take him to Taft School, because that is the

18    school that can service Reginald's needs, but we're

19    not the type of school that Reginald needs.

20            So I said, well, if memory served me

21    correctly, I've heard people talk about this Taft

22    School, and it's a school for bad boys.  She says,

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

100

1    well, I don't know, but that's where I recommend you

2    take him, and you can talk to them.  I said, I'm not

3    doing that.  I'm going to bring him here, because this

4    is the school in his zone.  She assured me that that

5    would not happen, that Reginald would not come back to

6    Takoma.

7              MR. GLOVER:  I'm going to strike as

8         non-responsive.

9    BY MR. GLOVER:

10        Q    My question is:  To your knowledge, how do

11   you know -- I apologize.  I have to be more specific.

12   The question I'm asking you, if you don't understand

13   it, or if it seems vague, please let me know.  I'm

14   asking these specific questions because I'm looking

15   for specific answers.  To your knowledge, you stated

16   that you only have notices for about six days of

17   suspensions.  How did you come up with 44 days of

18   suspensions?

19        A    When we actually got the report and we

20   gathered documentation for the school year for

21   Reginald, after I got an educational advocate, that's

22   when I came up with the total days missed for

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

101

1  Reginald.

2      Q    What did you base that upon?

3      A    The records were provided to us.

4      Q    And when did this take place?

5      A    When did what take place?

6      Q    When did it take place that you were

7  provided with records --

8      A    And let me back up.  It wasn't the

9  educational advocate.  I believe the records came from

10  the guardian ad litem after Reginald had entered

11  foster care.  I believe those records were provided at

12  that time.

13      Q    And who was the guardian ad litem?

14      A    At that time Amy Paresk, P-A-R-E-S-K, I

15  believe.

16      Q    And who provided you with these records that

17  you determined --

18          MS. ALVAREZ:  She just answered that.

19  BY MR. GLOVER:

20      Q    I didn't catch that.

21      A    Amy Paresk.  She was guardian ad litem.

22      Q    Do you recall where she obtained these

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

102

1    records from?

2        A    From Takoma.

3        Q    Did there ever come a time where you were

4    telephoned by the staff at Takoma to actually come and

5    remove your son from the school?

6        A    Several -- I mean there were lots of

7    occasions that I was telephoned to remove him from

8    school.

9        Q    And why -- do you recall who contacted you?

10       A    Again, the front office in most cases.

11       Q    And what did they tell you?

12       A    That his -- I mean he was just out of

13   control or they were not able to do anything with him

14   and that I needed to pick him up for the remainder of

15   the days in most cases.

16       Q    During this time, did you ever speak to your

17   son about his discipline behaviors at school?

18       A    Always I talked with Reginald about this.

19       Q    And what would he tell you?

20       A    That he was being mistreated, and he was

21   always blamed for everything and that the teacher

22   don't say anything to the other kids, that a lot of

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

103

1    the kids get away with things and he doesn't.  He felt

2    like he was being singled out in a lot of cases.

3         Q    How were his grades?

4         A    Reginald could do the work, but because of

5    the volume of time spent out of the classroom

6    significantly lowered his grades.

7         Q    When you say "significantly lower," what

8    were his grades while at Takoma?

9         A    Actually, Reginald could have been a B

10   student, and I think in a lot of cases he did get B's

11   and probably in private school got pretty good grades

12   as well, B, maybe average, a very good reader, but it

13   ended up Reginald getting straight F's.

14        Q    Did Reginald bring homework home?

15        A    He did.

16        Q    Did you watch him do his homework?

17        A    I worked with Reginald a lot, because

18   education in my home is highly respected, and I know

19   it's the key.  Reading in my home was high on my list

20   as well.

21        Q    So in addition, I mean you were able to

22   assist him in the homework even though he's leaving

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

104

1    the house, even though --

2         A    This is prior to his leaving the house.  If

3    you recall, we did not have -- this problem did not

4    start until February, actually, with him leaving and

5    staying out late.  There were a couple of times, as I

6    said, maybe around October that he didn't come in not

7    until later, but the problem really went out of hand

8    sometime after Valentine's Day February.

9         Q    Would that be February of 2006?

10        A    That's correct.

11        Q    And around that time, February 2006, were

12   you able to do his homework with him?

13        A    He had totally just turned against

14   education, I mean totally.  To just mention reading,

15   it was . . .

16        Q.   What did you do when he totally turned

17   against education?  What did you do?

18        A    Of course, as a parent, you're going to

19   continue to try.  You're going to continue to try and

20   find out the problem, and you're going to work with

21   that kid and say this is what we're going to do, and

22   even though I would do that in a lot of cases with

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

105

1   Reginald, there were cases that Reginald wouldn't take

2   the work back to school, or even if he went out with

3   it in his book pack, he may have purposely left it in

4   his locker and would not turn it in in cases because I

5   had -- the homework would come right back home.

6       Q    So he wasn't turning in homework on some

7   occasions?

8       A    On some occasions.

9       Q    And on some occasions he wasn't home there

10  to do it?

11      A    No, he was home to do it.  When this problem

12  initially started, it started on weekends.  It didn't

13  escalate again to the week until, like I said, the

14  beginning of 2006.

15      Q    Well, during that period of 2006, he was not

16  home to do his homework?

17      A    He had turned against education, whether he

18  was home or not.  It was virtually --

19      Q    I understand what you're saying, but it's a

20  yes-or-no question.  Around February of 2006, you said

21  it became a continuous thing where he wasn't coming

22  home, where he was staying out late.  He wasn't home

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

106

1    then to do his homework, correct?

2         A    That's correct, that's correct.

3         Q    When you stated that you were aware --

4    withdrawn.  You had about six notices regarding

5    suspensions, correct?

6         A    Somewhere along that line.  It may not have

7    been six.  I'm not sure.  I just remember very few.

8         Q    But you did receive some notification --

9         A    Some notification, yes.

10        Q    -- about his suspensions.  When you got the

11   notifications of suspension, did you ever go to the

12   school?

13        A    Absolutely.

14        Q    Who did you speak to?

15        A    Well, of course, you've got to speak to the

16   principal when you take the child back.

17        Q    And that again being Principal Grant?

18        A    Yes.

19        Q    And upon speaking to Principal Grant about

20   these suspension notifications, what did you say to

21   her?

22        A    I continued to reiterate that Reginald is a

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

107

1    child with special needs, and that we need to draft a

2    504 plan.  We need to come together as a team and

3    determine how we can better serve Reginald.

4        Q    Now, it's my understanding that you

5    previously testified that you didn't start, you didn't

6    then revisit the 504 plan until later in the first

7    semester.

8        MS. ALVAREZ:  I'm sorry.  Now I'm thoroughly

9        confused.

10   BY MR. GLOVER:

11       Q    You had previously testified that you

12   initially spoke to her about the 504 plan when he

13   first enrolled in school, correct?

14       A    The 504 plan was given, yes.

15       Q    And then you didn't again address it until I

16   think you said the end of the first semester or

17   beginning of the second semester?

18       A    The reason being because --

19       Q    Before you go any further, is that a correct

20   assessment of your testimony?

21       A    No, it's not.

22       Q    Okay.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

108

1    A    The 504 plan, I had talked to them about it,

2    and I assumed that they were doing -- because of my

3    experience, that they would call together the team for

4    the meeting, which never occurred.

5    Q    When you say you "talked to them about it,"

6    when did you talk to them about it, and who did you

7    talk to?

8    A    When Reginald first initially started to get

9    suspended, I reminded the staff that Reginald is a

10   child with special needs, and I believe this was, to

11   the best of my recollection, is October, and that at

12   that time is when I said to them that we need to come

13   together and figure out a way to better serve

14   Reginald.  I was told at that time by Dr. Grant,

15   they're not a babysitter, they're not a babysitting

16   facility, they are a school, and kids that come to

17   school need to know how to sit down and do their work.

18   Q    In addition to filing that due process

19   complaint, did you ever file any written, oral or any

20   other types of complaints against Dr. Grant?

21   A    Repeat that.

22   Q    Certainly.  I believe that based -- your

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

109

1  attorney stated that you filed a due process complaint

2  with respect to your son, correct?

3      A    That's correct.

4      Q    In addition to that, did you ever file or

5  call anybody --

6      A    Yes.

7      Q    -- or file any, an oral complaint against

8  Dr. Dr. Grant?

9      A    Yes, I did.

10     Q    Who did you call?

11     A    I called the Board of Education -- it was in

12  March.

13     Q    March of --

14     A    2006.

15     Q    So you waited --

16     A    And I may have called -- let me take that

17  back.  I believe I called them twice.  I may have

18  called them in October.  I'm not sure, but I know

19  after the repeated suspensions I definitely called

20  back in March, but I believe I contacted them in 2005.

21  I remember contacting them twice, but in March was

22  when -- after the repeated suspensions, I had to put

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

110

1    my foot down.

2        Q    Are you sure, or you think?

3        A    I don't think.  I know I called them back in

4    March.

5        Q    I'm talking about with respect to the

6    October call.

7        A    That I believe it was in October.  I do

8    remember twice making -- more than twice, but to the

9    best of my recollection, I believe my initial call was

10   in 2005 October.

11       Q    Do you have any records to demonstrate that

12   phone call?

13       A    There's documentation, because we did try

14   and -- records were retrieved indicating that I had

15   made contact.

16       Q    Well, let me rephrase that.  Do you have any

17   records or documentation demonstrating that you called

18   to make complaints with respect to Dr. Grant?

19       A    My attorney does.

20       Q    Okay, and what records are those?  What do

21   you have?

22       A    Actually, it was the calls that I had made

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

111

1    that were logged, when I made those calls, and the

2    statements that they did not -- the call was logged,

3    and it was as though there was no follow-up, and it

4    was said in the records that I did review, that

5    normally they follow up on these type of things, but

6    why they did not follow up, it was unknown.

7        Q    Was there ever a time that you lost custody

8    of Reginald?

9        A    Absolutely, yes.

10       Q    And let me back up a little bit.  Ma'am, do

11   you drink?

12       A    When you say "drink," I'm a social drinker.

13       Q    Social drinker.  Had you ever gone to visit

14   the school after you had a drink?

15       A    No, never.

16       Q    Had you ever appeared at any type of

17   parent/teacher conference after you had a drink?

18       A    No.

19       Q    When did you first lose custody of your son?

20       A    May 13th, I believe.

21       Q    Of what year?

22       A    2006.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

112

1      Q     And what was the basis of losing custody of

2    your child?

3      A     Reginald had come -- well, actually, the

4    police had brought him in late on a Friday night.  We

5    had to file a missing report again, and I asked

6    Reginald after they brought him home, where have you

7    been, and Reginald said to me, I don't have to tell

8    you, or something to this degree, and I said to him,

9    of course you do, you have to say, let me know where

10   you have been.  It was just the back and forth talk,

11   but never actually giving me an answer.  He just gets

12   so mad, because I told him, these things are not going

13   to continue.

14          The police had been involved now I guess --

15   this is May -- frequent calls to the police.  They are

16   very much aware that Reginald's behavior is totally

17   out of control.  Mornings that I've taken him to

18   school, I had to get police to help me do that.  He

19   just actually picked up one of -- well, this belt that

20   I have here, because I said to him, you're not going

21   to continue to behave in this manner.  If I have to

22   put you in Boot Camp, that will happen.

113

1          So Reginald actually threatened me with this

2     belt here.  I was at the kitchen table, he ran into

3     the bathroom, my bathroom, because it was a small

4     place we're staying, and he's breaking things,

5     breaking the bathroom apart, so I keep calling to him,

6     Reginald what are you doing?  I'm on the fourth floor.

7     He's not letting me in the bathroom, and he's in there

8     I know at least ten minutes, if not longer, so I just

9     moved away from the door so he couldn't see my feet,

10    because he was bending down, and he says, I see you

11    out there, mommy, I still see you out there.  I moved

12    away from the door so he could not see my feet.

13          When it got quiet, I did not know if

14    Reginald was behind the door, and I pushed the door,

15    and the door hit Reginald here on the side of his

16    face, and at that time I felt awful, because he was

17    screaming for dear life, "You really hurt me, you

18    really hurt me," and at that time I apologized to

19    Reginald, letting him know that in no form or fashion

20    do I intend to hurt you, but I'm not going to have you

21    breaking the world, doing the things that you're

22    doing, and I don't know what you're doing in here.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

114

1           (Exhibit D was marked for identification and

2      retained by counsel.)

3   BY MR. GLOVER:

4      Q    Showing you what has been marked as

5   Defendant's D --

6           MS. ALVAREZ:  I'm sorry.  I don't know what

7      has been marked.  It's just this one order?

8           MR. GLOVER:  Yes.

9   BY MR. GLOVER:

10     Q    Do you recognize what has been marked as

11  Defendant's Exhibit D for identification?

12     A    Yes.

13     Q    And it appears to be a Magistrate order,

14  correct?

15     A    That's correct.

16     Q    And in this order it addresses your ongoing

17  hearing relating to the custody of your child,

18  correct?

19     A    Yes.

20     Q    I'd ask you to turn to Page 5.  I'm going to

21  ask you to start reading the third box up going down.

22  The third box from the bottom, working your way down.

115

1          MS. ALVAREZ:  I'm sorry.  I don't know what

2     you're referring to.  Third box from the bottom,

3     up, down.

4          MR. GLOVER:  If you let me finish, I'll tell

5     you.  Third box from the bottom, working your way

6     down.

7          MS. ALVAREZ:  The child cannot safely remain

8     in the home; is that what you mean?

9          MR. GLOVER:  Exactly.

10    BY MR. GLOVER:

11        Q    Just let me know when you've finished

12    reading that.

13        A    I've read that.

14        Q    Have you ever struck your child with a shoe?

15        A    No.

16        Q    Have you ever choked your child?

17        A    No.

18        Q    Other than pushing the door against --

19             MS. ALVAREZ:  I'm going to object to this.

20    What is the relevance of this?

21             MR. GLOVER:  It goes to the child's state.

22             MS. ALVAREZ:  This is not relevant to any --

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

116

1          MR. GLOVER:  Your objection is noted,

2     Counselor.  I can proceed.

3          MS. ALVAREZ:  No, not necessarily.  I'd like

4     to know why you think this is relevant.

5          MR. GLOVER:  It's my deposition.  We can

6     call the judge if you want, I'm entitled to ask

7     these questions.  It goes to the mind state and

8     the behavior of the child.

9          MS. ALVAREZ:  The mind state and behavior of

10     the child?

11          MR. GLOVER:  Absolutely.

12          MS. ALVAREZ:  In what way?

13          MR. GLOVER:  If the child is being abused,

14     then it definitely goes to his mind state and

15     behavior.

16          MS. ALVAREZ:  His mind state and behavior

17     where, when?

18          MR. GLOVER:  During any alleged abuse.

19     BY MR. GLOVER:

20          Q     Have you ever struck your child?

21          A     When you say "did I ever strike my child,"

22     what do you mean "did I ever strike my child"?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

117

1      Q      Have you ever disciplined your child with

2  your hands?

3      A      Not in a manner to injure my child or to

4  hurt my child, no.

5      Q      That wasn't my question.  My question is:

6  Have you disciplined your child with your hands?

7      A      I believe in physical discipline, but not

8  abuse.

9      Q      It's a yes-or-no question.  Have you ever

10 disciplined your child with your hands?

11     A      Not abusively, no.

12     Q      Have you ever put your hands on your child

13 while attempting to discipline him?

14     A      Yes.

15     Q      Okay.  How many times have you done that?

16     A      Reginald has been -- Reginald at that time

17 was 12, I did not have to really -- I could talk to

18 Reginald until Reginald pretty much lost his father

19 and attended Takoma, and as I said again, everything

20 went out of control.

21     Q      Leading up -- I mean during the time that

22 your son attended Takoma, did there ever come a time

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

118

1    when you disciplined him with your hands?

2            MS. ALVAREZ:  She's already answered that.

3            THE WITNESS:  I've said yes.

4    BY MS. JONES RIGHT:

5        Q    And how many times?

6        A    Gosh, when you say "how many times," do you

7    want me to go back to -- how far do you want me to go

8    back.

9        Q    During the time he was at Takoma.

10       A    Oh, the times he was at Takoma?

11       Q    Yes.

12       A    Geez, Reginald was at the age at that time I

13   could really talk to, so I didn't have to just

14   physically discipline Reginald.  And I continue to

15   say, for the record, my son was not hit or choked with

16   a shoe, any of those things.

17       Q    My question is:  During the time he was at

18   Takoma, did you ever discipline your son, and if so,

19   how many times?

20           MS. ALVAREZ:  What kind of discipline?

21           MR. GLOVER:  With her hands.

22           THE WITNESS:  No.  Again, I say no.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

119

1   BY MR. GLOVER:

2       Q    Okay.  And when after the door struck your

3   son did you lose custody of your son?

4       A    The Saturday, of course, Reginald gets up

5   and he leaves out of the house again, so he comes

6   back -- I'm sleeping.  He leaves and he comes back.

7   So he says, mom, can I go swimming, and so I said to

8   him, I said Reg, I said yes, and I gave him money to

9   go swimming.  I believe I -- no, I didn't take him to

10  the pool, which is several blocks down.  It was a

11  Sunday, well, that Saturday night he did not come

12  in -- well, I went to the pool to pick him up.  This

13  is the 12th, because the incident occurred on the

14  11th.  I went to the pool at Takoma to pick him up,

15  and he ran off from me at that time.  I called the

16  police, and I sat at home all day, waited and waited.

17          About 10:30 Reginald still had not come

18  home.  I again called the police, which is the

19  umpteenth time, and later on that night, I guess about

20  maybe 12:30, 1:00, they bring Reginald in, and that

21  morning Reginald really -- he wanted to leave out of

22  the house early that morning again, which at that time

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

120

1    I just simply pulled the bed -- because it was to the

2    point I couldn't do anything to keep this kid in the

3    house.  I pulled the bed behind the door so he

4    couldn't get out of the house.  He was mad because he

5    could not get out of the house that morning, because

6    he was leaving out at 6:00 every morning on weekends,

7    and I'm sleeping.

8              Reginald himself started to dial 911, I

9    guess just making phone calls to 911.  Well, the phone

10   rang, and it was 911, and they said, ma'am, did

11   anyone -- has anyone been calling 911, is everything

12   okay, do you need any help.  I said no.  I looked at

13   Reginald, and I said, Reg, have you been dialing 911?

14   He said, no, mommy.  She said, well, there have been

15   several calls from there.  I said, I've been having a

16   lot of difficulty with Reginald.  You know, maybe it's

17   the time that I need an ambulance to really just take

18   him and have him checked out.  This is how the

19   ambulance was supposedly to come to the address.

20             The ambulance did come, and I explained to

21   them that I had been having a lot of difficulty, there

22   had been constant police involvement, and I think it

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

121

1   was at that time really that I really needed to take

2   Reginald to Children's to have him evaluated, because

3   I had talked to his therapist and made them aware I

4   was having a lot of trouble with him.

5           At that time the police arrived, and they

6   took Reginald into the kitchen, and they had been --

7   it was like we had a personal relationship with the

8   police officers, and they knew me and knew the type of

9   parent that I was, at least I thought so.  When

10  Reginald came out of the kitchen with this new officer

11  and one of the old officers that had been visiting the

12  home frequently and promised to look out for Reginald

13  at school and so forth and so on, they came out

14  telling me that -- even after I had explained the

15  incident that happened with the child, telling me that

16  they had talked with Reginald to coerce him into

17  lying, I think this is what happened, when they went

18  into the kitchen out of my presence and talked to

19  Reginald.

20          I don't know what type of promises they made

21  to Reginald, but I know about 15 minutes later they

22  came back saying to me, well, you know, Ms. Tomonia,

122

1    you've been abusing your son, and I could not believe

2    my ears.  I could not believe my ears.

3           All this time I had spent with my son from

4    day one, followed him through school, trying to be his

5    advocate, make sure he get an education and then

6    calling the police on several occasions, even taking

7    him and stopping at the police station to ask for

8    help.  I could not believe my ears.

9    Q     What day was that?

10   A     May 13th.

11   Q     And was Reginald taken out of your custody?

12   A     We were asked to go to -- I was asked to

13   go -- they called in I guess a CFSA worker at that

14   time that came in before we left the home, and they

15   said that they would take -- asked if I would go to

16   Children's Hospital.  I had no problem with that, and

17   that gentleman's name at CFSA was Wills Davis, I

18   believe.  Reg was carried over to Children's Hospital.

19   They found no allegations of abuse at that time,

20   despite his eye.  Okay?  So they released Reginald.

21          Will, the CFSA social worker, he and I

22   talked, and he thought it was just parent/child

123

1    conflict.  So he recommended that there is a place,

2    and he just think Reginald needed a cooling off period

3    after I shared all of the things we were experiencing

4    in the home, and based on the fact that his father had

5    died recently, that he maybe needed a cooling off

6    period at the Sasha Bruce house.

7         Q    Who's Sasha Bruce?

8         A    It's a temporary shelter for kids in the

9    D.C. area.

10        Q    When did Reginald's father die?

11        A    It was October of 2005.

12        Q    Were they close, Reginald and his father?

13        A    Yes, yes.  So the problem with Sasha Bruce

14   was the child had to be 12, but I mean the staff was

15   so, just accommodating and supportive.  They

16   understood what I was going through with Reginald, and

17   they really wanted to help, at least that worker that

18   was on at that time, on the clock at that time.  Well,

19   when they changed shifts that night, I guess it must

20   have been about 12:00, I had actually left Sasha Bruce

21   and Reginald was there, still in my care, okay, just a

22   cooling off period.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

124

1         I went to go home, believe it or not.   I

2    arrived home and stuck my key in the door only to find

3    out I could not get into my house.   While talking to

4    the police, Reginald had removed all the keys to the

5    apartment, so I am locked out.   What happened during

6    that change of the shift, they called my daughter at

7    the emergency number to pick up the child because he

8    was not old enough to stay there, and they met her.

9    She lives in Stafford, Virginia.   They met at a

10   halfway point.

11        And I didn't want to call that night,

12   because, number one, I didn't know my way back.   I

13   don't know my way around D.C. very well other than up

14   in Northwest.   This place was in Northeast, okay, and

15   I didn't want to just call and just say, Reginald, did

16   you take the keys, because it had been a rough day as

17   it was.

18        So I stayed at my girlfriend's house, and I

19   was just plain tired, really seriously tired.   I had

20   been up with Reginald for a couple of nights, probably

21   the entire weekend.   And so that morning, when I

22   called Sasha Bruce, that was when I was told that

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

125

1    Reginald was not there.  So I said, what do you mean

2    he's not there?  And they said they had tried to

3    contact me.  I said, yeah, I couldn't get in my house.

4    I said, Reginald has my keys, and they explained then

5    that he was not old enough to be there, and they had

6    turned him over to the care of his sister.  So at that

7    time I called his sister, and she came up to the

8    apartment.  That way I was able to get in.

9         Well, unbeknownst to us, Reginald again was

10   suspended from school, afraid to face his sister and

11   tell his sister that he was suspended.  So she was

12   there getting -- and let me retract that.  I knew that

13   he was suspended.  She didn't know that he was

14   suspended, because I had just found out that he had

15   been suspended, because it's still around this time

16   where he kicked the car when I found out the child was

17   suspended.

18        All of this stems right at the same time,

19   okay?  So his sister did not know he was suspended.

20   So that morning she went to the house, because she had

21   both sets of keys, and she attempted to get him ready

22   for school.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

126

1    He said, I don't have any clothes to wear, I

2    don't have anything to wear to school, instead of

3    saying -- at the time I called my daughter they

4    finally arrived at the house.  So I went, why didn't

5    you just call and say you were close by?  She said,

6    because I'm getting him ready for school.  I said,

7    sweetheart, he is suspended from school.  At the time

8    I said he was suspended, out the door Reginald ran.

9    Q    Were you there at the house?

10   A    I had just come, I had just walked in the

11   door, and out the door he ran.

12   Q    Was there ever a court proceeding or legal

13   proceeding that you appeared to, or what, if any,

14   where Reginald was removed legally removed from your

15   custody?

16   A    When he went out that door -- this is the

17   Monday, which I believe is the 14th.  CFSA was called

18   in again, because we called the police, because he had

19   run off again.  This is during school hours, so I

20   called to report that he's gone again, and we had just

21   gotten him back from Sasha Bruce.  What happened in

22   retrospect with that, the police came out with a CFSA

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

127

1    worker again because they've got this thing.  So they

2    picked up Reginald from around the block or so.

3          Well, there's a different worker that comes

4    in now, and he comes in and he's just going through

5    the whole house and investigating my entire home.  I

6    had no problem with that.  And as a result of that, he

7    says, well, take him to -- you got to go back to

8    Children's Hospital.  This is the second visit to

9    Children's Hospital the very next day, and this worker

10   has in his mind that my child is being abused, and

11   this is when everything just hit the fan.

12         MS. ALVAREZ:  I'd like to call a break.  I'd

13      like to consult with my client about something.

14         (Whereupon, a short recess was taken.)

15   BY MR. GLOVER:

16      Q    After your son -- why was your son taken

17   back to Children's Hospital, if you know?

18      A    I don't know.

19      Q    Okay.  When was the next time you saw your

20   son after he was taken to Children's Hospital?

21         MS. ALVAREZ:  Objection; what is the

22      relevance of this?

128

1          MR. GLOVER:  Counselor, you can object.

2     There is relevance.  It goes to the child's

3     behavior and the child's mindset.  Where is the

4     control of the child?

5  BY MS. JONES RIGHT:

6     Q     The next time you saw your child?

7     A     I believe he was at St. Ann's, yeah, St.

8  Ann's.

9     Q     Do you recall when is the next time you saw

10 him?

11    A     I don't recall specifically.

12    Q     Within the next week or the next two days?

13    A     It may have been the next week or two.

14    Q     Okay, how did you come to find out he was at

15 St. Ann's?

16          MS. ALVAREZ:  Objection; relevance.

17          THE WITNESS:  I don't know anyway.

18 BY MR. GLOVER:

19    Q     What did you do when you found out the child

20 was at St. Ann's?

21    A     What do you mean what did I do?  What could

22 I do?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

129

1    Q    Did you go seek to visit him?

2    A    Of course, of course, right.

3    Q    When did you seek to visit him?

4    A    We tried to go and visit Reginald weekly or

5    every other week, my daughter and myself.

6    Q    Was there ever any court hearing that you

7    appeared at with regard to your custody of your son

8    after he was at St. Ann's?

9    A    I was at all the court hearings.

10   Q    When was the first court hearing?

11   A    I'm not sure.

12   Q    What occurred at that hearing?

13   A    Of course, he was removed from the home.

14   Q    And if you know, what was the basis for him

15   being removed from the home?

16   A    Alleged abuse.

17   Q    And based on those allegations, he was

18   removed from the home?

19   A    Yes.

20   Q    During those court proceedings regarding the

21   custody of your child, did you have an attorney?

22   A    No.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

130

1      Q    Do you recall what judge it was before?

2      A    Judge Breslow.

3      Q    In addition to removing the child from the

4   home, were any orders imposed upon you?

5      A    Yes.

6      Q    And what, if any, orders were imposed upon

7   you?

8      A    Drug testing, parenting classes.

9      Q    Did the Court ever mandate you to attend any

10  counseling?

11     A    Yes.

12     Q    Did you attend the drug testing courses?

13     A    Not drug testing courses, parenting courses.

14     Q    Did you attend the parenting courses?

15     A    Yes.

16     Q    When was the first time you attended a

17  parenting course?

18     A    I don't remember.

19     Q    Was it shortly after --

20     A    My recollection of this whole ordeal is very

21  bleak, because it was very disturbing.

22     Q    When was the last time you attended a

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

131

1    parenting course?

2         A    I completed the parenting course.

3         Q    When was the last time you attended

4    counseling?

5         A    Last Friday.

6         Q    And how long had you been attending

7    counseling?

8         A    You mean time, an hour, or what do you mean?

9         Q    During the time -- from the first time you

10   started going to counseling until last Friday, how

11   long had you been going?

12        A    Actually, prior to this -- I can't say prior

13   to this.  It may have been somewhere shortly after the

14   child was removed, because I was very distraught and

15   stressed and depressed.

16        Q    So sometime around May of 2006?

17        A    No.  I'm not sure.  I'm really just not

18   sure.

19        Q    Approximately how many counseling courses

20   had you attended?

21        A    I don't know.

22        Q    From the time that you initially started

132

1    going to counseling, whenever that time or that date

2    was, until last Friday being the most recent course,

3    was there any breaks or --

4        A    Yeah, it was, because -- there were breaks,

5    yes.

6        Q    Starting backwards from this last Friday,

7    when did you start this session of counseling?

8            MS. ALVAREZ:  What do you mean by a

9            "session" in counseling?

10           MR. GLOVER:  Well, she said she went to

11           counseling.  I want to know, Friday going back,

12           this group of sessions.  She said there were

13           breaks.  I want to know what time period this

14           most recent session would go.  Was it one month

15           prior, two weeks prior?

16           MS. ALVAREZ:  I you mean a series of

17           questions that she saw a counselor, is that --

18           MR. GLOVER:  I'll adopt that question, yeah.

19           THE WITNESS:  Let's see.  Reginald returned

20           home in May, and of course, I was still to be

21           undergoing counseling, but I had a -- I'm not

22           sure.  I don't know.  I don't know.  This is a

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

133

1      very uncomfortable thing for me to just think

2      back through, because it's not pleasant.

3  BY MR. GLOVER:

4      Q    I understand, but you understand my

5  position, my job, these are questions I have to ask.

6      A    Okay.

7      Q    Do you recall the name of the doctor that

8  you saw for counseling?

9      A    Edith Mahlman.

10     Q    Where is Dr. Mahlman's office located?

11     A    Kaiser Permanente Mental Health Kensington.

12     Q    While undergoing counseling, had you

13 undergone any psychological or psychiatric evaluation?

14     A    Yes.

15     Q    When were those?

16     A    I don't know when they were, but the judge

17 ordered testing.

18     Q    And do you recall when?

19     A    I don't.

20     Q    How many psychiatric/psychological

21 evaluations did the Court order you to undergo?

22     A    That was the only one that I had undergo.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

134

1      Q    Approximately how long was your son residing

2  at St. Ann's, if you know?

3      A    I don't know.  I really don't.  I'm not

4  sure.  He went to Children's Hospital from St.

5  Ann's -- St. Ann's actually referred him to Children's

6  Hospital.

7      Q    And do you recall when that was?

8      A    No, I don't.

9      Q    Do you recall what year?

10      A    2006 for sure.

11      Q    Was it beginning of the year, middle, end of

12  the year?

13      A    I believe it was somewhere in May or June.

14  I'm not sure.

15      Q    And if you know, why was your son referred

16  to Children's Hospital?

17      A    His behavior, out-of-control behavior while

18  at St. Ann's.

19      Q    And when you say "out of control behavior,"

20  what, if anything, was your son doing?

21      A    I was not there.  This is St. Ann's report.

22  That's all I know.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

135

1       Q    Okay, and was your son referred to any

2   specific department at Children's Hospital from

3   St. Ann's?

4       A    Psychiatric.

5       Q    And how long was your son referred to the

6   psychiatric department of Children's Hospital?

7            MS. ALVAREZ:  Do you mean how long was he

8       there?

9   BY MR. GLOVER:

10      Q    Sure.

11      A    A month or so, month and a half.  I'm not

12  sure.

13      Q    And did you ever speak to any of the staff

14  at Children's Hospital about the services that were

15  being rendered to your child during the month that he

16  was at Children's Hospital?

17      A    I did.

18      Q    And what, if anything, did they tell you?

19      A    I'm not sure.  Again, I just can't think

20  back that far.  This was not very pleasant, and some

21  of those things I have just blocked.

22      Q    Did you speak to your child?

136

1    A    Oh, of course.

2    Q    And what did he tell you?

3    A    I attended a couple of the little group

4    sessions with him.  Of course, he told me he didn't

5    like it, he wanted to come home, and if he -- he said

6    to me, mommy, if I didn't lie on you, I wouldn't be in

7    this predicament now.  I really hurt myself, and I

8    said, you did not just hurt yourself, you hurt the

9    entire family.  We're all hurting.

10    Q    Was anyone present with you when he said

11    that to you?

12    A    I believe this was just a conversation that

13    the two of us had, because he began to really open up

14    during his stay there.

15    Q    After spending a month at the psych ward,

16    psychiatric department of Children's Hospital, where

17    was your son?

18    A    He was placed with my daughter, his sister,

19    in Stafford, Virginia.

20    Q    I apologize.  When your child was placed

21    with St. Ann's, was the school semester still going

22    on?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

137

1       A       It was, it was.

2       Q       And if you know, was he going to school?

3       A       I believe that Dr. Grant had suspended

4   Reginald for the remainder of the year.  She indicated

5   at that last meeting that Reginald was not going to

6   come back to Takoma, and he did go back to Takoma and

7   he was -- when the social worker took him to school,

8   she immediately told the social worker he was

9   suspended for the rest of the year.

10      Q       If you know -- do you know when this was?

11      A       He was removed May 15th, so he had to go

12  back to school that week of -- somewhere around,

13  before the 20th or right in that area, because I do

14  recall that happening, and -- yeah, I recall that

15  happening.

16      Q       Did you ever speak to anyone from St. Ann's

17  regarding your son?

18      A       I did.

19      Q       What, if anything, did they tell you?

20      A       About his behavior as well, the things that

21  he was doing there, I mean just a repeat.  Out of

22  control behavior, fighting the other kids, cursing out

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

138

1     the staff, leaving the facility.

2          Q     Do you remember who you specifically spoke

3     to at St. Ann's?

4          A     I do.  I believe it was Sister Mary -- I

5     can't remember her last name.  Sister Mary, the last

6     name I don't recall.

7          Q     Okay.  How long was your son with your

8     daughter in Stafford, Virginia?

9          A     For the entire summer.

10         Q     And after the summer, was your son ever

11    enrolled in school?

12         A     He was.

13         Q     And what school was he enrolled in?

14         A     Turner Elementary.

15         Q     And who enrolled your son in Turner

16    Elementary?

17         A     He was with CFSA, so whether the social

18    worker did or a foster parent, I'm unsure.

19         Q     Were you present when your son was enrolled

20    in Turner Elementary?

21         A     I wasn't.

22         Q     Prior to your son being enrolled in Turner

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

139

1    Elementary, did you ever speak with any staff at

2    Turner Elementary?

3        A    I had no idea where my son was going to go

4    to school or where he lived.

5            MS. ALVAREZ:  I'd like to bring it to your

6        attention that it's almost 3:00, and you noticed

7        the deposition of Reginald at 3:00.  What is the

8        plan here?

9            MR. GLOVER:  Well, I mean you guys were a

10       little late.  We took an hour lunch.

11           MS. ALVAREZ:  We were 20 minutes late.

12           (Discussion was held off the record.)

13           MR. GLOVER:  I'm allowed seven hours with

14       your client.  We can either squeeze Reginald in

15       or schedule another deposition for next week

16       Thursday.

17           MS. ALVAREZ:  Why don't we deal with

18       Reginald since he's here.

19           MR. GLOVER:  I'm in the middle of a

20       deposition here.

21           MS. ALVAREZ:  We can call her back.

22           MR. GLOVER:  Well, give us a second.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

140

1      (Whereupon, a short recess was taken.)

2      MR. GLOVER:  We got two choices.  We can

3  continue on with Ms. Tomonia.  I could probably

4  wrap this up in another hour and a half, two

5  hours, and then I probably don't anticipate

6  taking that long with your son.  Or I can break

7  your deposition now, and I can go forward with

8  Reginald so we can complete him and he doesn't

9  have to come back another day, doesn't have to

10  miss another day of school, and we'll have to

11  finish yours afterwards, depending on the court

12  reporter's schedule, or we'll have to schedule

13  you for another day before Thursday.

14      MS. ALVAREZ:  We'll go with Reginald.

15      MR. GLOVER:  Okay.  Before we do, let me go

16  get my calendar, because I want to pick a date

17  right now before we start.

18      (Signature having not been waived, the

19  deposition of LINDA FAY TOMONIA was concluded at

20  3:00 p.m.)

21

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

141

1

2

3                  ACKNOWLEDGEMENT OF WITNESS

4          I, Linda Fay Tomonia, do hereby acknowledge

5      that I have read and examined the foregoing

6      testimony, and the same is a true, correct and

7      complete transcription of the testimony given by

8      me, and any corrections appear on the attached

9      Errata sheet signed by me.

10

11

12    _____      _____

13    (DATE)                    (SIGNATURE)

14

15

16

17

18

19

20

21

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

142

1                          E R R A T A   S H E E T

2      IN RE:   TOMONIA VS. DISTRICT OF COLUMBIA

3      RETURN BY:

4      PAGE      LINE                         CORRECTION AND REASON

5      _____     _____     _____

6      _____     _____     _____

7      _____     _____     _____

8      _____     _____     _____

9      _____     _____     _____

10     _____     _____     _____

11     _____     _____     _____

12     _____     _____     _____

13     _____     _____     _____

14     _____     _____     _____

15     _____     _____     _____

16     _____     _____     _____

17     _____     _____     _____

18     _____     _____     _____

19     _____     _____     _____

20     _____     _____     _____

21     _____     _____     _____

22     (DATE)              (SIGNATURE)

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

143

1                    E R R A T A   S H E E T

2    IN RE:   TOMONIA VS. DISTRICT OF COLUMBIA

3    RETURN BY:

4    PAGE    LINE                    CORRECTION AND REASON

5    _____   _____    _____

6    _____   _____    _____

7    _____   _____    _____

8    _____   _____    _____

9    _____   _____    _____

10   _____   _____    _____

11   _____   _____    _____

12   _____   _____    _____

13   _____   _____    _____

14   _____   _____    _____

15   _____   _____    _____

16   _____   _____    _____

17   _____   _____    _____

18   _____   _____    _____

19   _____   _____    _____

20   _____   _____    _____

21   _____   _____    _____

22   (DATE)          (SIGNATURE)

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

144

1

2

3  CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

4          I, Laurie Bangart-Smith, Registered

    Professional Reporter, the officer before whom

5    the foregoing deposition was taken, do hereby

    certify that the foregoing transcript is a true

6    and correct record of the testimony given; that

    said testimony was taken by me stenographically

7    and thereafter reduced to typewriting under my

    supervision; and that I am neither counsel for,

8    related to, nor employed by any of the parties to

    this case and have no interest, financial or

9    otherwise, in its outcome.

10          IN WITNESS WHEREOF, I have hereunto set my

    hand and affixed my notarial seal this 28th day

11   of January, 2008.

12   My commission expires:  March 14th, 2011

13

14   _Laurie Bangart-Smith_

15   _____

16   LAURIE BANGART-SMITH

    NOTARY PUBLIC IN AND FOR

17   THE DISTRICT OF COLUMBIA

18

19

20

21

22

Case 1:07-cv-00882-JR    Document 46-2    Filed 02/28/2008    Page 145 of 260
DEPOSITION OF LINDA FAY TEMONIA, VOLUME
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

145

**A**

**able** 31:15 36:20
  102:13 103:21
  104:12 125:8
**absence** 98:9
**absolutely** 22:20
  23:1 30:10 66:9
  66:9,9 85:12
  106:13 111:9
  116:11
**abuse** 116:18
  117:8 122:19
  129:16
**abused** 116:13
  127:10
**abusing** 122:1
**abusively** 117:11
**Academy** 17:4,12
  17:20 18:1,5,8
  18:10,20 20:17
  20:18 22:13,18
  23:6,13 24:20
  27:13 30:19
  38:11,13,14
  40:8,9
**accept** 71:18 72:3
**accepted** 64:21
**accommodating**
  123:15
**accustomed** 62:21
  69:5
**acknowledge**
  141:4
**ACKNOWLE...**
  141:3
**action** 1:7 5:13
  47:15,16,17
  67:5
**actions** 67:14
  70:12 97:17
  98:11
**activities** 67:15
**acts** 15:10
**ad** 101:10,13,21
**Adderall** 55:21
  55:22 56:2,12
**addition** 82:14

89:10 103:21
  108:18 109:4
  130:3
**address** 10:20
  11:2,6,8,14,17
  11:22 12:3,6,9
  12:16 13:1,9,12
  14:1 37:11,19
  39:4,18 78:22
  107:15 120:19
**addresses** 114:16
**administer** 59:8
  59:16 61:5,7
**administered**
  56:6 61:10 74:4
  74:10,12
**administering**
  59:10
**adopt** 132:18
**advised** 6:2
**advocate** 100:21
  101:9 122:5
**AD/HD** 18:15
  26:18 38:5 56:1
**affixed** 144:10
**afford** 6:12
**afraid** 125:10
**aftercare** 49:5,6
  51:4,6 52:4,5,14
  52:16,20,20
  53:1,4,15,16,22
  54:5 55:2,5,6
  82:20 98:7
**afterward** 90:8
**after-school** 83:4
  83:9
**age** 80:22 118:12
**agencies** 77:14
**agency** 43:17
**agent** 39:14,15
**agents** 15:10
**aggressive** 24:6
  31:12 61:1,19
**agitate** 36:3
**agitated** 57:3 58:3
**ago** 79:5
**ahead** 68:11,12

**Ahougataue**
  28:11
**al** 1:9
**allegation** 77:12
**allegations** 14:20
  15:4 122:19
  129:17
**allege** 80:16,17
**alleged** 79:8,8
  116:18 129:16
**alleging** 15:4,9
  90:16
**allow** 6:7
**allowed** 32:22
  139:13
**allowing** 80:20
**altogether** 47:22
**Alvarez** 3:3,4
  7:16,20 8:6,6,18
  9:14,19 10:1,7
  12:21 13:2 16:6
  20:3 21:1,4,9,22
  22:3 23:5 27:12
  40:12,14 42:9
  43:12 44:14
  46:7 47:16
  51:15 52:1
  53:12,17 57:13
  57:17 66:14,19
  68:17,19 70:1
  73:13,18,21
  78:6,12 80:10
  81:13 84:21
  85:1 92:17
  95:19 96:14,20
  101:18 107:8
  114:6 115:1,7
  115:19,22 116:3
  116:9,12,16
  118:2,20 127:12
  127:21 128:16
  132:8,16 135:7
  139:5,11,17,21
  140:14
**ambulance**
  120:17,19,20
**Amended** 4:14

67:4 68:14 77:2
**Amy** 101:14,21
**Ann's** 128:7,8,15
  128:20 129:8
  134:2,5,5,18,21
  135:3 136:21
  137:16 138:3
**answer** 6:11 46:5
  112:11
**answered** 68:17
  101:18 118:2
**answering** 95:6
**answers** 100:15
**anticipate** 140:5
**anybody** 109:5
**anymore** 34:19
**anyway** 51:2
  128:17
**apart** 113:5
**apartment** 10:21
  11:6,7 12:9
  124:5 125:8
**apologize** 13:6
  15:21 37:9
  49:17 100:11
  136:20
**apologized**
  113:18
**appear** 9:2 141:8
**appearance** 36:3
**appeared** 111:16
  126:13 129:7
**appears** 42:8,13
  114:13
**appointment**
  45:21
**appointments**
  48:7
**appropriate**
  64:10
**approval** 72:12
**approximately**
  11:10 14:10
  72:19 83:14
  90:18 131:19
  134:1
**April** 10:17 11:3

**11:4** 86:3 95:2
**area** 14:11 80:3
  87:19 123:9
  137:13
**areas** 76:10
**aren't** 86:16
**arrived** 121:5
  124:2 126:4
**articulate** 27:17
  44:12 60:12
  63:12 67:18
  70:9
**articulated** 21:6
  26:4
**articulating**
  38:21
**Arts** 15:17 23:4
  23:17 28:18
  29:7,14 32:5
**asked** 7:13 28:22
  33:4 34:2 39:18
  51:18 53:21
  54:4,10 59:7,17
  61:4,13 63:1
  68:17 86:8
  87:12,16,19
  91:16 95:5
  99:15 112:5
  122:12,12,15
**asking** 5:13,19
  7:1,5 21:4,5
  43:8 48:4
  100:12,14
**asks** 55:14
**assessment** 64:5
  107:20
**assist** 19:7 103:22
**assistant** 35:19
  62:10,13 96:6
  96:10 99:7
**assumed** 108:2
**assumption** 92:1
**assure** 6:9 94:13
**assured** 30:20
  100:4
**ATM** 85:11,13,13
**attached** 141:8

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

146

attempted 125:21
attempting
  117:13
attempts 45:9
  48:7 70:6
attend 15:16,20
  23:2,11 29:6
  32:3 39:19
  46:19 49:6 55:6
  130:9,12,14
attendant 38:22
attended 18:9
  24:14 32:21
  45:19 52:8,12
  117:19,22
  130:16,22 131:3
  131:20 136:3
attending 47:11
  48:5,6 93:22
  131:6
attention 18:15
  70:13 77:1
  139:6
attorney 2:5 3:11
  5:9,10 6:2 7:11
  8:3,6,18 50:14
  109:1 110:19
  129:21
Avenue 10:21
  11:13 12:5,8
  13:9 17:5 37:11
  37:12 80:2,6
average 31:20,21
  32:2 103:12
aware 30:19
  45:11,13 81:18
  82:10 91:2
  93:12 94:14
  98:14 106:3
  112:16 121:3
awful 32:11 77:19
  113:16
A's 32:1 34:14
A-H-O-U-G-A-...
  28:12
a.m 1:16

**B**

B 4:8,12 42:1,3,7
  42:10 47:19
  103:9,12
babies 69:4
babysit 76:7
babysitter 76:7,9
  108:15
babysitting
  108:15
back 10:11 15:13
  17:14 24:4
  25:14 27:20
  29:5 31:11
  36:11 48:8 51:7
  58:19 59:15
  60:22 61:19
  62:15 64:22
  65:1,7 71:18
  72:16 74:2,14
  80:20 82:6 95:3
  96:17 99:16
  100:5 101:8
  105:2,5 106:16
  109:17,20 110:3
  111:10 112:10
  118:7,8 119:6,6
  121:22 124:12
  126:21 127:7,17
  132:11 133:2
  135:20 137:6,6
  137:12 139:21
  140:9
backing 18:13
  23:18 40:3
backwards 132:6
bad 91:17 99:22
Bangart-Smith
  1:22 2:18 144:4
  144:16
bank 85:17 87:2
barricade 50:6,15
base 77:12 101:2
based 26:10 39:4
  95:7 108:22
  123:4 129:17
basic 79:11
basis 57:12 94:2,6

112:1 129:14
bathroom 113:3,3
  113:5,7
battle 35:21
bed 120:1,3
began 25:3 34:17
  136:13
beginning 22:11
  75:15 81:13
  99:6 105:14
  107:17 134:11
behalf 3:2,8 37:22
behave 112:21
behavior 17:2,7,9
  17:11 24:2,6
  25:20 26:11
  31:1,10,12
  32:10 34:3
  36:19 48:1,10
  48:11,13,14,15
  49:6 51:9 55:3,7
  59:13 60:14,16
  60:20 61:2,18
  61:20 62:1
  63:18,22 64:2
  66:12 97:10
  99:11 112:16
  116:8,9,15,16
  128:3 134:17,17
  134:19 137:20
  137:22
behavioral 24:11
behaviors 17:15
  19:15 24:4 25:4
  26:9 27:6,17,18
  29:2 56:16 61:2
  102:17
Bekkali 3:20 82:4
belief 77:7
believe 11:13 13:4
  14:10 16:15
  18:12,21 20:4
  24:16 25:14
  28:11 33:14,18
  33:21 34:4,4
  40:3 44:7,9,21
  49:16,18 62:10

62:12 70:10,22
  71:12,14 73:7
  75:1 76:16,21
  77:14,15 80:19
  80:22 83:10
  84:4 87:3,4,22
  88:22 89:2 91:3
  96:2 98:4 101:9
  101:11,15
  108:10,22
  109:17,20 110:7
  110:9 111:20
  117:7 119:9
  122:1,2,8,18
  124:1 126:17
  128:7 134:13
  136:12 137:3
  138:4
belt 112:19 113:2
bending 113:10
best 68:3,8
  108:11 110:9
better 29:1,16
  31:3,3,4 45:10
  107:3 108:13
big 7:5
biological 8:4
  44:8
birth 10:16 13:15
birthday 86:3,6
bit 15:14 18:13
  23:18 40:3
  111:10
black-marked
  35:14
Blake 51:8,13,22
  60:10 62:9 63:2
  63:3 68:4,5,7
  70:9 73:12
  87:14 88:8,11
  88:16,22 93:6
  96:12 97:13,15
blame 27:21
blamed 32:14,16
  32:17 33:9 35:6
  102:21
bleak 130:21

block 92:2 127:2
blocked 135:21
blocks 79:22
  119:10
Board 39:6,14
  77:15 79:1
  109:11
book 105:3
Boot 112:22
bottom 67:9
  114:22 115:2,5
box 19:18 114:21
  114:22 115:2,5
boy 7:5
boys 99:22
Branch 37:8
break 66:15,18
  81:14,16,22
  127:12 140:6
breakfast 86:5,7
breaking 113:4,5
  113:21
breaks 132:3,4,13
Breslow 130:2
Breslow's 46:13
Bridges 17:4,12
  17:19 18:1,5
bring 9:6,10 33:4
  53:22 54:4
  64:21 100:3
  103:14 119:20
  139:5
brought 9:15 48:4
  82:16 112:4,6
Bruce 123:6,7,13
  123:20 124:22
  126:21
bylaws 30:2
B's 32:1 34:15
  103:10

**C**

C 3:1 4:14 5:1
  66:20 67:3
cab 88:19
calendar 23:3
  49:13 140:16
call 21:16 24:13

52:22 53:3
60:20 63:18
78:18 92:3
108:3 109:5,10
110:6,9,12
111:2 116:6
124:11,15 126:5
127:12 139:21
**called** 35:20
39:15 53:19
58:18 60:1
61:12 62:1 63:7
64:1,17,18 68:1
68:2 86:20 87:2
90:21 91:21
97:7,8 99:5
109:11,16,17,18
109:19 110:3,17
119:15,18
122:13 124:6,22
125:7 126:3,17
126:18,20
**calling** 21:3 113:5
120:11 122:6
**calls** 45:9 52:17
59:22 110:22
111:1 112:15
120:9,15
**calm** 98:2
**Camp** 112:22
**cancel** 86:17 87:6
**candidate** 74:9
**candidly** 5:21
**can't** 6:6,17 11:22
25:11 33:14
46:3 60:11
64:17 81:11
88:1 131:12
135:19 138:5
**car** 125:16
**card** 85:11,13,13
85:14,15,17,17
85:19 86:2,9,17
86:21 87:8,18
88:3
**care** 10:10 25:7
46:22 47:4,8

52:7 85:4
101:11 123:21
125:6
**cared** 52:6
**carefully** 28:9
**caring** 35:10
**Carolyn** 85:6,7
**carried** 59:14
65:1 71:18
122:18
**carry** 24:19
**case** 44:15 144:8
**cases** 35:6 36:1
66:5 72:11 96:5
102:10,15 103:2
103:10 104:22
105:1,4
**catch** 101:20
**caught** 92:7
**caused** 60:14
70:10
**causing** 60:4
**cease** 12:16
**certain** 5:22 9:5
15:5,6
**Certainly** 41:4
57:10 95:21
108:22
**CERTIFICATE**
144:3
**certify** 144:5
**CFSA** 50:13,14
122:13,17,21
126:17,22
138:17
**chance** 53:8,9,9
**change** 124:6
**changed** 35:14
123:19
**charter** 18:8,10
18:20 19:1
22:19 23:20
24:20 29:16,21
30:1 40:6
**chartered** 16:5,7
**chastise** 32:22
**check** 89:19

**checked** 39:5
120:18
**checking** 78:19
**Chief** 8:2
**child** 39:8,19
43:17 47:10
52:12 55:15
65:21 66:13
78:21 80:21
90:9 91:7,8,12
92:7 93:11,11
93:11,17,18
94:3,4,7,12 99:4
106:16 107:1
108:10 112:2
114:17 115:7,14
115:16 116:8,10
116:13,20,21,22
117:1,3,4,6,10
117:12 121:15
123:14 124:7
125:16 127:10
128:4,6,19
129:21 130:3
131:14 135:15
135:22 136:20
**children** 19:11
32:14 35:8 52:8
**Children's** 121:2
122:16,18 127:8
127:9,17,20
134:4,5,16
135:2,6,14,16
136:16
**child's** 93:16,20
96:3 115:21
128:2,3
**choices** 140:2
**choked** 115:16
118:15
**chronically** 32:14
35:5
**cite** 22:3,5
**Civil** 1:2,7 2:16
**claims** 14:20
**clarify** 47:6 70:1
90:3 97:14

**class** 61:1,19,20
**classes** 130:8
**classroom** 19:8
25:5 26:14,14
62:3,6,17,21
67:17,19,22
68:15 69:1,2,5
69:10 70:7 72:8
103:5
**classrooms** 68:10
70:14,17,19,19
71:5,7
**clean** 6:14
**clear** 8:20 44:11
85:16
**clerk** 72:10,10
**client** 46:3 127:13
139:14
**client's** 20:21
**clock** 123:18
**close** 19:9,12
51:10 64:12
123:12 126:5
**closed** 68:9 70:7
72:8
**clothes** 126:1
**coerce** 121:16
**Columbia** 1:1,9
2:20 5:11 14:19
14:21 15:1,10
142:2 143:2
144:17
**Columbia's** 14:22
**come** 16:21 19:19
24:10 34:2 50:4
52:22 53:6,14
53:15 55:1
67:21 73:2
80:20 85:10
87:7,10,17 99:2
99:14 100:5,17
102:3,4 104:6
105:5 107:2
108:12,16 112:3
117:22 119:11
119:17 120:19
120:20 126:10

128:14 136:5
137:6 140:9
**comes** 119:5,6
127:3,4
**coming** 9:9 99:16
105:21
**commencing** 5:22
**commission**
144:12
**committed** 43:16
**community** 18:8
18:10,20 20:17
20:18 22:13,18
23:6,13,20
24:20 27:13
30:18 38:11,13
38:14 40:8,9
71:6 77:8
**complaint** 4:14
14:18 67:5
68:14 77:2 78:4
78:6,13 108:19
109:1,7
**complaints** 17:2,6
17:10,11 78:11
108:20 110:18
**complete** 6:8,11
140:8 141:7
**completed** 131:2
**completely** 48:9
**concerned** 28:7,9
47:2 48:2
**concluded** 140:19
**conduct** 64:5
**conference**
111:17
**confirmation**
89:1
**conflict** 123:1
**confused** 51:15
107:9
**consider** 68:9
**consistent** 57:12
**consistently**
56:13
**constant** 19:10
35:21 120:22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

148

constantly 32:13
constitutional
  15:6
consult 61:8
  127:13
contact 63:21
  64:4 66:2,4,7
  79:5 83:21 89:5
  90:4 110:15
  125:3
contacted 34:2
  59:17 69:8
  77:13,14 78:9
  78:10 88:17,21
  102:9 109:20
contacting 78:17
  89:10 109:21
continue 54:21
  99:14 104:19,19
  112:13,21
  118:14 140:3
continued 48:18
  49:11,12,21
  54:15 78:18
  106:22
continuing 34:10
  34:11,20
continuous
  105:21
continuously
  59:21 80:21
control 17:9 48:2
  48:10 102:13
  112:17 117:20
  128:4 134:19
  137:22
conversation
  39:21 75:18
  136:12
cooling 123:2,5
  123:22
coordinator 25:8
  25:13,17,18
  53:4 54:11
copies 10:5 65:18
  65:19,20
copy 20:12,14

21:14,15 38:4,7
  38:8,10 40:5,9
  41:2,13
corner 80:2
correct 8:21 9:2,7
  12:19 15:2,3,7,8
  15:11,12 17:17
  17:18 18:12
  22:16 27:14
  40:7 42:21 43:6
  43:8,18 44:13
  44:18,22 45:1
  46:15 49:18
  55:11 59:1
  63:22 67:11
  75:2,3 77:5
  82:16 104:10
  106:1,2,2,5
  107:13,19 109:2
  109:3 114:14,15
  114:18 141:6
  144:6
CORRECTION
  142:4 143:4
corrections 141:8
correctly 71:13
  77:10 95:2
  99:21
couldn't 72:10
  73:2 113:9
  120:2,4 125:3
counsel 4:9 5:5
  8:11 20:19
  40:16 42:4 46:2
  66:21 114:2
  144:7
counseling
  130:10 131:4,7
  131:10,19 132:1
  132:7,9,11,21
  133:8,12
counselor 24:15
  27:14 51:8,22
  60:2,10 64:11
  68:4,18 87:14
  116:2 128:1
  132:17

counter 86:7 88:6
couple 7:16 54:8
  58:16 72:14
  90:7 95:12
  97:20 104:5
  124:20 136:3
course 26:6 54:9
  61:9 87:18
  104:18 106:15
  112:9 119:4
  129:2,2,13
  130:17 131:1,2
  132:2,20 136:1
  136:4
courses 130:12,13
  130:13,14
  131:19
court 1:1 4:12 6:5
  6:6,16 42:13
  126:12 129:6,9
  129:10,20 130:9
  133:21 140:11
covered 38:3 75:9
credit 85:19
curious 85:2
current 10:20
currently 13:21
curriculum 52:10
  52:11
cursing 137:22
Curtis 85:6,8
custody 9:17
  111:7,19 112:1
  114:17 119:3
  122:11 126:15
  129:7,21
C's 32:1 34:15,16

D

D 3:3,4 4:15 5:1
  114:1,5,11
dart 51:2
date 9:1 10:16
  13:15 46:14,16
  61:16 84:7 89:5
  132:1 140:16
  141:13 142:22
  143:22

dated 46:11
dates 29:11
daughter 79:12
  80:18,20 81:4,7
  81:8,9 124:6
  126:3 129:5
  136:18 138:8
Davis 122:17
day 41:1 45:11
  47:8 59:6,22
  61:17 64:20
  69:19,20 72:1
  72:16 87:11
  93:9 95:10
  97:19 104:8
  119:16 122:4,9
  124:16 127:9
  140:9,10,13
  144:10
daycare 17:1
days 53:2,6,13
  54:8 56:22
  71:15 72:14,20
  91:20 97:20
  98:15 100:16,17
  100:22 102:15
  128:12
DCPS 41:10 77:8
  78:9
deal 77:20 139:17
dealing 29:1
dealings 78:1
dear 113:17
debit 85:11,14,15
  85:16 86:21
December 14:10
  14:12,13,15
  46:14,17 74:19
  74:19
decided 60:20
decision 33:11
  58:2
decline 34:10,12
  34:13
defendant 3:8
  67:13 77:6
Defendants 1:10

5:5
Defendant's 8:20
  42:1,7 47:18
  67:3 114:5,11
Defense 8:14
defiant 18:16
  36:18
Deficit/Hypera...
  18:15
definitely 83:10
  84:9 92:11
  109:19 116:14
degree 112:8
demonstrate
  98:17 110:11
demonstrating
  39:3 41:12
  110:17
denied 49:5 51:4
  87:18
Dennis 5:12
departing 86:16
department 79:2
  80:8,13 135:2,6
  136:16
depending 140:11
deposed 5:16 46:6
deposition 1:13
  2:1 4:10,11 5:15
  5:18 7:9 8:14,21
  9:2,5,6,11 10:9
  10:10 22:6 42:7
  42:11 46:4 67:3
  116:5 139:7,15
  139:20 140:7,19
  144:5
depressed 131:15
describe 31:1
  32:10 54:17
designated 19:3
desire 75:22
despite 122:20
deteriorate 34:18
determine 107:3
determined
  101:17
devious 36:18

diagnose 18:14
diagnosed 16:10
16:14,16,19
22:12 30:17
74:7
diagnosis 22:14
dial 120:8
dialing 120:13
didn't 36:11
38:12,17 41:20
53:9 59:13 61:6
65:19 81:4
86:10 87:13,20
101:20 104:6
105:12 107:5,5
107:15 118:13
119:9 124:11,12
124:15 125:13
126:4 136:4,6
die 123:10
died 12:11 123:5
different 11:6
127:3
differently 35:18
difficult 36:4 71:1
difficulty 120:16
120:21
direct 67:8 77:1
directions 27:19
36:9 53:7 54:19
61:1
directives 53:11
directly 80:8,13
disabilities 16:5
16:10,11 29:17
67:15,17 77:9
82:12 93:16,21
disability 16:14
18:14 19:3 30:9
62:19 68:16
72:7 81:7,9 91:8
disciplinary 31:5
66:2,7 82:15
89:11 96:3
discipline 102:17
117:7,13 118:14
118:18,20

disciplined 32:19
32:21 117:1,6
117:10 118:1
discovery 22:2
discriminated
79:9 80:18
discriminating
77:8
discuss 30:7 33:5
87:12,16 89:21
90:1 91:6 95:14
97:13
discussed 26:3
75:21 76:1
discussing 87:15
88:8
discussion 9:18
42:2 57:22
139:12
disorder 18:16,17
30:16 62:19
69:3
distance 64:13
distraction 19:10
distraught 78:20
131:14
District 1:1,1,9
2:19 5:11 14:19
14:21,22 15:1
15:10 80:8,12
142:2 143:2
144:17
disturbing 130:21
division 1:2 39:15
doctor 21:20 22:8
56:19 57:22
59:12,15 61:8
133:7
doctors 57:7
doctor's 45:21
48:6
document 8:15
20:21 21:11,13
21:17,19 22:1,9
22:10 41:8
42:15 67:6
documentation

26:7 37:19 38:2
98:16 99:4
100:20 110:13
110:17
documented
93:10
documenting
93:2
documents 9:5,10
9:13 10:6 38:20
39:2 41:9,9
74:15,21 75:1
doesn't 22:5
34:19 103:1
140:8,9
doing 41:6 50:17
54:20 60:20
91:2,21 93:1,7,8
100:3 108:2
113:6,21,22,22
134:20 137:21
don't 7:2,4,4
13:19 14:2
15:22 21:1
25:14 26:19
29:4,10,10,10
30:12,14 33:18
34:4 39:13,16
39:22 40:11,20
41:15 53:1 54:7
63:11 64:11,17
65:5,13 69:21
71:21 72:14
73:16 74:15
76:2,10 78:17
78:21 83:11
84:9,20 85:8
91:21 92:6,18
92:22 96:12
100:1,12 102:22
110:3 112:7
113:22 114:6
115:1 121:20
124:13 126:1,2
127:18 128:11
128:17 130:18
131:21 132:22

132:22 133:16
133:19 134:3,3
134:8 138:6
139:17 140:5
door 50:6,16,18
50:21 51:2
94:22 113:9,12
113:14,14,15
115:18 119:2
120:3 124:2
126:8,11,11,16
dosage 59:15,16
dosages 59:11
downtown 15:17
Dr 16:20,22 18:14
20:1 21:6 22:14
56:3,14 60:2,9
61:13 62:11,13
62:14 63:1 74:7
75:8,9,18,22
76:1,2,8,15
77:18,19,22
78:2,4,7 79:7,8
79:15 80:17,18
80:19 81:2,3,19
82:11 91:10
93:6 96:7,8,10
97:15,17 98:9
98:11 99:7,8,10
99:12 108:14,20
109:8,8 110:18
133:10 137:3
draft 107:1
drew 73:3
drink 111:11,12
111:14,17
drinker 111:12
111:13
drive 94:5,6
dropped 86:14
88:6
drug 130:8,12,13
due 15:9 25:20
27:16 78:13
108:18 109:1
duly 5:3
D's 34:15,16

D.C 1:14 2:8 3:6
3:14 11:15
15:14,18 17:5
29:20 37:8
41:16,17 123:9
124:13
D.C.P.S 67:14

E

E 3:1,1 4:8 5:1,1
142:1,1,1 143:1
143:1,1
earlier 98:19
early 33:11 73:20
74:20 90:20
119:22
earned 19:16
ears 122:2,2,8
Eastern 11:13
13:9 37:11,11
EC 77:6
economy 19:14
Ed 25:8,12,16,18
edge 57:5 58:5
Edith 133:9
education 34:17
34:20 39:7,15
39:18 44:7
77:15 79:2,2
81:4 103:18
104:14,17
105:17 109:11
122:5
educational 44:7
44:9 100:21
101:9
effect 28:12 44:3
76:21
either 60:16
85:17 97:12
139:14
elaborate 81:11
Elementary 15:15
37:3,4,14,15
52:18 53:20
82:11 90:17
138:14,16,20
139:1,2

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

150

| | | | | |
|---|---|---|---|---|
| emergency 124:7 | Esq 3:4 | 35:3 59:9 61:13 | 113:16 | 108:8 111:19 |
| employed 144:8 | ESQUIRE 3:3,9 | 72:4 77:16 | fidgety 57:3 | 129:10 130:16 |
| employees 30:8 | 3:10 | 120:20 121:14 | fifth 36:21 37:2 | 131:9 |
| ended 88:7 | essence 35:7 | 125:4 | fighting 27:21 | five 87:4 |
| 103:13 | estimate 25:22 | exploded 93:8 | 31:13 32:18 | floor 2:6 3:12 |
| enroll 17:17 18:1 | 99:1 | extended 44:9 | 33:21 54:1,5,19 | 113:6 |
| 18:5 52:13 | estimation 26:1 | 66:12 | 61:2 137:22 | folks 75:19 |
| 55:18 63:8 65:2 | et 1:9 | extent 20:21 21:2 | fights 27:22 32:18 | follow 36:9 75:4,7 |
| 73:1,11 | evaluated 121:2 | 21:13 | figure 108:13 | 111:5,6 |
| enrolled 17:4 | evaluation 133:13 | eye 122:20 | file 38:14 83:1,14 | followed 89:1 |
| 18:6,7,19 19:1 | evaluations | | 84:3,4 108:19 | 122:4 |
| 30:3 37:2 38:10 | 133:21 | **F** | 109:4,7 112:5 | following 18:6,7 |
| 39:8 45:14,16 | event 41:8 | face 113:16 | filed 14:18 78:3 | 27:19 31:11 |
| 55:9,20 61:22 | eventually 51:1 | 125:10 | 78:10,12 109:1 | 33:21 53:7,10 |
| 65:21,22 69:22 | exact 54:16 | faces 88:13 | filing 78:6 83:20 | 54:19 61:1 |
| 83:3,8 84:13 | exactly 72:14 | facility 108:16 | 108:18 | 64:22 67:13 |
| 89:9 107:13 | 83:12 92:21 | 138:1 | filled 38:2 56:9 | follows 5:4 |
| 138:11,13,15,19 | 115:9 | facing 78:20 | 65:16 | follow-up 111:3 |
| 138:22 | EXAMINATION | fact 15:11 38:22 | finally 126:4 | foot 110:1 |
| enrolling 15:14 | 4:1,3 5:5 | 66:6 79:10,19 | financial 144:8 | foregoing 141:5 |
| 17:3 30:6 37:13 | examined 141:5 | 80:3 123:4 | find 49:9 72:2 | 144:5,5 |
| 38:18 | example 19:8 | facts 47:22 48:1 | 87:7,10 92:20 | foremost 6:4 |
| enrollment 30:22 | 24:3 | fact-finding 5:19 | 104:20 124:2 | forget 58:16 |
| 40:4,19 41:5,6 | examples 49:3 | faculty 30:8 | 128:14 | forgot 33:16 |
| 41:10 55:8,14 | exceed 43:18 | fair 66:1 | fine 6:21,22 | form 113:19 |
| 57:15 61:15,16 | exclude 67:14 | Fairfax 45:17 | finish 66:17 115:4 | forms 55:14 |
| 64:21 65:16 | excluded 67:16 | fairly 91:8 | 140:11 | forth 37:19 50:14 |
| enter 6:8 | 69:9 | fall 89:7 | finished 115:11 | 112:10 121:13 |
| entered 22:13 | excuse 15:20 23:5 | family 43:17 | first 4:14 5:3 6:4 | forward 94:20 |
| 48:15 101:10 | 49:13 77:13 | 84:19 136:9 | 13:13 16:13 | 140:7 |
| entire 6:8,12 | 83:13 96:14 | fan 127:11 | 17:3,6 18:12 | foster 14:4,5 |
| 22:21 33:9 | Exhibit 4:10,11 | far 118:7 135:20 | 23:14,19 24:17 | 46:22 47:4,8 |
| 35:13 87:15 | 4:12,14,15 8:10 | fashion 113:19 | 28:3,5 38:18 | 101:11 138:18 |
| 88:9 124:21 | 8:14,20 42:3,7 | father 12:11 13:6 | 40:20 49:4,10 | found 9:16 52:15 |
| 127:5 136:9 | 42:10 47:19 | 117:18 123:4,10 | 54:6 60:5 61:17 | 73:8 83:5 87:2 |
| 138:9 | 66:20 114:1,11 | 123:12 | 61:22 63:9,15 | 88:4 92:13,19 |
| entitled 116:6 | exists 21:14 | favor 91:2 93:1,7 | 63:17,20 64:1,7 | 122:19 125:14 |
| entry 41:1,12 | expect 49:19 | 93:8 | 67:4,18,20 | 125:16 128:19 |
| episode 49:4,10 | experience 36:11 | Fay 1:13 2:2 5:2 | 68:14,20 69:18 | four 91:20 |
| Eric 3:9 5:9 | 108:3 | 10:15 140:19 | 69:19,21,22 | fourth 2:7 3:13 |
| Errata 141:9 | experienced 24:5 | 141:4 | 70:2 71:10 | 23:16 31:16 |
| escalate 48:18 | experiencing 72:5 | February 104:4,8 | 72:18 74:11,16 | 32:3,6,9 33:12 |
| 105:13 | 123:3 | 104:9,11 105:20 | 75:15 76:3,6 | 33:19 34:1,8 |
| escalated 24:22 | expires 144:12 | Federal 2:16 | 77:5 78:21 83:3 | 36:5,21 80:8,12 |
| 25:1 | explain 19:5 52:3 | feel 33:2,2 60:14 | 83:6 85:4,5 86:1 | 113:6 |
| escort 93:17,21 | 61:21 | feet 113:9,12 | 87:3 90:21 91:2 | Foxhall 3:5 |
| especially 65:6 | explained 30:16 | felt 33:1,9 35:9 | 107:6,13,16 | frame 84:10 |
| | | 60:13 103:1 | | |

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

151

frankly 56:15
frequent 89:18
  112:15
frequently 25:3
  48:5 89:17
  90:22 121:12
Friday 45:20
  58:12,13 71:12
  73:4 112:4
  131:5,10 132:2
  132:6,11
friend 1:4,6 82:21
front 19:11 50:18
  50:21 53:3 98:4
  102:10
full 10:13 42:21
  47:14 78:15
further 39:9
  43:15 107:19
F's 32:1 103:13

**G**

G 5:1
game 73:20
gap 71:17
gather 99:4
gathered 100:20
Geez 90:20
  118:12
general 2:5 3:11
  5:10 8:2,3
generally 84:7
gentleman's
  122:17
Georgia 10:21
  12:5,8 17:5 80:2
  80:6
getting 10:1 25:19
  59:20,21,22
  95:19 103:13
  125:12 126:6
girl 85:5
girlfriend 49:7
girlfriend's
  124:18
give 12:22 37:19
  38:8 49:3 56:4
  57:4 58:4,10

97:21 139:22
given 35:7 53:8
  107:14 141:7
  144:6
gives 63:6
giving 33:7
  112:11
Glover 3:9 4:3
  5:6,9 7:22 8:12
  9:21 10:4,12
  13:5 16:8 20:6
  20:19 21:2,5,12
  21:16,18 22:2,7
  23:9 27:14,15
  40:2,13,15
  41:22 42:5,11
  42:12 43:14
  44:16,17 46:2
  46:10 47:17,20
  51:20 52:2
  53:18 57:15,19
  58:6 66:16 67:1
  68:18,21 70:8
  74:1 78:8,14
  80:15 81:12,15
  81:17,21 82:2,9
  84:22 85:2,9
  92:19,21 93:4
  95:21 96:1,16
  97:1 100:7,9
  101:19 107:10
  114:3,8,9 115:4
  115:9,10,21
  116:1,5,11,13
  116:18,19
  118:21 119:1
  127:15 128:1,18
  132:10,18 133:3
  135:9 139:9,13
  139:19,22 140:2
  140:15
go 6:3 28:17,19
  28:22 39:4 49:7
  51:7,12 52:12
  54:9 56:17
  62:12 66:16
  68:11,12 74:14

81:2 82:21,22
  89:12,15,20
  92:1 93:13 96:3
  97:3 106:11
  107:19 118:7,7
  119:7,9 122:12
  122:13,15 124:1
  127:7 129:1,4
  132:14 137:6,11
  139:3 140:7,14
  140:15
goal 47:1,1,4
goes 115:21 116:7
  116:14 128:2
going 5:13,19,20
  6:9,10,10,19,22
  7:1,12 9:14 10:5
  10:10 20:19
  27:3 28:8 29:5
  29:21 35:4 39:9
  52:19 54:21
  55:7 64:15 69:6
  70:15 71:10
  72:13 74:2,8
  76:20 79:17
  86:5,17 91:1,15
  92:1 93:18
  94:11,14,21
  95:9 99:9,14
  100:3,7 104:18
  104:19,20,21
  112:12,20
  113:20 114:20
  114:21 115:19
  123:16 127:4
  131:10,11 132:1
  132:11 136:21
  137:2,5 139:3
good 5:7,8 19:15
  28:6 34:9 45:7,8
  45:10 65:5
  76:12,19,19
  103:11,12
goodness 88:12
  89:13
Gosh 26:1 29:10
  65:13 118:6

gotten 52:21 86:4
  126:21
governed 30:2
grade 17:3 23:14
  23:15,16,16,19
  25:21 28:3,3,5,8
  28:14,14 29:6
  31:8,16,16,19
  32:4,7,9 33:12
  33:17,19 34:1,8
  36:5,21,21 37:2
grades 18:9 31:18
  34:7,10,12,14
  34:17 103:3,6,8
  103:11
Grant 5:11 60:2,9
  62:11,13,14
  63:1,9,13,14,15
  67:13 75:8,9,18
  75:22 76:1,8,15
  77:6,18,19,22
  78:2,4,7 79:7,8
  79:15 80:17,18
  80:19 81:2,3,19
  82:11 91:10
  93:6 96:7,8,10
  97:15 99:7,10
  99:12 106:17,19
  108:14,20 109:8
  110:18 137:3
granted 43:1,10
Grant's 76:2
  97:17 98:9,11
  99:8
great 63:5
grievances 78:11
grin 36:2
ground 6:1
group 132:12
  136:3
guard 89:2
guardian 101:10
  101:13,21
guess 7:4 28:1
  112:14 119:19
  120:9 122:13
  123:19

guidelines 75:11
guys 139:9

**H**

H 4:8 142:1 143:1
half 57:4 58:4
  135:11 140:4
halfway 124:10
hand 104:7
  144:10
handed 8:15
  41:22 88:5
Handing 8:13
handled 73:7
hands 117:2,6,10
  117:12 118:1,21
handy 41:18
happen 100:5
  112:22
happened 50:22
  52:21 59:4 72:5
  99:5 121:15,17
  124:5 126:21
happening
  137:14,15
hasn't 42:9
Hawkings 84:18
  84:20
haywire 51:13
head 6:17,17
  24:16 35:21
Health 133:11
heard 77:21
  99:21
hearing 4:12
  42:14 46:14,16
  46:19,21 47:5
  47:13,21 114:17
  129:6,10,12
hearings 129:13
held 2:4 4:13 9:18
  42:2,14 139:12
help 75:12 76:9
  91:9 112:18
  120:12 122:8
  123:17
Hendricks 77:16
  78:16

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

152

hereunto 144:10
hesitate 7:11
hey 86:4
he's 10:10 13:22
  27:21 49:4
  54:20 56:22
  60:16 65:6
  70:20 71:3 74:9
  82:4 92:1 99:16
  103:22 113:4,7
  113:7 125:2
  126:20 127:4
  139:18
high 103:19
highly 103:18
hit 113:15 118:15
  127:11
hitting 17:13
  27:19
holding 60:4 61:9
holiday 34:5
  45:20
home 36:6 39:4
  47:11,12 48:5
  49:4,9,20,22
  56:7 71:11
  82:15,16,22
  83:22 84:12,14
  84:18 88:3
  95:11 97:18,19
  98:2 103:14,18
  103:19 105:5,9
  105:11,16,18,22
  105:22 112:6
  115:8 119:16,18
  121:12 122:14
  123:4 124:1,2
  127:5 129:13,15
  129:18 130:4
  132:20 136:5
Homesley 5:12
homework
  103:14,16,22
  104:12 105:5,6
  105:16 106:1
Hospital 122:16
  122:18 127:8,9

127:17,20 134:4
  134:6,16 135:2
  135:6,14,16
  136:16
hour 131:8
  139:10 140:4
hours 126:19
  139:13 140:5
house 48:4 50:6
  82:21 86:12
  104:1,2 119:5
  119:22 120:3,4
  120:5 123:6
  124:3,18 125:3
  125:20 126:4,9
  127:5
huh-uh 6:18
hundred 87:5
hurt 113:17,18,20
  117:4 136:7,8,8
hurting 136:9
husband 12:18,20
hyperactivity
  17:2
H-A-W-K-I-N-...
  84:22

I
idea 139:3
identification
  8:10 42:3 66:20
  114:1,11
identified 7:22
identify 7:21 8:8
immediately
  71:18 86:20
  137:8
implement 21:8
  26:21 27:8
implementation
  24:8
implemented
  22:18,21 30:4
imposed 130:4,6
impossible 56:17
incident 119:13
  121:15
inclined 33:15

83:10
incorrect 77:5
increase 94:11
INDEX 4:1
indicated 38:3,5
  137:4
indicating 110:14
individual 14:19
  16:18
individual's
  30:13
inform 50:7,8,11
  97:16
information 77:7
informed 50:4,12
  86:20
informing 48:3
  69:9 88:18
initial 54:6 57:6
  57:15 99:8
  110:9
initially 28:1
  52:13 57:7 96:5
  105:12 107:12
  108:8 131:22
initiated 25:7
injure 117:3
instruct 46:2
instructed 55:4
  62:2
instructions
  31:11 33:22
  53:7
instrument 5:19
intend 113:20
intentionally
  67:13
interest 144:8
intern 82:4
introduced 85:6
investigating
  127:5
involved 32:20
  66:10 112:14
involvement
  120:22
isn't 7:13 66:6

it's 16:4,5,6 20:4
  20:21 29:18
  33:15 34:19
  60:17 62:3
  64:13,14 70:19
  73:22 74:20
  80:7 81:12 85:4
  86:5 99:22
  103:19 105:19
  107:4,21 114:7
  116:5 117:9
  120:16 123:8
  125:15 133:2
  139:6
Ivy 14:7 44:22
I'd 114:20 116:3
  127:12,12 139:5
I'll 77:4 96:17
  115:4 132:18
I'm 5:9,13,19,20
  6:1,9,10,19,22
  7:1,5,5 12:21
  13:4 18:11
  20:19 21:5 23:7
  23:12 29:20
  33:15 40:3
  42:22 43:8,8
  49:8 51:15,15
  53:12 59:21
  60:1 67:2,11
  69:16 71:16
  74:19,21 75:16
  76:8 77:5 79:17
  80:1,10 81:11
  81:13 82:3
  83:10,20 85:2
  89:4 90:12
  91:18 94:21
  95:9,19,19
  96:20 99:13
  100:2,3,7,12,13
  100:14 106:7
  107:8,8 109:18
  110:5 111:12
  113:6,20 114:6
  114:20 115:1,19
  116:6 119:6

120:7 126:6
  129:11 131:17
  131:17 132:21
  134:3,14 135:11
  135:19 138:18
  139:13,19
I've 7:13,22 8:15
  99:21 112:17
  115:13 118:3
  120:15

J
Jacqueline 16:20
  22:14
January 1:15
  13:16 144:11
job 1:20 92:3,6
  133:5
joined 82:3
Jones 3:10 8:1
  10:9 22:5 82:2
  118:4 128:5
journal 40:22
  41:8,12
judge 46:13 116:6
  130:1,2 133:16
Julie 46:13
July 43:2,11
June 134:13

K
Kaiser 16:17 20:2
  56:3,10 57:8,12
  57:21 74:7
  133:11
Kamel 3:20 82:4
Karen 3:3,4 8:6
Kaurbinder 20:1
  21:6 56:3,14
  61:13 74:7
keep 41:10 50:6
  50:16,21 86:8
  113:5 120:2
Kensington 16:17
  56:10 133:11
key 103:19 124:2
keys 124:4,16
  125:4,21

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

153

kicked 54:15
125:16
kid 33:8 36:13
48:17 77:18
104:21 120:2
kids 16:5 17:13
24:6 27:20
29:17 35:10
52:6 62:20 65:5
69:4 70:20 71:6
76:10 79:13,13
102:22 103:1
108:16 123:8
137:22
kind 118:20
kitchen 113:2
121:6,10,18
knew 37:17 49:1
49:3 71:6 121:8
121:8 125:12
know 6:11 7:3,11
13:17,20 14:1,5
21:1 27:7 29:20
34:11 35:8 37:4
38:17 39:13,16
40:20 41:4 45:2
45:5,9,18 48:16
48:17 53:10
64:11,12 68:13
71:7 78:15,16
79:1,8 81:1,4,9
84:20 85:2,5,8
86:12,13,22
87:13 88:9,12
91:21 92:6,11
92:12,14,15,17
92:18,22 95:16
96:9 100:1,11
100:13 103:18
108:17 109:18
110:3 112:9
113:8,13,19,22
114:6 115:1,11
116:4 120:16
121:20,21,22
124:12,13
125:13,19

127:17,18
128:17 129:14
131:21 132:11
132:13,22,22
133:16 134:2,3
134:15,22 137:2
137:10,10
knowing 61:9
93:16,20
knowledge 22:17
44:2,21 62:4
81:6 90:9,14,18
91:12,20 95:8
100:10,15
known 29:17
94:18
knows 45:5
K-A-U-R-B-I-N...
20:5

L

lack 35:9
ladies 7:10
lady 96:8
lasting 59:5,19
60:8,13,15,17
late 48:3 49:19
86:6 104:5
105:22 112:4
139:10,11
Laurel 13:22
Laurie 1:22 2:17
144:4,16
Law 3:4
lawsuit 78:3
lay 6:1
Leading 117:21
learn 24:10 67:21
94:10
Learning 15:17
23:4,17 28:18
29:7,14 32:5
leave 48:4 52:20
62:12 92:6
119:21
leaves 119:5,6
leaving 13:2
50:16,22 70:17

70:18 103:22
104:2,4 120:6
138:1
left 13:3 84:18
105:3 122:14
123:20
legal 43:21 44:5
126:12
legally 126:14
letter 21:5,9,10
letting 113:7,19
Let's 22:6 40:14
41:22 49:13
132:19
lie 136:6
life 113:17
limiting 90:12
Linda 1:4,6,13
2:2 5:2 8:4
10:15 140:19
141:4
line 5:22 9:11
67:10,11 106:6
142:4 143:4
list 103:19
listed 79:4
listen 36:1 91:7
listened 74:8
litem 101:10,13
101:21
litigation 8:3 18:2
little 15:13 18:13
23:18 28:7 31:3
33:7 36:7,14,15
40:3 57:3,3 58:3
80:22 86:6 88:5
91:9 111:10
136:3 139:10
live 12:7
lived 13:13 79:11
139:4
lives 80:1 124:9
living 79:22
located 37:5
133:10
locked 124:5
locker 105:4

logged 111:1,2
logo 85:18
long 7:12 11:1,8
11:17 12:2 14:8
59:5 60:8,15
131:6,11 134:1
135:5,7 138:7
140:6
longer 25:6 49:1
49:3,6 53:21,22
55:5 82:3 83:8
84:14 99:11,13
113:8
look 28:22 67:4,9
86:7 121:12
looked 120:12
looking 40:16
42:20,21 46:11
49:8 72:6 76:8
76:18,19 92:6
100:14
looks 33:7 76:19
lose 111:19 119:3
losing 112:1
loss 71:19
lost 95:19 111:7
117:18
lot 26:17 35:5,22
36:10 54:14
66:11 102:22
103:2,10,17
104:22 120:16
120:21 121:4
lots 17:6 23:21,22
82:21 102:6
lovable 36:8
love 36:12
loved 34:18
loving 36:13
lower 103:7
lowered 103:6
lunch 59:16 66:18
81:22 82:1
91:16 139:10
lying 121:17

M

mad 112:12 120:4

Magistrate 46:13
114:13
Magistrate's 4:15
Mahlman 133:9
Mahlman's
133:10
maintain 29:11
making 10:5
94:22 110:8
120:9
man 95:4
mandate 130:9
manner 112:21
117:3
March 109:12,13
109:20,21 110:4
144:12
Marcia 5:12
marked 8:10,13
42:1,3,7,9 47:18
66:20 67:2
114:1,4,7,10
Mary 5:11 63:13
63:14 67:13
77:6 138:4,5
Maryland 13:22
16:17
MasterCard
85:18
material 82:8
96:19
matriculate 23:19
28:3,13 31:15
36:21
matter 33:5,6
46:17 79:10,18
80:2
may 12:17 13:4
29:4 35:20 62:2
62:11,16 68:8,9
71:7,14,16
72:21 76:16,19
77:21 84:10
85:7 86:14,15
86:17,21 88:2
88:22 89:1 90:7
93:2 95:3 98:6

Case 1:07-cv-00882-JR    Document 46-2    Filed 02/28/2008    Page 154 of 260
DEPOSITION OF LINDA FAY TOMONIA, VOLUME
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

154

98:10 99:6
105:3 106:6
109:16,17
111:20 112:15
122:10 128:13
131:13,16
132:20 134:13
137:11
ma'am 5:16 7:18
8:19 10:13,18
10:20 11:5,9,12
11:18,21 12:5
12:13 13:15,20
14:18 15:13
42:6,20 43:6,20
44:18,20 46:16
48:20 49:17
50:11 67:2
111:10 120:10
McDonald's
79:18 80:4,6,13
McKinney 16:20
16:22 18:14
22:15
McManus 14:7,9
44:22 45:2,5
mean 19:6 26:6
26:16 31:21
33:7 37:20 47:6
50:2 51:12 59:6
62:4 71:4 78:7
89:16 90:2,20
99:10 102:6,12
103:21 104:14
115:8 116:22
117:21 123:14
125:1 128:21
131:8,8 132:8
132:16 135:7
137:21 139:9
meaning 7:13
56:22
medical 57:11
medicate 56:15
56:20,22 58:1
58:17
medicated 57:7

medication 38:5
48:8 55:11,13
55:15,17,19
56:5,6,11,12,18
56:20 57:10,21
58:8,14,15,19
58:22 59:2,5,8
59:16,18 60:3,6
60:7,13,15,17
61:7,8,10 74:2,4
medications
59:10 61:5
medicine 74:12
meet 26:8
meeting 99:6
108:4 137:5
meetings 24:12
24:13,14 26:3,4
36:2 60:1 96:13
member 51:19
members 75:20
memory 99:20
Mental 133:11
mention 51:19
104:14
mentioned 51:3
59:4
merely 82:4
met 97:12 124:8,9
middle 134:11
139:19
mind 116:7,9,14
116:16 127:10
mindset 128:3
mine 42:9 49:7
79:11
mine's 82:21
minor 1:5
minutes 66:17
87:4 113:8
121:21 139:11
missed 59:11
71:15,16 80:10
100:22
missing 45:11
72:1 83:2,15,21
84:3 112:5

Missouri 80:2
mistreated
102:20
mixed 77:14
mom 86:9,16
87:20 91:18
119:7
moment 9:15
mommy 36:12
113:11 120:14
136:6
Monday 45:20
58:12,13 73:1,8
126:17
money 85:20,21
91:16 119:8
monitor 59:12
month 74:16,16
84:8 132:14
135:11,11,15
136:15
monthly 24:12
months 22:12
48:6 57:1
mood 91:17
morning 5:7,8
58:9,10,11,15
73:8 86:4,5
91:14 119:21,22
120:5,6 124:21
125:20
Mornings 112:17
mother 1:5 8:5
43:1,10 44:8
46:4
motion 47:13
motivation 34:17
moved 51:1 113:9
113:11

N
N 3:1 5:1
name 5:9 10:14
14:5 16:18
25:11,12 28:10
29:3 30:12
46:13 60:10
62:10 63:10

71:21 73:16
78:15,16,21,21
79:16,17 96:9
96:11 98:5,9
122:17 133:7
138:5,6
names 71:6 77:14
88:12
necessarily 116:3
need 7:6,10,10
75:10 76:12,13
76:20 81:14
91:10 107:1,2
108:12,17
120:12,17
needed 60:7 72:7
102:14 121:1
123:2,5
needs 29:18 35:10
76:9,9,11 77:19
79:13 91:9 93:9
93:9,11 99:18
99:19 107:1
108:10
neighbor 79:11
79:20
neighbor's 79:16
81:6
neither 144:7
never 48:3 65:20
108:4 111:15
112:11
new 36:17 121:10
nice 76:3
Nigerian 28:11
night 49:11 50:2
50:2,3 84:15
112:4 119:11,19
123:19 124:11
nights 124:20
nods 6:18
non-responsive
100:8
normally 111:5
Northeast 124:14
Northwest 2:7 3:5
3:13 10:21

11:16 12:1 17:5
37:8 124:14
notarial 144:10
Notary 2:19
144:3,16
note 25:5 94:15
noted 44:16 116:1
notes 39:20 40:22
41:8 46:12,14
notice 2:17 4:11
8:20 9:1,4,11
57:2 58:3 93:3
97:22
noticed 139:6
notices 100:16
106:4
notification 92:8
106:8,9
notifications
52:18 106:11,20
notified 53:20
54:3 68:15
92:16
notorious 77:7
November 4:13
42:14 44:12
46:12 78:13
number 12:9
13:17 79:3,4
99:2 124:7,12
nurse 60:3,10
99:8

O
O 5:1
Oak 45:17
oath 5:3
object 115:19
128:1
objection 116:1
127:21 128:16
observed 88:19
observing 82:4
obtained 101:22
occasions 50:20
58:16,18 90:7
98:11 102:7
105:7,8,9 122:6

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

155

occur 92:10
occurred 25:2,3
  32:15,17 33:11
  34:5 47:5 108:4
  119:13 129:12
October 13:8
  49:21 84:10,11
  104:6 108:11
  109:18 110:6,7
  110:10 123:11
October/Nove...
  48:17,19
ODD 18:16 38:6
  56:1
office 2:5 3:4,11
  5:10 8:3 9:5
  26:17 27:2,3,3,4
  27:5,16,18 53:3
  54:9 72:10
  75:19 76:17
  87:15,17 88:9
  88:10 97:15,16
  97:20 98:8
  102:10 133:10
officer 121:10
  144:4
officers 121:8,11
offices 2:4
officials 40:19
oh 7:19 39:5 63:4
  64:12,13 65:2
  74:17 80:6
  82:18 88:11
  89:13 118:10
  136:1
okay 5:18 6:14,15
  6:20,22 7:7,8,14
  7:15 8:19 10:4
  13:6 15:22 16:9
  17:16 19:13
  23:10,12,15
  27:1 29:12
  40:13 42:17
  43:5 44:1,5,16
  46:9 48:11
  49:17 50:1 52:1
  53:17 54:12

57:2 60:5 61:12
  63:12,14 66:19
  67:8 69:7 72:17
  73:21 77:1 83:8
  86:11 87:20
  90:10 91:2,9
  94:2 95:13 97:8
  97:14 107:22
  110:20 117:15
  119:2 120:12
  122:20 123:21
  124:14 125:19
  127:19 128:14
  133:6 135:1
  138:7 140:15
old 121:11 124:8
  125:5
older 81:1
Once 34:18
ones 9:16,19,21
ongoing 114:16
online 39:17
open 7:13 26:8
  62:3,5,17,21
  69:2,5 70:19
  75:19 88:5
  136:13
opportunity 46:5
  66:12
opposed 34:10
opposition 34:20
  56:20
Oppositional
  18:16
oral 4:11 6:20
  8:21 9:4,11 20:7
  108:19 109:7
ordeal 130:20
order 4:12,15
  10:2,3,4 42:13
  42:17,20,22
  43:9 44:2,11,11
  46:11,11 47:18
  114:7,13,16
  133:21
ordered 42:22
  43:9,16 133:17

orders 9:17,17
  130:4,6
outcome 144:9
outlines 9:1,5
outright 36:18
out-of-control
  134:17
overall 48:9

P

P 3:1,1 5:1
pack 105:3
page 4:2,10 67:4
  67:9 77:3,4
  114:20 142:4
  143:4
Pages 1:21
papers 41:10 63:6
  64:19 65:9,10
  65:12,14,15,16
  65:18,20 73:3
paragraph 42:21
  67:10,11 77:2,4
parent 32:21 33:7
  48:3 56:15 58:2
  104:18 121:9
  138:18
parenting 130:8
  130:13,14,17
  131:1,2
parents 14:4,6
  33:4
parent/child
  122:22
parent/teacher
  111:17
Paresk 101:14,21
Park 15:15 38:21
  38:21 39:3 50:5
  52:3 55:20 63:4
  63:7,8 64:12,19
  65:14,15 66:1,2
  69:15 71:14,15
  71:17 72:6 73:1
  73:5,6,14 74:4
  75:5 84:14
  90:13
Parker 5:12

part 52:10,11
participant 47:14
participating
  47:12
particular 49:10
  64:20
parties 14:20
  144:8
pass 13:7
passed 12:19
Patricia 3:10 8:1
pending 7:13
people 99:21
percent 6:9
period 25:21
  43:17 53:1,2
  54:8 57:13,16
  62:11 83:13,17
  83:18 84:13,17
  96:7 105:15
  123:2,6,22
  132:13
periodically
  79:19
periods 15:19
Permanente
  16:17 20:2 56:3
  56:10 57:8,12
  57:21 74:7
  133:11
permission 48:4
person 30:15
  48:16,22 49:2
  85:5 88:14 98:7
personal 121:7
person's 84:3
  96:11
pertaining 47:17
phone 79:4
  110:12 120:9,9
phrased 29:18
physical 117:7
physically 50:19
  50:20 118:14
pick 19:17 34:3
  54:10 82:22
  90:22 95:5

102:14 119:12
  119:14 124:7
  140:16
picked 32:13 35:5
  39:17 91:5,14
  112:19 127:2
picking 33:8
picnic 32:21
pill 57:4 58:5,10
Piney 37:8
pinpoint 84:9
place 6:1 27:10
  30:21 32:7 51:6
  62:2 64:3,10
  70:14,21 71:4
  72:6,9 101:4,5,6
  113:4 123:1
  124:14
placed 46:22 47:3
  47:7 136:18,20
plain 124:19
plainly 54:20
Plaintiffs 1:7 3:2
plan 19:4,5,6,7,19
  21:8 22:18 24:8
  25:7 26:21 27:8
  27:10 30:4,18
  32:7 37:18,18
  38:4,4,8,9,11,12
  38:13 40:6,10
  41:2,6 55:13
  62:5 64:5 74:22
  75:9 107:2,6,12
  107:14 108:1
  139:8
planning 66:14
play 34:5
pleasant 133:2
  135:20
please 7:11 10:13
  22:4 42:1
  100:13
point 12:15 19:16
  35:14 44:10
  51:3 65:8 70:18
  72:15 87:6 88:2
  94:20 120:2

124:10
points 19:17 91:1
police 48:5 50:12
50:12 80:8,12
82:16 83:1,15
83:21 112:4,14
112:15,18
119:16,18
120:22 121:5,8
122:6,7 124:4
126:18,22
pool 119:10,12,14
posed 28:2
position 133:5
possession 20:22
possible 5:21 59:7
possibly 93:8
predicament
136:7
preliminaries
73:7
prescribed 56:2
56:11,13 57:7
57:11,20
prescriptions
56:4,8
presence 121:18
present 3:18 34:6
38:20 39:2
42:17 75:17
76:14 97:16
136:10 138:19
presented 19:2
22:10 65:13,15
presently 12:5
43:20 44:5,20
45:14
pretty 32:2 33:15
64:20 103:11
117:18
prevalent 31:9
previous 37:16
40:5 41:21
59:10 75:2
previously 107:5
107:11
primarily 26:10

primary 98:7
principal 26:8
28:21 29:3
35:19,20 62:13
63:9,15 64:20
65:1 72:2,13
77:6 96:6,6
97:12 106:16,17
106:19
principals 15:1
principal's 27:18
62:10
prior 9:9 11:4,11
11:20 13:8
14:15 15:14
30:6 37:13 39:7
41:17 84:11
85:7 86:16 90:4
104:2 131:12,12
132:15,15
138:22
private 16:3,4
17:4 24:5 29:15
87:19 103:11
prize 19:18
probably 39:16
45:20 74:18
76:10 89:18
98:22 103:11
124:20 140:3,5
problem 7:12
59:9,14 65:3,6
66:8 93:18
104:3,7,20
105:11 122:16
123:13 127:6
problems 23:21
23:22 24:1,11
24:19 30:18
31:5,7,9 36:7,14
36:15 54:14,17
60:4 61:11,14
66:3 77:18
79:12,14 82:15
89:11 96:3
Procedure 2:17
proceed 22:6

116:2
proceeding
126:12,13
proceedings
129:20
process 40:4 41:5
55:9 78:13
108:18 109:1
production 20:20
21:3,16
Professional 2:18
144:4
program 52:9,14
52:16 53:22
54:7,16 55:2,5,6
82:20 83:4,6,9
programs 67:14
progress 34:11
59:13
progressing
59:22
promised 121:12
promises 121:20
promoted 28:4,16
prompted 47:15
47:21
propose 99:15
protective 43:1
43:10 44:13
provide 22:8
36:10 37:14
38:1 41:15
58:22 59:3
74:11 75:11
76:13,13
provided 20:10
20:14,16 40:4
41:1,5,13 47:10
52:7 55:10,13
57:10 65:8 74:3
75:1 101:3,7,11
101:16
provoke 36:3
proximity 19:9,12
psych 136:15
psychiatric
133:13 135:4,6

136:16
psychiatric/psy...
133:20
psychiatrist
24:17
psychological
133:13
psychologist
24:17 25:6,9,16
public 2:19 14:22
15:14 16:2,7
18:8,10,20 19:1
22:19 24:21
29:15,16,21,22
40:6 73:22
144:3,16
pulled 120:1,3
purchases 85:19
purpose 46:21
52:4
purposely 105:3
purposes 7:21
8:14 42:8,11
56:21,21 58:1
67:3
pursuant 2:16 9:6
9:10 21:22
pushed 113:14
pushing 24:6
115:18
put 109:22 112:22
117:12
P-A-R-E-S-K
101:14
p.m 49:11 52:7
140:20

_____

Q

question 6:8,13
7:2,3,7,13,14
27:9 28:1 38:15
41:7,11 43:22
48:12 51:17
57:6 71:3 81:15
82:6 92:9 93:20
95:6 96:15,17
96:21 97:2
100:10,12

105:20 117:5,5
117:9 118:17
132:18
questioning 5:22
questions 5:14,20
6:10 7:1,17 45:9
46:5 90:12
100:14 116:7
132:17 133:5
quiet 113:13

_____

R

R 3:1 5:1 142:1,1
143:1,1
ran 79:13 113:2
119:15 126:8,11
rang 120:10
rapport 28:6
45:10
reaction 76:3,5,6
read 10:8 34:18
34:19 43:9 77:4
77:10 82:6
96:17 115:13
141:5
reader 103:12
readily 16:1 84:5
reading 43:3
103:10 104:14
114:21 115:12
reads 42:22 67:12
67:16 82:7
96:18
ready 125:21
126:6
realize 86:2
really 26:19 51:11
52:10 75:10
91:17 104:7
113:17,18
117:17 118:13
119:21 120:17
121:1,1 123:17
124:19 131:17
134:3 136:7,13
reask 7:7
reason 33:15
38:13 66:11

Case 1:07-cv-00882-JR    Document 46-2    Filed 02/28/2008    Page 157 of 260
DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

157

76:17 107:18
142:4 143:4
**reasoning** 88:2
**reasons** 26:5 90:6
**recall** 16:1,18
18:18 25:10,11
25:12 28:10
29:3,8 30:11,12
30:13 38:15
39:12,14 40:17
50:17 53:1 61:4
63:9 72:14,17
73:17 79:3 80:4
84:2,5,7 89:3
96:11 101:22
102:9 104:3
128:9,11 130:1
133:7,18 134:7
134:9 137:14,14
138:6
**receive** 21:19
52:17 106:8
**received** 65:10
**receiving** 17:12
94:9
**receptionist** 72:9
98:7
**recess** 40:1 82:1
127:14 140:1
**recognize** 8:15,17
42:15 67:5
114:10
**recollect** 71:13
**recollection** 68:3
108:11 110:9
130:20
**recommend**
100:1
**recommendation**
20:7,8,9,10,13
28:21 61:7 74:6
**recommended**
17:7,16 19:20
19:21 20:1
28:17,19 68:7
71:20 73:10
123:1

**recommending**
17:22 21:7
**reconvene** 81:22
**record** 6:14 7:18
7:21 8:19 9:18
10:8,14 42:2
82:2 94:15
118:15 139:12
144:6
**records** 37:16,21
37:22,22 38:5
39:20 40:22
41:11,20 101:3
101:7,9,11,16
102:1 110:11,14
110:17,20 111:4
**redirect** 66:11
**reduced** 144:7
**reenroll** 17:8,18
17:19
**referred** 16:22
30:20 90:10
134:5,15 135:1
135:5
**referring** 12:13
14:13 20:17
51:16 58:12
115:2
**refused** 36:1
**Reg** 119:8 120:13
122:18
**regard** 64:4 129:7
**regarding** 4:12
17:7 42:13
63:21 75:5
77:22 106:4
129:20 137:17
**Reginald** 3:19 8:5
8:8,9,9 12:14,14
13:3,11,14 19:7
26:9 29:2 30:3,6
30:20 35:4,6
36:6,8,8,12 38:3
41:16 44:21
45:8,10,19,22
46:7,8 47:14
48:15 49:8,22

51:10,12,14
52:22 54:14
59:10,20,21
61:10,14,22
62:3,5,17 63:6,8
63:16 64:6,15
64:16,19,21,22
65:1,3 68:8 69:3
69:6,12 70:10
72:4 75:9,11
76:9,11,11,16
76:18,21 83:2
83:22 86:4,9,21
87:13,17,18
88:2 89:16,19
89:21 90:2,8,22
91:8 92:4,5,5
95:11 97:17,18
97:19 99:9,13
99:14,19 100:5
100:21 101:1,10
102:18 103:4,9
103:13,14,17
105:1,1 106:22
107:3 108:8,9
108:14 111:8
112:3,6,7 113:1
113:6,14,15,19
117:16,16,18,18
118:12,14 119:4
119:17,20,21
120:8,13,16
121:2,6,10,12
121:16,19,21
122:11,20 123:2
123:12,16,21
124:4,15,20
125:1,4,9 126:8
126:14 127:2
129:4 132:19
137:4,5 139:7
139:14,18 140:8
140:14
**Reginald's** 13:2,6
17:7 40:5 47:2
48:1 51:9 62:18
63:18 72:7

80:22 97:10
99:18 112:16
123:10
**Registered** 2:18
144:4
**regular** 52:10
**reiterate** 106:22
**related** 144:8
**relating** 14:20
41:1 114:17
**relationship**
35:13 43:21,21
44:6 45:7 121:7
**released** 122:20
**relevance** 115:20
127:22 128:2,16
**relevant** 115:22
116:4
**remain** 10:2
115:7
**remainder** 102:14
137:4
**remember** 11:22
29:4 38:16 54:7
58:17 60:11
62:15 64:6,17
69:14,21 71:21
72:22 74:15
76:18 78:21,22
83:11 85:5 88:1
88:12 89:5,6,7
95:2 98:9 106:7
109:21 110:8
130:18 138:2,5
**reminded** 108:9
**remove** 33:11
97:18 102:5,7
**removed** 49:22
55:2 67:19,22
68:15 69:1,14
70:3,5 71:9,12
73:4 84:12 88:3
124:4 126:14,14
129:13,15,18
131:14 137:11
**removing** 130:3
**rendered** 15:5

135:15
**repeat** 90:15
108:21 137:21
**repeated** 109:19
109:22
**repeatedly** 67:16
80:21
**rephrase** 7:6 39:1
41:3 43:7 57:9
110:16
**report** 40:18
41:14 83:2,15
83:21,22 84:3,4
100:19 112:5
126:20 134:21
**Reported** 1:22
**reporter** 2:18 6:5
6:6,17 7:19 82:7
96:18 144:3,4
**reporter's** 140:12
**reports** 41:12
45:8 55:10,12
**representing** 5:11
**request** 20:20
**requested** 9:6
66:6 82:7 96:18
**requesting** 9:17
22:1
**reside** 11:5,8,11
11:17,20 12:2
15:19
**resided** 11:1 12:8
12:9,18 13:10
14:8 84:18
**resides** 12:6
**residing** 12:16
13:21,22 14:3,6
14:16 37:10
44:22 134:1
**resolved** 33:6
**respect** 60:14
83:15 109:2
110:5,18
**respected** 103:18
**respond** 5:21 6:13
7:14
**Respondent**

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

158

43:16
responding 51:16
response 6:9
responses 6:20
rest 97:19 137:9
result 17:22 18:2
 19:3 127:6
retained 4:9 8:11
 42:4 66:21
 114:2
retaliated 33:1,3
retract 125:12
retrieved 110:14
retrospect 126:22
return 55:4 88:4
 142:3 143:3
returned 32:6
 132:19
reunification
 47:1,4
reverse 87:5
review 111:4
reviewed 9:20,21
revisit 107:6
revoked 43:2,11
 44:10,13
rewarded 19:15
re-enrolled 69:11
 69:16 72:19
re-enrolling
 71:22
right 1:4 8:1 14:2
 18:12 22:6
 41:19 43:20
 44:20 63:11
 74:20 80:7
 94:19 95:1
 105:5 118:4
 125:18 128:5
 129:2 137:13
 140:17
rights 15:7,11
 44:8,9
Road 3:5 37:8
Rochelle 25:15
rocks 88:19
room 7:10

rough 98:22
 124:16
roughly 48:16
 91:19 97:7
rule 21:22
rules 2:16 6:1
 22:2
run 79:19 84:14
 126:19
R.T 1:5,5 67:14
 67:16

S

S 3:1 4:8 5:1
 142:1 143:1
safely 115:7
safety 47:2
Safeway 91:15
 94:17
SAIL 28:18,20
 30:3,6,8 34:22
 35:9 36:5 38:12
Sasha 123:6,7,13
 123:20 124:22
 126:21
sat 119:16
Saturday 119:4
 119:11
saw 34:11 127:19
 128:6,9 132:17
 133:8
saying 53:13 64:2
 70:2,3 76:18
 91:18 93:1
 99:12,14 105:19
 121:22 126:3
says 43:12,13,19
 67:4 99:16,22
 113:10 119:7
 127:7
schedule 139:15
 140:12,12
school 15:16,16
 15:17,20,20
 16:2,3,4,4,5,7,9
 17:4,8 18:6,7,8
 18:10,20,21
 19:2,21,21

20:15,16 21:7
22:11,19 23:2,4
23:10,11,17,20
24:5,21 25:21
26:8 28:18,22
29:7,9,14,15,15
29:16,22 30:1,4
30:7,9 31:2,8,10
31:19 32:5,5
33:10,12,17,19
34:1,2,22 36:6
37:14,15 38:19
38:22 39:3,6,7,8
39:18 40:21
41:21 45:12,14
45:16,19,22
48:5 49:11,14
52:6,10,11,15
52:19 53:14,21
54:9 56:17,18
56:21,21 57:1
58:1,18,20 59:6
60:10 61:3,11
61:17 62:17
62:3,5,16,20
64:13 65:21
66:10 67:12,20
68:9 70:11
71:10,20 72:1,2
72:20 73:11,13
73:14,15,16,18
73:20,22 74:5
74:10,13 80:20
82:11 83:5
86:14,15,20
87:11,12,14,22
88:1,4,18 89:11
89:12,14,15,21
90:17 91:12,21
92:1,2,3 93:13
93:14,17,19,21
94:3,4,7,11,12
94:13,15,21
95:4,8,9,10,14
95:17 96:4 97:3
97:4,6,7,8,11,18
98:13 99:3,5,17

99:18,19,22,22
100:4,20 102:5
102:8,17 103:11
105:2 106:12
107:13 108:16
108:17 111:14
112:18 121:13
122:4 125:10,22
126:2,6,7,19
136:21 137:2,7
137:12 138:11
138:13 139:4
140:10
schools 14:22
 15:1,15 59:10
 75:2
school's 52:14
screaming 113:17
seal 144:10
seat 27:20 60:22
seated 27:20
second 18:11,12
 23:14,19 24:20
 25:20,21 27:12
 28:3,8,14 42:21
 59:15 67:4
 69:19 73:16
 74:16 75:15
 83:11 91:5
 107:17 127:8
 139:22
Secondly 6:16
section 8:2 19:4,5
 19:6,19 21:8
 22:17 24:8,13
 27:8,9 32:7
 40:10 41:2,6,13
 67:16 74:22
 75:9
security 10:18
 13:17 89:2
see 6:4 9:13 39:7
 40:14 59:13
 61:14 70:6 86:9
 86:10,21 91:16
 113:9,10,11,12
 132:19

seeing 61:11 62:4
seek 129:1,3
seen 61:3
semester 75:15,16
 83:11 90:21
 91:3,5 107:7,16
 107:17 136:21
sending 98:2
sent 8:18 27:3,4,5
 27:16,18 93:13
sentence 77:5
September 61:17
series 132:16
seriously 59:7
 124:19
serve 107:3
 108:13
served 99:20
service 99:18
services 15:5 19:2
 43:17 47:9,11
 47:12,13 67:15
 93:10 135:14
session 132:7,9,14
sessions 132:12
 136:4
set 47:13 144:10
sets 125:21
setting 19:8 62:7
 68:8 69:3 70:7
seven 12:4 83:20
 139:13
severe 77:17
shakes 6:17
shared 123:3
sheet 141:9
shelter 123:8
Shepard 63:4,7,8
 64:12,19 65:14
 65:15 69:15
 71:14,15,17
 72:5 73:1,5,6,14
she's 54:13 96:9
 118:2
shift 124:6
shifts 123:19
shoe 115:14

Case 1:07-cv-00882-JR Document 46-2 Filed 02/28/2008 Page 159 of 260
DEPOSITION OF LINDA FAY TEMORIA, VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

159

118:16
**short** 36:1 40:1
  127:14 140:1
**SHORTHAND**
  144:3
**shortly** 130:19
  131:13
**show** 38:11
**showed** 55:10,12
**showing** 34:11
  41:16 42:6 67:2
  114:4
**sick** 62:12 96:7
**side** 113:15
**Signature** 140:18
  141:13 142:22
  143:22
**signed** 141:9
**significantly**
  103:6,7
**simply** 120:1
**singled** 103:2
**sister** 125:6,7,10
  125:11,19
  136:18 138:4,5
**sit** 19:9 51:1
  91:10 96:12
  108:17
**situation** 62:22
  72:4
**six** 98:22 100:16
  106:4,7
**sleeping** 119:6
  120:7
**slow** 95:20
**small** 113:3
**snicker** 36:2
**social** 10:18 13:17
  50:13,13 111:12
  111:13 122:21
  137:7,8 138:17
**somewhat** 31:3,4
**son** 1:5 12:11,12
  12:14,15 13:11
  13:14,20 14:3,6
  14:8,16 15:5,14
  15:16,19 16:10

16:13,16,19,21
  17:17,19 18:1,5
  18:6,14,19 19:3
  21:7 23:2,11,18
  24:10 25:22
  28:2,13,19 29:4
  29:6 30:21 32:3
  32:6 33:6,8,8,10
  33:13,17,20
  34:3 36:20 37:1
  37:13 38:1 41:7
  43:22 44:6 45:2
  45:6,11,14 47:3
  50:16,21 52:13
  52:19 53:21,22
  54:4,4 55:1,4,9
  55:17,19,22
  56:12,15 57:7
  57:10 58:7,13
  58:15,22 59:6
  65:17,22 66:3
  67:19,21 69:9
  74:4 76:7 77:16
  77:18 78:1,19
  83:16 84:13,18
  85:10 86:1,2
  87:7 88:18 89:9
  90:5,11,16 92:6
  92:15 93:9,13
  94:10,14 95:5,9
  98:12 105:5,17
  109:2 111:19
  117:22 118:15
  118:18 119:3,3
  122:1,3 127:16
  127:16,20 129:7
  134:1,15,20
  135:1,5 136:17
  137:17 138:7,10
  138:15,19,22
  139:3 140:6
**son's** 13:15 24:20
  26:5,11 30:9
  31:1,18 32:10
  34:7 37:15
  38:22 63:21
  74:2,12 82:15

89:11 95:8
**sorry** 12:21 13:4
  18:11 23:7
  51:15 80:10
  95:19 96:20
  107:8 114:6
  115:1
**sort** 10:2,3
**South** 2:6 3:12
**space** 76:12,13
  88:6
**span** 70:13
**speak** 7:10 26:19
  34:21 54:10
  95:18 97:5 98:8
  102:16 106:14
  106:15 135:13
  135:22 137:16
  139:1
**speaking** 6:7
  106:19
**special** 19:2 25:8
  25:12,16,18
  29:17 35:10
  77:19 79:13
  93:9 96:10 99:7
  107:1 108:10
**specific** 70:11
  84:2 100:11,14
  100:15 135:2
**specifically** 15:15
  17:11 18:18
  25:1 27:17
  30:15 34:13
  38:8,16 39:12
  40:17 49:2
  53:16 55:14
  58:17 60:6,7,9
  60:19 61:4
  62:16 67:8,10
  68:13 70:9,15
  80:16 86:13
  92:15 98:1
  128:11 138:2
**speculate** 7:5
**spell** 20:3
**spelled** 84:21

**spend** 26:13
**spending** 27:2
  136:15
**spent** 25:4 26:17
  103:5 122:3
**spoiled** 76:11
**spoke** 30:11 32:22
  39:12 107:12
  138:2
**spoken** 56:14
  71:1
**spring** 89:4,7
**squeeze** 139:14
**St** 128:7,7,15,20
  129:8 134:2,4,5
  134:18,21 135:3
  136:21 137:16
  138:3
**stabilize** 48:7
**staff** 30:8 34:21
  35:11 37:14
  38:1,17,21 39:2
  39:13,13 40:5
  50:5,7 51:19
  52:18 53:3,20
  57:11 58:21
  59:2 66:1 69:8
  74:3,11 75:4,20
  87:15 88:9,10
  97:15,16,21
  98:4,4 102:4
  108:9 123:14
  135:13 138:1
  139:1
**Stafford** 124:9
  136:19 138:8
**standing** 50:18,19
  60:22 76:16
**start** 10:1 27:1
  48:11,13 60:2
  61:20 73:7
  90:20 94:21
  104:4 107:5
  114:21 132:7
  140:17
**started** 49:21
  51:12 52:15

83:5 91:6 94:9,9
  96:5 99:3
  105:12,12 108:8
  120:8 131:10,22
**starting** 32:18
  43:4 94:16
  132:6
**state** 10:13 81:3
  115:21 116:7,9
  116:14,16
**stated** 12:18
  17:16 27:7
  39:10 40:4 41:4
  44:21 47:9 53:8
  54:20 55:8 65:8
  74:22 82:14
  95:13 98:18
  100:15 106:3
  109:1
**statement** 60:18
**statements** 77:21
  111:2
**STATES** 1:1
**station** 122:7
**statutory** 15:6
**stay** 36:10 49:18
  124:8 136:14
**stayed** 124:18
**staying** 27:20
  48:3 104:5
  105:22 113:4
**stems** 125:18
**stenographically**
  144:6
**stipulate** 16:6
  78:12
**stipulated** 44:14
**stole** 85:11
**stood** 50:21
**stop** 89:19 95:5
**stopped** 48:9
  52:19 91:15
**stopping** 122:7
**straight** 71:14
  103:13
**straightforward**
  5:18

Case 1:07-cv-00882-JR Document 46-2 Filed 02/28/2008 Page 160 of 260
DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

160

| | | | | |
|---|---|---|---|---|
| street 2:7 3:13<br>12:1,3 13:12<br>14:1 64:14<br>71:20 73:11,13<br>80:1,7,9,14<br>stressed 131:15<br>strike 100:7<br>116:21,22<br>struck 115:14<br>116:20 119:2<br>structure 36:10<br>struggle 28:15<br>stuck 124:2<br>student 32:20<br>38:3 41:16,17<br>77:17 81:18<br>103:10<br>students 32:20<br>35:8 52:8 77:8<br>79:7 82:10<br>submitted 65:19<br>subsequently<br>72:19<br>substance 97:2<br>successfully<br>23:19 28:2,13<br>31:15 36:20<br>sudden 34:18<br>suggested 18:4<br>suitable 62:6 84:1<br>suited 29:1<br>Sum 97:2<br>summer 22:12<br>39:7 57:1 79:14<br>138:9,10<br>Sunday 119:11<br>supervision 35:9<br>43:1,10 44:13<br>144:7<br>supervisor 8:2<br>support 33:10<br>64:15<br>supportive 26:9<br>51:10 78:18<br>123:15<br>supposed 39:4<br>58:7 59:3 | supposedly<br>120:19<br>sure 6:1 10:2<br>23:12 47:14<br>53:12 71:16<br>74:20,21 75:16<br>80:1 87:1 89:4<br>94:22 95:10<br>106:7 109:18<br>110:2 122:5<br>129:11 131:17<br>131:18 132:22<br>134:4,10,14<br>135:10,12,19<br>surface 87:21<br>surprised 51:11<br>survive 19:8 69:6<br>suspend 91:1<br>suspended 25:4<br>25:20,22 33:13<br>33:17,20 59:21<br>80:21 81:19<br>82:11 89:17,22<br>90:2,5,8,9,12,14<br>90:17,19 91:13<br>91:18,19 92:5,8<br>92:15 93:14<br>94:10,17 95:3<br>98:13 108:9<br>125:10,11,13,14<br>125:15,17,19<br>126:7,8 137:3,9<br>suspending 98:1<br>suspension 26:7<br>34:5 82:20 90:3<br>90:4,18 93:3<br>97:22 106:11,20<br>suspensions 26:5<br>26:10 60:2 91:4<br>91:6 92:13 93:2<br>95:8,15,16<br>98:18,21 100:17<br>100:18 106:5,10<br>109:19,22<br>sweetheart 126:7<br>swimming 119:7<br>119:9 | sworn 5:3<br>system 19:16<br><br>**T**<br>T 4:8 142:1,1<br>143:1,1<br>table 113:2<br>Taft 73:18,19<br>99:17,21<br>tail 76:12<br>take 6:6,17 7:6<br>10:10 25:14<br>28:22 51:6 57:4<br>58:5,7 62:15,16<br>63:2 64:11<br>66:17 73:4,9<br>81:16,21 94:12<br>95:9 97:18<br>99:17 100:2<br>101:4,5,6 105:1<br>106:16 109:16<br>119:9 120:17<br>121:1 122:15<br>124:16 127:7<br>taken 2:16 22:11<br>25:7 40:1 82:1<br>85:4 86:2<br>112:17 122:11<br>127:14,16,20<br>140:1 144:5,6<br>Takoma 15:15<br>37:3,4,13,15<br>38:21,21 39:3<br>40:5 41:10<br>48:15,21,21<br>49:14 50:5 51:7<br>51:19 52:3,18<br>53:20 55:9,20<br>57:18 58:22<br>59:2,4,16,17,18<br>61:5,11,16,22<br>62:2,20 63:15<br>64:2 65:4,7,11<br>65:22 66:1 68:8<br>69:4,8 71:9,19<br>71:20,22 72:5,8<br>72:16,18 73:2,6<br>74:4,12 75:5 | 77:6,17 81:19<br>82:11,19 83:19<br>84:14 89:10<br>90:13,17 93:19<br>93:22 98:13<br>100:6 102:2,4<br>103:8 117:19,22<br>118:9,10,18<br>119:14 137:6,6<br>Takoma's 50:7<br>talented 6:5,16<br>talk 46:3 51:9,13<br>59:12 99:21<br>100:2 108:6,7<br>112:10 117:17<br>118:13<br>talked 51:11<br>56:18 75:8<br>77:15 87:19<br>102:18 108:1,5<br>121:3,16,18<br>122:22<br>talking 17:14,14<br>24:4 27:20<br>31:10 36:11<br>57:13,17 60:22<br>61:18,19 69:11<br>69:16 71:5,8<br>110:5 124:3<br>tantrums 36:16<br>taxi 88:19<br>teach 99:13<br>teacher 19:9,12<br>26:22 27:8 28:5<br>28:7,10 70:21<br>71:1,8 102:21<br>teachers 17:14<br>24:15 26:18<br>27:21<br>teaching 30:7<br>team 24:12,13<br>26:4 75:10<br>107:2 108:3<br>telephone 79:3<br>telephoned 102:4<br>102:7<br>tell 30:15 35:2 | 53:5 68:5,14<br>92:4 95:1 96:14<br>102:11,19 112:7<br>115:4 125:11<br>135:18 136:2<br>137:19<br>telling 79:14<br>121:14,15<br>Temper 36:16<br>temporary 123:8<br>ten 26:2 113:8<br>terms 34:17 36:18<br>37:20 75:11<br>testified 5:3 97:3<br>107:5,11<br>testimony 96:2<br>107:20 141:6,7<br>144:6,6<br>testing 130:8,12<br>130:13 133:17<br>that's 6:21 15:8<br>15:12 16:4<br>22:16 28:11<br>39:8 43:12<br>44:14 45:1<br>46:15 47:17<br>59:1,14 73:8,19<br>75:3 81:21<br>82:18 88:7 92:7<br>92:14 95:6<br>98:22 100:1,21<br>104:10 106:2,2<br>109:3 114:15<br>134:22<br>therapist 121:3<br>there's 59:13<br>80:13 86:12<br>110:13 127:3<br>they're 108:15,15<br>they've 127:1<br>thing 33:9 41:17<br>62:18 105:21<br>127:1 133:1<br>things 35:6 36:13<br>36:18 51:12<br>78:20 103:1<br>111:5 112:12 |

Case 1:07-cv-00882-JR    Document 46-2    Filed 02/28/2008    Page 161 of 260
DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

161

| | | | | |
|---|---|---|---|---|
| 113:4,21 118:16 | 84:1,10,11,17 | 62:8 64:10 65:2 | 58:18 65:7 | **underlying** 47:22 |
| 123:3 135:21 | 85:10 86:12 | 65:3 68:22 69:1 | 105:4 114:20 | 48:1 |
| 137:20 | 88:3,17 89:9 | 70:15 72:8,14 | **turned** 104:13,16 | **understand** 7:3 |
| **think** 26:19 29:18 | 90:2,13 91:10 | 90:22 93:5,6 | 105:17 125:6 | 10:7 53:12 |
| 31:3 35:5 40:6 | 91:19 92:4,12 | 94:17 97:22 | **Turner** 138:14,15 | 100:12 105:19 |
| 40:14 49:10 | 93:7 94:16 95:3 | 98:3,10 108:14 | 138:20,22 139:2 | 133:4,4 |
| 62:9 73:3,5 74:9 | 95:7 96:7 | 112:12 124:22 | **turning** 105:6 | **understanding** |
| 75:10,14 103:10 | 101:12,14 102:3 | 136:4 137:8 | **twice** 84:4,6 94:8 | 26:18,20 29:20 |
| 107:16 110:2,3 | 102:16 103:5 | **tolerate** 55:7 | 109:17,21 110:8 | 29:22 107:4 |
| 116:4 120:22 | 104:11 108:12 | 99:11 | 110:8 | **understood** 46:7 |
| 121:17 123:2 | 108:14 111:7 | **Tomonia** 1:4,6,13 | **two** 15:22 23:7,7 | 123:16 |
| 133:1 135:19 | 113:16,18 | 2:2 3:19 5:2,7 | 23:13 32:19 | **UNITED** 1:1 |
| **third** 18:11 23:15 | 117:16,21,22 | 8:4,5,7,9,9 9:15 | 35:22 43:18 | **unknown** 111:6 |
| 23:16,16 28:14 | 118:9,12,17 | 10:15,16 45:22 | 48:6 53:2,13 | **unprofessional** |
| 29:6 31:2,8,16 | 119:15,19,22 | 46:8 90:5 | 58:18 70:2 | 35:22 |
| 31:19 33:16 | 120:17 121:1,5 | 121:22 140:3,19 | 71:15 72:21 | **unsure** 138:18 |
| 114:21,22 115:2 | 122:3,14,19 | 141:4 142:2 | 86:13 88:15 | **unwillingness** |
| 115:5 | 123:18,18 125:7 | 143:2 | 91:3 95:17 96:4 | 26:21 27:7 |
| **thorough** 26:20 | 125:15,18 126:3 | **Torry** 98:5,6,10 | 97:3,9,11 | **use** 7:10 |
| **thoroughly** 107:8 | 126:7 127:19 | **total** 72:17 88:15 | 128:12,13 | |
| **thought** 60:3 | 128:6,9 130:16 | 98:12 100:22 | 132:15 136:13 | **V** |
| 121:9 122:22 | 130:22 131:3,8 | **totally** 48:2 | 140:2,4 | **vague** 33:15 |
| **threatened** 113:1 | 131:9,9,22 | 104:13,14,16 | **type** 17:11 36:13 | 100:13 |
| **three** 13:13 71:15 | 132:1,13 | 112:16 | 36:17 62:21 | **Valentine's** 104:8 |
| 72:21 88:15 | **times** 19:12 25:21 | **transaction** 87:3 | 69:3 99:19 | **Valley** 45:17 |
| 91:20 | 32:19 49:18 | **transcript** 6:19 | 111:5,16 121:8 | **various** 14:22 |
| **throwing** 88:19 | 54:3 66:11 70:2 | 144:5 | 121:20 | **vice** 96:6 97:12 |
| **Thursday** 139:16 | 82:21 83:14 | **transcription** | **types** 17:15 | **vicinity** 79:11 |
| 140:13 | 84:2 89:20 | 141:7 | 108:20 | **views** 35:4 |
| **time** 6:7,12 7:2,9 | 90:10,11,16,19 | **transfer** 63:6 | **typewriting** 144:7 | **violated** 15:11 |
| 16:13 20:19 | 91:11 92:9,10 | **translate** 6:18 | **typical** 61:2 | **violating** 15:6 |
| 25:4,9 26:13,17 | 92:14 93:12 | **treated** 35:18 | | **Virginia** 45:17 |
| 27:2.35:1,1 37:9 | 94:11 98:12 | **treating** 91:7 | **U** | 124:9 136:19 |
| 38:18 40:20 | 104:5 117:15 | **tried** 62:9 78:17 | **uh-huh** 6:18 | 138:8 |
| 45:19 48:14 | 118:5,6,10,19 | 79:4 125:2 | **umpteenth** | **virtually** 56:17 |
| 49:19 50:4,17 | **tired** 54:21 | 129:4 | 119:19 | 105:18 |
| 53:1,2 54:6,7,13 | 124:19,19 | **trouble** 65:3,4 | **unable** 79:5 | **Visa** 85:18 |
| 55:1,19 58:21 | **title** 30:13 | 121:4 | **unbeknownst** | **visit** 89:12,20 |
| 59:20 61:15 | **today** 5:14,14,20 | **true** 141:6 144:5 | 125:9 | 111:13 127:8 |
| 62:1,12 67:18 | 6:5,10 9:9,10 | **try** 50:6,16,21 | **uncertain** 81:11 | 129:1,3,4 |
| 68:7,14 69:7,8 | 40:11 45:3,6,12 | 61:12 73:10 | **uncomfortable** | **visiting** 121:11 |
| 69:13 70:4,5,21 | **token** 19:14 | 104:19,19 | 133:1 | **visitor** 89:18 |
| 71:16,19 72:18 | **told** 33:5 35:11 | 110:13 | **undergo** 133:21 | **volume** 1:12,21 |
| 72:18 74:3 | 36:9 39:5,9,11 | **trying** 36:3 69:14 | 133:22 | 103:5 |
| 75:21,22 76:3 | 53:13,14,14 | 122:4 | **undergoing** | **voluntary** 52:9 |
| 76:17 79:5 83:2 | 54:20 55:5 | **turn** 17:13,14 | 132:21 133:12 | **vs** 1:8 142:2 143:2 |
| 83:13,17,18 | 59:18 60:6 62:6 | 24:6 31:12 | **undergone** | |
| | | | 133:13 | **W** |

DEPOSITION OF LINDA FAY TOMONIA - VOLUME I
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

162

| | | | | |
|---|---|---|---|---|
| **wait** 72:15 | **way** 36:16 69:6 | 140:14 | **work** 29:21 70:15 | 49:13,14 67:12 |
| **waited** 109:15 | 73:3 80:17 87:1 | **we're** 9:14 10:5 | 78:19 86:6,16 | 87:22 99:3 |
| 119:16,16 | 108:13 114:22 | 21:3 42:6 72:1 | 86:18,19 91:11 | 100:20 111:21 |
| **waiting** 17:13 | 115:5 116:12 | 76:7 85:16 86:5 | 91:22 103:4 | 134:9,11,12 |
| 24:5 31:11 | 124:12,13 125:8 | 91:1,1,7 93:1 | 104:20 105:2 | 137:4,9 |
| **waived** 140:18 | **wear** 126:1,2 | 98:1,1 99:18 | 108:17 | **years** 12:4 13:13 |
| **walk** 94:3,4 | **weather** 89:6,8 | 104:21 113:4 | **worked** 24:18 | 13:14 15:22 |
| **walked** 87:13,15 | **Wednesday** 1:15 | 136:9 | 103:17 | 23:5,7,8,12,13 |
| 91:22 99:8 | 71:13 | **we've** 9:16 | **worker** 50:13,14 | 29:13 31:10 |
| 126:10 | **week** 61:22 63:17 | **what's** 10:16 | 122:13,21 | 43:18 61:3 |
| **walking** 61:1,19 | 63:18,20 64:1,7 | 13:15 79:16 | 123:17 127:1,3 | 62:20 |
| 64:13 | 64:22 67:20 | 91:17 | 127:9 137:7,8 | **yelling** 71:5 |
| **walks** 94:22 | 68:20 69:14,18 | **WHEREOF** | 138:18 | **yesterday** 45:21 |
| **want** 7:4,4 10:1 | 69:19,21,22 | 144:10 | **working** 114:22 | 46:1 |
| 15:13 16:15 | 70:2 71:10 83:7 | **whooping** 76:12 | 115:5 | **yes-or-no** 105:20 |
| 24:16 34:19 | 89:18 94:8 95:4 | **Who's** 123:7 | **works** 79:18 80:4 | 117:9 |
| 35:19 36:16 | 95:14 97:6,7 | **Wilhoyte** 5:13 | 80:14 | **young** 25:15 95:4 |
| 53:9 56:15 57:4 | 105:13 128:12 | **William** 5:12 | **world** 113:21 | **younger** 26:21 |
| 62:16 65:5,5 | 128:13 129:5 | **willing** 28:6 61:12 | **wouldn't** 65:14 | **you're** 6:10 9:17 |
| 66:16 68:13 | 137:12 139:15 | **Wills** 122:17 | 73:9 105:1 | 15:4,9 29:20 |
| 74:18 76:21 | **weekend** 58:4 | **wind** 92:7 | 136:6 | 51:16 61:18 |
| 77:1 87:13 | 124:21 | **withdraw** 18:18 | **wrap** 140:4 | 90:16 98:14 |
| 92:14 96:9 98:5 | **weekends** 56:22 | 43:22 48:12 | **written** 19:4 20:7 | 104:18,19,20 |
| 116:6 118:7,7 | 105:12 120:6 | 64:8 85:20,21 | 20:9,9 41:8 | 105:19 112:20 |
| 124:11,15 | **weekly** 94:2,6 | **withdrawal** 64:18 | 108:19 | 113:21,22 115:2 |
| 132:11,13 | 129:4 | 65:9,10 | **wrong** 42:22 43:9 | **you've** 14:21 |
| 140:16 | **weeks** 95:12,18 | **withdrawn** 29:5 | 60:17 67:12 | 70:19 106:15 |
| **wanted** 36:17,17 | 96:4 97:4,9,11 | 29:19 53:19 | 91:17 98:6 | 115:11 122:1 |
| 53:5 66:10 | 132:15 | 55:18 63:7 73:4 | | |
| 119:21 123:17 | **well-known** 89:13 | 87:3 106:4 | **X** | **Z** |
| 136:5 | **went** 30:21 35:3 | **withdrew** 64:6,16 | **X** 4:8 | **zone** 38:22 63:3 |
| **wanting** 64:5 | 58:19 63:7 | **WITNESS** 8:4 | | 64:15 65:6 |
| **ward** 136:15 | 64:18 71:13,22 | 13:1,3 20:4 | **Y** | 100:4 |
| **warm** 89:6,7 | 72:2 73:6 86:7 | 21:10 23:7 | **yeah** 10:7 80:6 | |
| **Washington** 1:14 | 86:14 87:11 | 43:13 46:9 | 125:3 128:7 | **$** |
| 2:8 3:6,14 11:15 | 88:1 89:20 95:3 | 51:18 53:16 | 132:4,18 137:14 | **$200** 87:3 |
| 11:16 15:18 | 95:17 97:4 | 57:20 68:20 | **year** 11:3,4,10,19 | |
| 17:5 | 104:7 105:2 | 70:5 73:15,19 | 12:21 13:8 17:6 | **1** |
| **wasn't** 35:7 47:10 | 117:20 119:12 | 73:22 80:12 | 17:8 18:6,7,19 | **1** 1:21 78:13 |
| 53:10 59:5,19 | 119:14 121:17 | 85:3 92:18,20 | 18:22 22:11,21 | **1-120866** 1:20 |
| 60:13,15 68:18 | 124:1 125:20 | 92:22 118:3,22 | 23:3,10 24:18 | **1:00** 119:20 |
| 70:15,18 76:3 | 126:4,16 132:10 | 128:17 132:19 | 24:20 25:21 | **1:30** 81:22 |
| 86:19 101:8 | 134:4 | 141:3 144:10 | 26:22 27:12 | **10th** 46:14,17 |
| 105:6,9,21,22 | **weren't** 92:16 | **woman** 78:18 | 29:8,9 31:2,8,16 | **10:00** 1:16 |
| 117:5 138:21 | **we'll** 16:6 66:17 | **wondered** 95:7 | 31:19 32:7,9 | **10:30** 119:17 |
| **watch** 28:8 49:7 | 78:12 81:16,21 | **wonderful** 63:5 | 33:12,17,19 | **11** 83:2 |
| 103:16 | 86:11 140:10,12 | **words** 54:16 99:9 | 34:1,8 36:5,21 | **11th** 119:14 |
| | | | 37:2 48:20 | **11:00** 49:11 |

L.A.D. REPORTING & DIGITAL VIDEOGRAPHY
(202)861-3410 (800)292-4789 (301)762-8282 (703)288-0026 (410)539-3664

163

**114** 4:15
**12** 67:10,11
  117:17 123:14
**12th** 119:13
**12:00** 123:20
**12:27** 81:12
**12:30** 66:16
  119:20
**13** 13:4
**13th** 12:1,2,17
  13:12 14:10,12
  14:13,15 111:20
  122:10
**14th** 126:17
  144:12
**144** 1:21
**1442** 3:5
**15** 87:4 121:21
**15th** 137:11
**1955** 10:17
**1995** 13:16

---

**2**

**20** 66:17 139:11
**20th** 137:13
**2000** 74:18
**20001** 2:8 3:14
**20007** 3:6
**2001** 16:15
**2001/2002** 18:21
  22:22
**2002** 23:10
**2002/2003** 23:3
**2003** 23:11
**2004** 49:15
**2005** 12:17 13:8
  48:22 49:15
  74:19 84:11
  90:21 109:20
  110:10 123:11
**2005/2006** 48:21
  49:16,17 67:12
**2006** 13:3,4 74:20
  78:13 84:10
  86:3 89:4 104:9
  104:11 105:14
  105:15,20
  109:14 111:22

---

131:16 134:10
**2007** 4:13 14:13
  14:14,15 42:14
  43:2,11 44:12
  46:12,14,17
**2008** 1:15 144:11
**2011** 144:12
**202)333-8553** 3:7
**202)727-6295** 2:9
  3:15
**21st** 10:17 86:3
**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**
  10:19
**23** 1:15
**25** 70:22
**28th** 144:10

---

**3**

**3rd** 13:16
**3:00** 139:6,7
  140:20
**30th** 4:13 42:14
  44:12 46:12

---

**4**

**407** 10:22
**42** 4:13
**421** 11:7 12:9
  13:1
**44** 98:15 100:17
**44-day** 99:2
**441** 2:7 3:13

---

**5**

**5** 4:3 114:20
**5th** 43:2,11
**504** 19:4,5,6,19
  21:8 22:17 24:8
  24:13 25:7
  26:21 27:8,9
  30:4,17 32:7
  37:18,18 38:3,4
  38:7,8,11,12,13
  40:6,10 41:2,6
  41:13 55:13
  62:5 64:5 74:22
  75:9 107:2,6,12
  107:14 108:1

---

**6**

**6th** 2:6 3:12
**6:00** 52:7 120:6
**66** 4:14
**6817** 10:21

---

**7**

**7-CV-0882(JR)**
  1:8
**7720** 37:11
**7721** 11:13 13:9

---

**8**

**8** 4:11 77:2,4,4

---

**9**

**9** 67:9
**911** 120:8,9,10,11
  120:13
**99** 6:9

145

V O L U M E   II

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

Civil Division

1  LINDA TOMONIA, et al.

2            Plaintiffs

**ORIGINAL**

3     vs.                    No. 7-CV-0882(JR)

4  THE DISTRICT OF COLUMBIA

5  et al.

6            Defendant

7     _____/

8      Continued deposition of LINDA FAY TOMONIA,

9  was taken on Wednesday, January 30, 2008, commencing

10 at 2:20 P.M., at 441 4th Street, N.W., 6th Floor,

11 Washington, D.C., before Susan Farrell Smith, Notary

12 Public.

                - - - - - -

Pages  145 - 230

Reported by SUSAN FARRELL SMITH

Job No. 1-121349



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY

1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

146

1    APPEARANCES:

2              KAREN D. ALVAREZ, ESQUIRE

3          Law Office of Karen D. Alvarez, Esq.

4          1442 Foxhall Road, N.W.

5          Washington, D.C. 20007

6          202.333.8553

7                  On behalf of the Plaintiffs

8          ERIC GLOVER, ESQUIRE

9          Office of the Attorney General

10         6th Floor South

11         441 4th Street, N.W.

12         Washington, D.C. 20001

13         202.727.6295

14                 On behalf of the Defendants

15

16   REPORTED BY:  Susan Farrell Smith

17   ALSO PRESENT:  Kamel Bekkali

18

19

20

21

22

147

1                    EXAMINATION INDEX

2

LINDA FAY TOMONIA

3        CONTINUED BY MR. GLOVER          148
         BY MS. ALVAREZ                   225

4

5

                    EXHIBIT INDEX

6

                                              MARKED

7   TOMONIA DEPOSITION EXHIBIT

    E       504 meeting papers                161

8

9           (Exhibit retained by counsel.)

10

11

12

13

14

15

16

17

18

19

20

21

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

148

1              CONTINUED EXAMINATION

2    BY MR. GLOVER:

3        Q.    Good afternoon.

4              MS. ALVAREZ:  Wait a second.  Before we

5        get started, I just wanted to check on the

6        time.  I have 2:20.  And I've been waiting

7        since 20 of 2:00.  I think Ms. Tomonia arrived

8        at around 2:10.  So my calculation is you have

9        an hour and a half.

10             MR. GLOVER:  Okay.

11             MS. ALVAREZ:  Minus the 10 minutes, so an

12       hour and 20 minutes.

13             MR. GLOVER:  Okay.

14   BY MR. GLOVER:

15       Q.    Mr. Tomonia, as Madam Reporter had

16   articulated, this is a continuation of --

17             MR. GLOVER:  Off the record.

18             (Discussion off the record.)

19   BY MR. GLOVER:

20       Q.    Excuse me, Ms. Reporter had just restated

21   this is a continuation of deposition.  There are

22   certain rules that I outlined at the beginning of

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

149

1    the initial deposition.  Do you remember those

2    rules?

3        A.    Could you repeat them?

4        Q.    Certainly.  That you allow me to finish

5    any and all questions before you respond.  That you

6    will answer all questions orally.  Do you remember

7    those rules that I articulated to you?

8        A.    I do.

9        Q.    Are you going to adhere to those rules

10   that I articulated?

11       A.    Absolutely.

12       Q.    Okay.  I think we left off your last

13   deposition on or about the time that your son,

14   Reginald Tomonia, was removed from your home.  You

15   had testified that on or about May of 2006 he was

16   removed from the home.  Correct?

17       A.    Correct.

18       Q.    Around that time, let's say a month

19   immediately preceding your son's immediate -- your

20   son's removal from the home, how would you describe

21   his behavior?

22           MS. ALVAREZ:  Asked and answered.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

150

1      Objection.

2      Q.    You can answer.

3      A.    Reginald's father passed March 9th and --

4  I mean, his behavior escalated to staying out of the

5  home late at night, having to call the police to

6  look for him, not coming home from school until

7  around 10:00 o'clock.  Just an out-of-control

8  behavior.

9      Q.    Did you have a curfew for him at that time

10  or was there a set time --

11      A.    Absolutely.

12      Q.    What time was he supposed --

13      A.    He wasn't -- he wasn't supposed to be out

14  at all.  He was to go to my girlfriend's for

15  babysitting, because the after-care program had

16  suspended him for the remainder of the school year

17  from the program entirely.

18          He would not do that.  He would leave

19  school and just go off.  Because I was to pick him

20  up from my girlfriend's house, which is roughly

21  around 6:00 o'clock in the evening.

22      Q.    Would he be at your girlfriend's house?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

151

1      A.      Absolutely not.

2      Q.      Do you know where he would be?

3      A.      No.

4      Q.      During that one month prior to your son

5   being removed from the house, would you say that

6   you -- would you say that you had control over your

7   son?

8      A.      Yes.

9              MS. ALVAREZ:  I'm sorry.  What was the

10        question?

11             MR. GLOVER:  The question was would you

12        say you had control over your son?

13             MS. ALVAREZ:  What period of time?

14             MR. GLOVER:  One month prior to being

15        removed from the home?

16     A.      Yes.

17     Q.      Did your son graduate from Takoma?

18     A.      No.  My son was retained for the 5th

19   Grade.

20     Q.      Do you recall the next school that your

21   son was enrolled at after Takoma?

22     A.      Yes.  Turner Elementary.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

152

1      Q.      When your son was enrolled at Turner

2    Elementary, where was he residing?

3      A.      With Carolyn Curtis, a foster parent.

4      Q.      Prior to your son being enrolled at Turner

5    Elementary, did you ever speak with Ms. Curtis?

6      A.      After my son -- well, I don't believe he

7    got there until September, so I wouldn't have spoken

8    with her.

9      Q.      Well, my question -- let me phrase it this

10   way.  At any point prior to -- at any point prior to

11   the time your son was enrolled at Turner Elementary,

12   while he was in the custody of Ms. Carolyn Curtis,

13   did you ever speak with her?

14     A.      He wasn't in the custody of Carolyn Curtis

15   prior to Turner.

16     Q.      And when, if you know, when was your son

17   placed in the custody of Curtis?

18             MS. ALVAREZ:  Wait a minute.  You mean

19        when was he placed in the foster home of

20        Carolyn Curtis?

21             MR. GLOVER:  Sure.

22             MS. ALVAREZ:  He was never in the custody

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

153

1          of Carolyn Curtis.

2          Q.    When was he placed in the home of

3    Ms. Curtis?

4          A.    I believe early September.  Maybe the

5    first or second week.

6          Q.    Do you recall where he was beforehand?

7          A.    With my daughter in Stafford, Virginia.

8    Natasha Johnson.

9          Q.    And how long was he with your daughter?

10         A.    He was there the entire Summer.

11         Q.    And do you know why he went from your

12    daughter's to Ms. Curtis' home?

13         A.    Absolutely.  Well, he was at my daughter's

14    on an extended stay as awarded by the courts.

15         Q.    And how did he end up with Ms. Curtis?

16              MS. ALVAREZ:  Excuse me.  I'm going to

17         call a break for a moment.  I want to consult

18         with my client.

19              MR. GLOVER:  This counts as your time,

20         counsel.

21              MS. ALVAREZ:  Yeah.  You can time it.  I

22         have to 2:27.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

154

1         (Leaving room.)

2         MR. GLOVER:  (Standing in hallway)

3    Actually, no, I withdraw that.  There is a

4    question pending.  Absolutely not.  Counselor,

5    I'm putting this on the record.  There is a

6    question pending.  You can't take her out of

7    the room.  There was a question pending.  There

8    was a question pending.  You can't take her out

9    of the room with a question pending.

10        (Ms. Alvarez and witness back in room.)

11        MS. ALVAREZ:  What was the question?

12        MR. GLOVER:  I would like a read-back.

13   And I would like for the record to reflect that

14   there was a question pending when counsel

15   attempted to remove her client, or actually did

16   ask her client to get up and leave the

17   deposition room.

18        MS. ALVAREZ:  Yes, that's correct.  For

19   the record, that is correct.  And my client and

20   I had no opportunity to speak, and my client

21   and I have come back immediately.  Please

22   proceed with one question and then stop so I

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

155

1       have a moment to consult with my client.

2               MR. GLOVER:  Sure.  After she answers you

3       can.

4               THE WITNESS:  And what was the question?

5               (Whereupon the record was read.)

6               MS. ALVAREZ:  Was that the question?

7        Ms. Curtis?

8               MR. GLOVER:  Yeah.

9       A.      That was the foster parent.

10      Q.      My question is --

11              MR. GLOVER:  Now, if you would like a

12       break.

13              MS. ALVAREZ:  Thank you.

14              (Whereupon a brief recess was taken, after

15       which the following was heard:

16              MS. ALVAREZ:  Thanks.

17      Q.      Okay.  Now, after -- when your son was

18      enrolled at Turner Elementary, at any point did you

19      contact the staff at Turner Elementary?

20      A.      Yes.

21      Q.      When did you first contact the staff at

22      Turner Elementary?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

156

1      A.      I don't recall.

2      Q.      Was it the Fall, the Winter?

3      A.      Yes.  It was probably September, toward

4   the end.

5      Q.      And why did you contact -- why did you

6   contact Turner?

7      A.      Because my son's education is very

8   important to me.

9      Q.      How did you know your son was enrolled at

10  Turner Elementary?

11     A.      I had communication with my son.

12     Q.      And who did you contact at Turner

13  Elementary?

14     A.      I don't recall who I contacted.  I

15  eventually spoke with the principal, Ms. Parker.

16     Q.      And who is Ms. Parker?

17     A.      The principal.

18     Q.      And do you recall specifically when you

19  spoke with Ms. Parker?

20     A.      Roughly around the end of October or mid

21  November, I believe.

22     Q.      And what did you tell Ms. Parker?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

157

1     A.     I wanted to visit his school.

2            MS. ALVAREZ:  I'm sorry.  I didn't catch

3       that answer.

4     A.     I wanted to visit the school and --

5            MS. ALVAREZ:  You wanted to visit, is that

6       what you said?

7     A.     Yes.  But there was also a meeting that

8  was to be scheduled.

9     Q.     Now, at this point, we said at the end of

10  October or November when you contacted Ms. Parker,

11  what was your status in relation to your child?

12    A.     My child and I had weekly visits.

13    Q.     But at that point, were you in this point,

14  end of October or November, were you his custodial

15  guardian?

16    A.     I don't understand what you mean.

17    Q.     Did he reside with you?

18    A.     He did not.

19    Q.     Where did he reside at this point?

20    A.     Carolyn Curtis.

21    Q.     And when you say that there was a meeting,

22  what meeting are you referring to?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

158

1     A.     There was to be a 504 meeting.

2     Q.     And was there a 504 meeting held?

3     A.     It was.

4     Q.     When you say a 504 meeting, what do you

5 mean, or what do you infer a 504 meeting to mean?

6     A.     A team come to create our -- just going to

7 put together a plan to help Reginald succeed in a

8 regular school setting.

9     Q.     And where was that meeting held?

10    A.     That was meeting was held at Turner

11 Elementary.

12    Q.     And did you attend?

13    A.     Via phone.

14    Q.     Did your attorney attend?

15    A.     Yes.

16    Q.     When I say your attorney, I'm talking

17 about the attorney that's here with you today,

18 Ms. Alvarez.

19    A.     Yes.

20    Q.     When did you first retain the services of

21 Ms. Alvarez for this case?

22    A.     I believe 2006.  Somewhere around that

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

159

1    timeframe.

2            MS. ALVAREZ:  2006?

3        A.    I believe.  Let me think about that.

4            MR. GLOVER:  I object, counsel.  Let her

5        answer.

6            MS. ALVAREZ:  No.  I'm sorry.

7        A.    The best of my recollection, I think

8    some -- maybe 2006.  As far as I can remember,

9    2005.  Somewhere in that area.  Let me think.

10   Because I'm going to say 2005, and again, I don't

11   maintain dates very well.  And without my notes,

12   it's very difficult for me to tell you.

13       Q.    And what happened at this meeting, this

14   504 meeting, as you described?

15       A.    A 504 plan was drafted.

16       Q.    Do you recall any of the details of the

17   504 plan?

18       A.    Yes.  That I was to receive a weekly

19   package of Reginald's, I believe, work.  And daily

20   progress reports.

21       Q.    I guess what I'm looking at is with

22   respect to this 504 plan, can you tell me what plans

160

1    were put into place to assist Reginald while he was

2    at school if any?

3        A.    I can't.

4        Q.    Do you recall if they allowed him to sit

5    closer to the board?

6        A.    That was requested.

7        Q.    My question is, do you recall if they

8    allowed --

9        A.    I cannot tell you.  I wasn't in the

10   classroom.

11       Q.    Do you recall if they gave him more time

12   for quizzes?

13       A.    I spoke with him, and I believe he said

14   they did.

15       Q.    Do you recall if they gave him an

16   opportunity to take work home that he did not

17   complete in class to complete it while at home?

18       A.    I can't tell you that.

19       Q.    Do you recall if they gave him any type of

20   counseling?

21       A.    It was requested, and they were supposed

22   to.  How much --

161

1    Q.    Do you recall if they gave him any

2  behavioral analysis?

3         MS. ALVAREZ:  Excuse me.  Let me ask a

4      question.  By gave him, you mean what appears

5      in the plan as opposed to what was actually

6      implemented?

7         MR. GLOVER:  Yes.

8    Q.    As we sit here today, do you have any

9  independent recollection of what was provided for in

10 that 504 plan?

11   A.    I can't tell you what he actually --

12        MR. GLOVER:  I think we are up to D;

13     aren't we.

14        (Discussion off the record.)

15        (Whereupon Tomonia Deposition Exhibit E

16     was marked.)

17   Q.    Ma'am, do you recognize this -- I'm sorry?

18        MS. ALVAREZ:  This is Exhibit E.

19        MR. GLOVER:  Actually, I want that back.

20     I want to have another exhibit.  I gave you the

21     wrong one.  I apologize.

22   Q.    Ma'am, I just handed you what has been

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

162

1    marked as Defendant's Exhibit E for identification.

2    Do you recognize the document?

3              MS. ALVAREZ:  Wait a second.  Recognize,

4         by recognize, you mean have you seen it before?

5              MR. GLOVER:  Do you recognize it.  It's a

6         fairly simple question, counselor.

7              MS. ALVAREZ:  As opposed to whether you

8         can identify it.

9    Q.     Do you recognize the document, ma'am?

10   A.     Yes.

11   Q.     And how do you recognize it?

12   A.     I believe it was sent.  In some of the 504

13   materials that I reviewed.

14   Q.     Okay.  And just so that we're clear, we

15   look at -- examining the top of this document, it

16   says meeting held.  Am I correct in reading that it

17   says November 7th, 2006?

18   A.     Yes.

19   Q.     And is that the date that the 504 meeting

20   was held with regard to your son, Reginald Tomonia?

21   A.     Let me think about that.  I believe it

22   was.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

163

1       Q.    Okay.  And this was at Turner Elementary

2    school; correct?

3       A.    Yes.

4       Q.    And I -- a 504 plan was put in place for

5    your son as a result of this meeting; correct?

6             MS. ALVAREZ:  By put in place you mean

7        implemented?

8             MR. GLOVER:  Implemented at school.

9             MS. ALVAREZ:  Implemented or just

10        developed?

11      Q.    A plan was developed and then implemented;

12    correct?

13      A.    It was developed.

14      Q.    To your knowledge, was this 504 plan

15    implemented?

16      A.    No.

17      Q.    And how do you know that, ma'am?

18      A.    There was a meeting that we revisited the

19    504.

20      Q.    Okay.  And when was that?

21      A.    Maybe January.  Early January, I believe.

22      Q.    And why was there a meeting to revisit the

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

164

1    504 plan?

2        A.    When I reviewed it, as a matter of fact,

3    there were some things that I thought that we needed

4    to include in the 504.

5        Q.    When you say include -- let me back up a

6    little bit.  As a result of the 504 plan that was

7    held on November 7th, 2006, were any of the plans,

8    policies or any of the plans or policies outlined at

9    that 504 meeting implemented with respect to your

10   son?

11           MS. ALVAREZ:  You mean were any -- wait a

12       minute.

13           MR. GLOVER:  No.  I mean my question,

14       counselor.  If she can't understand it, she'll

15       let me know.  You don't let me know.

16       A.    Okay.  What are you asking me?

17       Q.    Okay.  As a result of the November 7th,

18   2006 504 plan that was held with respect to your

19   son, Reginald Tomonia, were any of the, any portion

20   of that plan implemented with respect to your son?

21       A.    By -- you mean by November?  In November?

22       Q.    After the meeting, were any of the plans

165

1  that you said that -- you said that we came

2  together, there was team together to help develop a

3  plan for your son --

4      A.    I'm going to say no.

5      Q.    So nothing.  It's your testimony here

6  today --

7           MS. ALVAREZ:  That's her testimony.  Asked

8       and answered.

9      Q.    My question to you, ma'am, is it's your

10 testimony that none of the plan --

11     A.    No.

12     Q.    -- was implemented?

13          MS. ALVAREZ:  Asked and answered.

14     Q.    Is that correct?

15          MS. ALVAREZ:  Objection.  No more of that.

16          MR. GLOVER:  You can object.

17     Q.    Ma'am?  She can object.  You can answer.

18          MS. ALVAREZ:  You've already answered the

19      question.  Don't answer.

20          MR. GLOVER:  Are you instructing her not

21      to answer.

22          MS. ALVAREZ:  I'm telling her not to

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

166

1      answer something that you have just asked.

2          MR. GLOVER:  Mark that for a ruling.

3    Q.    After the -- so you said this plan was

4  revisited.  When was this plan revisited?  Excuse

5  me.  I mean, what was the purpose of this plan being

6  revisited?

7    A.    To finalize the plan.

8    Q.    To finalize the plan?

9    A.    Uh-huh.

10    Q.    And when was that?

11    A.    I believe it was January.

12    Q.    Okay.

13    A.    Sometime in January.

14    Q.    And whose determination was it to finalize

15  this plan?

16    A.    The team, I would say.  The whole team.

17    Q.    Did you contact the team?  Did the team

18  contact you?  How did this come about?

19    A.    I believe that was stated when we came

20  together initially.

21    Q.    Pardon?

22    A.    I believe that it was stated initially

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

167

1    that it, the 504 plan would be revisited once it was

2    developed.

3        Q.    And what was the result of this meeting in

4    January?

5        A.    Let me step back.  I remember asking the

6    team to include rewards, some incentives for

7    Reginald's appropriate behavior.

8        Q.    My question is, independent of what you

9    recall requesting, do you recall what was -- what

10   new policies or plans were implemented in this

11   revisitation of the 504 plan?

12       A.    Okay.  And I just told you what was.

13       Q.    Okay.

14       A.    That the rewards of the token economy was

15   to be included in the 504 plan.

16       Q.    Did you address that at the initial 504

17   plan meeting?

18       A.    I'm sure I did.  I was via the phone.

19   Because I always feel you reward good behavior.

20       Q.    Well, my question is:  As we sit here

21   today, do you recall specifically requesting the

22   token economy plan?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

168

1      A.    Yes.

2            MS. ALVAREZ:  We're talking about the

3      first 504 meeting; is that right?

4            MR. GLOVER:  Yes.

5      Q.    After the initial 504 plan was implemented

6  at that first 504 meeting, was there any improvement

7  in Reginald's behavior?

8      A.    No.

9      Q.    Was there an improvement in his

10  schoolwork?

11     A.    No.

12     Q.    Were you -- how often -- how often after

13  that initial 504 meeting would you say you were in

14  contact with your son?

15     A.    Refine that for me.

16     Q.    How often did you call him?  After that

17  first 504 meeting, how often did you call him?  How

18  often did you see him?

19     A.    Well, I actually saw him weekly, but I

20  would check on him every other day.

21     Q.    You say check on him.  How would you

22  check --

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

169

1      A.      I would call him.

2      Q.      You got to let me finish so she can get

3  everything.

4      A.      I'm sorry.

5      Q.      Was he home when you would call?

6      A.      Yes.

7      Q.      Did you ever speak to Ms. Curtis about

8  your son's behavior?

9      A.      Absolutely.

10     Q.      And what did she say about his behavior?

11     A.      Well, she was definitely having problems

12  at school with him.  She had lost a job as a result

13  of suspensions from school.

14     Q.      Did your son get suspended from school?

15     A.      Yes.

16     Q.      How often did your son get suspended from

17  school?

18     A.      If I can remember, roughly seven days, the

19  beginning of the school year term.

20     Q.      And how did you come to learn that?

21     A.      I was in constant communication with the

22  foster mom.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

170

1    Q.    And what was your son suspended for?

2    A.    Inappropriate behavior.

3    Q.    When you say that --

4    A.    Talking back, walking out of the class,

5    roaming the halls.

6    Q.    Did you ever discuss with Ms. Curtis what,

7    if anything, she said to your son about his

8    behavior?

9    A.    Clarify that for me.

10   Q.    Did you ever talk to Ms. Curtis and ask

11   her, did she ever speak to Reginald about his

12   behavior at school?

13   A.    Yes.

14   Q.    What did she say?  Excuse me.  I'll

15   withdraw that.  What did you say to her?

16         MS. ALVAREZ:  What?

17   Q.    I'll withdraw further questions.

18         MS. ALVAREZ:  How many questions?

19         MR. GLOVER:  Counselor.

20         MS. ALVAREZ:  I'm asking.

21         MR. GLOVER:  No, no.  From now on, if you

22      have an objection, object.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

171

1        MS. ALVAREZ:  I can't understand the

2    question.

3        MR. GLOVER:  I don't need you talking

4    while I'm doing my deposition.  This is my

5    deposition.  You'll have ample time to question

6    your witness.  But as I'm questioning, unless

7    you have an objection, talking objections

8    aren't permitted.

9        MS. ALVAREZ:  I can object.

10        MR. GLOVER:  You've been obstructive this

11    entire time.

12        MS. ALVAREZ:  Right.

13        MR. GLOVER:  All right?  Moving on.

14    Moving on.

15        MS. ALVAREZ:  One question at a time.

16        MR. GLOVER:  Moving on.  Moving on.

17    Moving on.

18    Q.    Now, my question to you is during the time

19    that -- of your son being suspended, did you ever

20    speak with Ms. Curtis about her behavior -- excuse

21    me, your son's behavior at school?

22    A.    Yes.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

172

1      Q.    What, if anything, did she say she told

2    your son about his behavior while at school?

3      A.    Absolutely she would encourage him to do

4    better, as we would both discuss with him.

5      Q.    Did you ever discuss with Ms. Curtis

6    whether your son attended school every day while at

7    Turner?

8      A.    Yes.

9      Q.    Did he?

10      A.    Yes.  I mean, other than the suspensions.

11      Q.    While your son attended Turner, did he

12    stay in class the entire period?

13      A.    Absolutely not.

14      Q.    Would he leave school?

15      A.    There was -- I believe twice that I can

16    recall that he left the campus.

17      Q.    And how did you come to find that out?

18      A.    I believe from the principal.

19      Q.    So the principal called you?

20      A.    I don't recall exactly how I got the

21    information, but I did get the information, and I

22    remember calling the principal.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

173

1      Q.    And I believe you said that was

2  Ms. Parker; correct?

3      A.    Yes.

4      Q.    Now, let's say during the -- that would be

5  the Fall semester, while your son was attending

6  Turner Elementary, how often would you say that you

7  spoke with Ms. Parker?

8      A.    I don't remember the frequency of how --

9  how often I spoke with her, but I recall speaking to

10  her on many occasions.

11      Q.    I apologize, ma'am.  And during those

12  times, was she receptive to your phone calls?  She

13  received your calls?

14      A.    Yes.

15      Q.    Did she discuss with you your son's

16  behavior while at school?

17      A.    Yes.  We would talk.

18      Q.    Did she discuss with you your son's

19  educational development while at school?

20      A.    Yes.

21      Q.    And you would send on occasion, did you

22  send e-mails to the school?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

174

1      A.     Yes.

2      Q.     Were those e-mails responded to?

3      A.     Yes.   I believe so.

4      Q.     Would you send letters to the school?

5      A.     I don't per se recall a letter but e-mails

6  definitely.

7      Q.     Without telling me the content of these

8  things, to your knowledge, did your attorney ever

9  send letters to the school or e-mails to the school?

10     A.     I believe so.

11     Q.     Were those e-mails or letters responded

12  to?

13            MS. ALVAREZ:   Calls for speculation.

14      Objection.

15     Q.     If you know.

16     A.     I don't know.

17     Q.     Is there a time that you filed

18  a due-process violation with respect to your son?

19     A.     Yes.

20     Q.     And when did you file the due-process

21  violation?

22     A.     I don't recall.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

175

1      Q.     Do you recall -- if I was to say --

2   withdrawn.  Do you recall if it was during the

3   school year, that Fall semester school year of 2006?

4      A.     I just don't recall.  I do know it

5   occurred.

6      Q.     How many due-process violations did you

7   file, ma'am?

8      A.     I believe there were two.

9      Q.     Okay.  The first one, what was the basis

10  of your filing a due-process violation?

11     A.     I'm not going to recall any of this

12  information without my notes.

13     Q.     Do you recall the resolution of that

14  due-process violation?

15     A.     Again, I mean, there are lots of meetings,

16  and I'm not going to recall any of this stuff, a

17  stressful period of time, and my memory is vague.

18     Q.     Did you ever appear in a court hearing or

19  any type judicial proceeding as a result of filing

20  the due-process violation?

21     A.     I can't recall that.  There was lots of

22  meetings, and again, I'm not going to recall.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

176

1      Q.     That second due-process violation, do you

2  recall when you filed that?

3      A.     Again, I'm not going to recall without my

4  notes.  I have got to have the notes in front of me.

5      Q.     Do you keep notes?

6      A.     I do.

7      Q.     When you said during that initial

8  seven-day period at Turner when your son was

9  suspended, did you ever contact the school?

10     A.     I did.

11     Q.     And whom did you speak to?

12     A.     I don't recall who I spoke to.

13     Q.     What, if anything, did you tell them?

14     A.     That Reginald should not -- the suspension

15  should not occur with this child.

16     Q.     And why is that?

17     A.     Because he's a child that, with special

18  needs, and the behaviors that the school was

19  experiencing are a result of his disability.

20     Q.     And what did the individual that you spoke

21  to tell you?

22     A.     I don't recall.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

177

1        Q.      Did you ever -- withdrawn.  At the

2    previous deposition you testified that you had

3    brought a copy of Reginald's previous 504 plan to

4    the staff at Takoma when you enrolled him at the

5    school?

6        A.      Correct.

7        Q.      Did you ever provide the staff at Turner a

8    copy of Reginald's 504 plan?

9        A.      I did not enroll Reginald at Turner.

10       Q.      My question --

11       A.      I wouldn't -- no.

12       Q.      Okay.  Did you ever contact anyone from

13   the D.C. State Enforcement Agency to discuss your

14   school -- regarding your son's education?

15       A.      I'm not sure that D.C. State

16   Enforcement -- who is that and what is that?  I

17   don't know.  I contacted a lot of people.

18       Q.      My question -- well, let me ask you.  Do

19   you recall contacting anyone from the D.C. State

20   Enforcement Agency and the Office of the Attorney

21   General for the D.C. public schools regarding your

22   son's behavior?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

178

1      A.      If that's the Department of Education,

2    then yes.

3      Q.      Well, now I'm going to break that down.

4    Do you specifically recall -- withdrawn.   I

5    apologize.

6            Do you specifically recall contacting

7    anyone from the D.C. State Enforcement Agency

8    regarding your son?

9            MS. ALVAREZ:  She's already answered

10       that.  I'm objecting.

11           MR. GLOVER:  I broke the question in two,

12       counselor.

13           MS. ALVAREZ:  I'm objecting.  Asked and

14       answered.

15     Q.      You can answer.

16           MS. ALVAREZ:  No.  You've already answered

17       it.  I'm objecting.  Don't answer it.

18           MR. GLOVER:  Was that answered?

19           (Whereupon the record was read.)

20     Q.      Did you ever contact Clifford Janey

21    regarding your son?

22     A.      I did.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

179

1    Q.    When did you first contact Clifford Janey?

2    A.    I believe, I want to say maybe in March of

3    2006.  I believe March 2006.

4    Q.    And was this while your son was still

5    attending Takoma?

6    A.    Correct.

7    Q.    And what was your purpose of contacting

8    Mr. Janey?

9    A.    Because of the continued suspensions and

10   what was going on at Takoma.  And the refusal to

11   just provide assistance to us.

12   Q.    And what, if anything, did Mr. Janey tell

13   you?

14   A.    I believe that I didn't get very far.  I

15   did -- let me recant that.  I was led to partnership

16   office where I talked with a Mrs. Willis.  And a

17   Davison.  Ms. Davison maybe.

18   Q.    My question is pertaining more to your

19   conversation with Mr. Janey.

20   A.    I was led to those two offices which I

21   just stated to you.

22   Q.    You say you were led to.  Did he refer you

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

180

1     to them --

2         A.    We --

3         Q.    Ma'am, we can't both speak at the same

4     time.  Did he refer you to them or did you -- I

5     mean, I don't know what you meant by led.

6         A.    Referred to.

7         Q.    Okay.  Thank you.  Did you have any

8     additional conversations with Mr. Clifford Janey

9     regarding your son?

10        A.    That office, did I have any -- no.  I was

11    led to that office, I believe, or called those other

12    offices.

13        Q.    Do you recall having any conversation with

14    Mr. William Wilhoyte regarding your son?

15        A.    No.

16        Q.    Do you recall any conversation with a

17    Ms. Linda Roberts?

18        A.    No.

19        Q.    Do you recall any conversations with a

20    Ms. Jennifer Finch?

21        A.    Who?

22        Q.    Jennifer Finch.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

181

1      A.    No.

2      Q.    Do you recall any conversation with

3  Mr. Timothy Williams regarding your son?

4      A.    No.

5      Q.    Any conversations with an Abby Hairston?

6      A.    That name sounds familiar.

7      Q.    Do you recall how or why that may sound

8  familiar?

9      A.    I don't recall, but that does sound very

10  familiar.

11      Q.    Okay.  I believe you stated as a result of

12  the first 504 meeting that you had with -- at Turner

13  or with the team at Turner Elementary, a package or

14  materials were supposed to be provided to you from

15  the school; is that correct?

16      A.    That's correct.

17      Q.    Were materials or packages provided to

18  you?

19      A.    No.

20      Q.    Do you know if they were provided to

21  Ms. Curtis?

22      A.    I can't attest to what was provided to

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

182

1  Ms. Curtis.

2      Q.    Do you recall when the next time your son

3  was suspended while attending Turner Elementary?

4      A.    I'm -- I don't recall.  I just remember at

5  least seven suspensions.  And no, I don't recall the

6  dates.

7      Q.    I guess other than those seven, do you

8  have any independent recollection of your son being

9  suspended at any other time while attending Turner

10  Elementary?

11      A.    Again, I don't recall.

12      Q.    Other than the initial Section 504 meeting

13  and the subsequent Section 504 meeting that you

14  previously testified, did you ever have cause to go

15  down and meet with the staff at Turner Elementary?

16      A.    Yes.

17      Q.    Other than those two occasions, when was

18  the first time you went and met with the staff at

19  Turner Elementary?

20      A.    I believe that was around October.  I

21  believe somewhere October.

22      Q.    And what was the purpose of going down

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

183

1    there?

2        A.    I thought it was 504 meeting, but the 504

3    meeting had been changed.

4        Q.    Any other time that you can recall?

5        A.    Yes.    I was there, I believe, I want to

6    say somewhere, I believe I was there sometime in

7    December.    And again in January.

8        Q.    And do you recall what was your purpose of

9    going in January -- excuse me, December?

10       A.    I'm trying to think why was I there.    I

11   don't recall really why I was there in December.    It

12   may have been to do -- to review his records.    I'm

13   not sure.

14       Q.    So you would go down to the school and

15   review your son's records?

16       A.    I requested.

17       Q.    Were you able to review your son's

18   records?

19       A.    The -- well, when you say records, I have

20   to say no.

21       Q.    When you went down to review your son's

22   records, what happened?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

184

1      A.     When I say his records, his homework

2   portfolio, that kind of stuff.    There was none to

3   review.    Virtually none to review.

4      Q.     Do you recall or do you know why there was

5   none to receive?

6      A.     Yes.

7      Q.     And why is that?

8      A.     Because he spent the majority of his time

9   either in the office or walking the halls.

10     Q.     And how did you know that?

11     A.     The first person that would greet me when

12  I go through the door is my son.

13     Q.     So your son would leave the classroom?

14     A.     He was not in the classroom when I would

15  walk into the building.

16     Q.     Okay.    So he wasn't in the classroom when

17  you walked in the building?

18     A.     Yes.

19     Q.     Didn't do his work?

20     A.     No.    He couldn't do his work if he was in

21  the hallway.

22     Q.     I understand that, ma'am.    But if he

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

185

1    stayed in the classroom, he could have done the

2    work.  So my point is, he didn't remain in class and

3    complete his work?

4        A.    Wasn't in the class.

5        Q.    Well, my question was -- I will leave it

6    at that.  When you would walk in and you would see

7    your son in the halls, did you tell him to go to

8    class?

9        A.    First of all, I asked him why was he out

10   of class.

11       Q.    What did he say?

12       A.    That he was put out of class.

13       Q.    And did you ask him why he was put out of

14   class?

15       A.    Of course I would ask him.

16       Q.    What would he say?

17       A.    That he was just put out of class.  He's

18   not going to give me answers why he's put out of the

19   class.  Or he would tell me I don't know.

20       Q.    Did you ever learn why your son was put

21   out of class?

22       A.    Yes.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

186

1    Q.    Why was he put out of class?

2    A.    Because he is agitating the other students

3    or he's over-talking the teacher.  Or he, I believe,

4    walked out of class.

5    Q.    Do you recall your son being suspended in

6    February of 2007?

7    A.    Which school?

8    Q.    February 2007, I imagine that would be

9    Turner.

10   A.    I don't recall.

11   Q.    Just so I'm clear.  I know you stated that

12   you would go to your school to review the records

13   but that there would be no records there.  However,

14   the school would allow you to come down to examine

15   what, if anything, would be there; correct?

16        MS. ALVAREZ:  She discussed the homework

17    portfolio.

18   Q.    Correct?

19   A.    Homework portfolio.

20   Q.    Homework portfolio.  Correct?

21   A.    Uh-huh.

22   Q.    Did you ever specifically ask the school

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

187

1    to see your son's records?

2        A.    Which school are you referring to?

3        Q.    The school we've been discussing, ma'am,

4    Turner.

5        A.    Okay.  No.  Not to see his records but the

6    homework portfolio again.

7        Q.    Did you ever -- withdrawn.

8            Did you ever discuss with any of the

9    staff, including Ms. Parker, while your son was

10   attending Turner Elementary, why your son was being

11   removed from class or why your son was not in class?

12           MS. ALVAREZ:  I -- objection.  Could you

13       rephrase that so we can understand it?

14           MR. GLOVER:  Certainly.

15       Q.    Did you ever speak with Ms. Parker

16   specifically, the principal at Turner Elementary, as

17   to why your son was being -- why your son was not in

18   class?

19       A.    I did.

20       Q.    And what did she tell you?

21       A.    That they were making attempts to keep him

22   in class.  And even if he wasn't in class, she was

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

188

1    teaching him herself.

2        Q.    While your son was attending Turner

3    Elementary, were any other services such as

4    counseling or --

5            MS. ALVAREZ:  Objection.  Asked and

6        answered.

7            MR. GLOVER:  I did not -- let me finish

8        the question.  All right?

9            MS. ALVAREZ:  Uh-huh.

10       Q.    Were any services such as counseling

11    specifically provided while attending Turner?

12           MS. ALVAREZ:  Asked and answered.

13       Objection.  I instruct my client not to answer.

14       Q.    Do you, to your knowledge, did your son

15    attend any counseling classes while attending -- or

16    any counseling sessions while attending Turner

17    Elementary?

18       A.    To my knowledge, I wouldn't know.

19       Q.    To your recollection, while your son was

20    attending a -- was attending Turner Elementary

21    School, was a manifestation determination meeting

22    held?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

189

1      A.     I believe it was.

2      Q.     What was the result of that hearing if you

3   recall?  Withdrawn.

4             What is your understanding of what a

5   manifestation termination hearing is?

6      A.     Whether Reginald would be eligible for

7   services or not for special education services.

8      Q.     And as a result of that meeting, did your

9   son undergo any specific test or evaluations to make

10  said determinations?

11     A.     I'm not -- I'm not certain.

12     Q.     And what --

13            MS. ALVAREZ:  I'm sorry.  What was that

14      question?  Could you read it back?

15            (Whereupon the record was read.)

16     Q.     And ma'am?

17     A.     Yes.  I'm listening.

18     Q.     Please.  And what was the result of that

19  manifestation termination meeting?

20     A.     I believe it was that he did not qualify

21  for special education services, if this is the

22  meeting that I have -- that I'm thinking about.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

190

1    Q.    To your recollection or knowledge, during

2    that Spring semester while your -- withdrawn.

3         Did there come a time when your son left

4    Turner Elementary?

5    A.    Yes.

6    Q.    When did he leave Turner Elementary?

7    A.    I believe March.

8    Q.    And March of what year, ma'am?

9    A.    2006.  2006.

10    Q.    Okay.  And why did your son leave Turner

11    Elementary?

12    A.    He changed foster homes.

13    Q.    Backing up a little bit.  You stated that

14    there was a second -- or a second 504 meeting

15    sometime after the initial one that we discussed in

16    November of 2006; correct?

17    A.    I'm thinking.

18         MS. ALVAREZ:  Asked and answered.

19      Objection.

20    Q.    Do you recall what the results were of

21    that second 504 --

22         MS. ALVAREZ:  Asked and answered.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

191

1       Objection.

2               MR. GLOVER:  No, she did not --

3               MS. ALVAREZ:  Objection.

4       Q.    Do you recall what the results were?

5               MS. ALVAREZ:  Asked and answered.

6       Objection.  Don't answer the question.

7               MR. GLOVER:  We have to get a ruling on

8       this.  This is ridiculous.  I'm going to have

9       to call the court for a ruling.  I don't

10      believe that answer was responsive.

11              MS. ALVAREZ:  Why don't you check with

12      her?

13              MR. GLOVER:  No.

14              (Discussion off the record.)

15              (Whereupon the record was read.)

16      Q.    When you say your son changed foster

17      homes, do you know why it came about that he changed

18      foster homes?

19      A.    No, I don't.

20      Q.    And I believe you said that Ms. Curtis

21      lost her job as a result of the suspensions, I think

22      that's how you phrased it.  Specifically, what do

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

192

1    you mean, ma'am?

2        A.    She was terminated from employment because

3    of the frequent visits and having to pick up

4    Reginald from school.

5        Q.    And do you recall how often she told you

6    she got to pick Reginald up from school?

7        A.    No, I don't remember.

8        Q.    Do you recall if while residing with

9    Ms. Curtis, Reginald ever ran away from home?

10       A.    He did not.

11       Q.    Do you recall if while residing with

12   Ms. Curtis, Reginald ever stayed out overnight?

13       A.    He did not.

14       Q.    Do you recall while residing with

15   Ms. Curtis, that Reginald had a curfew or specific

16   time that he was to be home?

17       A.    I can't contest to that.

18       Q.    Okay.  Do you recall where is the next

19   school your son enrolled with after being enrolled

20   in -- after Turner Elementary School?

21       A.    Payne Elementary.

22       Q.    And do you recall what grade your son was

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

193

1    in when he enrolled at Payne Elementary?

2        A.    He was put into the 6th Grade.

3        Q.    And just so we're clear, I don't believe I

4    asked this, what grade was he in at Turner?

5        A.    5th.

6        Q.    Where was your son residing when he was

7    enrolled in Payne Elementary?

8        A.    With the Draytons.  Tammy Drayton.

9        Q.    Prior to your son being, moving in with

10    the Draytons, did you know the Draytons?

11        A.    No.

12        Q.    Were the Draytons foster parents?

13        A.    Yes.

14        Q.    Prior to your son being enrolled in Payne

15    Elementary, did you ever have any conversations with

16    the Draytons about your son's educational need?

17        A.    No.

18        Q.    Prior to your son being enrolled in Payne

19    Elementary, did you ever contact -- withdraw that.

20            Upon your son being enrolled at Payne

21    Elementary, did you ever contact the staff at Payne

22    -- excuse me -- yes, Payne Elementary, regarding

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

194

1    your son's educational needs?

2         A.    Rephrase that again.

3         Q.    Certainly.   Prior to your son being --

4    well, withdrawn.

5              Upon your son being enrolled at Payne

6    Elementary, did you ever contact any of the staff at

7    Payne Elementary regarding your son's educational

8    needs?

9         A.    When you say upon, do you mean when he was

10   enrolled?

11        Q.    I will go with that.   When he was

12   enrolled.

13             MS. ALVAREZ:   At the time?   Or later?

14        Q.    Within the timeframe, couple days before

15   or couple days after your son being enrolled.

16             MS. ALVAREZ:   So immediately at the time?

17             MR. GLOVER:   Yes.

18             MS. ALVAREZ:   Okay.

19        A.    I did.   I -- when you say immediately, do

20   you mean within the first week or two?

21        Q.    First week or two.   Did you ever contact

22   anyone at Payne regarding your son's educational

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

195

1   needs?

2       A.      Yes.

3       Q.      Who did you contact?

4       A.      The principal.  His name escapes me right

5   now.

6       Q.      What did you tell the principal?

7       A.      I talked with him.  I remember the very

8   first occasion Reginald was probably suspended, and

9   I requested to speak with the principal, and I was

10  never called back.

11      Q.      When was the first time you had a

12  conversation with any staff?

13      A.      Probably the first week Reginald was

14  enrolled or the second week.

15      Q.      And again, do you recall who you spoke to?

16      A.      I don't recall who I spoke with.  The

17  lady's name was Linda.  I can remember that much.

18      Q.      And what did you tell Linda and what did

19  Linda tell you?

20      A.      Reginald was suspended of course.  And I

21  was asking that suspension be withdrawn.

22      Q.      Was the suspension withdrawn?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

196

1    A.    No.

2    Q.    After your son was enrolled at Payne

3  Elementary, did you ever provide any of the staff at

4  Payne Elementary a copy of your son's Section 504

5  plan?

6    A.    Personally I didn't, no.

7    Q.    Do you recall that first time you called

8  regarding your son's suspension, do you recall when

9  approximately that was?

10    A.    I believe the second week, I want to say

11  in late March I believe it was.

12    Q.    Did you ever come to learn why your son

13  was suspended?

14    A.    I believe roaming the halls, to the best

15  of my recollection, and not staying in class.

16    Q.    During your son's time at Payne,

17  approximately how many times did you say he was

18  suspended?

19         MS. ALVAREZ:  I'm sorry.  What was that

20      question?

21    Q.    During your son's time at Payne,

22  approximately how many times was he suspended?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

197

1    A.    Maybe three.  I'm not sure.

2    Q.    And do you recall when those times -- do

3    you recall when was your son suspended?  I know you

4    just spoke about the first time.  When is the next

5    two times your son was suspended?

6    A.    The first time I believe it was 10 days.

7    The second time -- I mean, he was -- I call sending

8    a child home a suspension.  Even if it's a half a

9    day.  There were lots of times that I was not made

10   aware, but the Draytons were called to pick up the

11   child from school.

12   Q.    During the time that your son was enrolled

13   at Payne Elementary, what was your status with your

14   son?

15   A.    Still the mom, that's for sure.  We --

16   Q.    Were you his custodian?  Did he reside in

17   your home?

18   A.    I just said he was with the Draytons.

19   Q.    Okay.  Did you know, did the Draytons have

20   custodial rights?

21   A.    I don't understand that question.

22   Q.    To your knowledge, did the Draytons enroll

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

198

1    your son at Payne Elementary?

2         A.    I can't tell you.  I don't know who

3    enrolled him.

4         Q.    During the time that your son was

5    suspended, which I believe you mentioned

6    approximately three times, were you ever notified by

7    the school?

8         A.    Not by the school.  No.

9         Q.    How did you come to learn that your son

10   was suspended?

11        A.    Well, the first time I was at one of the

12   meetings at the student hearing office.  The second

13   time or my son made a phone call to me.  The third

14   time I just happened to have been contacting the

15   principal checking up on Reginald.  Just for

16   follow-up.

17        Q.    And during these three times, do you

18   recall specifically who notified you or how you come

19   to learn that your son was suspended.  Let's start

20   with the first time.

21             MS. ALVAREZ:  Objection.  Asked and

22        answered.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

199

1          MR. GLOVER:  Let me ask the question.

2     Q.     That when your son made that phone call,

3    what did he say to you?

4     A.     That the principal was suspending him.

5     Q.     Did he say why?

6     A.     I don't recall.

7     Q.     Did you ever follow up with the staff at

8    Payne Elementary to find out why your son was

9    suspended?

10     A.     Of course.

11     Q.     I believe you spoke about the first time.

12    That second time, did you ever find out why your son

13    was suspended?

14     A.     The second time was walking the halls or

15    not in the classroom.

16     Q.     The third time?

17     A.     The third time was assaulting a student.

18     Q.     Do you know the facts revolving that

19    assault -- involving that assault?

20     A.     I know the outcome.

21     Q.     What was the outcome?

22     A.     He was made to go to youth court, I

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

200

1    believe.  Youth court, I believe.  And he was asked

2    to apologize to his mother.  Basically.  Was the

3    outcome.

4        Q.    Was there a time while your son was

5    attending Payne Elementary where he was arrested?

6        A.    Yes.

7        Q.    And when was he arrested if you know?

8        A.    This was the time I just spoke about.

9        Q.    And do you recall who, if anyone, filed --

10   withdrawn.  Was a criminal complaint filed against

11   your son?

12       A.    We did go to court.  So I would say a

13   complaint was filed.

14       Q.    Do you know who filed the complaint?

15       A.    Yes.  The principal.

16       Q.    And how do you know the principal filed

17   the complaint?

18       A.    I was told that he filed the complaint.  I

19   spoke with him.

20       Q.    Who told you?  He told you specifically he

21   filed the complaint?

22       A.    Yes.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

201

1    Q.    And when was this conversation?

2    A.    I'm trying to think.  Somewhere May,

3    maybe.

4    Q.    May of what year, ma'am?

5    A.    2006.

6    Q.    And you said you went to court for this;

7    is that correct?

8    A.    I did.

9    Q.    And was there a resolution -- what court

10   was that?  Withdrawn.

11   A.    Youth division.

12   Q.    And do you recall if your son pled

13   guilty?  Did he not plead guilty?  Was something

14   else worked out?

15   A.    The only thing that I remember came out of

16   that, that he had to apologize to this student which

17   he had actually did prior to even leaving school

18   that very day.

19   Q.    Was there a time that your son was

20   arrested for carrying a gun, whether real or not, to

21   school?

22   A.    Not to my knowledge.

202

1      Q.    Was there a time that your son was

2  arrested for inappropriate touching?

3      A.    Not arrested.

4      Q.    Was there a time that your son -- was

5  there ever an incident involving your son for

6  inappropriate touching?

7      A.    There was.

8      Q.    When was that?

9      A.    I don't recall when.

10          MR. GLOVER:  But --

11      Q.    Was that when he was attending Payne?

12      A.    Yes.

13      Q.    And was that another student?

14      A.    Yes.

15      Q.    And how did you come to find out about

16  that?

17      A.    I don't recall how I found out about

18  that.  I don't recall.

19      Q.    How did you come to find out about the toy

20  gun incident?

21      A.    Ms. Parker.

22      Q.    Was there any court proceedings regarding

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

203

1    the incident with the inappropriate touching?

2        A.    No.

3        Q.    Was that matter resolved at the school?

4        A.    It was.

5        Q.    And are you aware of how it resolved?

6        A.    I'm not -- I can't elaborate on it.  I

7    don't know.

8        Q.    While your son was attending Payne

9    Elementary, did you ever go down to school to

10   examine your son's records or homework reports or

11   anything to that effect?

12       A.    I did.

13       Q.    And were you allowed to do so by the

14   staff?

15       A.    No.

16       Q.    Who wouldn't allow you to review the

17   records?

18       A.    The principal.

19       Q.    Did he tell you why?

20       A.    Because he didn't know who I was.  I said,

21   I had my ID here, and so he said he had just met the

22   Draytons.  But I informed him the Draytons was not

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

204

1    his parent.  I was.

2        Q.    After you showed him your ID, so forth,

3    was there ever a time that he had allowed you to

4    come down or contacted you to say you could come

5    down and review your son's records?

6        A.    Well, actually he ended up calling D.C.

7    counsel to get permission for me to review the

8    records.

9        Q.    And how do you know that?

10       A.    I was standing there.

11       Q.    And what happened at that point?

12       A.    I was shown partial records.

13       Q.    I apologize?

14       A.    Partial.

15       Q.    Okay.  If you recall, what records were

16   you shown?

17       A.    I don't recall just right off, but it

18   wasn't the entire file.

19       Q.    And how do you know that it wasn't the

20   entire file?

21       A.    Because at the -- I had another

22   opportunity to review the entire file.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

205

1    Q.    And when was that?

2    A.    I believe it was with my attorney.    I

3 don't remember when.

4    Q.    So you went back to the school with your

5 attorney?

6    A.    Yes.

7    Q.    And at that point, you were able to see

8 the entire file?

9    A.    Yes.

10    Q.    While your son was attending Payne

11 Elementary, did he get into any fights to your

12 knowledge?

13    A.    Not that -- I don't believe I heard of

14 any.

15    Q.    During while your son was attending Payne

16 Elementary, did you have an opportunity to speak

17 with the Draytons regarding your son's behavior?

18    A.    Yes.

19    Q.    What, if anything, did they tell you?

20    A.    They were working with him of course, but

21 they did not believe in the 504 plan.

22    Q.    They did not --

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

206

1      A.      Believe in the 504 plan.

2      Q.      What do you mean by that?

3      A.      They did not believe in the kids have

4  special needs.

5      Q.      To your knowledge while your son was

6  attending Payne Elementary, was a 504 plan in

7  effect?

8      A.      No.

9      Q.      So I guess I don't understand what you're

10 saying when you say they didn't believe in the 504

11 plan.

12     A.      Well, that's what they actually said to me

13 when the school started to call them.  And I

14 informed them that Reginald is a kid with special

15 needs, and they beg to differ with me.

16     Q.      So the school contacted the Draytons and

17 said that Reginald is a child of special need?

18     A.      No.  I don't know what the school did.

19     Q.      Okay.

20     A.      My -- the school wasn't even aware, I

21 believe Payne wasn't aware that Reginald was a kid

22 with a 504 plan.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

207

1      Q.    Okay.   Did you ever contact Payne and

2   inform them that your son was a 504 student?

3      A.    I don't recollect.   At some point in time

4   I -- there was a meeting, a discussion, I believe.

5      Q.    Were you in attendance for that discussion

6   or that meeting?

7            MS. ALVAREZ:   I'm sorry.   Could you repeat

8       the question?

9            (Whereupon the record was read.)

10     A.    It was during the time he was suspended.

11   That's all I can remember.

12     Q.    My question was, though, were you in

13   attendance?   You said there was a meeting.

14     A.    No.   I said that may have been, it was

15   discussion about the suspension.

16     Q.    My question, I guess, now to clarify it

17   was did you ever meet with the staff at Payne

18   Elementary to discuss a 504 plan with your son?

19     A.    No.

20     Q.    When your son was excluded from the

21   after-school program at Takoma, did you enroll him

22   in any other additional day care service?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

208

1       A.      No.

2       Q.      As a result of your son being excluded

3   from the -- allegedly excluded from the day care

4   service while at Takoma Elementary, as a result of

5   that exclusion, did you incur any out-of-pocket

6   expenses?

7       A.      Yes.

8       Q.      And what were those?

9       A.      I had to hire a sitter for him.

10      Q.      Who was your sitter?

11      A.      Shirley Jackson.

12          MS. ALVAREZ:  Excuse me.  Could you stop a

13       moment?  I seem to have run out of ink.

14          (Pause.)

15      Q.      Where did Shirley Jackson live?

16      A.      Washington, D.C., Northwest.

17          THE REPORTER:  Shirley?

18          THE WITNESS:  Yes, Shirley.

19      Q.      How much did you pay Ms. Jackson?

20      A.      I was paying her $100 a week.

21      Q.      Do you have any receipts or any notes or

22  any documentation to support that?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

209

1    A.    I don't have any receipts, but I have her.

2    Q.    Well, my question is:  Do you have any

3    receipts or documentation?

4    A.    No.  No.

5    Q.    Now, this is the same Shirley Jackson

6    which is the girlfriend that you were referring to

7    earlier?

8    A.    Yes.

9    Q.    So when you would go to this house, your

10   son wouldn't be there anyway; correct?

11   A.    Initially, he started to go.  And he

12   stopped.  Then, I mean, it was like sporadic, but

13   you still pay a sitter if they are keeping your kid.

14   Q.    How much in total did you pay Shirley

15   Jackson for watching your son?

16   A.    I would have to go through and just look,

17   and just calculate to see when he did in essence go.

18   Q.    How many --

19   A.    Off the top of my head, I don't know.

20   Q.    How many weeks in total was Shirley

21   Jackson to watch your son after he was removed from

22   the after-school program?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

210

1    A.    The problem is I don't recall exactly when

2    he was removed from the after-care program.

3    Q.    As a result of the incidents that occurred

4    with your son in his time at Takoma, Turner and

5    Payne, did you suffer any anxiety or emotional

6    stress?

7    A.    Yes.

8    Q.    And how did you suffer that anxiety or

9    emotional distress?

10   A.    Well, I was out of work.  Lost a lot of

11   time from work because I was just mentally drained.

12   Emotionally drained.  And with the latest being I

13   remember maybe a month.  Sometime in 2006.

14   Q.    You mentioned this, when did this anxiety

15   or emotional distress come about?

16   A.    So, just from the onset of dealing with

17   the Takoma staff.

18   Q.    When?

19   A.    September -- well, actually started in I

20   guess from the very, when I very -- when I initially

21   enrolled the child actually, because of the running

22   around from the school trying to get him in the

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

211

1    school, withdrawing him from one school, so from

2    the -- the start, the very beginning.

3        Q.    Did you as a result of this anxiety or

4    emotional distress, did you ever see a psychologist?

5        A.    Yes.

6        Q.    As a result of this anxiety?

7        A.    Yes.

8        Q.    Who did you see?

9        A.    Edith Mehan.

10       Q.    And when did you first start treating with

11   Edith Mehan?

12       A.    I have to go back and look.  I don't

13   recall.

14       Q.    How long did you treat with Edith Mehan?

15       A.    I'm still under treatment now.

16       Q.    Is this court-ordered treatment?

17       A.    I was seeing -- no.  It's not

18   court-ordered treatment.  I was seeing Mehan for

19   individual counseling.

20       Q.    When was the last time you saw Edith

21   Mehan?

22       A.    I no longer see Mehan.  I see -- last I

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

212

1    think two weeks ago.  It's another counselor now.

2        Q.    My question was when did you stop seeing

3    Edith Mehan?

4        A.    I don't remember.

5        Q.    Was it this year?  Was it last year?  Was

6    it the year before last?

7        A.    Last year probably.

8        Q.    2007?

9        A.    Yes.  Last year.

10       Q.    And you stated, you're seeing a new

11   counselor?

12       A.    Yes.

13       Q.    And is this as a result of a court order?

14       A.    It's -- Kaiser does not treat patients for

15   court orders.  Again, I'm there because I need

16   someone to talk to about things that are occurring

17   in my life.

18       Q.    As a result of any court proceedings, were

19   you ever directed and/or instructed to seek

20   psychological or psychiatric treatment and/or

21   counseling?

22       A.    Yes.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

213

1      Q.    And was Edith Mehan one of the persons

2   that you saw as a result of that court order?

3      A.    We -- Edith and I talked about that.

4      Q.    My question was as a result of that court

5   order, was Edith Mehan one of the counselors that

6   you saw?

7      A.    No.  Not as a result of a court order.

8      Q.    Okay.  The present individual that you're

9   seeing now, treatment, that person's name?

10     A.    I can't think right off what it is.

11     Q.    Okay.  Are you seeing -- again, I don't

12  know if you can answer this question.  Are you

13  seeing this person as a direct result of a court

14  order?

15     A.    Again, individual counseling that I feel I

16  need to sustain.

17     Q.    Presently, are you seeking treatment from

18  anyone as a -- any counselor, psychiatrist or

19  psychologist as a result of a court order?

20     A.    No.

21     Q.    When was the first time you were directed

22  to seek psychological, psychiatric or counseling as

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

214

1    a result of a court order?

2        A.    I don't remember the year.  After Reginald

3    was removed from the home.

4        Q.    And as a result of that, who did you start

5    treating with?

6        A.    As a result of that court order, who did I

7    start treating with?

8        Q.    Exactly.

9        A.    I was under care at Kaiser which I still

10   am.

11       Q.    I guess, ma'am, you're confusing me.  As a

12   result of the court order, you went to Kaiser?

13       A.    I was seeing a -- I cannot remember if it

14   was a result of the court order or whether I felt

15   the need.  I don't remember.  But it occurred after

16   the child was removed from home.  I can definitely

17   say that much.

18            MS. ALVAREZ:  I have 3:40 now.  Time is

19        almost up.

20            MR. GLOVER:  Well, I'm going to put a

21        statement on the record, and if I'm not done, I

22        may move to, for another deposition.  Just,

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

215

1          it's 3:40, Plaintiff's counsel stated time is

2          up.  I just wanted to make it clear for the

3          record that at the last session we broke for

4          lunch.  We took an hour lunch.  Plaintiff's

5          counsel is now come up with some policy that

6          the lunch period counts as -- against the

7          deposition seven-hour period.

8               It is the position of the Defendant that

9          everyone agreed upon taking a break.  It was

10         recommended by myself I will concede that we

11         take an hour for lunch.  It was not with the

12         intention of that being utilized against the

13         time for the deposition.

14    Q.    You stated that you missed time from

15    work.  How much time did you miss from work?

16    A.    I would have to go back through the

17    records.

18    Q.    Have you -- the last 30 days, have you

19    reviewed any records pertaining to this matter?

20    A.    No.

21    Q.    Ballpark, how many days would you say you

22    missed from work?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

216

1      A.    I can't.  I missed an enormous amount of

2  time from work.

3      Q.    Okay.  Approximately how much in income

4  did you lose as a result of that?

5      A.    Big bucks.

6      Q.    Let's hear it.

7      A.    I make over $30 an hour so -- if I missed

8  an enormous amount of time, it would have to

9  calculate, so I can't tell you dollar-for-dollar how

10  much I've lost.

11      Q.    Do you have any documentation, any letters

12  from your job, anything to show that you missed time

13  specifically resulting from this incident?

14      A.    Yes.

15      Q.    You don't have those here with you today?

16      A.    No.

17      Q.    Did your son graduate from Payne?

18      A.    That's difficult to answer.  He wasn't

19  allowed to participate.  He was suspended.  So he

20  was not allowed to participate in any of the

21  activities, but he was promoted to the 7th Grade.

22      Q.    Okay.  Why was he suspended?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

217

1      A.      Why was he suspended?   It may have been

2  incident with the assault.   I believe.

3          Can I withdraw that?   He was suspended

4  because -- but he wasn't suspended.   He was not

5  allowed to participate in the exercises due to his

6  behavior if I recall that correctly.

7      Q.      What was his behavior like?

8      A.      Not staying in class as he should.

9  Talking back.   Just remember that I had spoken to

10 the principal, and he said if Reginald -- the two of

11 them had made, you know, an agreement that Reginald

12 would not walk out of class, so forth and so on.

13 And if he did, then he would -- could not

14 participate in the ceremony or exercises.   And of

15 course, Reginald did not stay in the class.

16     Q.      Of course.   Did you ever speak to the

17 principal regarding this agreement?

18     A.      I did.

19     Q.      And what did he tell you about the

20 agreement?

21     A.      Well, he actually told me the two of them

22 had made this agreement and --

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

218

1      Q.     What did you say to that?

2      A.     I told him it was going to be impossible,

3   virtually impossible because I knew --

4      Q.     What?

5      A.     -- because he's not going to stay in

6   class.  I mean, he has a problem sitting still for a

7   long period of time.  He has a problem with

8   attention.

9              So to make an agreement like that with

10  Reginald was not the thing to do.

11     Q.     During that time that your son was at

12  Payne, was he on medication?

13     A.     Yes.

14     Q.     What medication was he on?

15     A.     Adderall and Risperdal.

16     Q.     And do you know, was he taking it?

17     A.     I wasn't -- he wasn't with me.  He was

18  with the foster parent.

19     Q.     Did there come a time after Payne that

20  your son was returned to your custody?

21     A.     Yes.

22     Q.     When was that?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

219

1      A.      I believe May or early June.

2      Q.      And was that per court order?

3      A.      Yes.

4      Q.      And how long did he remain in your

5   custody?

6      A.      Up until early December.

7      Q.      And how was your son's behavior during the

8   time period?

9      A.      Out of control.

10     Q.      Specifically, what was he doing?

11     A.      Staying out late at night.  Leaving the

12   house without permission.  Acting as an adult

13   basically, I mean -- defying all the rules.

14     Q.      During that time period from I guess let's

15   say September until December of that following year,

16   was he enrolled in school?

17             MS. ALVAREZ:  From what period?

18     Q.      September to December.

19     A.      Yes.

20     Q.      Was he enrolled in school?

21     A.      He was enrolled.

22     Q.      Where was he enrolled in school?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

220

1    A.    Oak Valley.

2    Q.    Where is that located?

3    A.    Fairfax, Virginia.

4    Q.    Was he going?

5    A.    He hasn't been to school for two months.

6    Q.    Did you talk to him about it?

7    A.    Every minute.

8    Q.    Did it work?

9    A.    No.

10    Q.    Do you know if Oak Valley had a 504 plan?

11    A.    Yes.

12    Q.    The 504 plan, did you see any progress as

13    a result of the 504 plan for the time period he was

14    in school?

15    A.    It's hard to say, because he wasn't

16    attending on a regular basis.

17    Q.    And what happened in December?

18    A.    He was removed from the home.

19    Q.    And why was that?

20    A.    His behavior was that I could not control

21    it, and I felt I had to keep him safe.

22    Q.    Give me a second.  Let me see if I have --

221

1    during the time period that your son was with you, I

2    believe you said during that I want to say May or

3    June to December time period, was he ever arrested?

4        A.    No.

5        Q.    Brought home by the police?

6        A.    Oh, yes.

7        Q.    How many times?

8        A.    Not more than five.

9        Q.    During those time periods where you say he

10   would stay out late or he wouldn't return home, do

11   you know where he went?

12       A.    No.

13       Q.    Do you have any recollection as we're

14   sitting here ever being in court before a hearing

15   officer as a result of your due-process violation

16   filings?

17       A.    Could you repeat?

18       Q.    Certainly.  Do you remember, ever recall

19   being in court in front of a hearing officer as a

20   result of your filings of your due-process

21   violation?

22       A.    I believe so.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

222

1      Q.    Do you recall specifically the hearing

2   officer telling you anything with respect to any

3   rulings he might have made on those due-process

4   violations?

5      A.    I don't recall that far back.

6      Q.    I don't have that much longer.  You will

7   be out of here shortly.

8            To your recollection, was your attorney

9   ever in contact with the staff at -- please, don't

10  tell me about the conversations, but was your

11  attorney ever in contact with the staff at Payne

12  Elementary?  If you know.

13     A.    I don't know.

14     Q.    If you know, did your attorney ever send

15  letters or send documentation to the staff at Payne

16  Elementary?

17     A.    There was some correspondence sent and

18  they may have been CC'ed or copied on it.  I'm not

19  sure.

20     Q.    Do you recall if the staff at Payne

21  responded to that correspondence?

22           MS. ALVAREZ:  Objection.  Calls for

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

223

1      speculation.

2      Q.    If you know.

3      A.    I don't know.

4      Q.    Did you yourself ever send any

5  correspondence to the staff at Payne Elementary?

6      A.    Yes.

7      Q.    Was that correspondence responded to?

8      A.    You know, I don't recall.

9      Q.    Was -- had you ever heard, now I'm

10  speaking about Turner Elementary, had you ever heard

11  of Turner Elementary other than -- having a policy

12  or practice of discriminating against students

13  with learning -- any -- had you ever heard of any

14  students at Turner Elementary being discriminated

15  against due to disabilities?

16      A.    No.

17      Q.    Had you ever heard of any students at

18  Payne Elementary being discriminated against because

19  of any disabilities?

20      A.    I don't know.

21      Q.    Almost at the finish line.  I will have

22  you out of here shortly.

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

224

1          After your son was suspended while at --

2    during any of the time that your son was suspended

3    while at Payne Elementary, now specifically speaking

4    only of the time at Payne, did you ever contact

5    Clifford Janey?

6         A.    Could you repeat that?

7         Q.    Certainly.  While your son was attending

8    Payne Elementary, you said he was suspended possibly

9    three times; correct?

10        A.    Yes.   Three occasions.

11        Q.    Did you ever contact Clifford Janey as a

12   result of those suspensions?

13        A.    I don't remember.

14        Q.    Did you ever contact William Wilhoyte as a

15   result of those suspensions?

16        A.    I can't recall.

17        Q.    Linda Roberts as a result of those

18   suspensions?

19        A.    Just don't recall.

20        Q.    Okay.   Jennifer Finch?

21        A.    I don't recall that.

22        Q.    Timothy Williams?

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

225

1    A.    I just don't recall them.

2    Q.    Did you ever specifically request from

3  Payne Elementary that they provide you with copies

4  of incident reports pertaining to your son?  Did you

5  ever recall specifically having that conversation

6  with anyone from Payne?

7    A.    I can't recall.  I may have.  I may have.

8  I just right off do not recall.

9    Q.    Do you recall if -- never mind.

10        MR. GLOVER:  Ma'am, I thank you for your

11     time.

12        MS. ALVAREZ:  I have a couple of

13     questions.

14                    EXAMINATION

15  BY MS. ALVAREZ:

16    Q.    Let me see.  You were asked a couple of

17  questions during the course of the deposition today

18  about viewing or examining school files, and I want

19  to follow up on those questions with a couple of my

20  own.

21        The phrase that was used at one point in

22  the questions and answers was, quote, the entire

226

1    file.  Do you know what's supposed to be in a school

2    file?

3        A.    No.

4        Q.    Okay.  How would you know whether the file

5    was complete or not complete that was shown to you?

6        A.    I wouldn't know.

7        Q.    Okay.  Now, you mentioned contacting

8    people at DCPS concerning the problems that you and

9    Reginald encountered at Takoma Elementary center.  I

10   would like you to tell us how you started contacting

11   people and where it led you.

12       A.    I remember the initial person I that

13   talked with was a Rosina Frisbee.  And she was the

14   secretary to -- god, I can't recall this person.  I

15   can't recall it.  Her name.  And it was a while

16   before I heard from that office.  I eventually had

17   to call them back again as the suspensions escalated

18   at Takoma.  And I was led to the parent partnerships

19   office.  With a -- spoke with a Donna Davison, I

20   believe.  And then to the special education office

21   where I spoke to a Karen -- Henry Wills, I believe.

22       Q.    Now, early today you were asked about

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

227

1    conversations with Clifford Janey.  Did you actually

2    speak with Clifford Janey personally?

3        A.    No.

4        Q.    Whom did you speak with?

5        A.    I thought with Mr. Janey was in this

6    office with the Rosina Frisbee person or I spoke

7    with the secretary that gave me the Frisbee's number

8    from Janey's office.  That's, I believe this is how

9    this chain went.  Mr. Janey's office, I didn't speak

10   with him, but a secretary that led me to -- gosh,

11   I -- her name escapes me, but her secretary is

12   Rosina Frisbee.  Who then gave me the parent

13   partnership and then special ed.

14           MS. ALVAREZ:  No further questions.  Thank

15       you very much.  Do you intend to look at the

16       documents that we've produced or not?

17           MR. GLOVER:  Sure.  I didn't know there

18       were any.

19           MS. ALVAREZ:  They have been sitting here

20       the last two sessions.

21           MR. GLOVER:  You didn't say anything.

22           MS. ALVAREZ:  They've been sitting there.

228

1        MR. GLOVER:  What am I, a clairvoyant, I'm

2   supposed to know that they are for me?

3        MS. ALVAREZ:  Well, they are there.

4        MR. GLOVER:  Thank you.

5        (Whereupon at 3:57 the deposition

6   concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

229

1            DISTRICT OF COLUMBIA

2

3        I, Susan Farrell Smith, Notary Public of

4    the District of Columbia, do hereby certify that

5    LINDA FAY TOMONIA personally appeared before me at

6    the time and place herein set out, and, after having

7    been duly sworn by me, was examined by counsel.

8            I further certify that the examination was

9    recorded stenographically by me and that this

10   transcript is a true record of the proceedings.

11           I further certify that I am not of counsel

12   to any of the parties, nor an employee of counsel,

13   nor related to any of the parties, nor in any way

14   interested in the outcome of this action.

15           As witness my hand and notarial seal this

16   7th day of February, 2008.

17

18

19                    Susan Farrell Smith

20                      Notary Public

21       (My Commission expires February 29, 2012)

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

230

1          ACKNOWLEDGEMENT OF DEPONENT

2

3    I, LINDA FAY TOMONIA, acknowledge that I have read

4    and examined the foregoing testimony, and the same

5    is a true, correct and complete transcription of the

6    testimony given by me, and any corrections appear on

7    the attached errata sheet signed by me.

8

9

10

11    _____          _____

12        (Signature)                      (Date)

13

14

15

16

17

18

19

20

21

22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

231

## A

**Abby** 181:5
**able** 183:17 205:7
**Absolutely**
  149:11 150:11
  151:1 153:13
  154:4 169:9
  172:3,13
**acknowledge**
  230:3
**ACKNOWLE...**
  230:1
**Acting** 219:12
**action** 229:14
**activities** 216:21
**Adderall** 218:15
**additional** 180:8
  207:22
**address** 167:16
**adhere** 149:9
**adult** 219:12
**afternoon** 148:3
**after-care** 150:15
  210:2
**after-school**
  207:21 209:22
**Agency** 177:13,20
  178:7
**agitating** 186:2
**ago** 212:1
**agreed** 215:9
**agreement** 217:11
  217:17,20,22
  218:9
**al** 145:5,9
**allegedly** 208:3
**allow** 149:4
  186:14 203:16
**allowed** 160:4,8
  203:13 204:3
  216:19,20 217:5
**Alvarez** 146:2,3
  147:3 148:4,11
  149:22 151:9,13
  152:18,22
  153:16,21
  154:10,11,18

155:6,13,16
157:2,5 158:18
158:21 159:2,6
161:3,18 162:3
162:7 163:6,9
164:11 165:7,13
165:15,18,22
168:2 170:16,18
170:20 171:1,9
171:12,15
174:13 178:9,13
178:16 186:16
187:12 188:5,9
188:12 189:13
190:18,22 191:3
191:5,11 194:13
194:16,18
196:19 198:21
207:7 208:12
214:18 219:17
222:22 225:12
225:15 227:14
227:19,22 228:3
**amount** 216:1,8
**ample** 171:5
**analysis** 161:2
**and/or** 212:19,20
**answer** 149:6
  150:2 157:3
  159:5 165:17,19
  165:21 166:1
  178:15,17
  188:13 191:6,10
  213:12 216:18
**answered** 149:22
  165:8,13,18
  178:9,14,16,18
  188:6,12 190:18
  190:22 191:5
  198:22
**answers** 155:2
  185:18 225:22
**anxiety** 210:5,8
  210:14 211:3,6
**anyway** 209:10
**apologize** 161:21
  173:11 178:5

200:2 201:16
204:13
**appear** 175:18
  230:6
**APPEARANCES**
  146:1
**appeared** 229:5
**appears** 161:4
**appropriate**
  167:7
**approximately**
  196:9,17,22
  198:6 216:3
**area** 159:9
**aren't** 161:13
  171:8
**arrested** 200:5,7
  201:20 202:2,3
  221:3
**arrived** 148:7
**articulated**
  148:16 149:7,10
**asked** 149:22
  165:7,13 166:1
  178:13 185:9
  188:5,12 190:18
  190:22 191:5
  193:4 198:21
  200:1 225:16
  226:22
**asking** 164:16
  167:5 170:20
  195:21
**assault** 199:19,19
  217:2
**assaulting** 199:17
**assist** 160:1
**assistance** 179:11
**attached** 230:7
**attempted** 154:15
**attempts** 187:21
**attend** 158:12,14
  188:15
**attendance** 207:5
  207:13
**attended** 172:6,11
**attending** 173:5

179:5 182:3,9
187:10 188:2,11
188:15,16,20,20
200:5 202:11
203:8 205:10,15
206:6 220:16
224:7
**attention** 218:8
**attest** 181:22
**attorney** 146:9
  158:14,16,17
  174:8 177:20
  205:2,5 222:8
  222:11,14
**awarded** 153:14
**aware** 197:10
  203:5 206:20,21

## B

**babysitting**
  150:15
**back** 154:10,21
  161:19 164:5
  167:5 170:4
  189:14 195:10
  205:4 211:12
  215:16 217:9
  222:5 226:17
**Backing** 190:13
**Ballpark** 215:21
**basically** 200:2
  219:13
**basis** 175:9
  220:16
**beg** 206:15
**beginning** 148:22
  169:19 211:2
**behalf** 146:7,14
**behavior** 149:21
  150:4,8 167:7
  167:19 168:7
  169:8,10 170:2
  170:8,12 171:20
  171:21 172:2
  173:16 177:22
  205:17 217:6,7
  219:7 220:20
**behavioral** 161:2

**behaviors** 176:18
**Bekkali** 146:17
**believe** 152:6
  153:4 156:21
  158:22 159:3,19
  160:13 162:12
  162:21 163:21
  166:11,19,22
  172:15,18 173:1
  174:3,10 175:8
  179:2,3,14
  180:11 181:11
  182:20,21 183:5
  183:6 186:3
  189:1,20 190:7
  191:10,20 193:3
  196:10,11,14
  197:6 198:5
  199:11 200:1,1
  205:2,13,21
  206:1,3,10,21
  207:4 217:2
  219:1 221:2,22
  226:20,21 227:8
**best** 159:7 196:14
**better** 172:4
**Big** 216:5
**bit** 164:6 190:13
**board** 160:5
**break** 153:17
  155:12 178:3
  215:9
**brief** 155:14
**broke** 178:11
  215:3
**brought** 177:3
  221:5
**bucks** 216:5
**building** 184:15
  184:17

## C

**calculate** 209:17
  216:9
**calculation** 148:8
**call** 150:5 153:17
  168:16,17 169:1
  169:5 191:9

Case 1:07-cv-00882-JR    Document 46-2    Filed 02/28/2008    Page 251 of 260
DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

232

197:7 198:13
199:2 206:13
226:17
**called** 172:19
180:11 195:10
196:7 197:10
**calling** 172:22
204:6
**calls** 173:12,13
174:13 222:22
**campus** 172:16
**can't** 154:6,8
160:3,18 161:11
164:14 171:1
175:21 180:3
181:22 192:17
198:2 203:6
213:10 216:1,9
224:16 225:7
226:14,15
**care** 207:22 208:3
214:9
**Carolyn** 152:3,12
152:14,20 153:1
157:20
**carrying** 201:20
**case** 158:21
**catch** 157:2
**cause** 182:14
**CC'ed** 222:18
**center** 226:9
**ceremony** 217:14
**certain** 148:22
189:11
**Certainly** 149:4
187:14 194:3
221:18 224:7
**certify** 229:4,8,11
**chain** 227:9
**changed** 183:3
190:12 191:16
191:17
**check** 148:5
168:20,21,22
191:11
**checking** 198:15
**child** 157:11,12

176:15,17 197:8
197:11 206:17
210:21 214:16
**Civil** 145:4
**clairvoyant** 228:1
**clarify** 170:9
207:16
**class** 160:17
170:4 172:12
185:2,4,8,10,12
185:14,17,19,21
186:1,4 187:11
187:11,18,22,22
196:15 217:8,12
217:15 218:6
**classes** 188:15
**classroom** 160:10
184:13,14,16
185:1 199:15
**clear** 162:14
186:11 193:3
215:2
**client** 153:18
154:15,16,19,20
155:1 188:13
**Clifford** 178:20
179:1 180:8
224:5,11 227:1
227:2
**closer** 160:5
**Columbia** 145:3,8
229:1,4
**come** 154:21
158:6 166:18
169:20 172:17
186:14 190:3
196:12 198:9,18
202:15,19 204:4
204:4 210:15
215:5 218:19
**coming** 150:6
**commencing**
145:13
**Commission**
229:21
**communication**
156:11 169:21

**complaint** 200:10
200:13,14,17,18
200:21
**complete** 160:17
160:17 185:3
226:5,5 230:5
**concede** 215:10
**concerning** 226:8
**concluded** 228:6
**confusing** 214:11
**constant** 169:21
**consult** 153:17
155:1
**contact** 155:19,21
156:5,6,12
166:17,18
168:14 176:9
177:12 178:20
179:1 193:19,21
194:6,21 195:3
207:1 222:9,11
224:4,11,14
**contacted** 156:14
157:10 177:17
204:4 206:16
**contacting** 177:19
178:6 179:7
198:14 226:7,10
**content** 174:7
**contest** 192:17
**continuation**
148:16,21
**continued** 145:12
147:3 148:1
179:9
**control** 151:6,12
219:9 220:20
**conversation**
179:19 180:13
180:16 181:2
195:12 201:1
225:5
**conversations**
180:8,19 181:5
193:15 222:10
227:1
**copied** 222:18

**copies** 225:3
**copy** 177:3,8
196:4
**correct** 149:16,17
154:18,19
162:16 163:2,5
163:12 165:14
173:2 177:6
179:6 181:15,16
186:15,18,20
190:16 201:7
209:10 224:9
230:5
**corrections** 230:6
**correctly** 217:6
**correspondence**
222:17,21 223:5
223:7
**couldn't** 184:20
**counsel** 147:9
153:20 154:14
159:4 204:7
215:1,5 229:7
229:11,12
**counseling**
160:20 188:4,10
188:15,16
211:19 212:21
213:15,22
**counselor** 154:4
162:6 164:14
170:19 178:12
212:1,11 213:18
**counselors** 213:5
**counts** 153:19
215:6
**couple** 194:14,15
225:12,16,19
**course** 185:15
195:20 199:10
205:20 217:15
217:16 225:17
**court** 145:2
175:18 191:9
199:22 200:1,12
201:6,9 202:22
212:13,15,18

213:2,4,7,13,19
214:1,6,12,14
219:2 221:14,19
**courts** 153:14
**court-ordered**
211:16,18
**create** 158:6
**criminal** 200:10
**curfew** 150:9
192:15
**Curtis** 152:3,5,12
152:14,17,20
153:1,3,12,15
155:7 157:20
169:7 170:6,10
171:20 172:5
181:21 182:1
191:20 192:9,12
192:15
**custodial** 157:14
197:20
**custodian** 197:16
**custody** 152:12
152:14,17,22
218:20 219:5

---

**D**

**D** 146:2,3 161:12
**daily** 159:19
**date** 162:19
230:12
**dates** 159:11
182:6
**daughter** 153:7,9
**daughter's**
153:12,13
**Davison** 179:17
179:17 226:19
**day** 168:20 172:6
197:9 201:18
207:22 208:3
229:16
**days** 169:18
194:14,15 197:6
215:18,21
**DCPS** 226:8
**dealing** 210:16
**December** 183:7

Case 1:07-cv-00882-JR   Document 46-2   Filed 02/28/2008   Page 252 of 260
DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

233

183:9,11 219:6
219:15,18
220:17 221:3
**Defendant** 145:10
215:8
**Defendants**
146:14
**Defendant's**
162:1
**definitely** 169:11
174:6 214:16
**defying** 219:13
**Department**
178:1
**DEPONENT**
230:1
**deposition** 145:12
147:7 148:21
149:1,13 154:17
161:15 171:4,5
177:2 214:22
215:7,13 225:17
228:5
**describe** 149:20
**described** 159:14
**details** 159:16
**determination**
166:14 188:21
**determinations**
189:10
**develop** 165:2
**developed** 163:10
163:11,13 167:2
**development**
173:19
**didn't** 157:2
179:14 184:19
185:2 196:6
203:20 206:10
227:9,17,21
**differ** 206:15
**difficult** 159:12
216:18
**direct** 213:13
**directed** 212:19
213:21
**disabilities**

223:15,19
**disability** 176:19
**discriminated**
223:14,18
**discriminating**
223:12
**discuss** 170:6
172:4,5 173:15
173:18 177:13
187:8 207:18
**discussed** 186:16
190:15
**discussing** 187:3
**discussion** 148:18
161:14 191:14
207:4,5,15
**distress** 210:9,15
211:4
**District** 145:2,3,8
229:1,4
**division** 145:4
201:11
**document** 162:2,9
162:15
**documentation**
208:22 209:3
216:11 222:15
**documents**
227:16
**doing** 171:4
219:10
**dollar-for-dollar**
216:9
**Donna** 226:19
**don't** 152:6 156:1
156:14 157:16
159:10 164:15
165:19 171:3
172:20 173:8
174:5,16,22
175:4 176:12,22
177:17 178:17
180:5 181:9
182:4,5,11
183:11 185:19
186:10 191:6,9
191:11,19 192:7

193:3 195:16
197:21 198:2
199:6 202:9,17
202:18 203:7
204:17 205:3,13
206:9,18 207:3
209:1,19 210:1
211:12 212:4
213:11 214:2,15
216:15 222:5,6
222:9,13 223:3
223:8,20 224:13
224:19,21 225:1
**door** 184:12
**drafted** 159:15
**drained** 210:11
210:12
**Drayton** 193:8
**Draytons** 193:8
193:10,10,12,16
197:10,18,19,22
203:22,22
205:17 206:16
**due** 217:5 223:15
**due-process**
174:18,20 175:6
175:10,14,20
176:1 221:15,20
222:3
**duly** 229:7
**D.C** 145:15 146:5
146:12 177:13
177:15,19,21
178:7 204:6
208:16

## E

**E** 145:1 147:7
161:15,18 162:1
**earlier** 209:7
**early** 153:4
163:21 219:1,6
226:22
**economy** 167:14
167:22
**ed** 227:13
**Edith** 211:9,11,14
211:20 212:3

213:1,3,5
**education** 156:7
177:14 178:1
189:7,21 226:20
**educational**
173:19 193:16
194:1,7,22
**effect** 203:11
206:7
**either** 184:9
**elaborate** 203:6
**Elementary**
151:22 152:2,5
152:11 155:18
155:19,22
156:10,13
158:11 163:1
173:6 181:13
182:3,10,15,19
187:10,16 188:3
188:17,20 190:4
190:6,11 192:20
192:21 193:1,7
193:15,19,21,22
194:6,7 196:3,4
197:13 198:1
199:8 200:5
203:9 205:11,16
206:6 207:18
208:4 222:12,16
223:5,10,11,14
223:18 224:3,8
225:3 226:9
**eligible** 189:6
**emotional** 210:5,9
210:15 211:4
**Emotionally**
210:12
**employee** 229:12
**employment**
192:2
**encountered**
226:9
**encourage** 172:3
**ended** 204:6
**Enforcement**
177:13,16,20

178:7
**enormous** 216:1,8
**enroll** 177:9
197:22 207:21
**enrolled** 151:21
152:1,4,11
155:18 156:9
177:4 192:19,19
193:1,7,14,18
193:20 194:5,10
194:12,15
195:14 196:2
197:12 198:3
210:21 219:16
219:20,21,22
**entire** 153:10
171:11 172:12
204:18,20,22
205:8 225:22
**entirely** 150:17
**ERIC** 146:8
**errata** 230:7
**escalated** 150:4
226:17
**escapes** 195:4
227:11
**Esq** 146:3
**ESQUIRE** 146:2
146:8
**essence** 209:17
**et** 145:5,9
**evaluations** 189:9
**evening** 150:21
**eventually** 156:15
226:16
**exactly** 172:20
210:1 214:8
**examination**
147:1 148:1
225:14 229:8
**examine** 186:14
203:10
**examined** 229:7
230:4
**examining** 162:15
225:18
**excluded** 207:20

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

234

208:2,3
exclusion 208:5
excuse 148:20
  153:16 161:3
  166:4 170:14
  171:20 183:9
  193:22 208:12
exercises 217:5
  217:14
exhibit 147:5,7,9
  161:15,18,20
  162:1
expenses 208:6
experiencing
  176:19
expires 229:21
extended 153:14
e-mails 173:22
  174:2,5,9,11

**F**

fact 164:2
facts 199:18
Fairfax 220:3
fairly 162:6
Fall 156:2 173:5
  175:3
familiar 181:6,8
  181:10
far 159:8 179:14
  222:5
Farrell 145:15,21
  146:16 229:3,19
father 150:3
FAY 145:12
  147:2 229:5
  230:3
February 186:6,8
  229:16,21
feel 167:19
  213:15
felt 214:14 220:21
fights 205:11
file 174:20 175:7
  204:18,20,22
  205:8 226:1,2,4
filed 174:17 176:2
  200:9,10,13,14

200:16,18,21
files 225:18
filing 175:10,19
filings 221:16,20
finalize 166:7,8
  166:14
Finch 180:20,22
  224:20
find 172:17 199:8
  199:12 202:15
  202:19
finish 149:4 169:2
  188:7 223:21
first 153:5 155:21
  158:20 168:3,6
  168:17 175:9
  179:1 181:12
  182:18 184:11
  185:9 194:20,21
  195:8,11,13
  196:7 197:4,6
  198:11,20
  199:11 211:10
  213:21
five 221:8
Floor 145:14
  146:10
follow 199:7
  225:19
following 155:15
  219:15
follow-up 198:16
foregoing 230:4
forth 204:2
  217:12
foster 152:3,19
  155:9 169:22
  190:12 191:16
  191:18 193:12
  218:18
found 202:17
Foxhall 146:4
frequency 173:8
frequent 192:3
Frisbee 226:13
  227:6,12
Frisbee's 227:7

front 176:4
  221:19
further 170:17
  227:14 229:8,11

**G**

General 146:9
  177:21
girlfriend 209:6
girlfriend's
  150:14,20,22
give 185:18
  220:22
given 230:6
GLOVER 146:8
  147:3 148:2,10
  148:13,14,17,19
  151:11,14
  152:21 153:19
  154:2,12 155:2
  155:8,11 159:4
  161:7,12,19
  162:5 163:8
  164:13 165:16
  165:20 166:2
  168:4 170:19,21
  171:3,10,13,16
  178:11,18
  187:14 188:7
  191:2,7,13
  194:17 199:1
  202:10 214:20
  225:10 227:17
  227:21 228:1,4
go 150:14,19
  182:14 183:14
  184:12 185:7
  186:12 194:11
  199:22 200:12
  203:9 209:9,11
  209:16,17
  211:12 215:16
god 226:14
going 149:9
  153:16 158:6
  159:10 165:4
  175:11,16,22
  176:3 178:3

179:10 182:22
  183:9 185:18
  191:8 214:20
  218:2,5 220:4
good 148:3
  167:19
gosh 227:10
grade 151:19
  192:22 193:2,4
  216:21
graduate 151:17
  216:17
greet 184:11
guardian 157:15
guess 159:21
  182:7 206:9
  207:16 210:20
  214:11 219:14
guilty 201:13,13
gun 201:20
  202:20

**H**

Hairston 181:5
half 148:9 197:8
halls 170:5 184:9
  185:7 196:14
  199:14
hallway 154:2
  184:21
hand 229:15
handed 161:22
happened 159:13
  183:22 198:14
  204:11 220:17
hard 220:15
hasn't 220:5
head 209:19
hear 216:6
heard 155:15
  205:13 223:9,10
  223:13,17
  226:16
hearing 175:18
  189:2,5 198:12
  221:14,19 222:1
held 158:2,9,10
  162:16,20 164:7

164:18 188:22
help 158:7 165:2
Henry 226:21
he's 176:17
  185:17,18 186:3
  218:5
hire 208:9
home 149:14,16
  149:20 150:5,6
  151:15 152:19
  153:2,12 160:16
  160:17 169:5
  192:9,16 197:8
  197:17 214:3,16
  220:18 221:5,10
homes 190:12
  191:17,18
homework 184:1
  186:16,19,20
  187:6 203:10
hour 148:9,12
  215:4,11 216:7
house 150:20,22
  151:5 209:9
  219:12

**I**

identification
  162:1
identify 162:8
II 145:1
imagine 186:8
immediate 149:19
immediately
  149:19 154:21
  194:16,19
implemented
  161:6 163:7,8,9
  163:11,15 164:9
  164:20 165:12
  167:10 168:5
important 156:8
impossible 218:2
  218:3
improvement
  168:6,9
inappropriate
  170:2 202:2,6

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

235

203:1
incentives 167:6
incident 202:5,20
  203:1 216:13
  217:2 225:4
incidents 210:3
include 164:4,5
  167:6
included 167:15
including 187:9
income 216:3
incur 208:5
independent
  161:9 167:8
  182:8
INDEX 147:1,5
individual 176:20
  211:19 213:8,15
infer 158:5
inform 207:2
information
  172:21,21
  175:12
informed 203:22
  206:14
initial 149:1
  167:16 168:5,13
  176:7 182:12
  190:15 226:12
initially 166:20
  166:22 209:11
  210:20
ink 208:13
instruct 188:13
instructed 212:19
instructing
  165:20
intend 227:15
intention 215:12
interested 229:14
involving 199:19
  202:5
it's 159:12 162:5
  165:5,9 197:8
  211:17 212:1,14
  215:1 220:15
I'll 170:14,17

I'm 151:9 153:16
  154:5 157:2
  158:16 159:6,10
  159:21 161:17
  165:4,22 167:18
  169:4 170:20
  171:4,6 175:11
  175:16,22 176:3
  177:15 178:3,10
  178:13,17 182:4
  183:10,12
  186:11 189:11
  189:11,13,17,22
  190:17 191:8
  196:19 197:1
  201:2 203:6
  207:7 211:15
  212:15 214:20
  214:21 222:18
  223:9 228:1
I've 148:6 216:10

_____

J

Jackson 208:11
  208:15,19 209:5
  209:15,21
Janey 178:20
  179:1,8,12,19
  180:8 224:5,11
  227:1,2,5
Janey's 227:8,9
January 145:13
  163:21,21
  166:11,13 167:4
  183:7,9
Jennifer 180:20
  180:22 224:20
job 145:22 169:12
  191:21 216:12
Johnson 153:8
judicial 175:19
June 219:1 221:3

_____

K

Kaiser 212:14
  214:9,12
Kamel 146:17
Karen 146:2,3

226:21
keep 176:5
  187:21 220:21
keeping 209:13
kid 206:14,21
  209:13
kids 206:3
kind 184:2
knew 218:3
know 151:2
  152:16 153:11
  156:9 163:17
  164:15,15
  174:15,16 175:4
  177:17 180:5
  181:20 184:4,10
  185:19 186:11
  188:18 191:17
  193:10 197:3,19
  198:2 199:18,20
  200:7,14,16
  203:7,20 204:9
  204:19 206:18
  209:19 213:12
  217:11 218:16
  220:10 221:11
  222:12,13,14
  223:2,3,8,20
  226:1,4,6
  227:17 228:2
knowledge
  163:14 174:8
  188:14,18 190:1
  197:22 201:22
  205:12 206:5

_____

L

L 145:1
lady's 195:17
late 150:5 196:11
  219:11 221:10
latest 210:12
Law 146:3
learn 169:20
  185:20 196:12
  198:9,19
learning 223:13
leave 150:18

154:16 172:14
  184:13 185:5
  190:6,10
leaving 154:1
  201:17 219:11
led 179:15,20,22
  180:5,11 226:11
  226:18 227:10
left 149:12 172:16
  190:3
letter 174:5
letters 174:4,9,11
  216:11 222:15
let's 149:18 173:4
  198:19 216:6
  219:14
life 212:17
Linda 145:5,12
  147:2 180:17
  195:17,18,19
  224:17 229:5
  230:3
line 223:21
listening 189:17
little 164:6 190:13
live 208:15
located 220:2
long 153:9 211:14
  218:7 219:4
longer 211:22
  222:6
look 150:6 162:15
  209:16 211:12
  227:15
looking 159:21
lose 216:4
lost 169:12
  191:21 210:10
  216:10
lot 177:17 210:10
lots 175:15,21
  197:9
lunch 215:4,4,6
  215:11

_____

M

M 145:1
Madam 148:15

maintain 159:11
majority 184:8
making 187:21
manifestation
  188:21 189:5,19
March 150:3
  179:2,3 190:7,8
  196:11
Mark 166:2
marked 147:6
  161:16 162:1
materials 162:13
  181:14,17
matter 164:2
  203:3 215:19
may 149:15 181:7
  183:12 201:2,4
  207:14 214:22
  217:1 219:1
  221:2 222:18
  225:7,7
ma'am 161:17,22
  162:9 163:17
  165:9,17 173:11
  175:7 180:3
  184:22 187:3
  189:16 190:8
  192:1 201:4
  214:11 225:10
mean 150:4
  152:18 157:16
  158:5,5 161:4
  162:4 163:6
  164:11,13,21
  166:5 172:10
  175:15 180:5
  192:1 194:9,20
  197:7 206:2
  209:12 218:6
  219:13
meant 180:5
medication
  218:12,14
meet 182:15
  207:17
meeting 147:7
  157:7,21,22

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

236

158:1,2,4,5,9,10
159:13,14
162:16,19 163:5
163:18,22 164:9
164:22 167:3,17
168:3,6,13,17
181:12 182:12
182:13 183:2,3
188:21 189:8,19
189:22 190:14
207:4,6,13
meetings 175:15
175:22 198:12
Mehan 211:9,11
211:14,18,21,22
212:3 213:1,5
memory 175:17
mentally 210:11
mentioned 198:5
210:14 226:7
met 182:18
203:21
mid 156:20
mind 225:9
Minus 148:11
minute 152:18
164:12 220:7
minutes 148:11
148:12
missed 215:14,22
216:1,7,12
mom 169:22
197:15
moment 153:17
155:1 208:13
month 149:18
151:4,14 210:13
months 220:5
mother 200:2
move 214:22
moving 171:13,14
171:16,16,17
193:9

**N**

name 181:6 195:4
195:17 213:9
226:15 227:11

Natasha 153:8
need 171:3
193:16 206:17
212:15 213:16
214:15
needed 164:3
needs 176:18
194:1,8 195:1
206:4,15
never 152:22
195:10 225:9
new 167:10
212:10
night 150:5
219:11
Northwest 208:16
notarial 229:15
Notary 145:15
229:3,20
notes 159:11
175:12 176:4,4
176:5 208:21
notified 198:6,18
November 156:21
157:10,14
162:17 164:7,17
164:21,21
190:16
number 227:7
N.W 145:14
146:4,11

**O**

O 145:1
Oak 220:1,10
object 159:4
165:16,17
170:22 171:9
objecting 178:10
178:13,17
objection 150:1
165:15 170:22
171:7 174:14
187:12 188:5,13
190:19 191:1,3
191:6 198:21
222:22
objections 171:7

obstructive
171:10
occasion 173:21
195:8
occasions 173:10
182:17 224:10
occur 176:15
occurred 175:5
210:3 214:15
occurring 212:16
October 156:20
157:10,14
182:20,21
office 146:3,9
177:20 179:16
180:10,11 184:9
198:12 226:16
226:19,20 227:6
227:8,9
officer 221:15,19
222:2
offices 179:20
180:12
Oh 221:6
Okay 148:10,13
149:12 155:17
162:14 163:1,20
164:16,17
166:12 167:12
167:13 175:9
177:12 180:7
181:11 184:16
187:5 190:10
192:18 194:18
197:19 204:15
206:19 207:1
213:8,11 216:3
216:22 224:20
226:4,7
once 167:1
onset 210:16
opportunity
154:20 160:16
204:22 205:16
opposed 161:5
162:7
orally 149:6

order 212:13
213:2,5,7,14,19
214:1,6,12,14
219:2
orders 212:15
outcome 199:20
199:21 200:3
229:14
outlined 148:22
164:8
out-of-control
150:7
out-of-pocket
208:5
overnight 192:12
over-talking
186:3
o'clock 150:7,21

**P**

package 159:19
181:13
packages 181:17
Pages 145:20
papers 147:7
Pardon 166:21
parent 152:3
155:9 204:11
218:18 226:18
227:12
parents 193:12
Parker 156:15,16
156:19,22
157:10 173:2,7
187:9,15 202:21
partial 204:12,14
participate
216:19,20 217:5
217:14
parties 229:12,13
partnership
179:15 227:13
partnerships
226:18
passed 150:3
patients 212:14
Pause 208:14
pay 208:19

209:13,14
paying 208:20
Payne 192:21
193:1,7,14,18
193:20,21,22
194:5,7,22
196:2,4,16,21
197:13 198:1
199:8 200:5
202:11 203:8
205:10,15 206:6
206:21 207:1,17
210:5 216:17
218:12,19
222:11,15,20
223:5,18 224:3
224:4,8 225:3,6
pending 154:4,6,7
154:8,9,14
people 177:17
226:8,11
period 151:13
172:12 175:17
176:8 215:6,7
218:7 219:8,14
219:17 220:13
221:1,3
periods 221:9
permission 204:7
219:12
permitted 171:8
person 184:11
213:13 226:12
226:14 227:6
personally 196:6
227:2 229:5
persons 213:1
person's 213:9
pertaining 179:18
215:19 225:4
phone 158:13
167:18 173:12
198:13 199:2
phrase 152:9
225:21
phrased 191:22
pick 150:19 192:3

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

237

192:6 197:10
**place** 160:1 163:4
163:6 229:6
**placed** 152:17,19
153:2
**Plaintiffs** 145:6
146:7
**Plaintiff's** 215:1,4
**plan** 158:7 159:15
159:17,22 161:5
161:10 163:4,11
163:14 164:1,6
164:18,20 165:3
165:10 166:3,4
166:5,7,8,15
167:1,11,15,17
167:22 168:5
177:3,8 196:5
205:21 206:1,6
206:11,22
207:18 220:10
220:12,13
**plans** 159:22
164:7,8,22
167:10
**plead** 201:13
**please** 154:21
189:18 222:9
**pled** 201:12
**point** 152:10,10
155:18 157:9,13
157:13,19 185:2
204:11 205:7
207:3 225:21
**police** 150:5
221:5
**policies** 164:8,8
167:10
**policy** 215:5
223:11
**portfolio** 184:2
186:17,19,20
187:6
**portion** 164:19
**position** 215:8
**possibly** 224:8
**practice** 223:12

**preceding** 149:19
**present** 146:17
213:8
**Presently** 213:17
**previous** 177:2,3
**previously** 182:14
**principal** 156:15
156:17 172:18
172:19,22
187:16 195:4,6
195:9 198:15
199:4 200:15,16
203:18 217:10
217:17
**prior** 151:4,14
152:4,10,10,15
193:9,14,18
194:3 201:17
**probably** 156:3
195:8,13 212:7
**problem** 210:1
218:6,7
**problems** 169:11
226:8
**proceed** 154:22
**proceeding**
175:19
**proceedings**
202:22 212:18
229:10
**produced** 227:16
**program** 150:15
150:17 207:21
209:22 210:2
**progress** 159:20
220:12
**promoted** 216:21
**provide** 177:7
179:11 196:3
225:3
**provided** 161:9
181:14,17,20,22
188:11
**psychiatric**
212:20 213:22
**psychiatrist**
213:18

**psychological**
212:20 213:22
**psychologist**
211:4 213:19
**public** 145:16
177:21 229:3,20
**purpose** 166:5
179:7 182:22
183:8
**put** 158:7 160:1
163:4,6 185:12
185:13,17,18,20
186:1 193:2
214:20
**putting** 154:5
**P.M** 145:14

—————

## Q

**qualify** 189:20
**question** 151:10
151:11 152:9
154:4,6,7,8,9,11
154:14,22 155:4
155:6,10 160:7
161:4 162:6
164:13 165:9,19
167:8,20 171:2
171:5,15,18
177:10,18
178:11 179:18
185:5 188:8
189:14 191:6
196:20 197:21
199:1 207:8,12
207:16 209:2
212:2 213:4,12
**questioning** 171:6
**questions** 149:5,6
170:17,18
225:13,17,19,22
227:14
**quizzes** 160:12
**quote** 225:22

—————

## R

**ran** 192:9
**read** 155:5 178:19
189:14,15

191:15 207:9
230:3
**reading** 162:16
**read-back** 154:12
**real** 201:20
**really** 183:11
**recall** 151:20
153:6 156:1,14
156:18 159:16
160:4,7,11,15
160:19 161:1
167:9,9,21
172:16,20 173:9
174:5,22 175:1
175:2,4,11,13
175:16,21,22
176:2,3,12,22
177:19 178:4,6
180:13,16,19
181:2,7,9 182:2
182:4,5,11
183:4,8,11
184:4 186:5,10
189:3 190:20
191:4 192:5,8
192:11,14,18,22
195:15,16 196:7
196:8 197:2,3
198:18 199:6
200:9 201:12
202:9,17,18
204:15,17 210:1
211:13 217:6
221:18 222:1,5
222:20 223:8
224:16,19,21
225:1,5,7,8,9
226:14,15
**recant** 179:15
**receipts** 208:21
209:1,3
**receive** 159:18
184:5
**received** 173:13
**receptive** 173:12
**recess** 155:14
**recognize** 161:17

162:2,3,4,5,9,11
**recollect** 207:3
**recollection** 159:7
161:9 182:8
188:19 190:1
196:15 221:13
222:8
**recommended**
215:10
**record** 148:17,18
154:5,13,19
155:5 161:14
178:19 189:15
191:14,15 207:9
214:21 215:3
229:10
**recorded** 229:9
**records** 183:12,15
183:18,19,22
184:1 186:12,13
187:1,5 203:10
203:17 204:5,8
204:12,15
215:17,19
**refer** 179:22
180:4
**Referred** 180:6
**referring** 157:22
187:2 209:6
**Refine** 168:15
**reflect** 154:13
**refusal** 179:10
**regard** 162:20
**regarding** 177:14
177:21 178:8,21
180:9,14 181:3
193:22 194:7,22
196:8 202:22
205:17 217:17
**Reginald** 149:14
158:7 160:1
162:20 164:19
170:11 176:14
177:9 189:6
192:4,6,9,12,15
195:8,13,20
198:15 206:14

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

238

206:17,21 214:2
217:10,11,15
218:10 226:9
**Reginald's** 150:3
159:19 167:7
168:7 177:3,8
**regular** 158:8
220:16
**related** 229:13
**relation** 157:11
**remain** 185:2
219:4
**remainder** 150:16
**remember** 149:1
149:6 159:8
167:5 169:18
172:22 173:8
182:4 192:7
195:7,17 201:15
205:3 207:11
210:13 212:4
214:2,13,15
217:9 221:18
224:13 226:12
**removal** 149:20
**remove** 154:15
**removed** 149:14
149:16 151:5,15
187:11 209:21
210:2 214:3,16
220:18
**repeat** 149:3
207:7 221:17
224:6
**rephrase** 187:13
194:2
**Reported** 145:21
146:16
**Reporter** 148:15
148:20 208:17
**reports** 159:20
203:10 225:4
**request** 225:2
**requested** 160:6
160:21 183:16
195:9
**requesting** 167:9

167:21
**reside** 157:17,19
197:16
**residing** 152:2
192:8,11,14
193:6
**resolution** 175:13
201:9
**resolved** 203:3,5
**respect** 159:22
164:9,18,20
174:18 222:2
**respond** 149:5
**responded** 174:2
174:11 222:21
223:7
**responsive**
191:10
**restated** 148:20
**result** 163:5 164:6
164:17 167:3
169:12 175:19
176:19 181:11
189:2,8,18
191:21 208:2,4
210:3 211:3,6
212:13,18 213:2
213:4,7,13,19
214:1,4,6,12,14
216:4 220:13
221:15,20
224:12,15,17
**resulting** 216:13
**results** 190:20
191:4
**retain** 158:20
**retained** 147:9
151:18
**return** 221:10
**returned** 218:20
**review** 183:12,15
183:17,21 184:3
184:3 186:12
203:16 204:5,7
204:22
**reviewed** 162:13
164:2 215:19

**revisit** 163:22
**revisitation**
167:11
**revisited** 163:18
166:4,4,6 167:1
**revolving** 199:18
**reward** 167:19
**rewards** 167:6,14
**ridiculous** 191:8
**right** 168:3
171:12,13 188:8
195:4 204:17
213:10 225:8
**rights** 197:20
**Risperdal** 218:15
**Road** 146:4
**roaming** 170:5
196:14
**Roberts** 180:17
224:17
**room** 154:1,7,9
154:10,17
**Rosina** 226:13
227:6,12
**roughly** 150:20
156:20 169:18
**rules** 148:22
149:2,7,9
219:13
**ruling** 166:2
191:7,9
**rulings** 222:3
**run** 208:13
**running** 210:21

---
**S**
**safe** 220:21
**saw** 168:19
211:20 213:2,6
**saying** 206:10
**says** 162:16,17
**scheduled** 157:8
**school** 150:6,16
150:19 151:20
157:1,4 158:8
160:2 163:2,8
169:12,13,14,17
169:19 170:12

171:21 172:2,6
172:14 173:16
173:19,22 174:4
174:9,9 175:3,3
176:9,18 177:5
177:14 181:15
183:14 186:7,12
186:14,22 187:2
187:3 188:21
192:4,6,19,20
197:11 198:7,8
201:17,21 203:3
203:9 205:4
206:13,16,18,20
210:22 211:1,1
219:16,20,22
220:5,14 225:18
226:1
**schools** 177:21
**schoolwork**
168:10
**se** 174:5
**seal** 229:15
**second** 148:4
153:5 162:3
176:1 190:14,14
190:21 195:14
196:10 197:7
198:12 199:12
199:14 220:22
**secretary** 226:14
227:7,10,11
**Section** 182:12,13
196:4
**see** 168:18 185:6
187:1,5 205:7
209:17 211:4,8
211:22,22
220:12,22
225:16
**seeing** 211:17,18
212:2,10 213:9
213:11,13
214:13
**seek** 212:19
213:22
**seeking** 213:17

**seen** 162:4
**semester** 173:5
175:3 190:2
**send** 173:21,22
174:4,9 222:14
222:15 223:4
**sending** 197:7
**sent** 162:12
222:17
**September** 152:7
153:4 156:3
210:19 219:15
219:18
**service** 207:22
208:4
**services** 158:20
188:3,10 189:7
189:7,21
**session** 215:3
**sessions** 188:16
227:20
**set** 150:10 229:6
**setting** 158:8
**seven** 169:18
182:5,7
**seven-day** 176:8
**seven-hour** 215:7
**sheet** 230:7
**she'll** 164:14
**She's** 178:9
**Shirley** 208:11,15
208:17,18 209:5
209:14,20
**shortly** 222:7
223:22
**show** 216:12
**showed** 204:2
**shown** 204:12,16
226:5
**Signature** 230:12
**signed** 230:7
**simple** 162:6
**sit** 160:4 161:8
167:20
**sitter** 208:9,10
209:13
**sitting** 218:6

Case 1:07-cv-00882-JR    Document 46-2    Filed 02/28/2008    Page 258 of 260
DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

239

221:14 227:19
227:22
**Smith** 145:15,21
146:16 229:3,19
**son** 149:13 151:4
151:7,12,17,18
151:21 152:1,4
152:6,11,16
155:17 156:9,11
162:20 163:5
164:10,19,20
165:3 168:14
169:14,16 170:1
170:7 171:19
172:2,6,11
173:5 174:18
176:8 178:8,21
179:4 180:9,14
181:3 182:2,8
184:12,13 185:7
185:20 186:5
187:9,10,11,17
187:17 188:2,14
188:19 189:9
190:3,10 191:16
192:19,22 193:6
193:9,14,18,20
194:3,5,15
196:2,12 197:3
197:5,12,14
198:1,4,9,13,19
199:2,8,12
200:4,11 201:12
201:19 202:1,4
202:5 203:8
205:10,15 206:5
207:2,18,20
208:2 209:10,15
209:21 210:4
216:17 218:11
218:20 221:1
224:1,2,7 225:4
**son's** 149:19,20
156:7 169:8
171:21 173:15
173:18 177:14
177:22 183:15

183:17,21 187:1
193:16 194:1,7
194:22 196:4,8
196:16,21
203:10 204:5
205:17 219:7
**sorry** 151:9 157:2
159:6 161:17
169:4 189:13
196:19 207:7
**sound** 181:7,9
**sounds** 181:6
**South** 146:10
**speak** 152:5,13
154:20 169:7
170:11 171:20
176:11 180:3
187:15 195:9
205:16 217:16
227:2,4,9
**speaking** 173:9
223:10 224:3
**special** 176:17
189:7,21 206:4
206:14,17
226:20 227:13
**specific** 189:9
192:15
**specifically**
156:18 167:21
178:4,6 186:22
187:16 188:11
191:22 198:18
200:20 216:13
219:10 222:1
224:3 225:2,5
**speculation**
174:13 223:1
**spent** 184:8
**spoke** 156:15,19
160:13 173:7,9
176:12,20
195:15,16 197:4
199:11 200:8,19
226:19,21 227:6
**spoken** 152:7
217:9

**sporadic** 209:12
**Spring** 190:2
**staff** 155:19,21
177:4,7 182:15
182:18 187:9
193:21 194:6
195:12 196:3
199:7 203:14
207:17 210:17
222:9,11,15,20
223:5
**Stafford** 153:7
**standing** 154:2
204:10
**start** 198:19
211:2,10 214:4
214:7
**started** 148:5
206:13 209:11
210:19 226:10
**State** 177:13,15
177:19 178:7
**stated** 166:19,22
179:21 181:11
186:11 190:13
212:10 215:1,14
**statement** 214:21
**STATES** 145:2
**status** 157:11
197:13
**stay** 153:14
172:12 217:15
218:5 221:10
**stayed** 185:1
192:12
**staying** 150:4
196:15 217:8
219:11
**stenographically**
229:9
**step** 167:5
**stop** 154:22
208:12 212:2
**stopped** 209:12
**Street** 145:14
146:11
**stress** 210:6

**stressful** 175:17
**student** 198:12
199:17 201:16
202:13 207:2
**students** 186:2
223:12,14,17
**stuff** 175:16
184:2
**subsequent**
182:13
**succeed** 158:7
**suffer** 210:5,8
**Summer** 153:10
**support** 208:22
**supposed** 150:12
150:13 160:21
181:14 226:1
228:2
**sure** 152:21 155:2
167:18 177:15
183:13 197:1,15
222:19 227:17
**Susan** 145:15,21
146:16 229:3,19
**suspended** 150:16
169:14,16 170:1
171:19 176:9
182:3,9 186:5
195:8,20 196:13
196:18,22 197:3
197:5 198:5,10
198:19 199:9,13
207:10 216:19
216:22 217:1,3
217:4 224:1,2,8
**suspending** 199:4
**suspension**
176:14 195:21
195:22 196:8
197:8 207:15
**suspensions**
169:13 172:10
179:9 182:5
191:21 224:12
224:15,18
226:17
**sustain** 213:16

**sworn** 229:7

———————

**T**

**take** 154:6,8
160:16 215:11
**taken** 145:13
155:14
**Takoma** 151:17
151:21 177:4
179:5,10 207:21
208:4 210:4,17
226:9,18
**talk** 170:10
173:17 212:16
220:6
**talked** 179:16
195:7 213:3
226:13
**talking** 158:16
168:2 170:4
171:3,7 217:9
**Tammy** 193:8
**teacher** 186:3
**teaching** 188:1
**team** 158:6 165:2
166:16,17,17,17
167:6 181:13
**tell** 156:22 159:12
159:22 160:9,18
161:11 176:13
176:21 179:12
185:7,19 187:20
195:6,18,19
198:2 203:19
205:19 216:9
217:19 222:10
226:10
**telling** 165:22
174:7 222:2
**term** 169:19
**terminated** 192:2
**termination**
189:5,19
**test** 189:9
**testified** 149:15
177:2 182:14
**testimony** 165:5,7
165:10 230:4,6

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

240

thank 155:13
180:7 225:10
227:14 228:4
Thanks 155:16
that's 154:18
158:17 165:7
178:1 181:16
191:22 197:15
206:12 207:11
216:18 227:8
They've 227:22
thing 201:15
218:10
things 164:3
174:8 212:16
think 148:7
149:12 159:3,7
159:9 161:12
162:21 183:10
191:21 201:2
212:1 213:10
thinking 189:22
190:17
third 198:13
199:16,17
thought 164:3
183:2 227:5
three 197:1 198:6
198:17 224:9,10
time 148:6 149:13
149:18 150:9,10
150:12 151:13
152:11 153:19
153:21 160:11
171:5,11,15,18
174:17 175:17
180:4 182:2,9
182:18 183:4
184:8 190:3
192:16 194:13
194:16 195:11
196:7,16,21
197:4,6,7,12
198:4,11,13,14
198:20 199:11
199:12,14,16,17
200:4,8 201:19

202:1,4 204:3
207:3,10 210:4
210:11 211:20
213:21 214:18
215:1,13,14,15
216:2,8,12
218:7,11,19
219:8,14 220:13
221:1,3,9 224:2
224:4 225:11
229:6
timeframe 159:1
194:14
times 173:12
196:17,22 197:2
197:5,9 198:6
198:17 221:7
224:9
Timothy 181:3
224:22
today 158:17
161:8 165:6
167:21 216:15
225:17 226:22
token 167:14,22
told 167:12 172:1
192:5 200:18,20
200:20 217:21
218:2
Tomonia 145:5
145:12 147:2,7
148:7,15 149:14
161:15 162:20
164:19 229:5
230:3
top 162:15 209:19
total 209:14,20
touching 202:2,6
203:1
toy 202:19
transcript 229:10
transcription
230:5
treat 211:14
212:14
treating 211:10
214:5,7

treatment 211:15
211:16,18
212:20 213:9,17
true 229:10 230:5
trying 183:10
201:2 210:22
Turner 151:22
152:1,4,11,15
155:18,19,22
156:6,10,12
158:10 163:1
172:7,11 173:6
176:8 177:7,9
181:12,13 182:3
182:9,15,19
186:9 187:4,10
187:16 188:2,11
188:16,20 190:4
190:6,10 192:20
193:4 210:4
223:10,11,14
twice 172:15
two 175:8 178:11
179:20 182:17
194:20,21 197:5
212:1 217:10,21
220:5 227:20
type 160:19
175:19

_____
U
_____

U 145:1
Uh-huh 166:9
186:21 188:9
undergo 189:9
understand
157:16 164:14
171:1 184:22
187:13 197:21
206:9
understanding
189:4
UNITED 145:2
utilized 215:12

_____
V
_____

V 145:1
vague 175:17

Valley 220:1,10
viewing 225:18
violation 174:18
174:21 175:10
175:14,20 176:1
221:15,21
violations 175:6
222:4
Virginia 153:7
220:3
virtually 184:3
218:3
visit 157:1,4,5
visits 157:12
192:3
vs 145:7

_____
W
_____

wait 148:4 152:18
162:3 164:11
waiting 148:6
walk 184:15
185:6 217:12
walked 184:17
186:4
walking 170:4
184:9 199:14
want 153:17
161:19,20 179:2
183:5 196:10
221:2 225:18
wanted 148:5
157:1,4,5 215:2
Washington
145:15 146:5,12
208:16
wasn't 150:13,13
152:14 160:9
184:16 185:4
187:22 204:18
204:19 206:20
206:21 216:18
217:4 218:17,17
220:15
watch 209:21
watching 209:15
way 152:10
229:13

Wednesday
145:13
week 153:5
194:20,21
195:13,14
196:10 208:20
weekly 157:12
159:18 168:19
weeks 209:20
212:1
went 153:11
182:18 183:21
201:6 205:4
214:12 221:11
227:9
we're 162:14
168:2 193:3
221:13
we've 187:3
227:16
what's 226:1
Wilhoyte 180:14
224:14
William 180:14
224:14
Williams 181:3
224:22
Willis 179:16
Wills 226:21
Winter 156:2
withdraw 154:3
170:15,17
193:19 217:3
withdrawing
211:1
withdrawn 175:2
177:1 178:4
187:7 189:3
190:2 194:4
195:21,22
200:10 201:10
witness 154:10
155:4 171:6
208:18 229:15
work 159:19
160:16 184:19
184:20 185:2,3

DEPOSITION OF LINDA FAY TOMONIA - VOLUME II
CONDUCTED ON WEDNESDAY, JANUARY 30, 2008

241

210:10,11
215:15,15,22
216:2 220:8
**worked** 201:14
**working** 205:20
**wouldn't** 152:7
177:11 188:18
203:16 209:10
221:10 226:6
**wrong** 161:21

___ Y ___
**Yeah** 153:21
155:8
**year** 150:16
169:19 175:3,3
190:8 201:4
212:5,5,6,7,9
214:2 219:15
**youth** 199:22
200:1 201:11
**You'll** 171:5
**you're** 206:9
212:10 213:8
214:11
**You've** 165:18
171:10 178:16

___ $ ___
**$100** 208:20
**$30** 216:7

___ 1 ___
**1-121349** 145:22
**10** 148:11 197:6
**10:00** 150:7
**1442** 146:4
**145** 145:20
**148** 147:3
**161** 147:7

___ 2 ___
**2:00** 148:7
**2:10** 148:8
**2:20** 145:14 148:6
**2:27** 153:22
**20** 148:7,12
**20001** 146:12

**20007** 146:5
**2005** 159:9,10
**2006** 149:15
158:22 159:2,8
162:17 164:7,18
175:3 179:3,3
190:9,9,16
201:5 210:13
**2007** 186:6,8
212:8
**2008** 145:13
229:16
**2012** 229:21
**202.333.8553**
146:6
**202.727.6295**
146:13
**225** 147:3
**230** 145:20
**29** 229:21

___ 3 ___
**3:40** 214:18 215:1
**3:57** 228:5
**30** 145:13 215:18

___ 4 ___
**4th** 145:14 146:11
**441** 145:14
146:11

___ 5 ___
**5th** 151:18 193:5
**504** 147:7 158:1,2
158:4,5 159:14
159:15,17,22
161:10 162:12
162:19 163:4,14
163:19 164:1,4
164:6,9,18
167:1,11,15,16
168:3,5,6,13,17
177:3,8 181:12
182:12,13 183:2
183:2 190:14,21
196:4 205:21
206:1,6,10,22
207:2,18 220:10

220:12,13

___ 6 ___
**6th** 145:14 146:10
193:2
**6:00** 150:21

___ 7 ___
**7th** 162:17 164:7
164:17 216:21
229:16
**7-CV-0882(JR)**
145:7

___ 9 ___
**9th** 150:3

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## FAMILY COURT

NOV 3 0 2007

In the Matter of:

R    T

Case No.:    Social File No.:

N-253-06    06 JSF 676

MAGISTRATE JUDGE JULIE BRESLOW

Next Hearing Date: December 10, 2007

Upon consideration of this Consent Motion to Revoke Protective Supervision and Request for Hearing, it is this 30th day of November, 2007, hereby

**ORDERED** that the order of protective supervision with the mother, granted on July 5, 2007, is hereby **REVOKED**, and it is further,

**ORDERED** that the Respondent is hereby **COMMITTED** to Child and Family Services Agency (CFSA) for period not to exceed two years, and it is further,

**ORDERED** that it would be contrary to the welfare of the child to be in the home with the mother because the mother is not able to care for the Respondent and control the Respondent's behavior, and it is further,

**ORDERED** that the Agency has made reasonable efforts to prevent removal from the home, identified by the following: 1. The Agency has monitored the Respondent's placement; 2. The Agency has made efforts to stabilize the Respondent in the home through services to assist the mother, such as, therapy, CBI and Multi-systemic therapy services; 3. The Respondent received tutoring, mentoring, and medication monitoring; and, 4. The Agency also offered assistance with school transportation.

Magistrate Judge Julie Breslow
D.C. Superior Court



Copies to:

Charmetra L. Parker, AAG
(202)727-8886 (fax)

Seraaj Social worker
(202)832-2951

Jonathan Krell, Esq., GAL
(202)467-4949

Karen Alvarez, Esq. Education Advocate
(202)333-1546

Sabine Browne, Esq., Counsel for Mother
(703)832-6400

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF COLUMBIA
2                   Civil Division
3    - - - - - - - - - - - - - - - -+
                                    |
4    LINDA TOMONIA, in her own       |
     right, and as next friend of    |          ORIGINAL
5    her son, R.T., and R.T., a      |
     minor, by his mother and next   |
6    friend, Linda Tomonia,          |
                                    |
7              Plaintiffs,           |   Civil Action No.:
                                    |
8      vs.                           |    7-CV-0882(JR)
                                    |
9    THE DISTRICT OF COLUMBIA,       |
     et al,                          |
10                                   |
                                    |
               Defendants.           |
11                                   |
     - - - - - - - - - - - - - - - -+
12
13          Deposition of Reginald Lee Tomonia
14                  Washington, D.C.
15            Wednesday, January 23, 2008
16                    3:00 p.m.
17
18
19
20   Job No. 1-120866
21   Pages 1 - 100
22   Reported by:  Laurie Bangart-Smith



L.A.D.
REPORTING &
DIGITAL VIDEOGRAPHY
1100 Connecticut Avenue, NW • Suite 850, Washington, D.C. 20036
Tel: 202.861.3410 • 800.292.4789 • Fax: 202.861.3425
Web: ladreporting.com • E-mail: lisa@ladreporting.com
Additional Offices: Rockville, MD • Baltimore, MD • Greenbelt, MD • McLean, VA

2

1                      Deposition of

2             REGINALD LEE TOMONIA

3

4   Held at the offices of:

5           OFFICE OF THE ATTORNEY GENERAL

6           6th Floor South

7           441 Fourth Street, Northwest

8           Washington, D.C. 20001

9           (202)727-6295

10

11

12

13

14

15

16          Taken pursuant to the Federal Rules of Civil

17   Procedure, by notice, before Laurie

18   Bangart-Smith, Registered Professional Reporter

19   and Notary Public in and for the District of

20   Columbia.

21

22

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

3

1                   A P P E A R A N C E S

2    ON BEHALF OF THE PLAINTIFFS:

3             KAREN D. ALVAREZ, ESQUIRE

4             Law Office of Karen D. Alvarez, Esq.

5             1442 Foxhall Road, Northwest

6             Washington, D.C. 20007

7             (202)333-8553

8    ON BEHALF OF THE DEFENDANT:

9             ERIC GLOVER, ESQUIRE

10            PATRICIA JONES, ESQUIRE

11            Office of the Attorney General

12            6th Floor South

13            441 Fourth Street, Northwest

14            Washington, D.C. 20001

15            (202)727-6295

16

17

18   Also present:

19            Linda Tomonia

20            Kamel Bekkali

21

22

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

4

1                         EXAMINATION INDEX

2                                                    PAGE

3    EXAMINATION BY MR. GLOVER . . . . . . . . . . .    5

4    EXAMINATION BY MS. ALVAREZ  . . . . . . . . . .   94

5

6

7

8

9                        E X H I B I T S

10                          (None)

11

12

13

14

15

16

17

18

19

20

21

22

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

5

1                    P R O C E E D I N G S

2                 REGINALD LEE TOMONIA,

3    having been first duly sworn, testified upon his oath

4    as follows:

5              EXAMINATION BY COUNSEL FOR DEFENDANTS

6    BY MR. GLOVER:

7        Q    Mr. Tomonia, my name is Eric Glover.  I'm an

8    attorney with the office of Attorney General for the

9    District of Columbia.  I represent --

10             MR. GLOVER:  I need to take about a

11        ten-minute recess.

12             (Whereupon, a short recess was taken.)

13   BY MR. GLOVER:

14        Q    Good afternoon, Mr. Tomonia.  My name is

15   Eric.  I'm an attorney with the Office of the Attorney

16   General for District of Columbia.  I represent the

17   defendants in this action, and I'm going to be asking

18   you some questions today.  However, before I ask you

19   some questions, there's certain preliminary questions

20   I have to ask you.

21             Now, sir, you were asked by the court

22   reporter are you going to be telling the truth, the

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

6

1    whole truth and nothing but the truth; is that

2    correct?

3        A    Yes.

4        Q    And you know what the truth is, right?

5        A    Yes.

6        Q    The truth is to be honest, correct?

7        A    Yes.

8        Q    And if I was to tell that you this pen was

9    red, would that be the truth or would that be a lie?

10       A    That would be a lie.

11           MR. GLOVER:  For the record, the pen is

12       black.

13   BY MR. GLOVER:

14       Q    And do we have your assurances that you're

15   going to tell the truth during this proceeding here

16   today?

17       A    Yes.

18       Q    And sir, do you think that there is

19   sometimes appropriate time to tell lies?

20       A    No.

21       Q    Okay, so, and you're going to tell the truth

22   here today?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

7

1      A     Yes.

2      Q     All right then.  Sir, could you please state

3   your name, your full name for the record.

4      A     Reginald Lee Tomonia.  That's my middle name

5   is Lee.

6      Q     Thank you, Reginald, or Mr. Tomonia.  Excuse

7   me.  And Mr. Tomonia, where do you reside presently?

8   Where do you live?

9      A     Shiloh Court, Laurel, Maryland, but I don't

10  know the address for the house.

11     Q     And how long have you lived at that address?

12     A     Three weeks probably.

13     Q     And who do you live with at that address?

14     A     Ivy McManus.

15     Q     And how long have you known Ms. McManus?

16     A     For a little while, because when I first

17  came to foster care I went to her house before.

18     Q     And when is the first time, if you remember,

19  that you went to her house?

20     A     I'm not sure, but I think it was in '07,

21  probably like the beginning of '07.

22     Q     Thank you, sir.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

8

1         And besides Ms. McManus -- withdrawn.  Would

2    it be fair for me to assume that Ms. McManus, you're

3    residing with her as her foster child?

4         A    Yeah.

5         Q    Okay.  And other than Ms. McManus, is there

6    anyone residing with you at that Shiloh Court address?

7         A    What do you mean?  Does she have kids?

8         Q    Yeah, is anybody else in the house?

9         A    Fred and Diandra.

10        Q    Back up a little.  I forgot the most

11   important part of my instructions.  As you can see, we

12   have a court reporter here, and she's going to be

13   taking down anything and everything that is said in

14   this room today, and you've been actually doing a very

15   good job.  I want to commend you on you that.  One of

16   the most important things is you allow me to finish

17   your questions before you give an answer, which you

18   have been doing.  When I ask you a question, give oral

19   answer.  We get in bad habit of saying "uh-huh" or

20   "huh-uh," but she can't take that down.  You got to

21   say yes or no so she can understand what you're

22   saying, okay?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

9

1      A    Okay.

2      Q    If I ask you a question you don't

3  understand, please don't hesitate to let me know.  If

4  at any point during this deposition you need to speak

5  to your attorney, don't hesitate to let me know.  I'll

6  have no problem with that as long as there is not an

7  open question, meaning if I ask you a question, you

8  haven't answered it yet, okay?

9      A    Yes.

10     Q    All right then.  And I apologize.  You said

11  Fred and whom else lives at the house?

12     A    Fred is her biological son.  Diandra is her

13  foster child.

14     Q    And you said you've been residing there

15  approximately three weeks?

16     A    Yes.

17     Q    And prior to that three weeks, where were

18  you residing, sir?

19     A    Before that three weeks?  With my mother.

20     Q    Okay, and with your mother being Linda

21  Tomonia?

22     A    Uh-huh, yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

10

1       Q    And she's present, here in this room today,

2   correct?

3       A    Yes.

4       Q    And for how long did you live with your

5   mother prior to living with Ms. McManus?

6       A    Maybe about I think -- I'm not sure.

7       Q    Do you have an estimation?

8       A    Maybe four or five months.

9       Q    And do you know the address where you were

10  living with your mother?

11      A    Yes, 6817 Georgia Avenue, Apartment 407.

12      Q    Is that here in the District?

13      A    Yes, Northwest.

14      Q    And prior to that four or five months

15  residing with your mother at the Georgia Avenue

16  address, where did you live, sir?

17      A    Before that?

18      Q    Yes.

19      A    The same apartment building, the same

20  address, just a different apartment, 421.

21      Q    And was that also with your mother, Linda

22  Tomonia?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

11

1      A      Yes.

2      Q      When you were residing at the 407 address,

3  was anyone other than yourself and your mother living

4  in that address?

5      A      No, it was just me and her.

6      Q      When you were at 421 apartment number, was

7  anyone else living with your mother, you and your

8  mother?

9      A      We were staying there, because we were

10  taking care of my father, because he was sick.

11      Q      Now, between the time that you resided at

12  the 407 apartment and the 421 apartment, had you

13  resided anywhere else, did you live anywhere else?

14      A      Besides those?

15      Q      Yeah.

16      A      I'm not sure.  I don't remember.   Eastern

17  Avenue.

18      Q      Okay.  Do you remember, was that here in the

19  District as well?

20      A      Northwest.

21      Q      What's your date of birth?

22      A      January 3rd, 1995.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

12

1      Q    And do you know your Social Security number?

2      A    No, sir, I don't.

3      Q    Okay.  Sir, was there ever a time when you

4  were a student at the Community Academy Public Charter

5  School?

6      A    Yes.

7      Q    And what grades were you a student at that

8  school for?

9      A    I'm not sure.

10         MS. ALVAREZ:  May I ask what you're looking

11     at?

12         MR. GLOVER:  I believe it's the section 504

13     plan.

14         MS. ALVAREZ:  From Community Academy?

15         MR. GLOVER:  Uh-huh.

16         MS. ALVAREZ:  So why did you ask me for that

17     earlier?

18         MR. GLOVER:  Counsel, it's my deposition.

19         MS. ALVAREZ:  I'm asking a question.

20         MR. GLOVER:  Please step aside, and let me

21     take this deposition.

22         MS. ALVAREZ:  It's my deposition, too, and

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

13

1      we're here to talk.

2           MR. GLOVER:  You can follow up with

3      questions.

4           MS. ALVAREZ:  I just did.  Thanks.  Let's

5      get going.

6           MR. GLOVER:  Yeah, you're right.

7           (Whereupon, reporter reads requested

8      material.)

9  BY MR. GLOVER:

10      Q    And when you were at the Community Academy

11  Public Charter School, were you in any special classes

12  that you remember?

13      A    No.

14      Q    No, you don't remember, or no, you weren't

15  in any special classes?

16      A    I weren't -- I don't think I was in any

17  special classes.

18      Q    Did you have any special programs while you

19  were at the Community Academy Public School or did

20  you -- did you spend more time with certain teachers

21  or you had any counseling or you sat closer to the

22  board, anything like that, if you remember?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

14

1       A       I did sit in the front of the class.

2       Q       Why did you sit in the front of the class?

3       A       Sometimes I was disruptive.

4       Q       When you say you were "disruptive," what did

5  you do?

6       A       Me and my classmates, we used to talk about

7  people sometimes, and we used to laugh in the back of

8  the class.

9       Q       Did sitting in the front of the class seem

10 to help?

11      A       A little bit.

12      Q       Were you disruptive in any other ways that

13 you remember?

14      A       Maybe.  I used to fight.

15      Q       And if you remember, this is going back to

16 your days at Community Academy Public Charter School?

17              MS. ALVAREZ:  He was six years old.

18              MR. GLOVER:  If he remembers.

19              MS. ALVAREZ:  All right.

20 BY MR. GLOVER:

21      Q       And how often would you get in a fight?

22      A       I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

15

1    Q    Do you recall how many fights you got in?

2    A    I'm not sure.

3    Q    Did you ever start any of these fights?

4    A    Sometimes.

5    Q    If you recall, why would you start the

6    fights?

7    A    Because maybe they would have said something

8    to me earlier that day, and I would take it into my

9    own hands.

10    Q    Did you know that you weren't supposed to

11    fight at the school?

12    A    Yes.

13    Q    While at Charter Academy, was there ever a

14    time that your mother had to come pick you up from

15    school because of your behavior?

16        MS. ALVAREZ:  Are we talking about Community

17        Academy?

18    BY MR. GLOVER:

19    Q    Community Academy.  Excuse me.

20    A    I'm not sure.

21    Q    Was there ever a time that you were

22    suspended from the school?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

16

1       A     I'm not sure.

2       Q     Do you recall what school you attended after

3  Community Academy?

4       A     No.

5       Q     If I were to say the SAIL school, would that

6  refresh your memory?

7       A     Yes.

8       Q     Was it the SAIL school that you attended

9  after Community Academy?

10      A     I think so.

11      Q     And do you recall what grades you attended

12  the SAIL school in?

13      A     Fourth and fifth.

14      Q     And starting with -- start with the fourth

15  grade.  Did you have any disciplinary problems while

16  at the SAIL school?

17      A     No, not really.  Every now and then.

18            MS. ALVAREZ:  Let's make it his first year

19      at SAIL, all right?

20            MR. GLOVER:  Okay.

21  BY MR. GLOVER:

22      Q     When you say "every now and then," what do

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

17

1    you mean?

2        A    I would get into a conflict every now and

3    then.

4        Q    When you say "conflict," what do you mean?

5        A    Like maybe I had an argument or a fight.

6        Q    Were you disruptive in the class also?

7        A    Not really.

8        Q    When you say "not really," what do you mean?

9        A    It wasn't me all the times.

10       Q    But were there times that you were

11   disruptive in the classroom?

12       A    Yes.

13            MS. ALVAREZ:  Disruptive or deceptive?

14            MR. GLOVER:  Disruptive.

15   BY MR. GLOVER:

16       Q    When you were disruptive, what would you do?

17       A    Probably talk when the teacher was talking.

18       Q    Again, during that first year at the SAIL

19   school, were any special programs set aside for you,

20   such as sitting close to the teacher, sitting in front

21   of the class, anything of that sort?

22       A    No.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

18

1    Q    What were your grades like during that first

2    year?

3    A    They were okay, like maybe, like because

4    back then we didn't use A's, B's and C's.  It was like

5    1's and 2's.

6    Q    You got to forgive me.  I didn't go to

7    school in D.C., so I don't have a point of reference

8    for that.  Was 1 a good or bad grade?

9    A    One was a good grade.

10    Q    So 1 is good, 2 is not as good, 3 is

11    whatever it would gradually get worse from 1, correct?

12    A    Yeah.

13    Q    And you said you got generally 1's and 2's?

14    A    Yeah.

15    Q    If you recall, during that first year at

16    SAIL, were there ever times that your mother had to

17    come down to the school because of your behavior?

18    A    No.  They probably called her.

19    Q    As we sit here today, do you recall any

20    instances where your mother was telephoned by any

21    staff of the SAIL school because of your behavior?

22    A    Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

19

1      Q      Why was your mother telephoned?

2      A      Because of fighting.

3      Q      And during that first year at the SAIL

4  school, approximately how many times would you say you

5  got into a fight?

6      A      Maybe four times, and that was it.

7      Q      And during those four times that you got

8  into a fight, did you start any of those fights?

9      A      No.

10      Q      Did you still know it was wrong to fight in

11  school?

12      A      Yes.

13      Q      Those four times that you got in a fight in

14  school during that first year at the SAIL school, do

15  you know how many times your mother was contacted via

16  telephone?

17      A      No.

18          MS. ALVAREZ:  What year are you talking

19      about?

20          MR. GLOVER:  That first year.

21          MS. ALVAREZ:  You already asked it.  Why did

22      you ask it again?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

20

1          MR. GLOVER:  I can ask it again, Counselor.

2          MS. ALVAREZ:  Asked and answered.

3          MR. GLOVER:  You're the one that's making it

4     longer.

5          MS. ALVAREZ:  Oh, no.

6    BY MR. GLOVER:

7     Q     During that first year, other than fights,

8    was your mother ever called because of any

9    disciplinary actions?

10         MS. ALVAREZ:  Asked and answered.  I'm

11    objecting again.

12         MR. GLOVER:  You can object.

13    BY MR. GLOVER:

14    Q     Other than fights, was your mother ever

15    called by the school?

16    A     Not really.

17    Q     Not really; is that a yes or a no?

18    A     No.

19    Q     Did you graduate that first year at SAIL

20    school?

21    A     Yes, I did.

22    Q     The second year at the SAIL school, how were

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

21

1   your grades?

2       A    I'm not sure.  I don't remember the second

3   year.

4       Q    Any particular reason you don't remember the

5   second year?

6       A    No.  It was a long time ago.

7       Q    Okay.  Do you remember any disciplinary

8   problems?

9       A    No.

10      Q    Do you recall getting in any fights that

11  second year?

12      A    I probably did.

13      Q    Do you know approximately how many fights

14  that second year?

15      A    No, I do not.

16      Q    More than one?

17          MS. ALVAREZ:  He's already answered that he

18      doesn't know, he doesn't remember.

19  BY MR. GLOVER:

20      Q    More than one?

21      A    Yes.

22      Q    More than two?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

22

1        A    I don't know.

2        Q    Do you recall if your mother was ever

3    notified due to any disciplinary problems during that

4    second year?

5            MS. ALVAREZ:   Objection; that calls for

6        speculation.

7    BY MR. GLOVER:

8        Q    Do you know?

9        A    I don't know.

10       Q    Do you know if your mother was ever called

11   to the school due to any of the fights you had at the

12   school?

13       A    I'm not sure.

14       Q    Do you ever recall seeing your mother at the

15   school when you attended SAIL pertaining to any

16   disciplinary problems you may have had at the school?

17       A    No.

18       Q    Did you graduate from that second year at

19   the SAIL school?

20       A    Yes, I did.

21       Q    And what did you attend after that?

22       A    Takoma Elementary.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

23

1      Q    If you know, what grade did you -- was

2    your -- withdrawn.  When you started Takoma

3    Elementary, what grade were you in?

4      A    I'm not sure.

5      Q    Do you know where Takoma Elementary is

6    located?

7      A    I think it's Piney Branch.

8      Q    And how did you get to school every day?

9      A    I would either walk, or my mother would take

10   me twice a week.

11     Q    Were there any days that you got up in the

12   morning and were supposed to go to school but didn't

13   go to school?

14     A    No.

15     Q    Were there ever days that you went to school

16   and then left school when you weren't supposed to?

17     A    Yes, there was.

18     Q    And why did you leave school?

19     A    I'm not sure.

20     Q    During that school year of -- that you were

21   at Takoma Elementary, how many times would you say you

22   went to school and then left when you weren't supposed

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

24

1    to?

2         A    Once.

3         Q    You only left school early once?

4         A    Yeah.

5         Q    So other than that one time, you stayed in

6    school every day that you were supposed to be there?

7         A    Unless they called my mother and told her to

8    come pick me up.

9         Q    Okay.  So other than that one time, unless

10   your mother came to pick you up, you stayed in school

11   throughout the entire day?

12        A    Yeah.

13        Q    Do you know Ms. Mary Grant?

14        A    Yes.

15        Q    And who is Ms. Grant?

16        A    Tall lady, light-skinned, light brown eyes.

17        Q    Do you know what she does?

18        A    Principal.

19        Q    What school is she the principal of?

20        A    Takoma.

21        Q    And did you ever speak to Ms. Grant?

22        A    Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

25

1      Q     What did you speak about?

2      A     I'm not sure.

3      Q     Did she ever discuss your behavior with you?

4      A     No.

5      Q     While at Takoma, were you ever disruptive in

6   class?

7      A     Yeah.

8      Q     What type of things would you do to be

9   disruptive?

10      A     I'm not sure.

11      Q     Would you talk in class?

12      A     I'm not sure.

13      Q     Would you yell across the classroom?

14      A     I'm not sure.

15      Q     Would you say mean things to other students?

16      A     I'm not sure.

17      Q     Would you fight?

18      A     No.

19      Q     During that first year at Takoma Elementary,

20   did you get in any fights at the school?

21      A     One.

22      Q     And when did you get into that fight?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

26

1      A     I'm not sure.  I just know it was at the

2  school.

3      Q     Was it inside the school, outside the school

4  or somewhere else?

5      A     Outside the school.

6      Q     And that one fight that you had, who started

7  it?

8      A     Another person.

9      Q     Were there any staff from the school present

10  when the fight occurred?

11      A     No.

12      Q     What did you do?

13      A     Huh?

14      Q     What did you do?

15      A     What do you mean?

16      Q     Punch him, kick him, slap him?

17      A     We were just fighting.

18      Q     When you say "after school," do you recall

19  what time it was?

20      A     Probably like 3:17 probably.  I just know it

21  happened after school.

22      Q     What were the school hours, if you know?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

27

1    A    From 8:45 to 3:15.

2    Q    Did anyone come break up the fight?

3    A    Yeah.

4    Q    Who broke it up?

5    A    The security guard.

6    Q    And what happened after the security guard

7    broke it up?

8    A    They took me to the office, let the other

9    boy go home and called my parents.

10    Q    Now, I know you stated that you don't

11    remember exactly when this fight occurred, but do you

12    remember, was it at the beginning of the school year,

13    the middle of the school year, the end of the school

14    year or something else?

15    A    Probably like the beginning.

16    Q    What happened after your mother was called?

17    A    They let me go home.

18    Q    Were you suspended?

19    A    I'm not sure.

20    Q    Had you ever been suspended from Takoma

21    Elementary?

22    A    Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

28

1     Q    Approximately how many times?

2     A    I'm not sure.

3     Q    More than once?

4     A    Yes.

5     Q    More than twice?

6     A    Yes.

7     Q    More than five times?

8     A    Yes.

9     Q    Why were you suspended?

10    A    For fighting or disrupting the class.

11    Q    Now I'm sort of confused.  You just said

12 that you only had one fight at the school.

13    A    Yeah, one fight.

14    Q    And you weren't suspended for that?

15    A    Yeah.

16    Q   But you just said that you got suspended for

17 fighting.  So my question to you is:  Again, I guess

18 I'll rephrase this.  Were you ever fighting while you

19 were a student at Takoma more than that one time?

20    A    No.

21    Q    So I'm curious now as to how did you get

22 suspended for fighting then?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

29

1      A    She sent me home like, told me don't come

2  back until my mother came.  My mother came the next

3  day, so I didn't really call it a suspension.

4      Q    My question I guess -- and I'll try to be as

5  specific as possible.  I believe you stated that you

6  don't recall how many times you were suspended from

7  Takoma; is that correct?

8      A    Yeah.

9      Q    Why were you suspended from the school on

10 the times that you were suspended?  Why were you

11 suspended?

12     A    For disrupting the class.

13     Q    And what were you doing to disrupt the

14 class?

15     A    I'm not sure.

16     Q    And those times that you were suspended from

17 the school, was your mother called?

18     A    I'm not sure.

19     Q    Those times that you were suspended from the

20 class, was your mother -- did your mother come to pick

21 you up?

22     A    I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

30

1    Q    Were there ever any times that you were

2 suspended from school that you didn't tell your mother

3 about?

4    A    Yes.

5    Q    How many times were you suspended from

6 Takoma Elementary that you didn't tell your mother?

7    A    Maybe twice.

8    Q    Why didn't you tell your mother?

9    A    I'm not sure.

10    Q    Was there a time while a student at Takoma

11 Elementary that you were caught throwing rocks at a

12 taxi cab?

13    A    Yes.

14    Q    Now, was that before, during or after

15 school?

16    A    It was way after school.

17    Q    And who caught you?

18    A    I don't know.

19    Q    What happened after you were caught throwing

20 rocks?

21    A    I'm not sure.

22    Q    Was there a time that you stole your

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

31

1   mother's debit card?

2        A    Yes.

3        Q    Why did you steal your mother's debit card?

4        A    I'm not sure.

5        Q    Do you recall when you stole your mother's

6   debit card?

7        A    No, I do not.

8        Q    What did you do with it once you stole it?

9        A    Took money off of it.

10       Q    Did you know it was wrong to do that?

11       A    Yeah.

12       Q    Did you know it was wrong to throw rocks at

13  a taxi cab?

14       A    Yes.

15       Q    While you were a student at Takoma

16  Elementary, were you ever arrested?

17       A    No.

18       Q    Were there ever any times where the police

19  had to bring you home?

20       A    Yes.

21       Q    How often did the police have to bring you

22  home?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

32

1              MS. ALVAREZ:  I missed the question.  What

2      was it?

3  BY MR. GLOVER:

4      Q    I said how often did the police have to

5  bring you home?

6      A    I'm not sure.

7      Q    More than once?

8      A    Yes.

9      Q    More than twice?

10      A    Yeah.

11      Q    More than three times?

12      A    I'm not sure.

13      Q    Did your mother have a curfew for you?

14      A    I'm not sure.

15      Q    Were you supposed to be home at a certain

16  time?

17      A    I'm not sure.

18      Q    What time did you typically come home?

19      A    Sometimes 11:00 p.m.

20      Q    Do you know if your mother wanted you home

21  before 11:00 p.m.?

22      A    I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

33

1       Q      Where would you go?

2       A      Sursum Corda.  I think it's First Street

3    Northwest.

4       Q      Thank you.  What did you do there?

5       A      Hang out with friends.

6       Q      Were you outside, were you in somebody's

7    residence?

8       A      Outside and sometimes inside.

9       Q      Did you know that you had to be home?

10      A      I'm not sure.

11      Q      What did the police say to you when they

12   came and picked you up?

13      A      Where have you been.

14      Q      What did you tell them?

15      A      They asked me what was the address, I said

16   First Place Terrace, Sursum Corda housing development.

17      Q      Would the police take you home?

18      A      Yes.

19      Q      When you got home, what would you say to

20   your mother?

21      A      Nothing.

22      Q      What would your mother say to you?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

34

1      A    Where have you been.

2      Q    How would you respond?

3      A    Nothing.

4      Q    Did she appear to be upset?

5      A    Yes.

6      Q    Did you ever think that maybe you shouldn't

7    have been out that late?

8      A    Sometimes.

9      Q    Did you still go out late afterwards anyway?

10      A    Repeat that.

11      Q    Did you still go out late afterwards anyway?

12      A    Sometimes.

13      Q    In addition to being disruptive in the

14    classroom, would there be times that you just left the

15    class when you weren't supposed to?

16      A    Yes.

17      Q    And why did you leave the class?

18      A    I'm not sure.

19      Q    How often would you leave classes?

20      A    I'm not sure.

21      Q    Do it once a week?

22      A    I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

35

1      Q     Did you know that you weren't supposed to

2   leave the class?

3      A     Yes, I did.

4      Q     While you were at Takoma, did they allow you

5   to sit in the front of the class?

6      A     No, I did not sit at the front of the class.

7      Q     Did they provide you with any special

8   programs to assist your education?

9      A     No.

10     Q     Any counseling?

11     A     I'm not sure.

12     Q     Did they give you extra time for your tests,

13  pop quizzes?

14     A     Yes.

15     Q     Allow you to take work home if you were

16  disruptive during the day so you could complete it at

17  home?

18     A     I'm not sure.

19     Q     Were you on any medication while you

20  attended Takoma Elementary?

21     A     Yes.

22     Q     What medication was that?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

36

1     A    I'm not sure.

2     Q    Do you know what the medication was for?

3     A    AD/HD.

4     Q    Were you ever diagnosed with AD/HD?

5     A    No, I'm not -- I'm not sure.

6     Q    But you were taking medicine for AD/HD?

7     A    Yes.

8     Q    And what does "AD/HD" mean to you?

9     A    Hyperdisorder.

10    Q    What does it mean to you?

11    A    Can't sit still.

12    Q    Did you like Takoma?

13    A    No.

14    Q    Why didn't you like Takoma?

15    A    I'm not sure.

16    Q    Were you given homework?

17    A    Yeah.

18    Q    Did you do it?

19    A    Sometimes.

20    Q    Those sometimes that you didn't do your

21  homework, why didn't you do it?

22    A    I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

37

1       Q    Your mother ever help you with your

2  homework?

3       A    Yes.

4       Q    How often would your mother help you with

5  your homework?

6       A    When I'd bring it home.

7       Q    Did you bring your homework home every day?

8       A    I did.

9       Q    So your mother helped you every night you

10  brought it home?

11      A    I didn't show it to her every night.

12      Q    And why didn't you show it to her?

13      A    I'm not sure.

14      Q    Did you know you were supposed to show your

15  mother your homework?

16      A    Can you repeat it.

17      Q    Did you think you were supposed to show your

18  mother your homework?

19      A    Yes.

20      Q    While you attended Takoma, did you ever run

21  away from home?

22      A    Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

38

1      Q    How long were you gone?

2      A    Maybe a night.

3      Q    Where did you stay?

4      A    Dartanian Hawkins.

5      Q    And who is Dartanian Hawkins?

6      A    He used to go to Takoma.

7      Q    Why did you run away?

8      A    I'm not sure.

9      Q    When you used the ATM card and you took the

10   money out, what did you do with the money?

11     A    Bought a cell phone and some shoes.

12     Q    Where did Dartanian Hawkins live?

13     A    I'm not sure.

14     Q    How did you come to return home after

15   running away and staying with Dartanian Hawkins or at

16   his home?  Did you police bring you home, did you go

17   home on your own, did your mother come and get you?

18     A    I'm not sure.

19     Q    Other than that one night with Dartanian

20   Hawkins, did you ever run away from home?

21     A    Not from her house.

22     Q    Did you run away from other homes?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

39

1      A    Foster homes.

2      Q    How many foster homes would you say you ran

3  away from?

4      A    Two.

5      Q    And where were they?

6      A    The one I'm at now, I did that once, and one

7  on 17th and Independence Southeast.

8      Q    You said 17th and Independence?

9      A    Uh-huh.

10     Q    And with whom were you residing?

11     A    Where?

12     Q    At that 17th and Independence address, who

13 were you living with?

14     A    Darrell and Tammy Drayton.

15     Q    And were Darrell and Tammy Drayton your

16 foster parents?

17     A    Yes.

18     Q    And why did you run away?

19     A    I'm not sure.

20     Q    How long were you gone?

21     A    For a day and -- for a whole night and a day

22 and a half.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

40

1      Q      And this present address where you're at

2   currently, when did you run away?

3      A      I ran away to go to a funeral.

4      Q      Which -- whose funeral did you go to?

5      A      A boy named Julius who got killed in

6   Northeast on his birthday.

7      Q      A friend of yours?

8      A      Yeah.

9      Q      When did you run away?

10      A      It was last Tuesday.

11      Q      Are you presently in school?

12      A      Yes.

13      Q      What school do you go to?

14      A      Oak Valley.

15      Q      Where is that at?

16      A      Fairfax, Virginia.

17      Q      You go every day?

18      A      No.

19      Q      When did you first start going to Oak

20   Valley?

21      A      When I left Payne Elementary.

22      Q      Do you recall when you left Payne

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

41

1    Elementary?

2         A    No, I do not.

3         Q    Did you -- this current school year I guess

4    would be the 2007/2008 school year, did you begin that

5    at Oak Valley?

6         A    Yes.

7         Q    I guess just to be clear.  You started at

8    the beginning of the last semester, which would be the

9    fall semester, fall of '07, you started that at Oak

10   Valley?

11        A    I'm not sure.

12        Q    Okay.

13             MS. ALVAREZ:  We'll stipulate that he did.

14             MR. GLOVER:  Okay, just so we're clear.

15   BY MR. GLOVER:

16        Q    And when you said you don't go every day,

17   how many days -- how many times have you not gone to

18   school?

19        A    I didn't go because I had a doctor's

20   appointment, and I didn't go for two months.

21        Q    Well, other than the time period that you

22   didn't go for two months, why didn't you go?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

42

1      A    I stayed home.

2      Q    Why did you stay home?

3      A    Because I didn't want to go to school.

4      Q    Why didn't you want to go to school?

5      A    I'm not sure.  Because I don't like that

6 school.

7      Q    And in those two months that you stayed

8 home, who were you residing with?

9      A    My mother.

10     Q    Did your mother know you were home?

11     A    No.

12     Q    Well, would you be home when your mother

13 left for work?

14     A    I don't think so.  I'm not sure.

15     Q    To your knowledge, did your mother ever

16 receive any phone calls, any documentation from Oak

17 Valley informing her that you weren't in school?

18     A    I'm not sure.

19     Q    If you know, specifically what two months

20 did you miss school?

21     A    I'm not sure.

22     Q    Was it November/December?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

43

1      A    I'm not sure.

2      Q    September/October?

3      A    I'm not sure.

4      Q    Did you know it was wrong not to go to

5  school?

6      A    Yeah.

7      Q    Where did you go?

8      A    I stayed in the house until after 3:00.

9      Q    What happened at 3:00?

10     A    Nothing.  That's when kids get out of

11  school.

12     Q    So what did you do?

13     A    I went to Sursum Corda.

14     Q    When did you start going back to school?

15     A    After that period, I think I was removed

16  from my mother's house.

17     Q    And why were you removed from your mother's

18  house?

19     A    Because I didn't go to school.

20     Q    While you were at Takoma, were you ever

21  asked to leave a classroom?

22     A    I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

44

1        Q    While you were at Takoma, was there ever a

2    time where your mother was called by, if you know, by

3    any of the staff of the school because of your

4    behavior?

5             MS. ALVAREZ:  I think you've already asked

6        that question.

7             MR. GLOVER:  I didn't ask that specifically.

8             MS. ALVAREZ:  I believe you did, yeah.

9    BY MR. GLOVER:

10       Q    Yes or no?

11       A    I'm not sure.

12       Q    Was there ever a time when you were enrolled

13   in the Takoma afterschool program?

14       A    Yes, I was.

15       Q    When did you start the program?

16       A    Beginning of the school year, in the middle

17   of that week.

18       Q    And what went on at the afterschool program?

19       A    What do you mean?

20       Q    What happened at the program?  What happened

21   at that school program?

22       A    Played Uno.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

45

1      Q     Anything else besides playing Uno?

2      A     I'm not sure.

3      Q     Did you go to the afterschool program every

4   day?

5      A     I'm not sure.

6      Q     Do you have any recollection of not going

7   every day?

8      A     What do you mean?

9      Q     Do you have any recollection of there were

10  times you were supposed to be there and you weren't

11  there?

12     A     I'm not sure.

13     Q     Was there ever a time that you were supposed

14  to be at the afterschool program and you left?

15     A     I'm not sure.

16     Q     To your knowledge, was there ever any time

17  when your mother came and looked for you at the

18  afterschool program and you weren't there?

19     A     I'm not sure.

20     Q     Was there ever a time when you were asked to

21  no longer attend the afterschool program?

22     A     Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

46

1       Q      Why was that?

2       A      I was disruptive.  I was playing.

3       Q      Did you ever get into a fight at the

4    afterschool program?

5       A      I'm not sure.

6       Q      Do you know what a section 504 plan is?

7       A      I'm not sure.

8       Q      If you know, did you have a section 504 plan

9    at Takoma?

10           MS. ALVAREZ:  Objection.  He's already said

11       he doesn't know what it is.

12           THE WITNESS:  I'm not sure.

13    BY MR. GLOVER:

14       Q      While at Takoma, did you have any

15    psychiatric evaluations at the school or --

16       A      I'm not sure.

17       Q      -- any counseling?

18       A      I'm not sure.

19           MS. ALVAREZ:  I'm going to object to this

20       line of questions on the ground that this is

21       information that is entirely within the command

22       and control of DCPS, your client.  Your client

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

47

1        knows whether this child was evaluated while he

2        was at Takoma.   Your client knows --

3            MR. GLOVER:  Objection noted.

4            MS. ALVAREZ:  -- whether he had a section

5        504 plan while he was at Takoma.

6            MR. GLOVER:  Objection noted.

7            MS. ALVAREZ:  So the only reason you're

8        asking this child this, that I can see, is either

9        to prolong this, make him uncomfortable, or try

10       to establish some basis or hypothesis that in

11       fact he may have had a 504 plan, in other words

12       to distort the truth, so in other words, we are

13       objecting to this.

14           MR. GLOVER:  Are you done?

15           MS. ALVAREZ:  Yes.

16           MR. GLOVER:  Objection noted.

17   BY MR. GLOVER:

18       Q    To your knowledge, did your mother bring any

19   medication to Takoma for you to take during the school

20   day?

21       A    I'm not sure.

22       Q    Did you take any medication while you were

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

48

1    at Takoma?

2         A    I'm not sure.

3         Q    Was there any medication that you were

4    supposed to take every day while you were attending

5    Takoma?

6         A    I'm not sure.

7         Q    Did you take medication every day while at

8    Takoma?

9         A    I'm not sure.

10        Q    Was there ever a time that you were placed

11   in Juvenile Hall?

12        A    Yes.

13        Q    And when was that?

14        A    In Payne Elementary.  I think it was Turner,

15   too.

16        Q    And do you have any recollection of being

17   sent to Juvenile Hall while at Takoma?

18        A    No.

19        Q    Starting with Turner, why were you sent to

20   Juvenile Hall?

21        A    Bringing a gun to school.

22        Q    Where did you get the gun?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

49

1     A    Not sure.

2     Q    Why did you bring it to school?

3     A    Not sure.

4     Q    Loaded?

5     A    I'm not sure.

6     Q    Revolver or automatic?

7     A    Not sure.

8     Q    Did it have a cylinder or a clip go in?

9     A    Not sure.

10    Q    How long have you been carrying a gun?

11       MS. ALVAREZ:  Objection.  I'm going to

12   instruct you not to answer that question.

13       MR. GLOVER:  We'll call the judge then.

14       (Whereupon, a short recess was taken.)

15 BY MR. GLOVER:

16    Q   I apologize if I asked you this question

17 before.  I'm sure your counsel will instruct you if I

18 had.  Why did you bring the gun to school?

19    A   It was a toy gun.

20       MS. ALVAREZ:  Okay.  Could you read me back

21   the last question before I objected and

22   instructed my client not to answer.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

50

1          (Whereupon, reporter reads requested

2      material.)

3          MS. ALVAREZ:  Excuse me.  If you could just

4      wait.

5          And what was the next question?

6          (Whereupon, reporter reads requested

7      material.)

8          MS. ALVAREZ:  Okay.

9  BY MR. GLOVER:

10     Q    And you stated that while you were attending

11  Payne -- let me back up a little bit.  Were you

12  arrested as a result of that?

13         MS. ALVAREZ:  I'm going to ask for

14     clarification.

15         MR. GLOVER:  Well, certainly.

16         MS. ALVAREZ:  Was he arrested for carrying a

17     toy gun; is that your question?

18         MR. GLOVER:  That is the question.  I'm

19     going to rephrase it.

20         MS. ALVAREZ:  Were you arrested for carrying

21     a toy gun?

22         THE WITNESS:  I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

51

1    BY MR. GLOVER:

2        Q    Were you brought to a police station?

3        A    I'm not sure.

4        Q    The time that you were brought to Juvenile

5    Hall when you were at Payne, why were you brought to

6    Juvenile Hall?

7        A    I'm not sure.  I forgot.

8        Q    Did you graduate from Takoma Elementary?

9        A    Yes.

10        Q    You moved on to the next grade?

11        A    Yes.

12        MS. ALVAREZ:  We'll note for the record that

13        he was retained by Takoma in fifth grade.  Your

14        DCPS records so state.

15        MR. GLOVER:  Thank you.

16    BY MR. GLOVER:

17        Q    Do you recall why you were retained?

18        A    When I was about to leave the school, they

19    told me I was going to sixth.  I think it was the

20    sixth.  I'm not sure.

21        Q    Did your mother ever make an attempt to take

22    you to Shepard Elementary school?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

52

1     A     I'm not sure.

2     Q     During any time that you were at Takoma

3   Elementary, were you withdrawn from that school or

4   taken out of that school?

5     A     I'm not sure.

6     Q     Did there ever come a time when your mother

7   barricaded the front door of her home to keep you in?

8     A     Yeah.

9     Q     What did she barricade it with?

10    A     Her bed.

11    Q     When your mother barricaded the door, what

12   did you do?

13    A     I'm not sure.

14    Q     Did you stay in the house, or did you leave?

15    A     Not sure.

16    Q     Did there ever come a time that you were

17   removed from the home, from your mother's care?

18    A     Yes.

19    Q     When was that?

20    A     Mother's Day.

21    Q     Mother's Day 2005, 2006, 2007?

22    A     I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

53

1        Q    And why were you removed from the home?

2        A    Not sure.

3        Q    Were you ever struck by your mother?

4        A    Not on purpose.

5        Q    When you say "not on purpose," what do you

6    mean?

7        A    The door hit me in my eye.

8        Q    How did the door hit you in the eye?

9        A    Because I was leaning on the door, and she

10   pushed it in.

11       Q    And why were you leaning on the door?

12       A    I'm not sure.

13       Q    When you say you were "leaning on the door,"

14   what door was that?

15       A    Bathroom door.

16       Q    Why were you in the bathroom?

17       A    I threatened her.

18       Q    When you say you "threatened her," exactly

19   what did you say?

20       A    I was going to hit her with that belt.

21       Q    Had you ever hit your mother?

22       A    No.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

54

1        Q    Had she ever hit you?

2        A    Yeah.  Not in an abuse way, though.

3        Q    How did she hit you?

4        A    Like if I would get in trouble, she would

5   give me a tap with her hand or something like that.

6        Q    Now, after you were hit with the door, what

7   happened?

8        A    Not sure.

9        Q    Were police called?

10       A    Yes.

11       Q    Did you speak to the police?

12       A    What do you mean?

13       Q    Did you speak to the police?  Did you tell

14  them what happened?

15       A    When they came to the house?

16       Q    Sure.

17       A    Yeah.

18       Q    What did you tell them?

19       A    I told them that she had hit me with the

20  door.

21       Q    What did the police do?

22       A    Huh?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

55

1      Q     What did the police do?  What did the police

2   do?

3      A     Took me out of there.  Basically, you could

4   say I lied to them.

5      Q     So what happened?

6      A     I told them that she hit me with her shoe.

7      MS. ALVAREZ:  I'm sorry.  Would you read

8      back the answer.  There was a question to which

9      you said "I lied on her."  What was that in

10     response to?

11     (Whereupon, reporter reads requested

12     material.)

13   BY MR. GLOVER:

14     Q     So you told the police a lie?

15     A     Yes.

16     Q     You know it's wrong to lie?

17     A     Yeah.

18     Q     Why did you lie on your mother?

19     A     Just to get some time away from her.

20     Q     Why did you feel like you needed time away

21   from your mother?

22     A     Because we were arguing.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

56

1      Q    And what happened after the police took you

2   from the home?

3      A    I went to CFSA.

4      Q    What happened then?

5      A    They wrote down a lot of stuff and processed

6   me into the system.

7      Q    What did they write down?

8      A    Not sure.

9      Q    When you say they "processed you into the

10  system," what does that mean?

11     A    They put my name in the system.

12     Q    What happened after that?

13     A    I think I went to Children's for an

14  evaluation.

15     Q    When you say "Children's" you're referring

16  to Children's Hospital?

17     A    Yes.

18     Q    What type of evaluation, if you know?

19     A    I'm not sure.

20     Q    Do you recall if it was a psychological

21  evaluation?

22     A    I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

57

1    Q    How long did you stay in Children's?

2    A    For about two hours.

3    Q    What happened after that?

4    A    They just -- I'm not sure.  They just gave

5    me an evaluation.  I'm not sure what they did.

6    Q    Okay.  Where did you go after that?

7    A    They took me to Sasha Bruce.

8    Q    What's Sasha Bruce?

9    A    Northeast.

10   Q    What is it?

11   A    It's a group home.

12   Q    And how long were you at Sasha Bruce?

13   A    Probably like four hours.

14   Q    What happened after that?

15   A    They called my sister to come pick me up.

16   Her husband came and picked me up and signed the

17   papers.

18   Q    What's your sister's name?

19   A    Tisha Johnson.

20   Q    What's her husband's name?

21   A    Michael.

22   Q    Last name, if you know?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

58

1      A    Johnson.

2      Q    Your sister come and get you?

3      A    Her husband did.

4      Q    I apologize.  Correct.  And where did you

5  go?

6      A    To their house.

7      Q    How long did you stay with them?

8      A    For that whole night.

9      Q    Where did you go from there?

10     A    They took me to my mother's house to get me

11  ready for school, and I was suspended.

12     Q    What were you suspended for?

13     A    I'm not sure.

14     Q    How long had you been suspended?

15     A    Probably like a week, I think.

16     Q    Did you tell any of your family members that

17  you were suspended?

18     A    No.  I think my mother knew.

19     Q    And what happened after they took you to get

20  ready for school?

21     A    My mother said I was suspended, and I left

22  out the house.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

59

1    Q    Where did you go?

2    A    To Takoma station.

3    Q    What happened then?

4    A    I was about to catch the train.

5    Q    Where were you going?

6    A    To the mall.

7    Q    And what happened?

8    A    Then the police picked me up.

9    Q    What happened after that?

10   A    They took me to the house, took me to

11   Children's Hospital again for another evaluation.

12   Q    And how long were you at Children's then?

13   A    I just stayed for like an hour, and then I

14   went to St. Ann's.

15   Q    And what is St. Ann's?

16   A    Another group home.

17   Q    And how long were you at St. Ann's?

18   A    I'm not sure.

19   Q    More than a day?

20   A    Yeah.

21   Q    During the time that you were at St. Ann's,

22   was school still in session at Takoma Elementary?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

60

1       A    Yes.

2       Q    And while you were residing at St. Ann's,

3  did you ever return to school at Takoma?

4       A    No, because I was suspended for the rest of

5  the year.

6       Q    Who told you you were suspended for the rest

7  of the year?

8       A    I think -- we went up, me and the people

9  went up there, they went to drop me off and get my

10  books and stuff, and Ms. Grant say I was suspended, I

11  wasn't to return for the rest of the year.

12      Q    Did you ask her why?

13      A    No.

14      Q    Did you know why?

15      A    No, no.  I'm sorry.  Let me correct that.

16  She hadn't suspended me for the rest of the year.  She

17  told me to come back next week.  I think that that was

18  a Thursday.

19      Q    And did you return the following week?

20      A    Yes.

21      Q    On the Thursday?

22      A    No, it was that Monday, because she told me

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

61

1    I could come back next week on Monday.  It was on a

2    Thursday.

3        Q    Did you return to school?

4        A    Yes.

5        Q    Did you return on that Monday?

6        A    Yes, I returned on Monday.

7        Q    Did you finish out the school year at

8    Takoma?

9        A    I'm not sure.

10        Q    From the time that you were told to return

11    on that Monday until the end of the school year, did

12    you go to school every day?

13        A    I'm not sure.  I don't think I did.

14        Q    Where was your father at this time when you

15    were attending Takoma?

16        A    He died while I was attending Takoma.

17        Q    Sorry to hear that.  Did he pass on before

18    or after you were taken out of your mother's custody?

19        A    Before.

20        Q    Were you close?

21        A    Yes.

22        Q    Sad when he passed on?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

62

1     A    Yes.

2     Q    Did there come a time that you left St.

3  Ann's to reside with someone else?

4     A    I went to Children's after St. Ann's.

5     Q    And how long were you at Children's?

6     A    For a month.

7     Q    And after that, where did you reside?

8     A    At Carolyn Curtis' house.

9     Q    Who is Carolyn Curtis?

10    A    Foster mother.

11    Q    And where does Ms. Curtis live, if you know?

12    A    I think it's Robinson Place, Southeast.

13    Q    And when did you first start residing with

14  Ms. Curtis?

15    A    Right after my school started to begin,

16  that's when I went to Turner.

17    Q    Thank you.  So it was the following school

18  year?

19    A    I think so.

20    Q    Okay, you said it was right after the

21  following school year?

22    A    It was the following school year.  It was

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

63

1    after Takoma.

2        Q    But when you began residing with Ms. Curtis,

3    had that following school year when you went to

4    Turner, had that started or -- let me rephrase the

5    question.  I apologize.  When you first began residing

6    with Ms. Curtis, had that new school year began?

7            MS. ALVAREZ:  No.

8            THE WITNESS:  Yeah.

9            MR. GLOVER:  Allow him to answer.

10           MS. ALVAREZ:  We'll stipulate just to keep

11       the record clear, and this is in the record.

12           MR. GLOVER:  I have a right to a deposition.

13       I have a right to an answer to the question.

14       You've been obstructing the entire time.  He's

15       entitled -- this is a legitimate question that I

16       have a right to ask; okay?

17           MS. ALVAREZ:  We'll stipulate that he began

18       the school year.

19   BY MR. GLOVER:

20       Q    Now, had you -- at the time that you began

21   residing with Ms. Curtis, had the school year started?

22       A    No.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

64

1      Q    Okay.  So when the school year started, when

2  you began at Turner, where were you residing?

3      A    What did you say?

4      Q    When you first started Turner, where were

5  you residing?

6      A    Ms. Curtis' house.

7      Q    And did Ms. Curtis enroll you at Turner

8  Elementary if you know?

9      A    Yes.

10      Q    Were you present with Ms. Turner when she

11  was going through the enrollment process?

12      A    What?

13      Q    Were you present with Ms. Curtis when she

14  was undergoing the enrollment process at Turner?

15      A    Yes.

16      Q    Do you recall if Ms. Curers ever informed

17  any of the staff at Turner that you had a section 504

18  plan?

19      A    I'm not sure.

20      Q    How long did you stay at Turner?

21      A    For half of that school year.

22      Q    Let me try to make it a little clearer.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

65

1    Were you there during that winter semester, that

2    entire winter semester?

3             MS. ALVAREZ:  You mean the fall semester?

4    BY MR. GLOVER:

5        Q    Excuse me.  Fall semester?

6        A    Yes.

7        Q    And were you there in part of that spring

8    semester?

9        A    I'm not sure.

10       Q    Were you there after December at Turner?

11       A    Yes.

12       Q    Do you know who Ms. Marcia Parker is?

13       A    Uh-huh, yes.

14       Q    And who is Ms. Parker?

15       A    A nice principal.

16       Q    Was she the principal at Turner while you

17   were attending Turner?

18       A    Yes.  I don't think she's the principal no

19   more.

20       Q    And how did you like Turner?

21       A    I liked it.

22       Q    How was your behavior while you were at

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

66

1    Turner?

2         A    It was okay.   I just walked the halls a lot.

3         Q    When you say you "walked the halls a lot,"

4    did you leave class to walk the halls?

5         A    Me and a couple of other people.

6         Q    Okay.   Were you supposed to be walking the

7    halls?

8         A    No.

9         Q    Any other disciplinary problems?

10        A    Not really.

11        Q    When you say "not really," what do you mean?

12        A    I mean no.

13        Q    Any fights while you were at Turner?

14        A    No.

15        Q    Any yelling across the hall, yelling across

16   the class?

17        A    No.

18        Q    Did Ms. Parker ever remove you from class?

19        A    I'm not sure.

20        Q    Did any of the staff at Turner Elementary

21   remove you from class during your time there?

22        A    I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

67

1      Q    While you were at Turner Elementary, were

2  you ever suspended?

3      A    Yeah.

4      Q    And why were you suspended?

5      A    For the toy gun incident.

6      Q    Was there any other occasion that you were

7  suspended while attending Turner Elementary?

8      A    I'm not sure.

9      Q    Pardon?

10     A    I think there is, but I'm not sure.

11     Q    Well, if you think so, do you recall what

12  was the other reason that you were suspended?

13     A    For walking the halls.

14     Q    How often would you walk the halls?

15     A    Every day.

16     Q    Did you go to all of your classes?

17     A    Some, somewhat.

18     Q    When you say "somewhat," what do you mean?

19     A    Like sometimes.  Basically you could say no,

20  I didn't.

21     Q    Did you know you were supposed to go to

22  class every day?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

68

1      A      Yeah.

2      Q      Did the staff at Turner provide you any

3  services to assist you with your education, such as

4  allowing you to sit closer to the board?

5      A      Yes, they did.

6      Q      Did they allow you extra time for your

7  quizzes?

8      A      Yes.

9      Q      Did they allow you to take work home that

10  you didn't finish to complete it at home?

11      A      Yes.

12      Q      Did they provide counseling services for

13  you?

14      A      Yes.

15      Q      Did they provide evaluations for you?

16      A      What do you mean?

17      Q      Did they provide behavior plans for you?

18      A      Yes.

19      Q      And did they provide little rewards for you

20  if you completed your work on time or if you did your

21  work?

22      A      Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

69

1    Q    And if you know, while you attended Turner

2    Elementary, were you ever evaluated for Special

3    Education classes?

4    A    I'm not sure.

5    Q    After they provided you the services that I

6    mentioned, sitting closer to the board, the allowing

7    to do -- more time for your quizzes, allowing to take

8    work home, how were your grades?

9    A    They were okay.

10    Q    Did they get better after the services?

11    A    Uh-huh.

12    Q    Is that a yes?

13    A    Yes.

14    Q    Do you ever recall seeing your mother at the

15    school?

16    A    Yes.

17    Q    How often did you see your mother at the

18    school?

19    A    Just once.

20    Q    And do you know why your mother was at the

21    school?

22    A    Not sure.  I think it was for a meeting.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

70

1       Q     Okay.  Do you know what the meeting was for?

2       A     I think it was about the five-something

3   plan.

4       Q     504 plan?

5       A     I think.

6       Q     Did you ever see your lawyer at the school?

7       A     Yes.  As my lawyer, do you mean her?

8       Q     Yes, this lawyer.

9       A     Oh, no.

10      Q     Okay.  Do you have another lawyer?

11      A     It was with the Child Family Services.  John

12  Crow, I think.

13      Q     The times that you were -- I believe you

14  said that one you don't recall and the second one

15  you're not sure, but when you were suspended from

16  Turner, how long were the suspensions if you know?

17      A     One was for the rest of the week, and the

18  other one, I think it was a two-day one.  I'm not

19  sure.

20      Q     And was the toy gun, was that the one week?

21      A     That was for the rest of the week.

22      Q     Okay.  After school were you going to

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

71

1    Ms. Curtis' every night?

2        A    Yes.

3        Q    Were there ever nights that you were staying

4    out?

5        A    No.

6        Q    While at Ms. Curtis', did the police ever

7    have to bring you home?

8        A    No.

9        Q    What were your grades like?

10       A    They were okay.

11       Q    A's, B's, or 1's, 2's?

12       A    I'm not sure.

13       Q    Are you doing your homework every night?

14       A    Sort of, sort of.

15       Q    When you say "sort of," what do you mean?

16       A    I would probably do it like -- I'd do some

17   of it, but I didn't do all of it.

18       Q    So you would start it; you just wouldn't

19   finish it?

20       A    Uh-huh.

21       Q    Is that a yes?

22       A    Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

72

1        Q    While you were attending Turner, was there

2    any time where Ms. Curtis had to come pick you up from

3    school because of disciplinary problems?

4        A    I'm not sure.

5        Q    Were there any times when Ms. Curtis had to

6    come down to the school because of disciplinary

7    problems?

8            MS. ALVAREZ:    Calls for speculation.

9    Objection.

10   BY MR. GLOVER:

11       Q    If he knows.   If you know.

12       A    I'm not sure.

13       Q    Did you ever see Ms. Curtis down at the

14   school other than the time that she enrolled you?

15       A    Yes, to come pick her son up for a doctor's

16   appointment or something.

17       Q    To your knowledge, did Ms. Curtis ever

18   receive phone calls from the staff at Turner

19   Elementary because of your behavior?

20       A    I'm not sure.

21       Q    To your knowledge, did Ms. Curtis ever

22   receive notifications from the school, whether

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

73

1    suspension slips or any other disciplinary literature,

2    from the school regarding your behavior at Turner

3    Elementary?

4        A    I'm not sure.

5        Q    Did you ever speak to anyone at Turner

6    Elementary about receiving any additional services

7    from the school?

8        A    What do you mean?

9        Q    Did you ever ask them to provide you any

10   additional services, any of the staff?

11       A    No.

12       Q    You stated that you were there for I believe

13   half the school year, a little over half the school

14   year; is that correct?

15       A    Yeah.

16       Q    When did you leave?

17       A    I'm not sure.

18       Q    My apologies.  You did state that.  I

19   believe you stated that you were at Turner after

20   December; is that correct?

21       A    Yes.

22       Q    Were you there all of January?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

74

1      A    Yes.

2      Q    Were you there all of February?

3      A    I'm not sure.

4      Q    Well, I think we can agree that there came a

5   time that you left Turner Elementary; is that correct?

6      A    Yeah.

7      Q    And where did you go?

8      A    To Payne elementary.  That's where I was

9   moved up to the sixth grade.

10      Q    Just so that I'm clear, you moved from

11   Turner Elementary to Payne Elementary because you were

12   moved up a grade?

13      A    No, because I was moving to another place.

14      Q    You were moving to another place?

15      A    Yeah.

16      Q    Let me ask this question more directly.

17   When you moved from -- why did you move from Turner

18   Elementary to Payne Elementary?

19      A    I'm not sure.

20      Q    When you moved from -- if you know, and when

21   you were moving from Turner Elementary to Payne

22   Elementary, were you still residing with Ms. Curtis?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

75

1       A    No.

2       Q    Who were you residing with?

3       A    Tammy and Doug Drayton.

4       Q    When did you first start residing with the

5   Draytons?

6       A    I'm not sure.

7       Q    Was it during that first semester of the

8   fall of --

9       A    Probably like the second semester maybe.

10  I'm not sure.

11      Q    Okay, and why did you leave Ms. Curtis to

12  reside with the Draytons?

13          MS. ALVAREZ:  He's already answered that.

14      He said he wasn't sure.

15          THE WITNESS:  I'm not sure.

16  BY MR. GLOVER:

17      Q    Okay.  Were you having any behavioral issues

18  at Ms. Curtis' residence?

19      A    No.

20      Q    If you recall, where does Ms. -- where did

21  the Drayton's live?

22      A    Seventeenth and Independence.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

76

1      Q      And that's Southeast, I believe you said?

2      A      Yes.

3      Q      Other than Mr. and Mrs. Drayton, who else

4  resided at that address?

5      A      His son Akim, and Naaji.

6      Q      Akim and Naaji, I believe you said?

7      A      Mm-hmm, yes.

8      Q      Thank you.  Just so that I'm clear, I want

9  to make sure I have it correct in my head.  When you

10  transferred from Turner to Payne, you were already

11  living with the Draytons?

12      A      Yes.  When I went to Payne I was living with

13  the Draytons.

14      Q      And do you know where Payne is located?

15      A      It's 17th and Independence.

16      Q      Seventeenth and Independence?

17      A      Yeah.  I think that's address.

18      Q      So it's in the same vicinity as the

19  Draytons?

20      A      It's basically just back north.

21      Q      You could walk there?

22      A      Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

77

1      Q     How did you like Payne?

2      A     It was okay.

3      Q     Do you know a gentleman by the name of

4    Dennis Homesley?

5      A     Yes.

6      Q     Who was Mr. Homesley?

7      A     Principal.

8      Q     And when you attended -- when you

9    transferred from Turner to Payne, when you arrived at

10   Payne, what grade were you in?

11     A     The sixth.

12     Q     And while attending Payne Elementary, were

13   you provided with services to assist you with your

14   education?  More specifically, were you sitting in

15   front of the class again?

16     A     No.

17     Q     Okay, did they have a behavior plan for you?

18     A     No.

19     Q     Did they provide you certain awards for

20   completing your reports or your projects on time?

21     A     No.

22     Q     Did they give you extra time for tests

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

78

1    and/or quizzes?

2        A    Yes.

3        Q    Were you allowed to take work home to finish

4    completing it at home?

5        A    Yes.

6        Q    Did they provide you with any counseling

7    services while at the school?

8        A    No.

9        Q    Are there any other services that you can

10   think of that they provided you while at Payne?

11       A    No.

12       Q    While attending Payne, did you go to school

13   every day?

14       A    Yes.

15       Q    Did you go to every class?

16       A    Yeah -- no.

17       Q    How many times a week would you miss class?

18       A    I'm not sure.

19       Q    How many times a day would you miss class?

20       A    I'm not sure.

21       Q    While attending Payne, did you have any

22   disciplinary problems?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

79

1      A     What do you mean?

2      Q     Were you talking in class?

3      A     Yes.

4      Q     Get into fights?

5      A     No.

6      Q     Walking the halls?

7      A     Yeah.

8      Q     Leaving school?

9      A     No.

10           MS. ALVAREZ:   I'm sorry.   What was the

11     answer to that?

12           THE REPORTER:   It was "no."

13 BY MR. GLOVER:

14     Q     Disruptive?

15     A     Yes.

16     Q     To your knowledge, were the Draytons ever

17 called down to the school because of your behavior

18 while attending --

19     A     Yes.

20     Q     How many times were the Draytons called down

21 to the school because of your behavior?

22     A     I'm not sure.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

80

1    Q    More than once?

2    A    Yeah.

3    Q    More than twice?

4    A    I'm not sure.

5    Q    And what were you doing that the Draytons

6    had to be called down to the school?

7    A    I was walking the halls.

8    Q    To your knowledge, were the Draytons ever

9    called by anyone from the school because of your

10   behavior?

11   A    Yeah.

12   Q    How many times?

13   A    I'm not sure.

14   Q    More than once?

15   A    I'm not sure.

16   Q    Okay.  During your first two weeks at Payne,

17   those initial two weeks after you were enrolled in

18   Payne, how often would you go to class?

19   A    I didn't really.

20   Q    And why didn't you go to class?

21   A    I walked the halls.

22   Q    Why did you walk the halls?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

81

1      A      I'm not sure.

2      Q      Were you ever instructed to go to class?

3      A      Yes.

4      Q      What did you do?

5      A      I would go for like 30 minutes and leave

6   back out.

7      Q      When you would go for those 30 minutes,

8   would the teacher and staff tell you not to leave?

9      A      Yes.

10      Q      And what would you do?

11      A      I would leave.

12      Q      I apologize.  Going back to Turner, you said

13   that you walked the halls there as well, correct?

14      A      Yes.

15      Q      Did the teachers or staff tell you not to

16   leave the class?

17      A      I'm not sure.

18      Q      And you knew you weren't supposed to be

19   walking the halls, right?

20      A      Yes.

21      Q      During the time that you attended Payne

22   Elementary, were you ever suspended?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

82

1          MS. ALVAREZ:  Read back that question.

2          (Whereupon, reporter reads requested

3     material.)

4          THE WITNESS:  Yes.

5  BY MR. GLOVER:

6      Q    What were you suspended for?

7      A    I'm not sure.

8      Q    How long were you suspended?

9      A    One for the rest of the year.

10     Q    And you said one for the rest of the year.

11  Were there other suspensions?

12     A    Yes.

13     Q    How many suspensions?

14     A    Probably like two.

15     Q    Including the one you just mentioned?

16     A    Yeah.

17     Q    And why were you suspended that time?

18     A    The last one?  I'm not sure.

19     Q    In total, how many days did you miss from

20  school because of these suspensions, if you know?

21     A    Maybe like two weeks.

22     Q    During your time at Payne, do you ever

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

83

1    recall having any conversations with principal

2    Homesley?

3         A    Yes.

4         Q    What do you remember speaking to him about?

5         A    About going to class.

6         Q    And what would he tell you?

7         A    If I don't go to class, he was going to call

8    my mother, my foster mother.

9         Q    Do you recall if that was early on when you

10   first enrolled, during the middle of your time on?

11        A    This is going on to the end of the school

12   year.

13            MS. ALVAREZ:  Excuse me.  This was going on

14       to the end of the school year; was that the

15       answer?

16            THE REPORTER:  Yes.

17            MS. ALVAREZ:  Could you read me the answer?

18            (Whereupon, reporter reads requested

19       material.)

20   BY MR. GLOVER:

21        Q    Toward that period, toward end of the school

22   year, were you missing a lot of school?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

84

1        A      Would you repeat that.

2        Q      Excuse me.   Toward that period when he spoke

3    to you, toward the end of the school year, had you

4    been missing a lot of class?

5        A      Yes.

6            MS. ALVAREZ:   Wait a second.   We haven't

7        established when he spoke to him.

8            MR. GLOVER:   Well, he said towards the end

9        of the school year.

10           MS. ALVAREZ:   No, I don't believe he said

11       that.   You just asked whether he had any talks

12       with Homesley, and he said yes.

13           MR. GLOVER:   And I believe he said yes, I

14       think it was toward the end of the school year,

15       but we can find out.

16           MS. ALVAREZ:   No, he said this was going on

17       until the end of the school year.

18           MR. GLOVER:   Okay.   Well, then I'll withdraw

19       the question.

20           MS. ALVAREZ:   Could you read his answers.

21           MR. GLOVER:   I'll just ask him the question.

22           MS. ALVAREZ:   I'd like the answers read,

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

85

1    please, so we're certain what was said and I can

2    object to them.   Thank you.

3        (Whereupon, reporter reads requested

4    material.)

5  BY MR. GLOVER:

6    Q    When you had that conversation that you just

7  referenced, what we just referenced with respect to

8  principal Homesley --

9        MS. ALVAREZ:   Objection.   My understanding

10    was that in effect he answered that there were

11    many conversations of that kind that he had with

12    Homesley.

13        MR. GLOVER:   I'll rephrase the question.

14        MS. ALVAREZ:   These conversations were going

15    on to the end of the school year.

16        MR. GLOVER:   I didn't hear that.   I heard

17    this was going on, but I'll rephrase the

18    question.

19  BY MR. GLOVER:

20    Q    More specifically -- well, withdrawn.   You

21  stated -- I previously asked you during that first two

22  weeks at Payne, were you going to school regularly,

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

86

1    and you said, not really, correct, going to classes

2    regularly, correct?

3        A    Correct.

4        Q    Did there ever come a time when you began

5    going to classes regularly?

6        A    A couple of times.

7        Q    Couple times?  But other than those couple

8    times, were you continuously just walking the halls?

9        A    Yes.

10       Q    Doing any homework?

11       A    Yeah, yes.

12       Q    Turning it in?

13       A    Yes.

14       Q    Doing any class work?

15       A    I did sometimes.  I didn't do it all the

16   time.

17       Q    Did Principal Homesley or any of the staff

18   at Payne Elementary ever remove you from a class?

19       A    Yeah.

20       Q    When was that?

21       A    This is like the last -- basically two weeks

22   before school was over.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

87

1    Q    And why did they remove you from the class?

2    A    I'm not sure.

3    Q    Was it for disciplinary reasons?

4    A    Not sure.

5    Q    How many times were you removed from the

6    class by Principal Homesley or some of the staff at

7    Payne Elementary?

8    A    For disruption?

9    Q    Or for any reason.

10    A    For disruption.

11    Q    We'll start off there, for disrupting class.

12    A    That's it.

13    Q    Okay.  How many times, would you say?

14    A    I'm not sure.

15    Q    While you were attending Payne Elementary,

16    was there a criminal complaint filed against you?

17    A    Yes.

18    Q    And do you know who filed that complaint

19    against you?

20    A    No, I do not.

21    Q    Do you know the basis of that complaint?

22    A    What you mean?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

88

1      Q      Do you know the basis of that complaint?  Do

2  you know why that complaint was filed against you?

3      A      I'm not sure.

4      Q      Were there ever any allegations filed

5  against you for inappropriate touching?

6      A      At Payne?

7      Q      Yeah.

8      A      No.

9      Q      Were there ever any allegations filed

10  against you for inappropriate touching?

11      A      Yes.

12      Q      Where was this at?

13      A      Ms. Curtis' house.

14      Q      What were the results of those allegations?

15      A      Counseling.

16      Q      And how long did you -- well, was it

17  counseling for you?

18      A      What do you mean?

19      Q      Were you referred to counseling as a result

20  of these allegations?

21      A      Yes.

22      Q      And where did you go to counseling?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

89

1          A     On Georgia Avenue.

2          Q     And how long did you undergo counseling?

3          A     I'm not sure.

4          Q     To your knowledge, or to your recollection,

5     were you arrested as a result of these complaints?

6          A     To what complaints?

7          Q     These inappropriate touching.

8          A     No.

9          Q     I apologize if I asked you this already.

10    How long was the counseling, if you know?

11         A     I'm not sure.

12         Q     To your knowledge, did Principal Homesley or

13    any of the staff at Payne Elementary provide the

14    Draytons with any disciplinary records pertaining to

15    you?

16         A     What you mean?

17         Q     Did they give them any reports, any

18    suspension reports, any disciplinary reports related

19    to you?

20         A     I'm not sure.

21         Q     Okay.  As a result of being suspended from

22    school at Takoma, at Turner and at Payne, how did you

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

90

1    feel?

2        A    Not sure.

3        Q    Did you feel stressed out?

4        A    Not sure.

5        Q    Did you ever seek any counseling, any

6    therapy because of you being suspended by the schools?

7        A    Yes.

8        Q    Where did you seek that counseling?

9        A    Jen Hutchinson.

10       Q    And who is Jen Hutchinson?

11       A    A counselor.

12       Q    And when did you start that counseling?

13       A    When I was over at Ms. Carolyn Curtis'

14   house.

15       Q    And who referred you to Ms. Hutchinson?

16       A    I'm not sure.

17       Q    And why did you go to Ms. Hutchinson?

18       A    For counseling.

19       Q    Counseling for what?

20       A    I'm not sure.

21       Q    Who told you that you were going to be

22   having counseling with Jen Hutchinson?

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

91

1      A    I'm not sure.

2      Q    As a result of being suspended from and

3  removed from class from Takoma, from Turner, from

4  Payne, were you ever embarrassed?

5      A    No.

6      Q    Did you graduate from Payne Elementary?

7  Withdrawn.  Let me --

8      A    Yes.

9      Q    Okay.

10     A    But I didn't walk across the stage, because

11  he pulled me off of it last week.

12     Q    When you say "he," who are you referring to?

13     A    Dennis Homesley.  I didn't get to walk

14  across the stage and graduate.

15     Q    But were you promoted to seventh grade?

16     A    Yes.

17     Q    Where?

18     A    Oak Valley.

19     Q    That's where you are now?

20     A    Yes.

21     Q    Did there -- were you in the custody of

22  Tammy and Darrell Drayton the entire time you were at

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

92

1    Payne Elementary?

2        A    Yes.

3        Q    Was there a time that you left the custody

4    of Tammy and Darrell Drayton?

5        A    Yes.

6        Q    And where did you go after that?

7        A    To my mother's house.

8        Q    I think we previously discussed that you're

9    now back with Ms. McManus, I believe, correct?

10       A    Yes.

11       Q    Did any of the staff at Takoma Elementary

12   school ever tell you that you were being suspended

13   because of your disability?

14       A    No.

15       Q    Did any of the staff at Turner Elementary

16   school tell you you were being suspended because of

17   your disability?

18       A    No.

19       Q    Did any of the staff at Payne Elementary

20   ever tell you you were being suspended because of your

21   disability?

22       A    No.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

93

1     Q   Did any of the staff at Takoma Elementary

2  tell you that you were being taken from a class

3  because of your disability?

4     A   No.

5     Q   Did any of the staff at Turner tell you that

6  you were being removed from classes because of your

7  disability?

8     A   No.

9     Q   Did any of the staff at Payne tell you you

10  were being removed from class because of your

11  disability?

12     A   No.

13     Q   Did you take any medication today?

14     A   Huh?

15     Q   Did you take any medication today?

16     A   Yes.

17     Q   Did you feel that that medication would

18  affect your ability to testify today?

19     A   What do you mean?

20     Q   Do you feel -- the medication that you took

21  today; did you take it this morning?

22     A   Yes.

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

94

1      Q     Do you feel that it in any way would have

2    affected your ability to give truthful and honest

3    testimony here today?

4      A     No.

5      Q     Did any of the staff at Takoma Elementary

6    tell you you were removed from the afterschool program

7    because of your disability?

8      A     No.

9           MR. GLOVER:   I thank you for your time,

10   Mr. Tomonia.

11          MS. ALVAREZ:   I have a couple of questions.

12          EXAMINATION BY COUNSEL FOR PLAINTIFF

13   BY MS. ALVAREZ:

14     Q     Reginald, do you mind if I just ask you a

15   couple of questions?  I know you're dying to get out

16   of here.

17          You talked with this gentleman about the

18   time when you were removed from your mother's home?

19     A     Yes.

20     Q     And the various conversations that you had

21   with the police.  During that period while you were at

22   Takoma, that whole year leading up to the time when

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

95

1    you were removed, did you feel afraid of your mom?

2         A    No.

3              MS. ALVAREZ:  No further questions.

4              MR. GLOVER:  Just on the record, in efforts

5         to secure the deposition of Reginald Tomonia, we

6         did interrupt the deposition of Linda Tomonia so

7         that we could get a deposition of Mr. Reginald

8         Tomonia done today so that he does not miss

9         another day of school.

10             Counsel and I have agreed that we will get

11        in contact tomorrow -- I believe tomorrow is the

12        24th of January -- to schedule another day for

13        Ms. Tomonia to come just to conclude the

14        deposition that we commenced today.  Of note,

15        discovery in this case closes, I believe, on the

16        31st of this month, so the deposition has to be

17        scheduled before that date.

18             Ms. Tomonia has articulated that she will

19        make any and all efforts to free her schedule so

20        she can resolve this matter, which I'm sure she

21        would like to do, and plaintiff's counsel has

22        informed me that she does not have her calendar

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

96

1    here with her today, and she would not feel

2    comfortable, rightfully so, without having her

3    calendar present.

4        We are going to contact one another tomorrow

5    to schedule a conclusion of Ms. Tomonia's

6    deposition prior to next week Thursday, which I

7    believe is the 31st of January.

8        (Signature having not been waived, the

9    deposition of REGINALD TOMONIA was concluded at

10   5:20 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

97

1

2

3                    ACKNOWLEDGEMENT OF WITNESS

4          I, Reginald Tomonia, do hereby acknowledge

5      that I have read and examined the foregoing

6      testimony, and the same is a true, correct and

7      complete transcription of the testimony given by

8      me, and any corrections appear on the attached

9      Errata sheet signed by me.

10

11

12    _____    _____

13    (DATE)                 (SIGNATURE)

14

15

16

17

18

19

20

21

22

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

98

1                    E R R A T A   S H E E T

2    IN RE:   TOMONIA VS. DISTRICT OF COLUMBIA

3    RETURN BY:

4    PAGE     LINE                    CORRECTION AND REASON

5    _____    _____    _____

6    _____    _____    _____

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____    _____    _____

22   (DATE)            (SIGNATURE)

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

99

1                    E R R A T A   S H E E T

2   IN RE:  TOMONIA VS. DISTRICT OF COLUMBIA

3   RETURN BY:

4   PAGE     LINE                    CORRECTION AND REASON

5   _____   _____    _____

6   _____   _____    _____

7   _____   _____    _____

8   _____   _____    _____

9   _____   _____    _____

10  _____   _____    _____

11  _____   _____    _____

12  _____   _____    _____

13  _____   _____    _____

14  _____   _____    _____

15  _____   _____    _____

16  _____   _____    _____

17  _____   _____    _____

18  _____   _____    _____

19  _____   _____    _____

20  _____   _____    _____

21  _____            _____

22  (DATE)           (SIGNATURE)

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

100

1

2

3    CERTIFICATE OF SHORTHAND REPORTER -- NOTARY PUBLIC

4            I, Laurie Bangart-Smith, Registered
     Professional Reporter, the officer before whom

5    the foregoing deposition was taken, do hereby
     certify that the foregoing transcript is a true

6    and correct record of the testimony given; that
     said testimony was taken by me stenographically

7    and thereafter reduced to typewriting under my
     supervision; and that I am neither counsel for,

8    related to, nor employed by any of the parties to
     this case and have no interest, financial or

9    otherwise, in its outcome.

10            IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my notarial seal this 30th day

11   of January, 2008.

12   My commission expires:  March 14th, 2011

13

14   *Laurie Bangart-Smith*

15   _____

16   LAURIE BANGART-SMITH
     NOTARY PUBLIC IN AND FOR

17   THE DISTRICT OF COLUMBIA

18

19

20

21

22

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

101

**A**

ability 93:18 94:2
abuse 54:2
Academy 12:4,14
  13:10,19 14:16
  15:13,17,19
  16:3,9
acknowledge
  97:4
ACKNOWLE...
  97:3
action 1:7 5:17
actions 20:9
addition 34:13
additional 73:6
  73:10
address 7:10,11
  7:13 8:6 10:9,16
  10:20 11:2,4
  33:15 39:12
  40:1 76:4,17
AD/HD 36:3,4,6,8
affect 93:18
affixed 100:10
afraid 95:1
afternoon 5:14
afterschool 44:13
  44:18 45:3,14
  45:18,21 46:4
  94:6
ago 21:6
agree 74:4
agreed 95:10
Akim 76:5,6
al 1:9
allegations 88:4,9
  88:14,20
allow 8:16 35:4
  35:15 63:9 68:6
  68:9
allowed 78:3
allowing 68:4
  69:6,7
Alvarez 3:3,4 4:4
  12:10,14,16,19
  12:22 13:4
  14:17,19 15:16

16:18 17:13
  19:18,21 20:2,5
  20:10 21:17
  22:5 32:1 41:13
  44:5,8 46:10,19
  47:4,7,15 49:11
  49:20 50:3,8,13
  50:16,20 51:12
  55:7 63:7,10,17
  65:3 72:8 75:13
  79:10 82:1
  83:13,17 84:6
  84:10,16,20,22
  85:9,14 94:11
  94:13 95:3
and/or 78:1
Ann's 59:14,15
  59:17,21 60:2
  62:3,4
answer 8:17,19
  49:12,22 55:8
  63:9,13 79:11
  83:15,17
answered 9:8
  20:2,10 21:17
  75:13 85:10
answers 84:20,22
anybody 8:8
anyway 34:9,11
apartment 10:11
  10:19,20 11:6
  11:12,12
apologies 73:18
apologize 9:10
  49:16 58:4 63:5
  81:12 89:9
appear 34:4 97:8
appointment
  41:20 72:16
appropriate 6:19
approximately
  9:15 19:4 21:13
  28:1
arguing 55:22
argument 17:5
arrested 31:16
  50:12,16,20

89:5
arrived 77:9
articulated 95:18
aside 12:20 17:19
asked 5:21 19:21
  20:2,10 33:15
  43:21 44:5
  45:20 49:16
  84:11 85:21
  89:9
asking 5:17 12:19
  47:8
assist 35:8 68:3
  77:13
assume 8:2
assurances 6:14
ATM 38:9
attached 97:8
attempt 51:21
attend 22:21
  45:21
attended 16:2,8
  16:11 22:15
  35:20 37:20
  69:1 77:8 81:21
attending 48:4
  50:10 61:15,16
  65:17 67:7 72:1
  77:12 78:12,21
  79:18 87:15
attorney 2:5 3:11
  5:8,8,15,15 9:5
automatic 49:6
Avenue 10:11,15
  11:17 89:1
awards 77:19
A's 18:4 71:11

**B**

B 4:9
back 8:10 14:7,15
  18:4 29:2 43:14
  49:20 50:11
  55:8 60:17 61:1
  76:20 81:6,12
  82:1 92:9
bad 8:19 18:8
Bangart-Smith

1:22 2:18 100:4
  100:16
barricade 52:9
barricaded 52:7
  52:11
basically 55:3
  67:19 76:20
  86:21
basis 47:10 87:21
  88:1
bathroom 53:15
  53:16
bed 52:10
began 63:2,5,6,17
  63:20 64:2 86:4
beginning 7:21
  27:12,15 41:8
  44:16
BEHALF 3:2,8
behavior 15:15
  18:17,21 25:3
  44:4 65:22
  68:17 72:19
  73:2 77:17
  79:17,21 80:10
behavioral 77:17
Bekkali 3:20
believe 12:12 29:5
  44:8 70:13
  73:12,19 76:1,6
  84:10,13 92:9
  95:11,15 96:7
belt 53:20
better 69:10
biological 9:12
birth 11:21
birthday 40:6
bit 14:11 50:11
black 6:12
board 13:22 68:4
  69:6
books 60:10
Bought 38:11
boy 27:9 40:5
Branch 23:7
break 27:2
bring 31:19,21

32:5 37:6,7
  38:16 47:18
  49:2,18 71:7
Bringing 48:21
broke 27:4,7
brought 37:10
  51:2,4,5
brown 24:16
Bruce 57:7,8,12
building 10:19
B's 18:4 71:11

**C**

C 3:1 5:1
cab 30:12 31:13
calendar 95:22
  96:3
call 29:3 49:13
  83:7
called 18:18 20:8
  20:15 22:10
  24:7 27:9,16
  29:17 44:2 54:9
  57:15 79:17,20
  80:6,9
calls 22:5 42:16
  72:8,18
can't 8:20 36:11
card 31:1,3,6 38:9
care 7:17 11:10
  52:17
Carolyn 62:8,9
  90:13
carrying 49:10
  50:16,20
case 95:15 100:8
catch 59:4
caught 30:11,17
  30:19
cell 38:11
certain 5:19
  13:20 32:15
  77:19 85:1
certainly 50:15
CERTIFICATE
  100:3
certify 100:5
CFSA 56:3

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

102

**Charter** 12:4
13:11 14:16
15:13
**child** 8:3 9:13
47:1,8 70:11
**Children's** 56:13
56:15,16 57:1
59:11,12 62:4,5
**Civil** 1:2,7 2:16
**clarification**
50:14
**class** 14:1,2,8,9
17:6,21 25:6,11
28:10 29:12,14
29:20 34:15,17
35:2,5,6 66:4,16
66:18,21 67:22
77:15 78:15,17
78:19 79:2
80:18,20 81:2
81:16 83:5,7
84:4 86:14,18
87:1,6,11 91:3
93:2,10
**classes** 13:11,15
13:17 34:19
67:16 69:3 86:1
86:5 93:6
**classmates** 14:6
**classroom** 17:11
25:13 34:14
43:21
**clear** 41:7,14
63:11 74:10
76:8
**clearer** 64:22
**client** 46:22,22
47:2 49:22
**clip** 49:8
**close** 17:20 61:20
**closer** 13:21 68:4
69:6
**closes** 95:15
**Columbia** 1:1,9
2:20 5:9,16 98:2
99:2 100:17
**come** 15:14 18:17

24:8 27:2 29:1
29:20 32:18
38:14,17 52:6
52:16 57:15
58:2 60:17 61:1
62:2 72:2,6,15
86:4 95:13
**comfortable** 96:2
**command** 46:21
**commenced**
95:14
**commend** 8:15
**commission**
100:12
**Community** 12:4
12:14 13:10,19
14:16 15:16,19
16:3,9
**complaint** 87:16
87:18,21 88:1,2
**complaints** 89:5,6
**complete** 35:16
68:10 97:7
**completed** 68:20
**completing** 77:20
78:4
**conclude** 95:13
**concluded** 96:9
**conclusion** 96:5
**conflict** 17:2,4
**confused** 28:11
**contact** 95:11
96:4
**contacted** 19:15
**continuously** 86:8
**control** 46:22
**conversation** 85:6
**conversations**
83:1 85:11,14
94:20
**Corda** 33:2,16
43:13
**correct** 6:2,6 10:2
18:11 29:7 58:4
60:15 73:14,20
74:5 76:9 81:13
86:1,2,3 92:9

97:6 100:6
**CORRECTION**
98:4 99:4
**corrections** 97:8
**counsel** 5:5 12:18
49:17 94:12
95:10,21 100:7
**counseling** 13:21
35:10 46:17
68:12 78:6
88:15,17,19,22
89:2,10 90:5,8
90:12,18,19,22
**counselor** 20:1
90:11
**couple** 66:5 86:6
86:7,7 94:11,15
**court** 1:1 5:21 7:9
8:6,12
**criminal** 87:16
**Crow** 70:12
**Curers** 64:16
**curfew** 32:13
**curious** 28:21
**current** 41:3
**currently** 40:2
**Curtis** 62:8,9,11
62:14 63:2,6,21
64:6,7,13 71:1,6
72:2,5,13,17,21
74:22 75:11,18
88:13 90:13
**custody** 61:18
91:21 92:3
**cylinder** 49:8
**C's** 18:4

——— **D** ———

**D** 3:3,4 5:1
**Darrell** 39:14,15
91:22 92:4
**Dartanian** 38:4,5
38:12,15,19
**date** 11:21 95:17
97:13 98:22
99:22
**day** 15:8 23:8
24:6,11 29:3

35:16 37:7
39:21,21 40:17
41:16 45:4,7
47:20 48:4,7
52:20,21 59:19
61:12 67:15,22
78:13,19 95:9
95:12 100:10
**days** 14:16 23:11
23:15 41:17
82:19
**DCPS** 46:22
51:14
**debit** 31:1,3,6
**December** 65:10
73:20
**deceptive** 17:13
**DEFENDANT**
3:8
**defendants** 1:10
5:5,17
**Dennis** 77:4 91:13
**deposition** 1:13
2:1 9:4 12:18,21
12:22 63:12
95:5,6,7,14,16
96:6,9 100:5
**development**
33:16
**diagnosed** 36:4
**Diandra** 8:9 9:12
**didn't** 18:4,6
23:12 29:3 30:2
30:6,8 36:14,20
36:21 37:11,12
41:19,20,22,22
42:3,4 43:19
44:7 67:20
68:10 71:17
80:19,20 85:16
86:15 91:10,13
**died** 61:16
**different** 10:20
**directly** 74:16
**disability** 92:13
92:17,21 93:3,7
93:11 94:7

**disciplinary**
16:15 20:9 21:7
22:3,16 66:9
72:3,6 73:1
78:22 87:3
89:14,18
**discovery** 95:15
**discuss** 25:3
**discussed** 92:8
**disrupt** 29:13
**disrupting** 28:10
29:12 87:11
**disruption** 87:8
87:10
**disruptive** 14:3,4
14:12 17:6,11
17:13,14,16
25:5,9 34:13
35:16 46:2
79:14
**distort** 47:12
**District** 1:1,1,9
2:19 5:9,16
10:12 11:19
98:2 99:2
100:17
**Division** 1:2
**doctor's** 41:19
72:15
**documentation**
42:16
**doesn't** 21:18,18
46:11
**doing** 8:14,18
29:13 71:13
80:5 86:10,14
**don't** 7:9 9:2,3,5
11:16 12:2
13:14,16 18:7
21:2,4 22:1,9
27:10 29:1,6
30:18 41:16
42:5,14 61:13
65:18 70:14
83:7 84:10
**door** 52:7,11 53:7
53:8,9,11,13,14

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

103

53:15 54:6,20
**Doug** 75:3
**Drayton** 39:14,15
75:3 76:3 91:22
92:4
**Draytons** 75:5,12
76:11,13,19
79:16,20 80:5,8
89:14
**Drayton's** 75:21
**drop** 60:9
**due** 22:3,11
**duly** 5:3
**dying** 94:15
**D.C** 1:14 2:8 3:6
3:14 18:7

_____

**E**

**E** 3:1,1 4:9 5:1,1
98:1,1,1 99:1,1
99:1
**earlier** 12:17 15:8
**early** 24:3 83:9
**Eastern** 11:16
**education** 35:8
68:3 69:3 77:14
**effect** 85:10
**efforts** 95:4,19
**either** 23:9 47:8
**elementary** 22:22
23:3,5,21 25:19
27:21 30:6,11
31:16 35:20
40:21 41:1
48:14 51:8,22
52:3 59:22 64:8
66:20 67:1,7
69:2 72:19 73:3
73:6 74:5,8,11
74:11,18,18,21
74:22 77:12
81:22 86:18
87:7,15 89:13
91:6 92:1,11,15
92:19 93:1 94:5
**embarrassed** 91:4
**employed** 100:8
**enroll** 64:7

**enrolled** 44:12
72:14 80:17
83:10
**enrollment** 64:11
64:14
**entire** 24:11
63:14 65:2
91:22
**entirely** 46:21
**entitled** 63:15
**Eric** 3:9 5:7,15
**Errata** 97:9
**Esq** 3:4
**ESQUIRE** 3:3,9
3:10
**establish** 47:10
**established** 84:7
**estimation** 10:7
**et** 1:9
**evaluated** 47:1
69:2
**evaluation** 56:14
56:18,21 57:5
59:11
**evaluations** 46:15
68:15
**exactly** 27:11
53:18
**EXAMINATION**
4:1,3,4 5:5
94:12
**examined** 97:5
**Excuse** 7:6 15:19
50:3 65:5 83:13
84:2
**expires** 100:12
**extra** 35:12 68:6
77:22
**eye** 53:7,8
**eyes** 24:16

_____

**F**

**fact** 47:11
**fair** 8:2
**Fairfax** 40:16
**fall** 41:9,9 65:3,5
75:8
**family** 58:16

70:11
**father** 11:10
61:14
**February** 74:2
**Federal** 2:16
**feel** 55:20 90:1,3
93:17,20 94:1
95:1 96:1
**fifth** 16:13 51:13
**fight** 14:14,21
15:11 17:5 19:5
19:8,10,13
25:17,22 26:6
26:10 27:2,11
28:12,13 46:3
**fighting** 19:2
26:17 28:10,17
28:18,22
**fights** 15:1,3,6
19:8 20:7,14
21:10,13 22:11
25:20 66:13
79:4
**filed** 87:16,18
88:2,4,9
**financial** 100:8
**find** 84:15
**finish** 8:16 61:7
68:10 71:19
78:3
**first** 5:3 7:16,18
16:18 17:18
18:1,15 19:3,14
19:20 20:7,19
25:19 33:2,16
40:19 62:13
63:5 64:4 75:4,7
80:16 83:10
85:21
**five** 10:8,14 28:7
**five-something**
70:2
**Floor** 2:6 3:12
**follow** 13:2
**following** 60:19
62:17,21,22
63:3

**follows** 5:4
**foregoing** 97:5
100:5,5
**forgive** 18:6
**forgot** 8:10 51:7
**foster** 7:17 8:3
9:13 39:1,2,16
62:10 83:8
**four** 10:8,14 19:6
19:7,13 57:13
**fourth** 2:7 3:13
16:13,14
**Foxhall** 3:5
**Fred** 8:9 9:11,12
**free** 95:19
**friend** 1:4,6 40:7
**friends** 33:5
**front** 14:1,2,9
17:20 35:5,6
52:7 77:15
**full** 7:3
**funeral** 40:3,4
**further** 95:3

_____

**G**

**G** 5:1
**General** 2:5 3:11
5:8,16
**generally** 18:13
**gentleman** 77:3
94:17
**Georgia** 10:11,15
89:1
**getting** 21:10
**give** 8:17,18
35:12 54:5
77:22 89:17
94:2
**given** 36:16 97:7
100:6
**Glover** 3:9 4:3
5:6,7,10,13 6:11
6:13 12:12,15
12:18,20 13:2,6
13:9 14:18,20
15:18 16:20,21
17:14,15 19:20
20:1,3,6,12,13

21:19 22:7 32:3
41:14,15 44:7,9
46:13 47:3,6,14
47:16,17 49:13
49:15 50:9,15
50:18 51:1,15
51:16 55:13
63:9,12,19 65:4
72:10 75:16
79:13 82:5
83:20 84:8,13
84:18,21 85:5
85:13,16,19
94:9 95:4
**go** 18:6 23:12,13
27:9,17 33:1
34:9,11 38:6,16
40:3,4,13,17
41:16,19,20,22
41:22 42:3,4
43:4,7,19 45:3
49:8 57:6 58:5,9
59:1 61:12
67:16,21 74:7
78:12,15 80:18
80:20 81:2,5,7
83:7 88:22
90:17 92:6
**going** 5:17,22
6:15,21 8:12
13:5 14:15
40:19 43:14
45:6 46:19
49:11 50:13,19
51:19 53:20
59:5 64:11
70:22 81:12
83:5,7,11,13
84:16 85:14,17
85:22 86:1,5
90:21 96:4
**good** 5:14 8:15
18:8,9,10,10
**grade** 16:15 18:8
18:9 23:1,3
51:10,13 74:9
74:12 77:10

91:15
grades 12:7 16:11
  18:1 21:1 69:8
  71:9
gradually 18:11
graduate 20:19
  22:18 51:8 91:6
  91:14
Grant 24:13,15
  24:21 60:10
ground 46:20
group 57:11
  59:16
guard 27:5,6
guess 28:17 29:4
  41:3,7
gun 48:21,22
  49:10,18,19
  50:17,21 67:5
  70:20

**H**

H 4:9 98:1 99:1
habit 8:19
hadn't 60:16
half 39:22 64:21
  73:13,13
hall 48:11,17,20
  51:5,6 66:15
halls 66:2,3,4,7
  67:13,14 79:6
  80:7,21,22
  81:13,19 86:8
hand 54:5 100:10
hands 15:9
Hang 33:5
happened 26:21
  27:6,16 30:19
  43:9 44:20,20
  54:7,14 55:5
  56:1,4,12 57:3
  57:14 58:19
  59:3,7,9
haven't 9:8 84:6
Hawkins 38:4,5
  38:12,15,20
head 76:9
hear 61:17 85:16

heard 85:16
Held 2:4
help 14:10 37:1,4
helped 37:9
hereunto 100:10
hesitate 9:3,5
He's 21:17 46:10
  63:14 75:13
hit 53:7,8,20,21
  54:1,3,6,19 55:6
home 27:9,17
  29:1 31:19,22
  32:5,15,18,20
  33:9,17,19
  35:15,17 37:6,7
  37:10,21 38:14
  38:16,16,17,20
  42:1,2,8,10,12
  52:7,17 53:1
  56:2 57:11
  59:16 68:9,10
  69:8 71:7 78:3,4
  94:18
homes 38:22 39:1
  39:2
Homesley 77:4,6
  83:2 84:12 85:8
  85:12 86:17
  87:6 89:12
  91:13
homework 36:16
  36:21 37:2,5,7
  37:15,18 71:13
  86:10
honest 6:6 94:2
Hospital 56:16
  59:11
hour 59:13
hours 26:22 57:2
  57:13
house 7:10,17,19
  8:8 9:11 38:21
  43:8,16,18
  52:14 54:15
  58:6,10,22
  59:10 62:8 64:6
  88:13 90:14

92:7
housing 33:16
Huh 26:13 54:22
  93:14
huh-uh 8:20
husband 57:16
  58:3
husband's 57:20
Hutchinson 90:9
  90:10,15,17,22
Hyperdisorder
  36:9
hypothesis 47:10

**I**

important 8:11
  8:16
inappropriate
  88:5,10 89:7
incident 67:5
Including 82:15
Independence
  39:7,8,12 75:22
  76:15,16
INDEX 4:1
information
  46:21
informed 64:16
  95:22
informing 42:17
initial 80:17
inside 26:3 33:8
instances 18:20
instruct 49:12,17
instructed 49:22
  81:2
instructions 8:11
interest 100:8
interrupt 95:6
issues 75:17
it's 12:12,18,22
  23:7 33:2 55:16
  57:11 62:12
  76:15,18,20
Ivy 7:14
I'd 37:6 71:16
  84:22
I'll 9:5 28:18 29:4

84:18,21 85:13
  85:17
I'm 5:7,15,17
  7:20 10:6 11:16
  12:9,19 14:22
  15:2,20 16:1
  20:10 21:2
  22:13 23:4,19
  25:2,10,12,14
  25:16 26:1
  27:19 28:2,11
  28:21 29:15,18
  29:22 30:9,21
  31:4 32:6,12,14
  32:17,22 33:10
  34:18,20,22
  35:11,18 36:1,5
  36:5,15,22
  37:13 38:8,13
  38:18 39:6,19
  41:11 42:5,14
  42:18,21 43:1,3
  43:22 44:11
  45:2,5,12,15,19
  46:5,7,12,16,18
  46:19 47:21
  48:2,6,9 49:5,11
  49:17 50:13,18
  50:22 51:3,7,20
  52:1,5,13,22
  53:12 55:7
  56:19,22 57:4,5
  58:13 59:18
  60:15 61:9,13
  64:19 65:9
  66:19,22 67:8
  67:10 69:4
  70:18 71:12
  72:4,12,20 73:4
  73:17 74:3,10
  74:19 75:6,10
  75:15 76:8
  78:18,20 79:10
  79:22 80:4,13
  80:15 81:1,17
  82:7,18 87:2,14
  88:3 89:3,11,20

90:16,20 91:1
  95:20

**J**

January 1:15
  11:22 73:22
  95:12 96:7
  100:11
Jen 90:9,10,22
job 1:20 8:15
John 70:11
Johnson 57:19
  58:1
JONES 3:10
judge 49:13
Julius 40:5
Juvenile 48:11,17
  48:20 51:4,6

**K**

Kamel 3:20
Karen 3:3,4
keep 52:7 63:10
kick 26:16
kids 8:7 43:10
killed 40:5
kind 85:11
knew 58:18 81:18
know 6:4 7:10 9:3
  9:5 10:9 12:1
  15:10 19:10,15
  21:13,18 22:1,8
  22:9,10 23:1,5
  24:13,17 26:1
  26:20,22 27:10
  30:18 31:10,12
  32:20 33:9 35:1
  36:2 37:14
  42:10,19 43:4
  44:2 46:6,8,11
  55:16 56:18
  57:22 60:14
  62:11 64:8
  65:12 67:21
  69:1,20 70:1,16
  72:11 74:20
  76:14 77:3
  82:20 87:18,21

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

105

88:1,2 89:10
94:15
**knowledge** 42:15
45:16 47:18
72:17,21 79:16
80:8 89:4,12
**known** 7:15
**knows** 47:1,2
72:11

**L**

**lady** 24:16
**late** 34:7,9,11
**laugh** 14:7
**Laurel** 7:9
**Laurie** 1:22 2:17
100:4,16
**Law** 3:4
**lawyer** 70:6,7,8
70:10
**leading** 94:22
**leaning** 53:9,11
53:13
**leave** 23:18 34:17
34:19 35:2
43:21 51:18
52:14 66:4
73:16 75:11
81:5,8,11,16
**Leaving** 79:8
**Lee** 1:13 2:2 5:2
7:4,5
**left** 23:16,22 24:3
34:14 40:21,22
42:13 45:14
58:21 62:2 74:5
92:3
**legitimate** 63:15
**Let's** 13:4 16:18
**lie** 6:9,10 55:14
55:16,18
**lied** 55:4,9
**lies** 6:19
**light** 24:16
**light-skinned**
24:16
**liked** 65:21
**Linda** 1:4,6 3:19

9:20 10:21 95:6
**line** 46:20 98:4
99:4
**literature** 73:1
**little** 7:16 8:10
14:11 50:11
64:22 68:19
73:13
**live** 7:8,13 10:4
10:16 11:13
38:12 62:11
75:21
**lived** 7:11
**lives** 9:11
**living** 10:5,10
11:3,7 39:13
76:11,12
**Loaded** 49:4
**located** 23:6
76:14
**long** 7:11,15 9:6
10:4 21:6 38:1
39:20 49:10
57:1,12 58:7,14
59:12,17 62:5
64:20 70:16
82:8 88:16 89:2
89:10
**longer** 20:4 45:21
**looked** 45:17
**looking** 12:10
**lot** 56:5 66:2,3
83:22 84:4

**M**

**making** 20:3
**mall** 59:6
**March** 100:12
**Marcia** 65:12
**Mary** 24:13
**Maryland** 7:9
**material** 13:8
50:2,7 55:12
82:3 83:19 85:4
**matter** 95:20
**may** 12:10 22:16
47:11
**McManus** 7:14

7:15 8:1,2,5
10:5 92:9
**mean** 8:7 17:1,4,8
25:15 26:15
36:8,10 44:19
45:8 53:6 54:12
56:10 65:3
66:11,12 67:18
68:16 70:7
71:15 73:8 79:1
87:22 88:18
89:16 93:19
**meaning** 9:7
**medication** 35:19
35:22 36:2
47:19,22 48:3,7
93:13,15,17,20
**medicine** 36:6
**meeting** 69:22
70:1
**members** 58:16
**memory** 16:6
**mentioned** 69:6
82:15
**Michael** 57:21
**middle** 4:4 27:13
44:16 83:10
**mind** 94:14
**minor** 1:5
**minutes** 81:5,7
**missed** 32:1
**missing** 83:22
84:4
**Mm-hmm** 76:7
**mom** 95:1
**Monday** 60:22
61:1,5,6,11
**money** 31:9 38:10
38:10
**month** 62:6 95:16
**months** 10:8,14
41:20,22 42:7
42:19
**morning** 23:12
93:21
**mother** 1:5 9:19
9:20 10:5,10,15

10:21 11:3,7,8
15:14 18:16,20
19:1,15 20:8,14
22:2,10,14 23:9
24:7,10 27:16
29:2,2,17,20,20
30:2,6,8 32:13
32:20 33:20,22
37:1,4,9,15,18
38:17 42:9,10
42:12,15 44:2
45:17 47:18
51:21 52:6,11
53:3,21 55:18
55:21 58:18,21
62:10 69:14,17
69:20 83:8,8
**mother's** 31:1,3,5
43:16,17 52:17
52:20,21 58:10
61:18 92:7
94:18
**move** 74:17
**moved** 51:10 74:9
74:10,12,17,20
**moving** 74:13,14
74:21

**N**

**N** 3:1 5:1
**Naaji** 76:5,6
**name** 5:7,14 7:3,3
7:4 56:11 57:18
57:20,22 77:3
**named** 40:5
**need** 5:10 9:4
**needed** 55:20
**neither** 100:7
**new** 63:6
**nice** 65:15
**night** 37:9,11
38:2,19 39:21
58:8 71:1,13
**nights** 71:3
**north** 76:20
**Northeast** 40:6
57:9
**Northwest** 2:7 3:5

3:13 10:13
11:20 33:3
**notarial** 100:10
**Notary** 2:19
100:3,16
**note** 51:12 95:14
**noted** 47:3,6,16
**notice** 2:17
**notifications**
72:22
**notified** 22:3
**November/Dec...**
42:22
**number** 11:6 12:1

**O**

**O** 5:1
**Oak** 40:14,19
41:5,9 42:16
91:18
**oath** 5:3
**object** 20:12
46:19 85:2
**objected** 49:21
**objecting** 20:11
47:13
**Objection** 22:5
46:10 47:3,6,16
49:11 72:9 85:9
**obstructing** 63:14
**occasion** 67:6
**occurred** 26:10
27:11
**office** 2:5 3:4,11
5:8,15 27:8
**officer** 100:4
**offices** 2:4
**Oh** 20:5 70:9
**okay** 6:21 8:5,22
9:1,8,20 11:18
12:3 16:20 18:3
21:7 24:9 41:12
41:14 49:20
50:8 57:6 62:20
63:16 64:1 66:2
66:6 69:9 70:1
70:10,22 71:10
75:11,17 77:2

Case 1:07-cv-00882-JR    Document 46-4    Filed 02/28/2008    Page 106 of 110
DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

106

77:17 80:16
84:18 87:13
89:21 91:9
**old** 14:17
**once** 24:2,3 28:3
31:8 32:7 34:21
39:6 69:19 80:1
80:14
**open** 9:7
**oral** 8:18
**outcome** 100:9
**outside** 26:3,5
33:6,8

**P**

**P** 3:1,1 5:1
**PAGE** 4:2 98:4
99:4
**Pages** 1:21
**papers** 57:17
**Pardon** 67:9
**parents** 27:9
39:16
**Parker** 65:12,14
66:18
**part** 8:11 65:7
**particular** 21:4
**parties** 100:8
**pass** 61:17
**passed** 61:22
**PATRICIA** 3:10
**Payne** 40:21,22
48:14 50:11
51:5 74:8,11,18
74:21 76:10,12
76:14 77:1,9,10
77:12 78:10,12
78:21 80:16,18
81:21 82:22
85:22 86:18
87:7,15 88:6
89:13,22 91:4,6
92:1,19 93:9
**pen** 6:8,11
**people** 14:7 60:8
66:5
**period** 41:21
43:15 83:21

**person** 84:2 94:21
**person** 26:8
**pertaining** 22:15
89:14
**phone** 38:11
42:16 72:18
**pick** 15:14 24:8
24:10 29:20
57:15 72:2,15
**picked** 33:12
57:16 59:8
**Piney** 23:7
**place** 33:16 62:12
74:13,14
**placed** 48:10
**PLAINTIFF**
94:12
**Plaintiffs** 1:7 3:2
**plaintiff's** 95:21
**plan** 12:13 46:6,8
47:5,11 64:18
70:3,4 77:17
**plans** 68:17
**Played** 44:22
**playing** 45:1 46:2
**please** 7:2 9:3
12:20 85:1
**point** 9:4 18:7
**police** 31:18,21
32:4 33:11,17
38:16 51:2 54:9
54:11,13,21
55:1,1,14 56:1
59:8 71:6 94:21
**pop** 35:13
**possible** 29:5
**preliminary** 5:19
**present** 3:18 10:1
26:9 40:1 64:10
64:13 96:3
**presently** 7:7
40:11
**previously** 85:21
92:8
**principal** 24:18
24:19 65:15,16
65:18 77:7 83:1

**put** 85:8 86:17 87:6
89:12
**prior** 9:17 10:5
10:14 96:6
**probably** 7:12,21
17:17 18:18
21:12 26:20,20
27:15 57:13
58:15 71:16
75:9 82:14
**problem** 9:6
**problems** 16:15
21:8 22:3,16
66:9 72:3,7
78:22
**Procedure** 2:17
**proceeding** 6:15
**process** 64:11,14
**processed** 56:5,9
**Professional** 2:18
100:4
**program** 44:13
44:15,18,20,21
45:3,14,18,21
46:4 94:6
**programs** 13:18
17:19 35:8
**projects** 77:20
**prolong** 47:9
**promoted** 91:15
**provide** 35:7 68:2
68:12,15,17,19
73:9 77:19 78:6
89:13
**provided** 69:5
77:13 78:10
**psychiatric** 46:15
**psychological**
56:20
**Public** 2:19 12:4
13:11,19 14:16
100:3,16
**pulled** 91:11
**Punch** 26:16
**purpose** 53:4,5
**pursuant** 2:16
**pushed** 53:10

**put** 56:11
**p.m** 1:16 32:19,21
96:10

**Q**

**question** 8:18 9:2
9:7,7 12:19
28:17 29:4 32:1
44:6 49:12,16
49:21 50:5,17
50:18 55:8 63:5
63:13,15 74:16
82:1 84:19,21
85:13,18
**questions** 5:18,19
5:19 8:17 13:3
46:20 94:11,15
95:3
**quizzes** 35:13
68:7 69:7 78:1

**R**

**R** 3:1 5:1 98:1,1
99:1,1
**ran** 39:2 40:3
**read** 49:20 55:7
82:1 83:17
84:20,22 97:5
**reads** 13:7 50:1,6
55:11 82:2
83:18 85:3
**ready** 58:11,20
**really** 16:17 17:7
17:8 20:16,17
29:3 66:10,11
80:19 86:1
**reason** 21:4 47:7
67:12 87:9 98:4
99:4
**reasons** 87:3
**recall** 15:1,5 16:2
16:11 18:15,19
21:10 22:2,14
26:18 29:6 31:5
40:22 51:17
56:20 64:16
67:11 69:14
70:14 75:20

**83**:1,9
**receive** 42:16
72:18,22
**receiving** 73:6
**recess** 5:11,12
49:14
**recollection** 45:6
45:9 48:16 89:4
**record** 6:11 7:3
51:12 63:11,11
95:4 100:6
**records** 51:14
89:14
**red** 6:9
**reduced** 100:7
**reference** 18:7
**referenced** 85:7,7
**referred** 88:19
90:15
**referring** 56:15
91:12
**refresh** 16:6
**regarding** 73:2
**Reginald** 1:13 2:2
5:2 7:4,6 94:14
95:5,7 96:9 97:4
**Registered** 2:18
100:4
**regularly** 85:22
86:2,5
**related** 89:18
100:8
**remember** 7:18
11:16,18 13:12
13:14,22 14:13
14:15 21:2,4,7
21:18 27:11,12
83:4
**remembers** 14:18
**remove** 66:18,21
86:18 87:1
**removed** 43:15,17
52:17 53:1 87:5
91:3 93:6,10
94:6,18 95:1
**repeat** 34:10
37:16 84:1

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

107

rephrase 28:18 50:19 63:4 85:13,17
Reported 1:22
reporter 2:18 5:22 8:12 13:7 50:1,6 55:11 79:12 82:2 83:16,18 85:3 100:3,4
reports 77:20 89:17,18,18
represent 5:9,16
requested 13:7 50:1,6 55:11 82:2 83:18 85:3
reside 7:7 62:3,7 75:12
resided 11:11,13 76:4
residence 33:7 75:18
residing 8:3,6 9:14,18 10:15 11:2 39:10 42:8 60:2 62:13 63:2 63:5,21 64:2,5 74:22 75:2,4
resolve 95:20
respect 85:7
respond 34:2
response 55:10
rest 60:4,6,11,16 70:17,21 82:9 82:10
result 50:12 88:19 89:5,21 91:2
results 88:14
retained 51:13,17
return 38:14 60:3 60:11,19 61:3,5 61:10 98:3 99:3
returned 61:6
Revolver 49:6
rewards 68:19
right 1:4 6:4 7:2 9:10 13:6 14:19

16:19 62:15,20 63:12,13,16 81:19
rightfully 96:2
Road 3:5
Robinson 62:12
rocks 30:11,20 31:12
room 8:14 10:1
Rules 2:16
run 37:20 38:7,20 38:22 39:18 40:2,9
running 38:15
R.T 1:5,5

S

S 3:1 4:9 5:1 98:1 99:1
Sad 61:22
SAIL 16:5,8,12 16:16,19 17:18 18:16,21 19:3 19:14 20:19,22 22:15,19
Sasha 57:7,8,12
sat 13:21
saying 8:19,22
schedule 95:12,19 96:5
scheduled 95:17
school 12:5,8 13:11,19 14:16 15:11,15,22 16:2,5,8,12,16 17:19 18:7,17 18:21 19:4,11 19:14,14 20:15 20:20,22 22:11 22:12,15,16,19 23:8,12,13,15 23:16,18,20,22 24:3,6,10,19 25:20 26:2,3,3,5 26:9,18,21,22 27:12,13,13 28:12 29:9,17 30:2,15,16

40:11,13 41:3,4 41:18 42:3,4,6 42:17,20 43:5 43:11,14,19 44:3,16,21 46:15 47:19 48:21 49:2,18 51:18,22 52:3,4 58:11,20 59:22 60:3 61:3,7,11 61:12 62:15,17 62:21,22 63:3,6 63:18,21 64:1 64:21 69:15,18 69:21 70:6,22 72:3,6,14,22 73:2,7,13,13 78:7,12 79:8,17 79:21 80:6,9 82:20 83:11,14 83:21,22 84:3,9 84:14,17 85:15 85:22 86:22 89:22 92:12,16 95:9
schools 90:6
seal 100:10
second 20:22 21:2 21:5,11,14 22:4 22:18 70:14 75:9 84:6
section 12:12 46:6 46:8 47:4 64:17
secure 95:5
security 12:1 27:5 27:6
see 8:11 47:8 69:17 70:6 72:13
seeing 22:14 69:14
seek 90:5,8
semester 41:8,9 65:1,2,3,5,8 75:7,9
sent 29:1 48:17 48:19

September/Oct... 43:2
services 68:3,12 69:5,10 70:11 73:6,10 77:13 78:7,9
session 59:22
set 17:19 100:10
Seventeenth 75:22 76:16
seventh 91:15
sheet 97:9
Shepard 51:22
she's 8:12 10:1 65:18
Shiloh 7:9 8:6
shoe 55:6
shoes 38:11
short 5:12 49:14
SHORTHAND 100:3
shouldn't 34:6
show 37:11,12,14 37:17
sick 11:10
Signature 96:8 97:13 98:22 99:22
signed 57:16 97:9
sir 5:21 6:18 7:2 7:22 9:18 10:16 12:2,3
sister 57:15 58:2
sister's 57:18
sit 14:1,2 18:19 35:5,6 36:11 68:4
sitting 14:9 17:20 17:20 69:6 77:14
six 14:17
sixth 51:19,20 74:9 77:11
slap 26:16
slips 73:1
Social 12:1
somebody's 33:6

somewhat 67:17 67:18
son 1:5 9:12 72:15 76:5
sorry 55:7 60:15 61:17 79:10
sort 17:21 28:11 71:14,14,15
South 2:6 3:12
Southeast 39:7 62:12 76:1
speak 9:4 24:21 25:1 54:11,13 73:5
speaking 83:4
special 13:11,15 13:17,18 17:19 35:7 69:2
specific 29:5
specifically 42:19 44:7 77:14 85:20
speculation 22:6 72:8
spend 13:20
spoke 84:2,7
spring 65:7
St 59:14,15,17,21 60:2 62:2,4
staff 18:21 26:9 44:3 64:17 66:20 68:2 72:18 73:10 81:8,15 86:17 87:6 89:13 92:11,15,19 93:1,5,9 94:5
stage 91:10,14
start 15:3,5 16:14 19:8 40:19 43:14 44:15 62:13 71:18 75:4 87:11 90:12
started 23:2 26:6 41:7,9 62:15 63:4,21 64:1,4

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

108

**starting** 16:14
48:19
**state** 7:2 51:14
73:18
**stated** 27:10 29:5
50:10 73:12,19
85:21
**STATES** 1:1
**station** 51:2 59:2
**stay** 38:3 42:2
52:14 57:1 58:7
64:20
**stayed** 24:5,10
42:1,7 43:8
59:13
**staying** 11:9
38:15 71:3
**steal** 31:3
**stenographically**
100:6
**step** 12:20
**stipulate** 41:13
63:10,17
**stole** 30:22 31:5,8
**Street** 2:7 3:13
33:2
**stressed** 90:3
**struck** 53:3
**student** 12:4,7
28:19 30:10
31:15
**students** 25:15
**stuff** 56:5 60:10
**supervision** 100:7
**supposed** 15:10
23:12,16,22
24:6 32:15
34:15 35:1
37:14,17 45:10
45:13 48:4 66:6
67:21 81:18
**sure** 7:20 10:6
11:16 12:9
14:22 15:2,20
16:1 21:2 22:13
23:4,19 25:2,10
25:12,14,16

26:1 27:19 28:2
29:15,18,22
30:9,21 31:4
32:6,12,14,17
32:22 33:10
34:18,20,22
35:11,18 36:1,5
36:15,22 37:13
38:8,13,18
39:19 41:11
42:5,14,18,21
43:1,3,22 44:11
45:2,5,12,15,19
46:5,7,12,16,18
47:21 48:2,6,9
49:1,3,5,7,9,17
50:22 51:3,7,20
52:1,5,13,15,22
53:2,12 54:8,16
56:8,19,22 57:4
57:5 58:13
59:18 61:9,13
64:19 65:9
66:19,22 67:8
67:10 69:4,22
70:15,19 71:12
72:4,12,20 73:4
73:17 74:3,19
75:6,10,14,15
76:9 78:18,20
79:22 80:4,13
80:15 81:1,17
82:7,18 87:2,4
87:14 88:3 89:3
89:11,20 90:2,4
90:16,20 91:1
95:20
**Sursum** 33:2,16
43:13
**suspended** 15:22
27:18,20 28:9
28:14,16,22
29:6,9,10,11,16
29:19 30:2,5
58:11,12,14,17
58:21 60:4,6,10
60:16 67:2,4,7

67:12 70:15
81:22 82:6,8,17
89:21 90:6 91:2
92:12,16,20
**suspension** 29:3
73:1 89:18
**suspensions**
70:16 82:11,13
82:20
**sworn** 5:3
**system** 56:6,10,11

---

**T**

**T** 4:9 98:1,1 99:1
99:1
**take** 5:10 8:20
12:21 15:8 23:9
33:17 35:15
47:19,22 48:4,7
51:21 68:9 69:7
78:3 93:13,15
93:21
**taken** 2:16 5:12
49:14 52:4
61:18 93:2
100:5,6
**Takoma** 22:22
23:2,5,21 24:20
25:5,19 27:20
28:19 29:7 30:6
30:10 31:15
35:4,20 36:12
36:14 37:20
38:6 43:20 44:1
44:13 46:9,14
47:2,5,19 48:1,5
48:8,17 51:8,13
52:2 59:2,22
60:3 61:8,15,16
63:1 89:22 91:3
92:11 93:1 94:5
94:22
**talk** 13:1 14:6
17:17 25:11
**talked** 94:17
**talking** 15:16
17:17 19:18
79:2

**talks** 84:11
**Tall** 24:16
**Tammy** 39:14,15
75:3 91:22 92:4
**tap** 54:5
**taxi** 30:12 31:13
**teacher** 17:17,20
81:8
**teachers** 13:20
81:15
**telephone** 19:16
**telephoned** 18:20
19:1
**tell** 6:8,15,19,21
30:2,6,8 33:14
54:13,18 58:16
81:8,15 83:6
92:12,16,20
93:2,5,9 94:6
**telling** 5:22
**ten-minute** 5:11
**Terrace** 33:16
**testified** 5:3
**testify** 93:18
**testimony** 94:3
97:6,7 100:6,6
**tests** 35:12 77:22
**thank** 7:6,22 33:4
51:15 62:17
76:8 85:2 94:9
**Thanks** 13:4
**that's** 7:4 20:3
43:10 62:16
74:8 76:1,17
87:12 91:19
**therapy** 90:6
**there's** 5:19
**things** 8:16 25:8
25:15
**think** 6:18 7:20
10:6 13:16
16:10 23:7 33:2
34:6 37:17
42:14 43:15
44:5 48:14
51:19 56:13
58:15,18 60:8

60:17 61:13
62:12,19 65:18
67:10,11 69:22
70:2,5,12,18
74:4 76:17
78:10 84:14
92:8
**threatened** 53:17
53:18
**three** 7:12 9:15
9:17,19 32:11
**throw** 31:12
**throwing** 30:11
30:19
**Thursday** 60:18
60:21 61:2 96:6
**time** 6:19 7:18
11:11 12:3
13:20 15:14,21
21:6 24:5,9
26:19 28:19
30:10,22 32:16
32:18 35:12
41:21 44:2,12
45:13,16,20
48:10 51:4 52:2
52:6,16 55:19
55:20 59:21
61:10,14 62:2
63:14,20 66:21
68:6,20 69:7
72:2,14 74:5
77:20,22 81:21
82:17,22 83:10
86:4,16 91:22
92:3 94:9,18,22
**times** 17:9,10
18:16 19:4,6,7
19:13,15 23:21
28:1,7 29:6,10
29:16,19 30:1,5
31:18 32:11
34:14 41:17
45:10 70:13
72:5 78:17,19
79:20 80:12
86:6,7,8 87:5,13

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

109

Tisha 57:19
today 5:18 6:16
  6:22 8:14 10:1
  18:19 93:13,15
  93:18,21 94:3
  95:8,14 96:1
told 24:7 29:1
  51:19 54:19
  55:6,14 60:6,17
  60:22 61:10
  90:21
Tomonia 1:4,6,13
  2:2 3:19 5:2,7
  5:14 7:4,6,7
  9:21 10:22
  94:10 95:5,6,8
  95:13,18 96:9
  97:4 98:2 99:2
Tomonia's 96:5
tomorrow 95:11
  95:11 96:4
total 82:19
touching 88:5,10
  89:7
toy 49:19 50:17
  50:21 67:5
  70:20
train 59:4
transcript 100:5
transcription
  97:7
transferred 76:10
  77:9
trouble 54:4
true 97:6 100:5
truth 5:22 6:1,1,4
  6:6,9,15,21
  47:12
truthful 94:2
try 29:4 47:9
  64:22
Tuesday 40:10
Turner 48:14,19
  62:16 63:4 64:2
  64:4,7,10,14,17
  64:20 65:10,16
  65:17,20 66:1

66:13,20 67:1,7
68:2 69:1 70:16
72:1,18 73:2,5
73:19 74:5,11
74:17,21 76:10
77:9 81:12
89:22 91:3
92:15 93:5
Turning 86:12
twice 23:10 28:5
  30:7 32:9 80:3
two 21:22 39:4
  41:20,22 42:7
  42:19 57:2
  80:16,17 82:14
  82:21 85:21
  86:21
two-day 70:18
type 25:8 56:18
typewriting 100:7
typically 32:18

_U_

uh-huh 8:19 9:22
  12:15 39:9
  65:13 69:11
  71:20
uncomfortable
  47:9
undergo 89:2
undergoing 64:14
understand 8:21
  9:3
understanding
  85:9
UNITED 1:1
Uno 44:22 45:1
upset 34:4
use 18:4

_V_

Valley 40:14,20
  41:5,10 42:17
  91:18
various 94:20
vicinity 76:18
Virginia 40:16
vs 1:8 98:2 99:2

_W_

wait 50:4 84:6
waived 96:8
walk 23:9 66:4
  67:14 76:21
  80:22 91:10,13
walked 66:2,3
  80:21 81:13
walking 66:6
  67:13 79:6 80:7
  81:19 86:8
want 8:15 42:3,4
  76:8
wanted 32:20
Washington 1:14
  2:8 3:6,14
wasn't 17:9 60:11
  75:14
way 30:16 54:2
  94:1
ways 14:12
Wednesday 1:15
week 23:10 34:21
  44:17 58:15
  60:17,19 61:1
  70:17,20,21
  78:17 91:11
  96:6
weeks 7:12 9:15
  9:17,19 80:16
  80:17 82:21
  85:22 86:21
went 7:17,19
  23:15,22 43:13
  44:18 56:3,13
  59:14 60:8,9,9
  62:4,16 63:3
  76:12
weren't 13:14,16
  15:10 23:16,22
  28:14 34:15
  35:1 42:17
  45:10,18 81:18
We'll 41:13 49:13
  51:12 63:10,17
  87:11
we're 13:1 41:14

85:1
What's 11:21
  57:8,18,20
WHEREOF
  100:10
winter 65:1,2
withdraw 84:18
withdrawn 8:1
  23:2 52:3 85:20
  91:7
WITNESS 46:12
  50:22 63:8
  75:15 82:4 97:3
  100:10
words 47:11,12
work 35:15 42:13
  68:9,20,21 69:8
  78:3 86:14
worse 18:11
wouldn't 71:18
write 56:7
wrong 19:10
  31:10,12 43:4
  55:16
wrote 56:5

_X_

X 4:9

_Y_

yeah 8:4,8 11:15
  13:6 18:12,14
  24:4,12 25:7
  27:3 28:13,15
  29:8 31:11
  32:10 36:17
  40:8 43:6 44:8
  52:8 54:2,17
  55:17 59:20
  63:8 67:3 68:1
  73:15 74:6,15
  76:17 78:16
  79:7 80:2,11
  82:16 86:11,19
  88:7
year 16:18 17:18
  18:2,15 19:3,14
  19:18,20 20:7

20:19,22 21:3,5
21:11,14 22:4
22:18 23:20
25:19 27:12,13
27:14 41:3,4
44:16 60:5,7,11
60:16 61:7,11
62:18,21,22
63:3,6,18,21
64:1,21 73:13
73:14 82:9,10
83:12,14,22
84:3,9,14,17
85:15 94:22
years 14:17
yell 25:13
yelling 66:15,15
you're 6:14,21
  8:2,21 12:10
  13:6 20:3 40:1
  47:7 56:15
  70:15 92:8
  94:15
you've 8:14 9:14
  44:5 63:14

_0_

07 7:20,21 41:9

_1_

1 1:21 18:8,10,11
1's 18:5,13 71:11
1-120866 1:20
100 1:21
11:00 32:19,21
14th 100:12
1442 3:5
17th 39:7,8,12
  76:15
1995 11:22

_2_

2 18:10
2's 18:5,13 71:11
20001 2:8 3:14
20007 3:6
2005 52:21
2006 52:21

DEPOSITION OF REGINALD LEE TOMONIA
CONDUCTED ON WEDNESDAY, JANUARY 23, 2008

110

**2007** 52:21
**2007/2008** 41:4
**2008** 1:15 100:11
**2011** 100:12
**202)333-8553** 3:7
**202)727-6295** 2:9
  3:15
**23** 1:15
**24th** 95:12

---
**3**
**3** 18:10
**3rd** 11:22
**3:00** 1:16 43:8,9
**3:15** 27:1
**3:17** 26:20
**30** 81:5,7
**30th** 100:10
**31st** 95:16 96:7

---
**4**
**407** 10:11 11:2,12
**421** 10:20 11:6,12
**441** 2:7 3:13

---
**5**
**5** 4:3
**5:20** 96:10
**504** 12:12 46:6,8
  47:5,11 64:17
  70:4

---
**6**
**6th** 2:6 3:12
**6817** 10:11

---
**7**
**7-CV-0882(JR)**
  1:8

---
**8**
**8:45** 27:1

---
**9**
**94** 4:4