```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA


LINDA TOMONIA, et al,           )
                                )
                                )
                                )
     Plaintiffs,                ) Civ.Action No 7-CV-0882(JR)
                                )
                                )
          v.                    )
                                )
DISTRICT OF COLUMBIA, et al,    )
                                )
     Defendants.                )
............................................ )
```

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs move, pursuant to Rule 56 and the Court's Order under Local Civil Rule 16.3, for summary judgment as to liability for all claims set forth in Plaintiffs' First Amended Complaint.

The grounds for Plaintiffs' motion are set forth in the attached Memorandum of Points and Authorities.


Respectfully submitted,

Karen D. Alvarez
D.C. Bar No. 423186
1442 Foxhall Rd., N.W.
Washington, D.C. 20007
(202) 333-8553

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LINDA TOMONIA, et al,          )
                               )
                               )
                               )
     Plaintiffs,               ) Civ.Action No 7-CV-0882(JR)
                               )
                               )
          v.                   )
                               )
DISTRICT OF COLUMBIA, et al,   )
                               )
     Defendants.               )
.....................................           )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs have moved for summary judgment. Plaintiffs' Statement of Material Facts not in Genuine Dispute (SMF) is attached.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings, discovery materials , tighter with affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitle to judgment as a matter of law. Fed. R. Civ. P. 56©. To determine which facts are material , a court must look to the substantive law o which each claim rests.Anderson v. Liberty Lobby, Inc. 477 U.S.242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. Id. at 248.

In considering a motion for summary judgment, the court must draw all justifiable inferences in the non-moving party's favor and accept the nonmoving parity's evidence as true. Id. at 255. A non-moving party must establish more that the mere existence of a

scintilla of evidence in support of its position. Id. at 252. To prevail on a motion for summary judgment, the moving party must show that the non-moving party failed to make a showing sufficient to establish the existence of an element of that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 US 317, 322 (1986) By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. Id.


I.    **Ds EXCLUDED RT FROM, DENIED RT BENEFITS OF, DCPS PROGRAMS, SERVICES AND BENEFITS AND DISCRIMINATED AGAINST HIM IN VIOLATION OF SECTION 504 AND THE ADA.**

A.  **Purpose and Applicability of ADA and Section 504**

In enacting Section 504, "discrimination against the handicapped was perceived by Congress to be most often the produced , not of invidious animus, but rather of thoughtlessness and indifference---of benign neglect." Alexander v. Choate, 105 SCT 712, 717 (1985). Section 504 and Title II of the ADA were designed to protect disabled persons from discrimination, both intentional and unintentional, in the provision of public services. Weixel v. Bd. Of Educ, 287 F3d 138, 146 (2d Cir 2002. Section 504 provides:

> No otherwise qualified individual with a disability… shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance.

20 U.S.C .794. For purposes of public schools, a qualified individual with a disability is a handicapped person of an age during which non-handicapped persons are provided those services. 34 C.F.R .104.3(k)(2). Similarly, Title II of the ADA states:

3

> "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or be subjected to discriminating by any such entity."

42. U.S.C. 12134. A "qualified individual with a disability" is someone who , with or without reasonable modifications, meets the eligibility requirements to receive services or participate in a public program. 42 USC 12131(2).

### B. **The ADA and Section 504 Are Interpreted in Tandem**

Apart from Section 504'slimiation to actions 'solely' by reason of disability and its application only to federally funded entities, as opposed to "public entities", the reach and requirements of both statutes are the same. Weixel, 287 F3d at 146 n.6; Hainze v. Richards, 207 F3d 795, 799 (5th cir 2000)( language of title II generally tracks the language of Section 504 of the Rehabilitation Act, to cover all programs of state or local government, regardless of receipt of federal financial assistance and it works in the same manner as Section 504). The ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehab Act and cases interpreting either are applicable and interchangeable. McPherson v. Mich. High Sch. Ath. Assn'n, 119 F3d 453, 459-60 (6th Cir. 1997)(en banc). Hainze v. Richards, 207 F.3d 795, 799 (5th cir 2000)

**C. Remedies and Rights under the ADA and Section 504 are those of Title VI of Civil Rights Act**

**1. Remedies are those available under Title VI of Civil Rights Act**

4

ADA  Title II specifically provides that the remedies , procedures and rights available under Section 504 shall be same as those available under Title II.42 U.S.C 12133; <u>Hainze v. Richards</u>, 207 F3d 795, 799 (5th cir 2000). <u>Pace v. Bogalusa City Sch. Bd</u>, 403 F.3d 272, 288 n.76  (5th Cir 2005); <u>Washington v. Indiana High Sch. Athletic Assn'</u> 181 F3d 840, 845 n. 6 (7th Cir 1999); <u>Gorman v. Bartch</u>, 152 F3d 907, 912 (8th Cir. 1998).

## 2. <u>Public Entity is liable for vicarious acts of employees in direct action under ADA and Section 504</u>

In a direct action under Title II of the ADA and Section 504, the public entity is liable for the vicarious acts of any of its employees and their is no need for the plaintiff to show a policy or custom of discrimination or exclusion. See <u>Alexander v. Sandoval</u>, 532 U.S. 275, 279-280 (2001)(plaintiff may sue directly under Title VI of Civil Rights Act for both injunctive relief and damages); <u>Rosen v. Montogmery Co</u>,121 F3d 154 (4th Cir.1997); <u>Doe v. Hawaii</u>, 351 F.Supp 2d 998,1011 (D.Hawaii  2004)(respondeat superior liability applies in Section 504 suits).

## 3. <u>Recovery of damages requires showing of intentional discrimination</u>

Proof of intentional discrimination is necessary before p may recover compensatory damages under Title II of the ADA and Section 504 of the Rehabilitation Act, both of which borrow remedies from Title Vi of the Civil Rights Act of 1964. <u>Alexander v. Sandoval</u>, 532 U.S. 275 , 280-81 (2001). Compensatory damages available under 504 where show deliberate indifference. <u>KM ex rel DG v. Hyde Park Cent. Sch. Dist</u>. 381 Sup 2d 343 (SD NY 2005) (disability harassment)/ Burden of proof is on defendant to show behavior was objectively reasonable**.**

4. **Deliberate indifference is standard for award of compensatory damages**

The appropriate test for intentional discrimination is the "deliberate indifference standard. Kennington v. Marion Co., 2004 US Dist Lexis 19572 at * 21-22( SD Ind. June 2004), citing Duvall v. County of Kitsap, 260 F3d 1124, 113839 (9th Cir 2001), citing City of Canton v. Harris, 489 US 378, 389 (1988).  ; Powers v MJB Acquisition Corp, 184 F3d 1147, 1153 (10th cir 1999); Bartlett v. NY State Bd of Law Examiners,  156 F3d 321, 331 (2d Cir 1998), rev'd on other grounds, 527 U.S .1031 (1999).

Deliberate indifference requires both harm that a federally protected right is substantially  likely and a failure to act on that likelihood. Duvall, 260 F3d at 1139 (citing 489 US at 389. Failure to act  must be result of conduct that is more than negligent and involves an element of deliberateness. Duvall , 260 F3d at 1139; Lovell v. Chandlers, 303 F.3d 1039, 1056 (9th Cir 2002).

**D. Elements of Discrimination/Exclusion/Denial Claim under Section 504 and Title II of ADA**

**1.  Elements of Claim**

The elements of a claim that a person has been discriminated against, excluded from, or denied the benefits of a program or service under Section 504 and Title II of the ADA are essentially the same. Under Section 504, Plaintiff must show that he is :

1-  handicapped
2-  otherwise qualified to participate in the program or service
3-  program receives fed fin assistance
4-  excluded solely by virtue of handicap

Sullivan v. Vallejo Valley City Unifed Sch Dist, 731 F.Supp 947, 957 (ED CA 1990).

A prima facie claim for relief under Title II requires that plaintiff show that he is :

(1) qualified handicapped individual;
(2) excluded from benefits/services or otherwise discriminated against
(3) by public entity and
(4) denial or discrimination was because of disability.

Swenson v. Lincoln Co. Sch. Dist., 260 F.Supp. 2d 1136, 1144 .

## 2. Handicapped qualified individual

Both Title II and Section 504 define a disabled individual as one who has "physical or mental impairment that substantially limits one or more major life activities, has a record of such impairment or is regarded as having such impairment. 29 U.S.C. 705(20)(B), 42 U.S.C. 12102(2). Both define "major life activity" to include "learning." 34 C.F.R. 104.3   (j)(2)(ii); 29 C.F.R. 1630.2(i).

## 3. Exclusion by virtue of handicap or because of handicap

Exclusion for reasons related solely to handicap, in the educational context, means any action or decision that in practice prevents a child from benefiting from the federally funded program or receiving the benefits of that program. John A. v. Gill, 565 F.Supp. 372, 383 (ND Ill 1983). See also Angleton(TX) Indep. Sch. Dist., Compliant No. 06-89-1149 (OCR Oct. 5, 1989), 16 Educ.for the Handicapped Law. Rep. 299.(failure of school district to provide Speech therapy to a speech and language-handicapped student on more than 20 occasions in school year constituted discrimination solely on basis of handicap). The accommodations that a student requires arise solely from the child's disability, consequently failure to provide those accommodations constitutes exclusion, discrimination, or failure to provide benefits in violation of Section 504. I.D. v. Westmoreland Sch. Dist, 788 F.Supp 634,640 (DNH 1983). See also Weixel, 287 F3d

138, 148 (refusal to make reasonable accommodation is refusal to provide any meaningful public education). Discriminatory animus in not required. Westmoreland, supra.

**4.RT was determined to be a handicapped student and otherwise qualified to participate in DCPS programs and services in 2002.**

RT is an otherwise qualified handicapped person within the meaning of Section 504.RT was determined to be a handicapped student, to be otherwise qualified to participate in DCPS programs and services, and to require accommodations in order to benefit from those programs and services in 2002. SMF No.1. In that year, Community Public Charter School, a DCPS charter school developed his first Section 504 Plan. Id.

Because Title II is substantially the same as Section 504, RT also is a qualifying handicapped individual under Title II. See Weixel v. Bd. Of Educ of NY, 287 F3d 138,146 (2d Cir 2002)(treating definitions as same).

**5.. DCPS receives federal financial assistance, for purposes of Section 504 claim and is a "public entity" for purposes of and Title II claim.**

DCPS receives federal financial assistance. SMF No.6 _. DCPS is a "public entity under Title II. A "public entity" includes any special purpose district or other instrumentality of the state or local government. 42 USC 12131(1). A school district is a "public entity ". DeBord v. Bd. Of Educ. Of Ferguson-Florissant Sch. Dist. , 126 F3d 1102, 1104 (8th Cir.1997)

**6. Defendants discriminated against RT, excluded him from and denied him the benefits of DCPS programs when they disciplined him for conduct arising out of his disability.**

Defendants repeatedly excluded or suspended RT for behavior arising out of his disability. SMF No. 12(b), No. 17, No. 22. Pattern of series of exclusions or suspensions that cumulatively total 10 days or more, and suspension of 10 days or more , each constitute significant change of placement, requiring pre-exclusion  evaluation pursuant to 34 CFR 104.35(a), to determine whether misconduct was caused by his handicapping condition).Prince George's County (MD) Pub. Sch., Complaint No. 03-90-1152 (OCR Mar. 22, 1991), 17 Educ. For the Handicapped Law Rep. 875. Suspending or excluding handicapped student without manifestation determination violates Section 504. Id.LIH, 103 F.Supp 2d 658; Turlington, 635 F2d 342. Kaelin v. Grubbs, 682 F2d 595 (approving Turlington);Jonathan G.v. Caddo Parish Sch. Bd., 875 FSupp 352, 360-61, 363 (WD LA Dec. 20, 1994) (where evaluations described disabled student as having behavioral difficulties, lack of respect for authority, poor impulse and anger control, defiance of authority poor work habits, suspensions for failing to comply with teacher requests and acting in defiant manner not only were related to his disability but predictable as result of disability and constituted exclusions of student  on account of his disability in violation of Section 504).

**7. Defendants discriminated against RT, excluded him from and denied him the benefits of DCPS programs when they deprived him of a full day of instruction,**

Defendants repeatedly excluded RT from the classroom. SMF No. 12(b).A school's refusal to allow student to attend a full day of school is a violation of Section 504.  Boston (MA) Renaissance Charter School, Complaint No. 01-97-1096 (OCR Sept. 5, 1997), 26 Indiv. With Disabilities Educ. Law Rep. 889 (504 accommodation plan for ADHD student that provides for early dismissals when student is "aggressive or

dangerous" violates Section 504). Section 504 Regulations require school to provide its

students with disabilities a school day comparable in length to the school day provided to

all other students, unless a group of knowledgeable persons has compelling medical or

educational reasons for recommending a shorter school day. Failure to provide a full day

of schooling, compounded by fact that early dismissals were not proving effective and

that the psycho-ed assessment did not recommend their continuation, constitutes a

violation of the section 504 regulations. Id.

**8. Defendants discriminated against RT, excluded him from and denied him the benefits of DCPS programs when they excluded him from school-based after care program for conduct arising from his disability.,**

Defendant Grant expelled RT from the Takoma EC after-care program for

conduct arising out of his disability. SMF No.12 (b) d.  Exclusion from after-care

programs for reasons of a child's disability constitutes discrimination prohibited by

Section 504. See <u>Morris Bd. Of Educ</u>. ( SEA N.J. 2007)( Failure to provide 1/1 aide to

handicapped student in after-school care violated 504 where after school care program

linked to school district), 48 Individ with Disabilities Law Rep (requiring reimbursement

of parent's costs in providing 1/1 aide).

**9. Defendants discriminated against RT, excluded him from and denied him the benefits of DCPS programs when they failed to provide him the accommodations required by his Section 504 Plan**

Defendants Grant , Parker and Homesley failed to implement RT's Section 504 Plan,

SMF No. 12 (b), No. 17(e), No. 51. Defendants discriminated against RT in violation of

Section 504 and Title II. <u>John A</u>. ,supra,  565 F.Supp. at 383.

**10. Defendant Grant discriminated against RT, excluded him from and denied him the benefits of DCPS programs when she "exited " him from Takoma EC**

Defendant Grant on or about May 14, 2006, issued a notice advising Ms.Tomonia that RT could not return to Takoma EC the following school year. SMF No. 12(b)e. Defendant excluded him in violation of Section 504. 29 U.S.C. 794.

**11. Defendants' Conduct was intentional**

Defendants deliberately discriminated against RT, intentionally excluded him from, or denied him the benefits of DCPS programs and services. They took actions that violated RT's federally protected rights and countenanced conduct on the part of others that they knew were likely to harm RT's rights, and failed to act on that likelihood. Defendants' conduct was intentional and subjects them to liability for compensatory damages.  Alexander , supra , 532 US at 280-281;  Kennington, supra, 2004 US Dist Lexis at * 21-22.


**II.    DEFENDANTS RETALIATED AGAINST PLAINTIFF LINDA TOMONIA IN VIOLATION OF SECTION 504 AND OF TITLE II OF THE ADA**

Section 504 and Title II of the ADA prohibits retaliation by a covered entity against any person engaged in an activity protected under those statutes. The elements of a retaliation test are four:

1)  Plaintiff was  engaged in protected activity;
2)  The alleged retaliator knew that Plaintiff was  involved in protected activity
3)  An adverse decision or course of action taken against Plaintiff;
4)  A causal connection exists bet protected activity and adverse action.

Weixal v. NY city, 287 F3d 138, 148 **(2d Cir** 2002)(Section 504 retaliation claim);See also Weissman v. Dawn  Joy Fashions Inc.214 F3d 224,234, 2000 WL 714377 (2d cir

June 5, 2000)(ADA retaliation claim). **See also** <u>Brown v. Brody</u>, 199 F3d 446, 452-453

(DC Cir 1999)(employment retaliation).

### 1. Plaintiff was engaged in protected activity

Plaintiff Linda Tomonia filed a due process complaint, to vindicate her son's rights

under Section 504. SMF No. 28.  At the opening of the third hearing on Plaintiff's

complaint, on March 19, 2007,  Plaintiff informed the hearing officer of an emerging

issue: Defendants' illegal suspension, that day, of her son RT, without benefit of

evaluation or manifestation determination. Id.; see also  SMF No.22-25.  Immediately

upon her statement of the emerging issue and request for an order requiring Defendants to

return RT to class, counsel for defendants moved to dismiss the hearing, alleging that the

Hearing Office lacked jurisdiction over Section 504 matters. SMF at 29.

Ms. Tomonia was engaged in protected activity. see <u>Muller v. Costello</u>, 187 F3d

298,311 (2d cir 1999) (seeking accommodations under Section 504 is protected activity).

### 2. Counsel for DCPS knew that Plaintiff was engaged in protected activity.

Counsel for DCPS knew that Plaintiff was attempting to vindicate her son's right to

evaluation, manifestation review, and to be free of disciplinary action for conduct arising

out of his disability. SMF at 29-30.

### 3. Counsel for DCPS took immediate adverse action

Counsel for DCPS acted immediately to avoid the possibility that the hearing officer

might order DCPS to return RT to class. SMF at 29.

### 4. Causal Connection Exists

Defendant's immediate action, resulted in the delay of any order from the hearing

officer until May 9, 2007, and eliminated all possibility that RT might be returned to

class. SMF No. 31, 36. See generally Alexander v. Tomlinson, 507 FSupp 2d 2,17 (DDC

2007) )(Section 504 employment discrimination)(2 month gap between protected activity

and adverse action sufficient to establish causation element of prima facie case), citing

Mitchell v. Baldridge, 759 F2d 80, 86 (DC Cir 1985); see also, Webster v. Pomperaug

Reg. Sch. Dist 15, 2007 US Dist Lexis 24165 at *51 (SD NY 2007 )(reviewing 504

employment retaliation cases)( courts have found time periods of 6 months to 12 months

suggestive of causal relationship between protected activity and adverse action).

**5.  Defendant Janey ratified action of DCPS counsel**

Defendant Janey ratified the action of DCPS counsel in retaliating against Plaintiff

Tomonia. SMF No. 32.

**III.    DEFENDANTS DISCRIMINATED AGAINST RT IN VIOLATION OF
THE DCHRA AND RETALIATED AGAINST LINDA TOMONIA IN
VIOLATION OF THE DC HRA**

The DC HRA is  intended to secure an end to disability discrimination. DC Code 2.

1401.01. It adopts the disability definitions of Section 504:

> "Disability means a physical or mental impairment that substantially limits one or
> more major life activities of an individual having a record of such impairment or
> being regarded as having such an impairment."

DC Code  2-1401.02 (5A). It prohibits discrimination by any person, defined as:

> " any individual,…organization, government agency…officer, employee,
> principal or agent, legal or personal representative  or any agent or representative
> of any of the foregoing. 2-1401.02 (21),

It applies to any "Educational institution", which it defines as "any public…institution

including an…elementary or secondary school…school system…and includes an agent

of an educational institution." DC. Code 2-1401.02 (8)

### 1.   Individuals are liable

Individual  defendants are  liable for violations of the act, because of language of statute and because of aiding and abetting provision of statute. Wallace v. Skadden Arps, 715 A.2d 873, 887-88 (DC 1998). Individuals are liable under DC HRA , both under definitions of applicable entities and under aiding and abetting provisions of the statute. Macintosh v. Bldg Owners & Managers Ass'n Int'l, 355 F.Supp. 2d 223,227-228  (DDC 2005); Lance v. United Mine Workers of America 1974 Pension Trust, 400 FSupp2d 29, 31-32 (DDC2005). A corporation and its agency are not a single jural entity, precluding individual liability by its officers under DC HRA. Smith v. Amer. Ass'n of Retired Persons, 1996 WL 11852(D.C.Super. Jan.26, 1996)(Kennedy, J)

### 2.   Punitive damages are available

Punitive damages available under Dc HRA for all forms of discrimination. DAKA, Inc. v. Breiner, 711 A.2d 86, 97-98 ( DC App 1998). Punitives may be awarded on a showing of  willful disregard of others' rights Id at 98-99.Wilful disregard of other's rights need not be proven by direct evidence, but may be inferred from all the facts and circs of the case. Id.

### 3.   DCHRA follows jurisprudence of the ADA

DC HRA follows ADA and its jurisprudence re disability discrimination. Mitchell v. Nat'l RR Passenger Corp, 407 F.Supp.2d 213, 240-41 (DDC 2005); Regan v. Grill Concepts-DC, Inc., 388 F.Supp 2d 131, 134 (DDC2004)(DCHRA follows ADA with respect to disability discrimination).

### 4.   Aiding or abetting a violation of the DCHRA is prohibited

The DCHRA prohibits aiding and abetting discriminatory acts. It states:

> It shall be an unlawful discriminatory practice for any person to aid, abet, invite, compel, or coerce the doing of any of the acts forbidden under the provisions of this chapter or to attempt to do so.

DC Code 2-1402.62

**5. Denial, restriction or abridgment of access to program and services of or by an educational institution are prohibited.**

The DC HRA prohibits acts on part of an educational institution that deny or restrict access to or the benefits of any services , programs or benefits, wholly or partially for a discriminatory reason. It states:

> "It is an unlawful discriminatory practice…for an educational institution
> (1) To deny, restrict, or to abridge or condition the use of, or access to, any of its facilities, services, programs, or benefits of any program or activity to any person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived…disability of any individual…."

DC Code 2-1402.41. Defendants Grant, Parker, Homesley, Janey and Wilhoyte aided and abetted in the unlawful discriminatory practice prohibited by 2-1402.1. See I-D, supra. Paragraphs 1-11; DC HRA follows ADA and its jurisprudence re disability discrimination. Mitchell v. Nat'l RR Passenger Corp, 407 FSupp2d 213, 240-41 (DDC 2005)(where appropriate ; Regan v. Grill Concepts-DC, Inc., 388 F.Supp 2d 131, 134 (DDC2004)(DCHRA follows ADA with respect to disability discrimination

**6. Denial, restriction or abridgment of access to program and services of or by an DC agency are prohibited.**

The DC HRA prohibits disability discrimination by any DC government agency or office. It states:

> Except as otherwise provided for by law… it shall be an unlawful discriminatory practice to a District government agency or office to limit or refuse to provide any facility, service, program or benefit to any individual on the basis of an individual's actual or perceived…disability…."

DC Code 2-1402.73  . Defendants Grant, Parker, Homesley, Janey and Wilhoyte aided and abetted in the unlawful discriminatory practice prohibited by 2-1402.73. See I-D, supra. Paragraphs 1-11; DC HRA follows ADA and its jurisprudence re disability discrimination. <u>Mitchell v. Nat'l RR Passenger Corp</u>, 407 FSupp2d 213, 240-41 (DDC 2005)(where appropriate ; <u>Regan v. Grill Concepts-DC, Inc</u>., 388 F.Supp 2d 131, 134 (DDC2004)(DCHRA follows ADA with respect to disability discrimination)

**7. Coercion/Retaliation are prohibited**.

The DC HRA prohibits retaliation or interference with any  person in the exercise or enjoyment of any right granted or protected by the HRA. It states:

> (a) It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against or interfere with any person in the exercise or enjoyment of , or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.
> (b) It shall be an unlawful discriminatory practice for any person to require, request or suggest that a person retaliate against , interfere with, intimidate or discriminate against a person because that person has opposed any practice made unlawful by this chapter, or because that person has opposed any practice made unlawful by this chapter….
> © It shall be an unlawful discriminatory practice for any person to cause or coerce, or attempt to cause or coerce, directly or indirectly, any person from complying with the provisions of this chapter.

D.C. Code 2-1402.61. Defendant Janey  aided and abetted in the unlawful discriminatory practice prohibited by 2-1402.61. See II, supra. Paragraphs 1-11; DC HRA follows ADA and its jurisprudence re disability discrimination. <u>Mitchell v. Nat'l RR Passenger Corp</u>,

16

407 F.Supp.2d 213, 240-41 (DDC 2005) Regan v. Grill Concepts-DC, Inc., 388 F.Supp

2d 131, 134 (DDC2004)(DCHRA follows ADA with respect to disability discrimination).

See also <u>Masolum v. DC__</u> F.Supp.2d __2006 WL 1770500  at *8 (DDC June 27, 2006 ),

citing <u>Carter-Obayuwana v. Howard Univ</u>., 764 A2d 779, 790 (D.C. 2001)(reciting same

elements for DC HRA retaliation as for retaliation under Section 504 and Title II).


**IV.    DEFENDANTS, ACTING UNDER COLOR OF STATE LAW,
DEPRIVED  LINDA TOMONIA OF  RIGHTS GUARANTEED HER
BY THE FIFTH  5TH AMENDMENT**

Section 1983 supplies a private right of action against a person who, under color of

state law, deprives a plaintiff of rights secured by the Constitution or state law. <u>Frazier v.

Fairhaven Sch.Comm.</u> 276 F.3d 52, 57 (1st Cir. 2002). Supervisory liability attaches

where the behavior of subordinates results in a constitutional violation and the

supervisor's inaction was affirmatively linked to that behavior or could be characterized

as supervisory condonation, acquiescence, or deliberate indifference.  <u>Doe. v. Town of

Bourne,</u> 2004 US Dist. Lexis 10021 at * 20-21 (D. Mass May 28, 2004), citing <u>Seekamp

v. Michaud</u>, 109 F3d 802,808 (1st Cir 1998). Deprivations of  const rights, even without a

showing of actual damage, may be vindicated at minimum by making such actionable for

nominal damages. Id. citing <u>Tatum v. Houser</u>, 642 F2d 253, 255 (8th Cir 1981).

Violations of  substantive constitutional rights are redressable by substantial

compensatory awards independent of actual injury. Id. citing <u>Herrera v. Valentine</u>, 653

F.2d 1220, 1227-1231 & n. 6-8 (8th Cir 1981). Damages may include out of pocket loss,

impairment of reputation, humiliation, mental anguish and suffering. <u>Elkins v. DC</u>, 2007

US Dist Lexis 91027 * 22( DDC 2007), citing <u>Memphis Comm. Sch. Dist. V. Stachura</u>,

477 U.S. 299, 307 (1986).


**A. Deprivation of Fundamental Substantive Due Process Rights to Direct Education of Her Child**

**1. Right to Direct Education of Child is Fundamental Substantive Right**

  Plaintiff Linda Tomonia's right to direct the education of her son is guaranteed

her by the Fifth Amendment. The DP clause of the Fifth Amendment guarantees that no

person shall be deprived of " life, liberty or property without due process of law."

U.S.Const. Amend. V.

   A government's attempt to deprive an individual of a " fundamental right"

triggers strict scrutiny by courts. See, e.<u>g., Hutchins v. DC</u>, 188 F3d 521, 536 (DC Cir

1999)(en banc). The Due process clause of the 5th Amendments provides heightened

protection against government interference with certain fundamental rights and liberty

interests. <u>Abigail Alliance v. Eschenbach</u>, 495 F3d 695, 702 (DC Cir 2007), citing

<u>Glucksberg</u> 521 US 702, 720 (1997). Among these specially protected fundamental rights

and liberties is the right to direct the education of one's own children. Glucksberg, 521

US at 720. A parent's liberty interest in controlling the education of her child is one of

the oldest fundamental interest recognized by the Supreme Court. <u>Toxel v. Granville</u>, 530

US 57,65 (__), <u>citing</u> <u>Meyer v. Nebraska</u>, 262 US 390, 399 (1923)( liberty interest

protected by the due process clauses includes a parent's liberty interest in  controlling  the

education of their own children). A parent has a fundamental right, as against the state, in

her interest in controlling the education of her child, <u>Hutchins v. DC</u>, 188 F.3d 531, 541

(D.C. Cir 1999)(en banc), citing  Wisconsin v. Yoder, 406 US 205, 215 (1972)(only state

interest of highest order can overcome parent's right to direct education of child)[1].

## 2. Plaintiff retained that fundamental substantive right by Court order

Plaintiff's fundamental substantive due process right was expressly retained

pursuant to an Order of Magistrate Judge Julie Breslow, issued September 19, 2006. SMF

No. 57.

## 4. Defendants acted with intent to deprive,  under color of state law.

Defendants acted deliberately.  SMF No. 61. The standard for intent is deliberate

indifference. Deliberate indifference requires both harm that a federally protected right is

substantially  likely and a failure to act on that likelihood. Duvall, 260 F3d at 1139 (citing

489 US at 389. Conduct that involves an element of deliberateness Failure to act  must be

result of conduct that is more than negligent and involves an element of deliberateness.

Duvall , 260 F3d at 1139

## 5. Plaintiffs' rights were clearly established

Plaintiff's right to direct the education of her son was clearly established in this

Circuit not later than 1999, when the Court of Appeals decided Hutchins, supra. A right is

clearly established if a reasonable official in that position would have understood that he

was under an affirmative duty to refrain from such conduct. Barret v. Stebenville City

Schools, 388 F.3d 967, 970 (6th Cir 2004)(undertaking qualified immunity analysis).

---

[1] A government's attempt to deprive an individual of a " fundamental right" triggers strict
scrutiny by courts. See, e.g., Hutchins v. DC, 188 F3d 531, 536 (DC Cir 1999)(en banc),
citing Reno v. Flores, 507 US 292, 301-02 (1993).Under strict scrutiny, any infringement
on a parent's fundamental right to control her child's education can be justified only if
the infringement is narrowly tailored to serve a compelling state interest. Id.

5. **Defendants Janey and Wilhoyte were personally involved in the actions of their subordinates**

Supervisory officials are personally involved in depriving Ms. Tomonia of her rights. SMF No. 61. They were directly informed of Homesley's violation of her rights and failed to act to avoid it. Id. Defendant Janey repeatedly failed to act to curb his subordinates' misconduct, exhibiting a pervasive indifference to their wrongs. Defendants Janey and Wilhoyte consequently are liable to Plaintiffs . Johnson v. Newburgh Enlarged Sch. Dist. 239 F3d 246 (2d Cir. 2001).

### C.  Deprivation of Fifth Amendment Right to Equal Protection of the Laws

The Due Process clause of the Fifth Amendment  contains an equal protection component. Washington v. Davis, 426 US 229, 239(1976)(citing Bolling v. Sharpe, 347 US 497(1954). It requires that persons similarly situated be treated equally. It prohibits sates from "depriving any person within its jurisdiction the equal protection of its laws, " and " essentially directs that all persons similarly situated be treated alike. Lawrence v. Texas, 539 US 558, 579 (2003), citing City of Cleburne v. City of Cleburne Living Center, 473 U.S. 432, 439 (1985). It demands particular scrutiny of state action that impinges on protected personal rights. City of Cleburne v. Cleburne Living Ctr, 473 US at, 440. While the "prototypical equal protection claims involves discrimination against people based on their member ship in a vulnerable class…the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." Barton v. City of Bristol, 294 F.Supp.2d 184, 194-95 (D.Conn. 2003), citing Harlen Assocs. v. Inc. Village of Mineola, 273 F.3d 494, 499 (2d Cir. 2000).

1. **DCPS regulations create parental rights to notice and participation in disciplinary conferences and hearings and rights of access to disciplinary information**

DCPS regulations promulgated at Chapter 25 of Title V of the DC Municipal Regulations create extensive due process rights for students subjected to disciplinary actions. They require, inter alias that a principal provide a parent oral notice, followed by written notice, mailed by certified mail within 24 hours of the day oral notice is given, of any disciplinary action that it proposes to take, requires that a principal hold a conference concerning any such action before it is taken, and provides that a parent my request an administrative hearing within two business days on any such action upon receipt of a request by the parent.

DCPS regulations promulgated at Chapter 26_ of Title 5 of the DC Municipal Regulations create a general right of access by a parent to her child's school records. 5 D.C. Mun. Regs 2600.1, DCPS disciplinary regulations specifically require that the parent be given access to the student's records "prior to the imposition of the proposed discipline," Id at 2506.5.   The records that Chapter 26 requires be open for inspection and review by a parent include: a student's cumulative record folder, any data collected or intended for use within DCPS, identifying data or information, academic work completed, grades and scores from standardized tests, health data and accident reports, observations and ratings by teacher, counselors and other DCPS personnel, and " reports of behavior or discipline problems or incidents." 5 D.C.Mun. Regs 2601.1.   Those regulations require that requests for access to records be made to the principal of the school which the child attends and where the records are located. Id. at 2600.4

**2. Plaintiff is a parent for purposes of the DCPS notice , disciplinary, and informational regulations.**

Plaintiff is both the biological mother of RT and retains, pursuant to the Order of a D.C. Superior Court magistrate, all parental rights with respect to RT's education.__ She, accordingly, is a "parent" for purposes of the DCPS regulations governing parental access to disciplinary information, receipt of notice concerning disciplinary actions, and participation in disciplinary hearings and conferences.

**3. Plaintiff provided DCPS, and Defendants Parker and Homelsey copies of the D.C. Superior Court Order**

Plaintiff provide Defendant Parker a copy of the Superior Court order on October 30, 2006. SMF No. 58.b. Defendant Parker verified that Order on the same date, in conversations with staff of the DC Child and Family Administration. Id. Plaintiff provided Defendants Homesley, Wilhoyte and Janey a copy of that Order on March 20, 2007. SMF No. 23.

**4. Defendants denied plaintiff her parental rights to notice and participation in disciplinary conferences and hearings and rights of access to disciplinary information**

When Defendant Parker suspended RT in February 2006, Defendant Parker withheld notice of disciplinary actions. SMF No. 17, Defendant Parker provided copies of some disciplinary notices to Plaintiff, but did so belatedly, after the disciplinary measures had been taken, and when any right to appeal those actions was moot. The following month, when RT transferred to Payne ES, Defendant Homesley began a series of disciplinary actions that continued through the end of the school

year, Defendant Homesley denied Plaintiff all notice and information as to every

disciplinary action he took. Defendants' Admissions, No. 20.

**5.    Defendants' conduct was irrational and motivated by animus or ill-will**

Throughout the period that Defendants Parker and Homesley were withholding or

denying Plaintiff Tomonia  notice and information concerning the disciplinary actions

that they were undertaking, Ms. Tomonia was actively engaged in pursuing RT's

rights under Section 504. SMF No. 18, 28,50. Both Parker and Homesley were aware

of Plaintiff's actions, since both defendants were involved in the administrative

proceedings that Plaintiff initiated to vindicate RT's rights. Dispute Resolution

Meetings required under DCPS due process complaint procedures, were held at

Turner ES in November 2006 and at Payne ES in May 2007.  Both defendants

attended those meetings.  The first of the administrative due process complaints was

not resolved until May 9, 2007; the second was not resolved until August 2007. SMF

No.44, 51.  Both complaints directly challenged discriminatory disciplinary actions

taken by Defendant Parker and asserted RT's rights, under Section 504, to evaluation,

manifestation review or determination and his Section 504 right to be free of

disciplinary action for conduct arising out of his disability. SMF  No.45, 51.

DCPS, and the Defendants, can not rationally maintain that Ms. Tomonia has a

right to vindicate her son's Section 504 rights in an administrative due process

complaint proceeding, but does not have a right to information about, or participation

in, disciplinary actions that the Defendants were taking.

Defendants have proffered various, conflicting, rationalizations for their decision

to deny Ms. Tomonia the information and participation rights granted her under

DCPS regulations.  SMF_No. 63. It is clear, that these are purely pre-textual, and were intended to prevent Ms. Tomonia from intervening, as was her right under the Supreme Court Order and under Section 504 and Title II, to put a stop to Defendants' on-going violation of RT's rights.

### 6. Defendants, acting under color of state law, deprived Plaintiff of rights guaranteed her under the Fifth Amendment.

Defendants' conduct violated DCPS regulations and deprived Plaintiff of her right to equal protection of the law. PDP Tricounty Industries, Inc. v. DC, 104 F3d 455 , 458-459(1997)( deliberate flouting of law that trammels significant personal or property rights violates substantive due process rights), citing Silverman v. Barry, 845 F2d 1072,1080 (1988). See also Club side v. Valentin, 468 F3d 144, 159-60 (2d Cir. 2006)( plaintiff establishes class of one equal protection claim when plaintiff  shows no rational basis for differential treatment and shows that the differences in treatment are sufficient to exclude the possibility that defendants acted on basis of mistake). There was no adequate post-deprivation remedy for the rights which Defendants denied Plaintiff Tomonia. See PDP Tricounty, supra, 104 F.3d at 460.

### VI. DEPRIVATION OF R.T.'S  SUBSTANTIVE DUE PROCESS RIGHT TO EDUCATION UNDER THE 5TH AMENDMENT WITHOUT DUE PROCESS OF LAW

### A. Deprivation of Substantive Due Process Interest in Education.

### 1. DC statute creates property interest in education

DC Code Section 38-202 provides that all students aged 5 through 18 are entitled to a free public education and requires all students between those ages to attend school daily.

**2.  RT has a property interest in his education.**

A property interest in education is created by state laws entitling students to a free public education and requiring them to attend school.  Goss v. Lopez, 419 US 565, 573, (1975)

**3. Exclusions from school require protection of the due process clause.**

Students facing 10-day suspensions from public school are entitled to protection under the due process clause.  Goss at 576.The Goss Court held that such protection requires schools to provide notice of the charges against the students, an explanation of the evidence the authorities have, and an opportunity to present student's side  of the story. Id. at 581.

Other exclusions from the educational process also require due process protection. Laney v. Farley, 501 F3d. 577, 581 (6th Cir. 2007). Removal or exclusion from school premises is not a prerequisite to a finding of "total exclusion from the educational process." Id. The focus of a substantive due process inquiry should be whether there has been an exclusion from the educational process, Id. Consequently, an in-school suspension may deprive a student of educational opportunities in the same ways as an out-of-school suspension. Id, citing Cole v. Newton Spec. Mun. Sep. Sch. Dist, 749, 751-52 (S.D. Miss. 1987), aff'd 853 F.2d 924 (5th Cir. 1988). (held: property interest in public education not implicated by 1-day in-school suspension where student required to

complete all academic requirements ). See also <u>Wise v. Pea Ridge Sch</u>. Dist, 855 F.2d 560, 563 n.3 (8th Cir 1988) (3-day in-school suspension does not implicate property interest in education where student completed all assigned work during the suspension and did not fall behind in his school work as result of suspension). An in-school suspension of sufficient length or consequence can implicate the Due process clause. 501 F3d. 577,584.

### 3.  RT was excluded from the educational process

RT was repeatedly suspended and repeatedly sent to spend his school days in the principal's office at both Turner ES and Payne ES. SMF at ___. Because Defendants often acted informally, without issuance of any formal suspension notice, SMF at _, or without documenting these suspensions or exclusions, SMF at __, it is impossible to determine how many days RT was excluded from the educational process. SMF __. At minimum, records show that RT was excluded from that process for something approximating  40 days during the period February 2007- June 2007. SMF at __.

### B.  RT was denied any meaningful hearing as to all exclusions

RT was a 12 year old handicapped student at the time that Defendants disciplined him. SMF at __Because Defendants denied his mother notice, information and participation as to the disciplinary actions they took,  RT was effectively deprived of any meaningful opportunity to be heard. SMF at __

### C.  Defendants Janey and Wilhoyte personally participated in depriving RT of his substantive and due process rights.

Supervisory officials are personally involved when the official : directly participated in the constitutional violation, or was informed of the violation through report or appeal, but failed to remedy the wrong, or created a policy or custom under which the unconstitutional practices occurred, or allowed the continuance of such a policy or custom, or was grossly negligent in supervising subordinates who committed such wrongful acts, or exhibited deliberate indifference to the right so others by failing to act on information indicating that unconstitutional acts were occurring. Johnson v. Newburgh Enlarged Sch. Dist. 239 F3d 246 (2d Cir. 2001).Defendants Janey and Wilhoyte were personally involved in depriving RT of his rights. SMF No, 24,25.

## CONCLUSION

Defendants have repeatedly discriminated against RT and deprived RT and his mother of their federal statutory and constitutional rights, as well as of their rights under state law.

Plaintiffs respectfully request that the Court grant Plaintiffs' motion.

Respectfully submitted,

Karen D. Alvarez
D.C. Bar No. 423186
1442 Foxhall Rd., N.W.
Washington, D.C. 20007
(202) 333-8553

27

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


LINDA TOMONIA, et al,                    )
                                         )
                                         )
                                         )
          Plaintiffs,                    )     Civ.Action No 7-CV-0882(JR)
                                         )
                                         )
              v.                         )
                                         )
DISTRICT OF COLUMBIA, et al,             )
                                         )
          Defendants.                    )
          .......................................................)

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE DISPUTE**


1.RT is a handicapped student otherwise qualified to participate in DCPS

programs and services, and was determined to require Section 504

accommodations in 2002. Ex. I-A at 4 , No. 10 (hearing officer's

determination); See also Ex. I-B at 7, findings 6, 7.8 (hearing officer's

determination).

　　　　1.　　RT' disabilities include  Attention Deficit Hyperactivity

Disorder [ADHD], which makes it  difficult for him to  focus on

classroom presentations, understand and follow directions, sit still

for prolonged periods, recall instructions for classroom and

homework assignments, and complete those assignments; in

addition to his ADHD,Psychiatric evaluations performed in June

1

2006 and July 2007 found R.T. to be severely emotionally disturbed; and Auditory Processing and Occupational Therapy evaluations performed in Summer 2007 found R.T. to have auditory processing and visual-motor integration disorders. These problems substantially limit his ability to perform a major life activity, that of learning. R.T., therefore, is an individual with a disability under the ADA, 42 U.S.C. § 12102, Section 504, 29 U.S.C. § 705(20), and the D.C. Human Rights Act, D.C. Code. § 2-1401.02(5A). Ex. I-A; Ex. I-B.

[ Paragraphs 3-5 intentionally deleted].

6.  Defendant Clifford Janey is Superintendent of DCPS, a public educational institution and independent agency within the District of Columbia government, which receives Federal educational and other funds. DCPS provides educational services, activities and programs through its own public schools and public charter schools.

Ex. I-C at 4 (Janey, Highlights of the Proposed FY 2006 operating budget for DCPS)(projected budget includes $173.3 million in US funds) As superintendent, Defendant Janey is responsible for implementing policies, plans and procedures that conform with the requirements of Federal and D.C .Law, including the Individuals with Disabilities

Education Act, as amended ( IDEA) , Section 504, the ADA, and the District of Columbia Human Rights Act.

7.  Pursuant to DCPS Board of Education regulations, Defendant Janey is the most senior policy-making officer of DCPS. Defendant Janey was personally involved in making decisions to exclude R.T. from DCPS educational programs, services and activities on account of his disability and to deprive him and his mother of procedural safeguards mandated by federal and local law. He is sued in his personal and in his official capacity.

8. Defendant Mary Grant is the principal of Takoma EC.

Doc.32 at Para 8(Defendant's Answer.

9.  Defendant Marcia Parker is the principal of Turner ES.

Doc. 28 at. Para 9 (Parker Answer)

.

10. Defendant Dennis Homesley is the Principal of Payne ES.

Doc. 32 at Para. 10 (Defendant's Answer

11. Defendant William Wilhoyte is an assistant superintendent of DCPS, and is the assistant superintendent directly responsible for supervising Payne ES.

Doc. 32 at Para. 11 (Defendants' Answer)

**Violation of Disabilities Statutes**

12.(a) For school year 2005-2006, R.T. resided within the residential boundaries of Takoma EC, which, under Board of Education regulations, was required to provide him educational programs, services, and activities that it provided to other students within its residential limits. Ex. V-E.

12(b) During school year 2005-2006, Defendant Mary Grant intentionally took the following actions that excluded R.T. from DCPS programs, activities and services, because of his disability:

a) Repeatedly excluded R.T. from his classroom because of his disabilities; Ex. I-B at 7 (Hearing Officer's Finding No.8)

b) Repeatedly telephoned, or instructed her staff to telephone, Ms. Tomonia and ordered Ms. Tomonia to remove her son from school because of his disabilities; Ex. I-B at 7 (Hearing Officer' Finding No.8)

c)  Repeatedly suspended R.T., because of his disabilities, and suspended him to all intents and purposes continuously from on or about May 1, 2006 through June 2006; Ex. I-B at 7 (Hearing Officer's Finding No. 8); Ex. 1-A at 5 ( hearing officer's Conclusion No.4); Ex II-B (Takoma 5/1/06 suspension notice)(5 day suspension); Ex II-C (Grant 5/15/06 suspension notice)( 10 day suspension); Ex II-D (Grant 5/25/06 suspension)(suspended until 5/30/06)

d)  Directed that R.T. be dismissed or excluded from Takoma EC's after-school program, because of his disabilities; Ex. II – F at 6, No. 12-14 (Defendants' Admissions)(RT removed from Takoma EC after school program because of his behavior in the program).

e) Directed that R.T. be excluded from Takoma EC and prohibited from attending Takoma EC for school year 2006-2007, because of his disabilities; Ex. II-E at 2 (stating "exit date " of 6/14/06); compare II-E at 1 ("retaining" RT in Fifth Grade)

f) Denied R.T. the accommodations he required under his Section 504 Plan; Ex. I-A at 4-5 (Hearing Officer's Finding No.10 (Section 504 Plan not implemented at Takoma EC)

g)  Deprived R.T. and his mother of the procedural safeguards to which they were entitled under federal law, by, *inter alia*, denying them notice of those rights, depriving them of their rights to manifestation determination meetings, re- evaluation and revision of accommodation plans and determination of eligibility for IDEA services on each and every occasion that R.T. was suspended or excluded from school.

V bEx. I-A; Ex. I-B at 7 (Hearing Officer's Finding #8 (Grant suspended student without documenting suspensions); Ex. II-A at 2 Para. 5, 6 (DCPS Special Ed. Service Center)(Dr. Grant made undocumented suspensions of RT); Ex. I-A at 3, 4-5 (Hearing Officer's Conclusion)(student faced multiple suspensions from Takoma and Turner); Ex. I-A at 5 (Hearing Officer's Conclusion No. 2, 3)(student

suspended multiple times for behavior arising from disability); Ex. I-A- at 5 (Hearing Officer's Conclusion No.5)( student suspended for behavior arising out of disability without conducting evaluations required for manifestation determination); Ex. I-B at 16, No.3 (hearing officer's conclusions)(RT subjected to "repeated formal and informal suspensions because of behavioral and emotional problems").

13.In March and May 2006 Ms. Tomonia contacted the central Administration of DCPS, seeking assistance for her son, and informed DCPS administrators that R.T. was being repeatedly excluded from Takoma EC. Ex. II-A at Para. 3 (declaration of DCPS Special Education Service Center employee)(Ms. Tomonia contacted Service Center for help in April 2006); Ex. II-G (letter from assistant to assistant superintendent)(Ms. Tomonia contacted office on March 24, 2006 and informed assistant on May 2. 2006 that RT suspended several times, at least 20 days to date)

14.DCPS administrators did not inform Ms. Tomonia of her rights and the rights of her son under Federal or local law, and did not act to restrain Defendant Grant from excluding R.T. from Takoma EC.

See Ex. II-A, II B.

15. As a result of his repeated exclusions from classroom instruction during school year 2005-2006, R.T. did not master Fifth Grade instructional material. Takoma EC informed Plaintiffs that R.T.

would have to repeat the Fifth Grade.  Ex. I-B at 7, Para. 9 (hearing officer's finding of fact).

16.  In August 2006, R.T. enrolled in Turner ES to repeat his Fifth Grade year.

17.  From August 2006 through February 2007, Defendant Marcia Parker intentionally took the following actions excluding R.T. from DCPS programs, activities and services, because of his disability:

a) Repeatedly excluded R.T. from his classroom because of his disabilities; Ex. I-B at 9-10 (hearing officer's determination)

b) On information and belief, instructed her staff to telephone R.T.'s foster parent on at least seven days in September and October 2006, ordering the foster parent to remove R.T. from school because of his disabilities;

c)  Excluded R.T., because of his disabilities, from Turner ES by suspending him on two or more occasions in February 2007 for periods exceeding ten days; Ex. I-B at 16, No. 4 (hearing officer's conclusions of law)(Parker February suspensions were suspensions for behavior arising out of RT's disability).

d) Deprived R.T. and his mother of their rights to manifestation determination meetings, re-evaluation and educational instruction when she suspended R.T.; Ex. I-A at 5 (hearing officer's determination)

e) Denied R.T. the accommodations he required under his Section 504 Plan; Ex. I-B at 17, No.5 (hearing officer's determination)

f) Withheld from Ms. Tomonia educational records, Section 504

Plan reports and other information that Defendant Parker was required

to provide Ms. Tomonia under DC Law, and under Section 504 and the

ADA. Ex. I-B at 14, No. 2 (hearing officer's determination).


18. On November 1, 2006, Ms. Tomonia informed the D.C. State

Enforcement Agency and the Office of General Counsel for DCPS that

Turner ES was excluding R.T. from school and denying him the

accommodations required by his Section 504 Plan. See Ex. I-A at 5.

19.  Defendants did not act to prevent R.T.'s exclusion from Turner

ES and did not act to ensure that R.T. and his mother received the

services and programs required by his Section 504 Plan. See Ex I-A; Ex

1-B (hearing officer's determinations finding that RT's rights violated)

20. On or about March 5, 2007 R.T. was enrolled at Payne ES.

21. For most of approximately the next two weeks R.T. spent

virtually no time in the classroom.

22. On March 19, 2007 Defendant Homesley intentionally excluded

R.T. from the programs, services and activities of Payne ES on account of

his disabilities, suspending him from school for a period of ten days.  Ex.

I-B at 11; Ex. I-B at 16, Conclusion No. 4 (hearing officer's conclusions of

law)( March 19 suspension was  suspension for behavior arising out of

RT's disability). Ex. VI-A (suspension notice faxed by social worker on

3/22/07)

23. On March 20, 2007 through March 22, 2007, Ms. Tomonia wrote Defendant Homesley and staff at Payne ES, advising them that R.T. was a student with disabilities, that exclusion from Payne on account of his disabilities violated federal law, and requesting that Defendant Homesley re-admit R.T.

Ex. VI-A at 13-15

24. During that period, Ms. Tomonia contacted the following officers and personnel of DCPS seeking their assistance in obtaining R.T.'s re-entry to Payne ES:

a) Defendant Superintendent Clifford Janey;

b) Defendant Assistant Superintendent William Wilhoyte;

c) Linda Roberts;

d) Jennifer Finch;

e) Timothy Williams;

f) DCPS General Counsel, Abby Hairston.

Ex. VI-A at 6-20

25. In Ms. Tomonia's communications to those DCPS officers and staff, Ms. Tomonia requested that they direct Defendant Homesley to permit R.T. to return to Payne ES. She informed those officers:  that Defendant Homesley had unlawfully excluded her son, a student with disabilities, from Payne Es, on account of his disabilities, that her son previously been excluded from school for 23 days during this school year and was in danger of being retained, again, as a result of loss of

classroom instruction, that Defendant Homesley had failed to convene the manifestation determination meeting required by Section 504 or to provide R.T. and Ms. Tomonia the due process safeguards mandated by Section 504: Ex. VI-A at 6-20.

26. Those persons took no steps to assure R.T's re-entry to Payne ES, did not act to require that Defendant Homesley convene a manifestation determination meeting or conduct evaluations of RT.

Ex. VI-D (3/27/07 letter of Ms. Tomonia)

27. Defendants Janey and Wilhoyte ratified or approved Defendant Homesley's exclusion of RT on account of his disabilities.

28. On November 1, 2006, Ms. Tomonia filed a Due Process Complaint with the DCPS Student Hearing Office, seeking, inter alia, enforcement of R.T.'s rights under Section 504 and the IDEA.   By sheer coincidence, Ms. Tomonia was at a hearing on her Due Process Complaint on March 19, 2007, the date that Defendant Homesley excluded R.T. from Payne ES.  Ms. Tomonia informed the Hearing Officer that Principal Homesley had that morning illegally excluded her son from Payne ES, and requested that the Hearing Officer order DCPS to re-admit RT to Payne, forthwith. Ex. I-A at 3-4.

29. Defendants initiated, at that Hearing, actions that were intended to deprive R.T., as a student with disabilities of his Due Process Rights, and deprive him of benefits available to DCPS students   and which   retaliated against Ms. Tomonia for her assertion of those rights at

the Due Process Hearing.  Immediately following Ms. Tomonia's request

for an order requiring that Payne ES re-admit R.T., Defendant's counsel

moved to dismiss her Due Process Complaint, alleging that the DCPS

Student Hearing Office had no jurisdiction to hear Section 504 matters

and alleging that Ms. Tomonia's sole recourse, under Section 504, was a

complaint filed with the Federal Department of Education's Office of Civil

Rights. Ex. I-A at 3-4.

30. Section 504 regulations promulgated at 34 C.F.R. § 104.36 and

DCPS regulations promulgated at 5 DCMR Chapter 24  require that

DCPS make available to  R.T. an impartial due process hearing, as well

as other procedural safeguards, including notice.

31. The Hearing Officer took DCPS' motion under advisement and

ordered the parties to submit memoranda of law on the issue. See Ex.I-A.

32.  On March 19 and March 20, 2007, Ms. Tomonia notified

Defendant Clifford Janey and DCPS General Counsel Abby Hairston that

DCPS' motion deprived students with disabilities of their due process

rights and requested that DCPS withdraw its motion to dismiss Ms.

Tomonia's Due Process Complaint for lack of Section 504 jurisdiction.

Ex. VIII-A

33. On March 26, 2007, DCPS submitted to the Hearing Officer a

memorandum asserting that Ms. Tomonia's Due Process Complaint must

be dismissed and Plaintiffs should be required to pursue a "grievance

procedure"

a) that was not in existence at the time that Plaintiffs filed their Due Process Complaint;

b) that was not in existence at the time that DCPS made its motion to dismiss;

c) of which DCPS had given Plaintiffs no notice; and

d)  that violated Section 504's due process hearing requirements. See Ex-I-A at 3-4.

34.  Defendant Janey ratified the actions of DCPS counsel retaliating against Plaintiffs, denying R.T. his due process rights solely because of his disability and depriving him of services or programs available to non-disabled students.

36.  As of May 10, 2007, the Hearing Officer had not issued a decision on DCPS' motion to dismiss, and Plaintiffs' Section 504 due process hearing had not recommenced. As a consequence, RT will have been denied relief for essentially the remainder of this school year. See Ex. I-A at 1 (hearing officer's determination bearing issue date of May 8, 2007)

37.(a) Defendants both failed to provide RT the accommodations that they were required to provide him under the Section 504 plan that DCPS had created, but failed repeatedly to revise that Plan to provide the additional accommodations that RT required. See Ex. I-B at 12(hearing officer's finding ).

(b) As a result of Defendants' refusal to conduct manifestation determinations and otherwise address RT's ADHD, psychological and emotional disabilities, RT spent large amounts of the time that he was in school (i) wandering the hallways, (ii) sitting in the school office, (iii) resting at his desk or (iv) wandering off campus. Ex. 1-B at 12, No. 19 (hearing officer's finding )

38. Defendants have failed to perform any assessment of the impact of R.T.'s ADHD on his ability to benefit from his public education, at any point during school years 2005-2007, or in connection with any exclusion of R.T. See Ex. I-A at 5 ( DCPS performed no evaluations for RT pursuant to Section 504)

39. Defendants, seeking to continue, unimpeded, their exclusion of R.T. from, and denial to him of the benefits of DCPS programs, services and activities, and acting to retaliate against Ms. Tomonia for her advocacy of R. T.'s rights as a student with disabilities, repeatedly withheld from Ms. Tomonia information, reports and educational records that Defendants are required to provide her under DC Law, under Section 504 and the ADA.

40. Records and notices withheld from Ms. Tomonia included, most notably, notices of suspensions, disciplinary actions, and security incidents, which Defendants Homesley and Parker denied Ms. Tomonia all together or which were withheld for a period long enough to prevent or

impede  Ms. Tomonia from taking action to preserve her son's right to remain in school.

41. Defendant Homesley has denied Ms. Tomonia notice of meetings and conferences concerning her son, and disciplinary actions under consideration or taken against him.

42. Defendants Janey and Wilhoyte ratified Principal Homesley's conduct in withholding information from Ms. Tomonia.

43. On information and belief, Defendant Parker or Defendant Homesley, acting alone or in concert with others, and acting in retaliation for Ms. Tomonia's advocacy of R.T.'s rights as a student with disabilities, altered or directed their staff to alter R.T.' s DCPS Cumulative File, eliminating his mother's name and address from that file and altering his Grade assignment.

44. On May 10, 2007 the DCPS Student Hearing Office transmitted to Plaintiffs the Hearing Officer's Determination of their November 1, 2006 Due Process Complaint

45. The Hearing Officer found that DCPS had repeatedly disciplined R.T. without conduct evaluations of R.T, and ordered DCPS to conduct comprehensive evaluations of R.T. and determine his need for services. Ex. I-A,

46. DCPS did not conduct evaluations of R.T.

47. On or about June 4, 2007 Defendant Homesley again decided to discipline R.T. by excluding him from school for the remainder of the

14

school year. Ex. II-F at 4-5, No. 8 (Defendants' Admissions)(disciplinary action taken June 4, 2007)

48. DCPS did not evaluate R.T, conduct a manifestation determination for RT, or comply with Section 504's due process requirements before disciplining R.T. Ex II-F at 3, No.3 (Defendant's Admissions)( DCPS convened no Section 504 meeting between 2/23/07 snd 6/20/07).

49. Ms. Tomonia requested that Defendants Janey and Wilhoyte rescind Defendant Homesley's suspension of R.T, at least pending a hearing on that suspension. They failed to respond to Ms. Tomonia's request or to rescind that suspension, ratifying Defendant Homesley's action. See Ex. VI-A.

50. On April 19, 2007 Ms. Tomonia filed a second Due Process complaint with the DCPS Student Hearing Office. Ex. I-B at 1.

51. On August 9, 2007 a Hearing Officer's Determination issued as to Plaintiffs' second Due Process complaint. The Hearing officer found that Defendants had failed to implement RT's 504 Plan and found that RT's required services under the Individuals With Disabilities Education Act.  Ex. I-B at 17. As a consequence of that decision and of an IEP meeting held pursuant to that decision, R,T, is enrolled at Oak Valley Center, a private special education facility that instructs students with severe emotional disturbance, ADHD and learning disabilities. See Ex. I-B at 18.

53. DCPS has a custom, practice or policy of excluding students with disabilities from or denying them the benefits of DCPS educational programs, services and activities.

54. DCPS will continue to exclude R.T. from, and deny him the benefit of DCPS programs, services and activities unless DCPS is enjoined from doing so.

## Deprivation of Constitutional Rights

55. DCPS regulations promulgated at Chapter 25 of Title V of the DC Municipal Regulations create extensive due process rights for students subjected to disciplinary actions. They require, inter alias that a principal provide a parent oral notice, followed by written notice, mailed by certified mail within 24 hours of the day oral notice is given, of any disciplinary action that it proposes to take, requires that a principal hold a conference concerning any such action before it is taken, and provides that a parent my request an administrative hearing within two business days on any such action upon receipt of a request by the parent.

56. DCPS regulations promulgated at Chapter 26_ of Title 5 of the DC Municipal Regulations create a general right of access by a parent to her child's school records. 5 D.C. Mun. Regs 2600.1, DCPS disciplinary regulations specifically require that the parent be given access to the student's records "prior to the imposition of the proposed discipline," Id at 2506.5.   The records that Chapter 26 requires be open for inspection and

review by a parent include: a student's cumulative record folder, any data collected or intended for use within DCPS, identifying data or information, academic work completed, grades and scores from standardized tests, health data and accident reports, observations and ratings by teacher, counselors and other DCPS personnel, and " reports of behavior or discipline problems or incidents." 5 D.C.Mun. Regs 2601.1.   Those regulations require that requests for access to records be made to the principal of the school which the child attends and where the records are located. Id. at 2600.4

57. In June 2006, Ms. Tomonia lost temporary custody of R.T.. On or about September 19, 2006 Magistrate Judge Breslow of D.C, Superior Court entered an Order affirming that Plaintiff Linda Tomonia retained all rights as parent to act with regard to all educational matters concerning RT. Judge Breslow further ordered that DCPS provide her access to all records, information, and meetings regarding RT. It stated:

> " The educational advocate, Karen Alvarez, and the mother. Linda Tomonia, are entitled to obtain educational records for [R.T.} from DCPS. Mother's access to [R.T.'s] educational records, information and meetings should not be restricted. Mother Linda Tomonia _retains all parental rights_ including the right to fully participate in [R.T's] education."

(Emphasis added). Ex. XII-F

58.  Counsel for Defendant District of Columbia was present at the hearing at which Judge. Breslow entered that Order. Ex. XII-F.

58b. Plaintiff Linda Tomonia gave a copy of Judge Breslow's Order to Defendant Parker in October 2006. Ex, XII-G.

59.Beginning in February 2007 Defendants began deliberately withholding from Plaintiff Linda Tomonia information concerning her son's education.

60. Information withheld from her by Defendants Parker, Homesley, Wilhoyte, and Janey included any and all notices of disciplinary actions taken against R.T, removals of R.T. from the classroom and suspensions of R.T. from school, as well as all factual information concerning the reasons, for the disciplinary actions taken, the rules that R.T. was alleged to have violated, and the persons involved in any of the incidents that supposedly precipitated the disciplinary actions taken by Defendants, and the duration of each suspension.

61. Defendants deliberately withheld such information and notice on, among others, the following occasions:

      (a) In February 2007, when Defendant Parker excluded and then suspended R.T; Ex. XII-A at 3 (2/6/07)(2-day suspension, notice only to foster parent); XII-B at 2 (2/8/07)( 2-day exclusion, no notice to anyone); Ex. XII-C 2/13/07)(5-day suspension, notice allegedly to social worker)(transmitted to mother 3/12/07)

      (b) In March 2007, when Defendant Homesley excluded or suspended R.T, and information was withheld by Defendants

Homesley, Wilhoyte and Janey; Ex. XII-D (Homesley letter); Ex. II-F at 7, No.20 (Defendants' Admissions)(Defendants denied Ms. Tomonia notice of and information concerning the 3/19/07 suspension)

(c) On or about May 5, 2007, when Defendant Homesley called police to the school and information was withheld by Defendants Homesley, Wilhoyte and Janey;

(d) On or about May 31, 2007, when Defendant Homesley excluded RT from school;

(e) On or about June 1, 2007, when Defendant Homesley filed a criminal complaint with the police, resulting in RT's arrest, and information was withheld by Defendants Homesley, Wilhoyte and Janey.

(f) On or about June 4, 2007, when Defendant Homesley decided to suspend R.T. from school for the remainder of the school year, and information was  withheld by Defendants Homesley, Wilhoyte and Janey.

62. Defendants withheld any prior notice of those actions from Ms. Tomonia, and refused, when she learned that Defendants had initiated disciplinary actions against her son, to provide her with copies of the suspension notices or any factual information concerning the suspension or the facts underlying it. Defendants' Admissions No. 20.

63. Defendants did not provide a single coherent explanation for their refusal to provide Ms. Tomonia access to this information. Instead, Defendants at different times and occasions offered conflicting, and implicitly contradictory, rationales, for their conduct, which were arbitrary, capricious, and purely pretextual. These included:

(a) That it was easier to telefax a copy of the suspension notice to a social worker than to telefax it to Ms. Tomonia (Defendant Parker, March 2007);

(b) that DCPS was not required to provide a copy of a suspension notice to Ms. Tomonia because Judge Breslow's Order did not expressly address the question of disciplinary notices (Defendant Homesley, March 2007); Ex. XII-D (Homesley 3/22/07 letter); see also Ex II-F at 7 No. 20(Defendants' Admissions)(Defendants denied Ms. Tomonia a copy of the notice and information concerning the suspension because Ms. Tomonia "was not the legal guardian at that time.")

(c) that DCPS would not release copy of a DCPS incident report reporting RT's misconduct to his mother, because release of a report " to public" was barred under the D.C. FOIA statute, if the report were draft report (DCPS General Counsel Hairston, May 2007);;

(d) that DCPS attorneys had ordered Defendant Homesley not to allow Ms. Tomonia access to her son's records (Defendant Homesley, May 2007).

64.  The logic underlying these rationales appeared to be that Ms. Tomonia, because she had lost temporary custody of her son, had lost, in effect, standing as his parent: a conclusion that blatantly disregarded Judge Breslow's Order. That Defendants asserted rationales for denying Ms. Tomonia access to information, particularly disciplinary information, and access to disciplinary proceedings, were entirely pretextual is apparent from the fact that Defendants did not, in connection with either of the Due Process Complaints filed by Ms. Tomonia ( first on November 1, 2006 and second on April 19, 2007) allege that Ms. Tomonia did not have standing to file such a complaint on her son's behalf.    See Ex. I-A (hearing officer's determination)(defendants did not argue standing); Ex. I-B(hearing officer's determination)(reflecting not argument from defendants as to mother's standing).

64. Defendants did provide such information to other persons who were not entitled under DCPS regulations or under Judge Breslow's Order either to receive that information or to utilize it to enforce R.T's rights.

65, Defendant Parker provided notice of the disciplinary action that she took to a social worker with a private company that had contracted with DC to provide foster care for R.T.

66. The social worker to whom Defendant Parker provided that information:

   a.  did not hold legal custody of R.T.;

  b.  did not have authority to represent R.T. or to make decisions on behalf of R.T. in connection with any educational questions;

  c.  did not have authority to represent R.T. in connection with any disciplinary conference or proceedings; and

  d.  did not have authority to request any administrative conference or hearing on his behalf

67. Defendant Homesley first took disciplinary action against R.T. in March 2007. Defendant Homesley gave notice of that suspension to a Mr. and Mrs. Drayton, private persons who had contracted with a private company to provide foster care to R.T., and invited them to a school conference concerning the then proposed disciplinary action.

68. As of March 19, 2007 Mr. and Mrs. Drayton::

  a.  did not have legal custody of R.T.;

  b.  were paid by and under contract to a private company that did not have legal custody of R.T;

  c.  did not have authority to represent R.T. or to make decisions on behalf of R.T. in connection with any educational questions;

  d.  did not have authority to represent R.T. in connection with any disciplinary conference or proceedings; and

  e.  did not have authority to request any administrative conference or hearing on his behalf.

  f.  Had known R.T. for less than two weeks;

22

g.  Had virtually no knowledge of R.T.'s psychiatric or educational history, of the accommodations that he  was entitled to receive, of accommodations or programming that he required, or of his capacity to understand or control his behavior.

69. There was no rational or lawful basis on which Defendants could refuse Ms.Tomonia information.

70.Defendants did so in order to prevent Ms. Tomonia from participating in any conference, prior to her son's suspension, from requesting an administrative due process hearing, or from taking other action to prevent her son's suspension or otherwise protect his rights. Defendants' actions in fact ensured that Ms. Tomonia could take no effective action before the suspension period had been completed.

71.Defendants' actions violated Ms. Tomonia's substantive due process right, under the Fifth Amendment to participate in, manage, or direct her son's education, and violated her Fifth Amendment right to Equal Protection of the laws.

72.  DC Code Section 38-202 provides that all students aged 5 through 18 are entitled to a free public education and .requires all students between the ages of 5 and 18  to attend school daily.

73.  R.T. has a property interest in his right, as a DC student, to attend school.

74.  The suspensions or exclusions initiated by Defendants Parker and

omesley in February, March and June 2007 resulted in the exclusion of R.T. from school for some 20 days in February and ten or more days in each of March and June.

75. As a result of those disciplinary actions, R.T. was excluded for some 40 days. or more during the period February 2007- June 14, 2007, the last day of school. This amounted to 40 percent of all school days during that period,

76. R.T. was deprived, by Defendants Homesley, Parker, Wilhoyte and Janey of his substantive due process property interest in attending school for some 40 days without a hearing and without any effective opportunity to obtain or means of obtaining a hearing.

77. Defendant Janey was the highest policy making official of DCPS at the time that he deprived Plaintiffs of their Fifth Amendment rights, consequently his actions are those of the Defendant the District of Columbia.

78. In addition, R.T. was excluded, for disciplinary reasons, by Defendant Parker for some seven days in September-October 2006., without complying with DCPS suspensions regulations, without notice of his rights or opportunity whatsoever for hearing..

79, . R.T. was suspended by Defendant Grant for some 51 days during the period December 2005 through June 2006.

80. Defendant Grant did not provide R.T. or his mother notice of R.T.'s right to a hearing to contest the disciplinary actions taken by Grant.

81..'R.T. was deprived of his substantive due process property interest in attending school for some 51 days without notice of his right to a hearing and without a hearing..

82. Takoma EC was the school within whose attendance zone R.T. resided. Ex. V- E .

83. Under DCPS regulations, R.T. had a right to attend Takoma EC, by virtue of his place of residence, and had no such right to admission to any other DCPS school. DCPS regulations created a property interest in RT's admission and attendance at Takoma EC. They state:

> " A local school administrator shall not exclude from admission or attendance any compulsory school-aged minor who resides in his or her school's attendance zone…unless the minor has been involuntarily transferred."

5 D.C. Mun. Reg.§2002.18,

84.. Defendant Grant informed R.T.'s mother that she would not permit RT to register at Takoma the following school year.

85. Defendant Grant deprived R.T. of his right to attend Takoma EC without notice of his right to a hearing and without providing him a hearing.


## PLAINTIFFS' INJURIES

86.   Defendants' intentional conduct excluded R.T. from, and denied him the benefits of, educational services and programs offered by DCPS solely on account of his  disabilities and their severity.

87. R.T. was excluded from the classroom and denied the classroom instruction that he required in order to benefit from his public education in school years 2005-2006 and 2006-2007.

88. R.T. was forced to repeat Fifth Grade in school year 2006-2007, has not yet mastered the Fifth Grade curriculum, and very likely will not have mastered the Fifth Grade curriculum by close of the 2006-2007 school year. Ex. I-B at 7 (Hearing Officer's Finding No.9)(at end of Takoma year RT below basic in reading and Math); Id. (RT retained in Fifth Grade); Ex. XIV-A at 2( testing administered Nov. 21, 2006 )(RT Reading at 4.9 Grade level); Id. (RT's Math at 4.2 Grade level); XIV-C at 2( Oak Valley testing 1/9/07)(RT now Reading at 5th grade level; Math at 4th Grade level).

89. R.T. was denied the accommodations that he required and that Defendants were legally obligated to provide him, with the result that RT at the age of twelve can not understand written material beyond the Third Grade level.

90. R.T. suffered humiliation and severe emotional distress, resulting in his hospitalization at Children's National Medical Center in June 2006. Ex. I-B at 8 (Hearing Officer's Finding No.10)( RT entered psychiatric ward of CNMC June 4, 2006); Ex XIV-B (3/30/06 medical record)(recording multiple suspensions, grief and depression); Ex. XIV-E (RT admitted CNMC for, inter alia, suicidal ideation

91.  Ms. Tomonia suffered economic losses, loss of work time and incurred additional child care expenses, when R.T. was excluded from Takoma EC and its child care program. Ex.XIV-D (medical expenses)

92. Ms. Tomonia suffered anxiety, emotional distress, and loss of work time as a result of Defendants retaliation against her.


:


Respectfully submitted,


Karen D. Alvarez
D.C. Bar No. 423186
1442 Foxhall Rd, N.W.
Washington, D.C. 20007
(202) 333-8553
202-333-1546(Fax)

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## STATE ENFORCEMENT & INVESTIGATONS DIVISION

David R. Smith, Due Process Hearing Officer
825 North Capitol Street, 8th Floor, N.E.
Washington, DC 20002
(202) 442-5432 (phone); (202) 442-5556(fax)

| | | |
|---|---|---|
| In the Matter of | ) | **IMPARTIAL DUE PROCESS** |
| | ) | |
| Reginald Tomonia ("Student") | ) | **HEARING OFFICER'S DECISION**[1] |
| Date of Birth: January 3, 1995 | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 825 North Capitol Street, NW |
| | ) | 8th Floor |
| | ) | Washington, DC 20002 |
| District of Columbia Public Schools | ) | |
| 825 North Capitol Street, NW | ) | Attending School: |
| Washington, DC 20002 | ) | Payne ES |
| ("DCPS" or "District") | ) | |
| | ) | Due Process Complaint Notice: |
| Respondent. | ) | November 6, 2006 |


Counsel for Parent:      Karen Alvarez, Esq.
1442 Foxhall Road, NW
Washington, DC. 20007

Counsel for DCPS:      Saurabh Gupta, Esq.
District of Columbia Public Schools,
9th Floor
825 North Capitol Street, NW
Washington, DC 20002

---

[1] An index of names is attached hereto for the benefit of the parties. The index will permit the parties to identify specific witnesses and other relevant persons. The index is designed to be detached before release of this Hearing Officer's Determination as a public record.

1

## INDEX OF NAMES

Reginald Tomonia v. DCPS

| Parent/Student's Representative | Karen Alvarez, Esq. |
|---|---|
| Parent: | Ms. Linda Tomonia |
|  |  |
| School System's Representative | Saurabh Gupta, Esq. |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## IMPARTIAL DUE PROCESS HEARING

**INTRODUCTION:**

A Due Process Hearing was convened on March 19, 2007. The Hearing was held at the District of Columbia Public Schools ("DCPS"), 825 North Capitol Street, N.E. Washington, D.C. 20002. The Hearing was held pursuant to a Due Process Complaint Notice submitted by counsel for the parent dated November 6, 2006.

**ISSUES:**

1.    Whether the hearing officer lacks jurisdiction to hear alleged Section 504 Plan matters.
2.    Whether DCPS failed to develop an appropriate Section 504 Plan for the student and whether DCPS inappropriately suspended the student.

**JURISDICTION:**

The Hearing was held and this decision was written pursuant to the *Individuals with Disabilities Education Improvement Act* (I.D.E.I.A.), 20 U.S.C. 1400, et. seq. and the *Rules of the Board of Education of the District of Columbia.*

**DUE PROCESS RIGHTS:**

The student's educational advocate waived a formal reading of the due process rights.

**FINDINGS OF FACT:**

1.    On November 6, 2006, a Due Process Complaint Notice was filed with the Student Hearing Office on behalf of the above named student. The Complaint was filed under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794. The Complaint alleged, among other things, repeated suspensions of the student in violation of Section 504 requirements resulting in the student being retained in the 5th Grade.

2.    On March 19, 2007, a Due Process Hearing was held at which Petitioner stated that the student had been suspended that day for ten days, an additional Section 504 violation and that Petitioner was requesting that Payne readmit the student.

3.    At the Hearing, DCPS made an oral Motion to dismiss the case stating that a DCPS hearing officer lacked jurisdiction to hear Section 504 violations. DCPS subsequently submitted a written Post Hearing Brief on March 26, 2007 presenting the same argument. In its Motion, DCPS states that hearing officers lack jurisdiction over Section 504 matters and that "There are adequate existing Section 504 due process channels for Petitioner to pursue this claim." However, DCPS' Motion did not contain a citation to support this contention.

4.    DCPS further states that the Student Haring Office of DCPS was specifically created to adjudicate special education hearings. The Motion refers to the Sections 200 and 201 of the Student Hearing Office Standard Operating Procedures with regard to jurisdiction and apparently concludes that because the SOP does not specifically reference Section 504 that the SHO is without jurisdiction to handle such matters.

5.    DCPS also refers to the *Blackman/Jones* Consent Decree as a basis for contending that the SHO and therefore hearing officers, lack jurisdiction to handle Section 504 matters. However, the Motion does not refer to a specific section of the Consent Decree that supports this position and the hearing officer has found no basis in the Consent Decree for concluding that it was the intent of the parties to preclude Section 504 issues from being decided by hearing officers.

6.    Lastly, in support of the contention that hearing officers lack jurisdiction, DCPS attached to its Motion a two page document titled "Procedural Safeguards – Section 504 of the Rehabilitation Act of 1973. Significant here is paragraph 7 as follows:

If your child qualifies under Section 504, you have the right to:

"7.    Seek resolution of issues if you are dissatisfied with any decision regarding the eligibility determination of your child. You may request a Section 504 central review by the impartial Central Review Team/Section 504 Coordinator and/or **hearing officer** by contacting the Section 504 Coordinator. The hearing provides opportunity for participation by the parents and/or student and representation by counsel. Either party may appeal the decision of the **hearing officer** and request a review of that decision. In addition, you may contact the Office of Civil Rights in the U.S. Department of Education."

(Emphasis added)

7.    Accordingly, DCPS' own guidance with respect to Section 504 provides for matters to be heard before a hearing officer. The provision about contacting the Department of Education's Office of civil rights, is not stated as an exclusive remedy, but rather an additional procedure that Petitioner could have followed.

8.    On April 3, 2007, Petitioner filed an opposition to the Motion to the brief filed by DCPS supporting the view that DCPS hearing officer do have jurisdiction to consider Section 504 matters. Among other things, the opposition points out that DCPS has historically used hearing officers to handle 504 cases and that DCPS is yet to structure a separate procedure for handling 504 matters.

9.    In view of the above discussion, it is clear that DCPS hearing officers have jurisdiction to consider Section 504 allegations; accordingly, for the reasons stated above, DCPS's Motion to Dismiss is **DENIED.**

10.    The next two issues concern whether DCPS failed to develop an appropriate Section 504 Plan for the student and whether DCPS inappropriately suspended the student. Based on the documents submitted as part of the record, while attending the Takoma EC, the student was determined eligible for

4

Section 504 services in 2002, due to a diagnosis of ADHD. The mother contends that the services however were not implemented.

11.    The student began attending the Turner ES for the 2005-2006 school year; however, the mother contends that Turner failed to implement the 504 Plan and also suspended the student multiple times for his behavior.

12.    While at Turner for the current school year, a 504 Plan was developed for the student on November 7, 2006 and November 14, 2006. The parent consented to DCPS performing a psycho-educational evaluation, a speech and language evaluation, focusing on receptive language and auditory processing skills, visual and perceptual testing as part of an occupational therapy evaluation and memory and sequencing ability testing.[2] The record does not reflect that these evaluations were completed.

13.    On January 25, 2007, a 504 Plan Meeting was convened, resulting in additions to the student's 504 Plan.[3] However, the record does not reflect that the plan was implemented.

## DECISION AND CONCLUSIONS OF LAW:

1.    This matter is before this Hearing Officer as the result of the student's educational advocate filing a Complaint contending that DCPS failed to offer the student a Free and Appropriate Public Education ("FAPE") in accordance with 34 C.F.R. §104 implementing Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

2.    Based on the record, the student qualified for Section 504 Plan services, resulting in a 504 Plan being prepared; however, notwithstanding the Plan, the student, diagnosed with ADHD, has been suspended from school multiple times due to his behavior.

3.    The mother consented to evaluations of the student at a meetings held on November 7 and 14, 2006 in which the student's 504 Plan was addressed; however, the evaluations agreed to have not been completed. A follow-up meeting on the 504 Plan took place on January 25, 2007, but there is no evidence that the services were implemented.

4.    Notwithstanding the fact that a 504 Plan was developed for the student, the student has faced multiple suspensions from school.

5.    Based on The Rules of the D.C. Board of Education, Section 3030.3, the petitioner, here the student, had the burden of proof, based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student and to provide the student with FAPE. Based on the record, DCPS has failed to implement the student's 504 Plan and failed to conduct requested evaluations; accordingly, the parent has met her burden..

---

[2]    DCPS-02
[3]    DCPS-03

5

**ORDER:**

1.      Within 20 school days of the issuance of this Order, DCPS shall conduct evaluations of the student in all areas of suspected disability, including a psycho-educational evaluation, a speech and language evaluation, focusing on receptive language and auditory processing skills, visual and perceptual testing as part of an occupational therapy evaluation and memory and sequencing ability testing. In the event DCPS fails to conduct the evaluations, the parent is entitled to obtain independent evaluations at DCPS expense, within the superintendent's cost guidelines.

2.      Within 10 days of completion or receipt of the last evaluations, DCPS shall convene a 504/IEP meeting to review the evaluations and either develop a revised 504 Plan or, if the student is determined eligible for special education, develop an IEP and discuss and determine an appropriate placement and discuss and determine whether or not the student is entitled to compensatory education services.

3.      All meeting shall be scheduled through the parent's counsel and any delay in any timeline as a result of the parent, student or parent's counsel shall extend the applicable timeline by one day for each day of delay.

**APPEAL PROCESS:**

**This is the final administrative decision in this matter.  Appeals on legal grounds may be made to a court of competent jurisdiction within 90 days of the rendering of this decision.**

Date: 5-8-07

Issued: 5/9/07

David R. Smith, Esq.
Impartial Hearing Officer

6

**INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA) 20 USC § 1400**
**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**IMPARTIAL DUE PROCESS HEARING**

| | | |
|---|---|---|
| In the Matter of | ) | **CERTIFICATION OF RECORD** |
| | ) | |
| Reginald Tomonia, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| District of Columbia Public Schools | ) | |
| 825 North Capitol Street, NW | ) | |
| Washington, DC 20002 | ) | |
| ("DCPS" or "District") | ) | |
| Respondent. | ) | |

I, David R. Smith, Impartial Due Process Hearing Officer in this matter, DO HEREBY CERTIFY that the attached Record of Proceeding itemizes the record in the above-entitled matter as of this date, consisting of the items admitted into evidence, including disclosure exhibits and the audio tape recording of the Due Process Hearing.

EXECUTED this _____ day of _____, 2007.

_____
DUE PROCESS HEARING OFFICER

## MATTER OF REGINALD TOMONIA V. DCPS

### RECORD OF PROCEEDING

| DATE | DESCRIPTION |
|---|---|
| 11-6-06 | Request for Due Process |
|  | Notice of Pre-Hearing Conference (as applicable) |
|  | Notice of Hearing |
| 3-26-07 | DCPS Disclosure Post Hearing Brief |
| 2-12-07 | DCPS Disclosures |
| 3-19-07 | Audio recordings of hearings |
| 4-3-07 | Petitioner's Response to DCPS Brief |
| 1-24-07 | Petitioner's Disclosures, 1-23 |
| 3-12-07 |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

8

# District of Columbia Public Schools
## *State Enforcement Investigative Division*
### STUDENT HEARING OFFICE
825 North Capitol Street, N.E.
8TH Floor
Washington, D.C. 20002
FAX: (202) 442-5556



### *FACSIMILE SHEET*

Date: May 9, 2007

TO: Karen Alvarez

FROM: STUDENT HEARING OFFICE

RE: Tomonia, Reginald

TOTAL NUMBER OF PAGES, INCLUDING COVER: 9

COMMENTS:

*CONFIDENTIALITY NTOICE*: The information accompanying this facsimile is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or the taking of any action in reliance on the content of this telecopied information is strictly prohibited.

08/06/2007  11:57    2026983825              STUDENT HEARING                    PAGE  02/19

# District of Columbia Public Schools

## State Enforcement and Investigation Division

### Kimm H. Massey, Esq., Due Process Hearing Officer
1150 5th Street, S.E., Washington, DC 20003
Facsimile:  (202) 689-3825
Phone:  (202) 698-3819

## Confidential

| | | |
|---|---|---|
| TOMONIA, REGINALD, Student<br>Date of Birth: 01/03/1995 | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | **IMPARTIAL DUE**<br>**PROCESS HEARING**<br>**OFFICER'S DECISION** |
| | ) | |
| vs. | ) | |
| | ) | |
| The District of Columbia Public Schools, | ) | Complaint Date: April 19, 2007 |
| Attending:  Payne Elementary School | ) | |
| | ) | Hearing Dates: June 19 and 27, 2007 |
| Respondent. | ) | AND July 17, 18 and 23, 2007 |
| | ) | |

Hearing Held: 1150 5th St., S.E
Washington, DC 20003

Parent:

Mrs. Linda Tomonia
6817 Georgia Avenue, N.W.,
Apartment 421
Washington, DC  20012

Counsel for the Parent/Student:

Karen D. Alvarez, Esq.
1442 Foxhall Road, N.W.
Washington, D.C. 20007

District of Columbia Public Schools:

Rashida T. Wilson, Esq.
Attorney-Advisor
Office of the General Counsel
825 North Capitol Street, NE,
9th Floor
Washington, D.C.  20002

1

## JURISDICTION

The Due Process hearing was convened and this Decision and accompanying Order written pursuant to the Individuals with Disabilities Education Improvement Act of 2004 (IDEIA), 20 U.S.C. §§ 1400 et. seq., the implementing regulations for IDEIA, 34 C.F.R. Part 300, and Title V, Chapter 30 of the District of Columbia Municipal Regulations ("D.C.M.R.").

## INTRODUCTION

Student is twelve years old. For the 2006/2007 school year, Student initially attended Turner Elementary School ("Turner"). However, in March of 2007, Student was transferred from Turner to Payne Elementary School ("Payne"), where he remained for the remainder of the school year.

On April 19, 2007, counsel for Parent and Student ("Petitioner's counsel") filed a Due Process Complaint ("Complaint") against the District of Columbia Public Schools ("DCPS"), alleging that DCPS (1) failed to provide Parent access to Student's educational records; (2) improperly determined that Student is not eligible for special education services; (3) improperly suspended Student for behavior arising out of his disability; (4) violated § 504 of the Rehabilitation Act ("§ 504"); and (5) failed to carry out the requirements of Student's § 504 Plan. As relief for the alleged violations of IDEA, § 504, and the Family Educational Rights and Privacy Act ("FERPA"), Petitioner requested the provision of specialized instruction and related services, an appropriate placement, compensatory education, copies of all educational records, and an order prohibiting DCPS from suspending Student or excluding him from the classroom.

DCPS did not respond to the Complaint.

The Student Hearing Office (SHO) scheduled Due Process Hearings for June 19, 2007 at 9:00 a.m. and 11:00 a.m. On June 11, 2007, Petitioner filed Plaintiff's Motion for Stay Put Order and Plaintiff's Motion to Compel Production of Educational Records. By letter dated June 12, 2007, Petitioner's counsel submitted a Five-Day Disclosure that listed six potential witnesses and forty-eight documents that Petitioner intended to rely on at the due process hearing. However, the letter did not enclose documents 1 through 31 and 42 through 48, stating instead that those documents were not attached because they either had been disclosed on January 24, 2007 and March 12, 2007 in connection with a prior case (documents 1 though 23), had been distributed by the SHO to all parties (documents 24 through 26), had been filed with the SHO and served upon all parties (documents 27 through 31), or were educational records generated by DCPS that had not been provided to Parent (documents 42 through 48).[1] DCPS also submitted its Five-Day Disclosure on June 12, 2007, disclosing eight potential witnesses and no documents.

---

[1] Petitioner's Five-Day Disclosure actually used the number 42 twice in referring to documents. The first document 42, a psychoeducational report, was included with the disclosure. The second document 42, a suspension notice, was among the documents that intentionally had not been disclosed.

2

The due process hearing was convened on June 19, 2007. As preliminary matters, DCPS objected to documents 1 through 31 of Petitioner's Five-Day Disclosure, Petitioner advanced its Motion for Production of Records, and the hearing officer raised Petitioner's Motion for Stay Put Order. The hearing officer stated that Petitioner's Motion for Stay Put Order was moot, as the school year had already ended by the time of the due process hearing, and Petitioner's counsel agreed. Thereafter, Petitioner requested a ruling on its Motion to Compel Production of Educational Records, asserting that Parent had been denied access to the records. After inquiry by the hearing officer, DCPS agreed that it could make Student's educational records available for review and copying on Friday, June 22, 2007. The hearing officer then granted Petitioner's motion and stated that an appropriate Order would follow.

With respect to documents 1 though 31 of Petitioner's disclosure, DCPS objected to that portion of the disclosure on grounds that the documents had not actually been disclosed and were not part of the record in this case because they were used in a prior case. DCPS also objected to Petitioner's attempt to incorporate by reference into its present Complaint the statement of facts set forth in its prior Complaint of November 1, 2006. Petitioner maintained that issues and documents from prior due process hearings could properly be incorporated into subsequent hearings. The hearing officer rejected Petitioner's argument, ruling that Petitioner's prior case was separate and distinct from the instant case, and that all documents and facts Petitioner intended to rely upon in this case had to be disclosed in this case. The hearing officer gave Petitioner the choice of either proceeding without relying upon documents 1 though 31, or requesting a continuance so that all documents listed in its disclosure could be produced prior to the next hearing. Petitioner selected the latter option, and the hearing officer granted a continuance until June 27, 2007 at 1:00 p.m. and 3:00 pm, noting that an appropriate Order would follow. Petitioner gave DCPS a copy of documents 1 through 21 and stated that documents 22 through 31 would be provided to DCPS at least five days before the next hearing and documents 1 through 31 would also be provided to the hearing officer. Thereafter, the hearing was adjourned.

The hearing was reconvened on June 27, 2007. Petitioner provided the hearing officer with a copy of documents 1 through 23. Petitioner also provided copies for the record of documents 24 through 27(b) and 49 through 54, which had been disclosed to DCPS by cover letter dated June 20, 2007. All of Petitioner's documents were received into evidence without objection from DCPS.

As a preliminary matter, Petitioner asserted that DCPS had failed to comply with the hearing officer's Order granting Petitioner's Motion to Compel Production of Educational Records, because all of Student's educational records had not been provided. DCPS responded that Petitioner's counsel arrived at the appropriate school on the designated day and received copies of records, and there was no prior notice given to the hearing officer or DCPS regarding any alleged failure to comply with the Order. The hearing officer deferred ruling on the issue, stating that Petitioner would need to present evidence regarding the records that had allegedly been withheld before a ruling would be appropriate.

3

Thereafter, DCPS made two oral motions. First, DCPS asserted that the issues in Petitioner's instant Complaint had already been litigated in Petitioner's prior action and should not be re-litigated. However, after the hearing officer led the parties through a comparison of Petitioner's prior and present Complaints, DCPS realized that the prior Complaint concerned primarily the 2004/2005 school year, whereas the Present Complaint concerns the 2006/2007 school year. As a result, DCPS withdrew its first oral motion.

The second oral motion concerned DCPS's contention that the hearing officer lacked authority to adjudicate any portion of the dispute that concerned § 504 of the Rehabilitation Act. The hearing officer ruled that evidence concerning Petitioner's § 504 claims would be admitted; however, the parties would be allowed to file briefs on the issue of the hearing's officer jurisdiction, and the hearing officer would defer ruling on the motion until issuance of the Hearing Officer's Determination.[2]

Once the preliminary issues had been settled, the hearing proceeded and expert witness testimony was presented. However, as the time allotted for the hearing neared its end, the parties and the hearing officer realized that additional hearings would be necessary. After consulting their individual calendars, the hearing officer and the parties selected July 17 and 18, 2007 at 9:00 a.m. and 11:00 a.m. for additional hearings, the hearing officer confirmed the dates with the SHO, and the hearing officer stated that an interim Order continuing the hearing would follow. The hearing was thereafter adjourned.

On June 28, 2007, Petitioner filed a Motion to Take Testimony of GAL, Jonathon Krell, on an Earlier Date. (GAL is short for guardian ad litem.) Petitioner asserted that Mr. Krell had attended the initial hearing on June 19, 2007, and had been on standby to testify by telephone during the second hearing on June 27, 2007, but would be on vacation "outside the area" during the entire week of July 17 and 18, 2007. Petitioner requested that additional time be set aside for Mr. Krell to testify during the week before the week of July 17th and 18th. On July 5, 2007, the hearing officer denied Petitioner's Motion on grounds of undue burden and inconvenience.

The hearing was reconvened on July 17, 2007. As a preliminary matter, Petitioner renewed its Motion to Take Testimony of GAL, Jonathon Krell, on an Earlier Date, but the hearing officer denied the Motion on the grounds set forth in the July 5, 2007 Order. Thereafter, the hearing proceeded until the allotted time period had expired, at which point the hearing was adjourned.

The hearing was reconvened on July 18, 2007. The parties proceeded with the examination and cross-examination of various witnesses. As the time allotted for the

---

[2] Subsequent to the conclusion of the due process hearings in this case, counsel for DCPS orally advised the hearing officer that DCPS had withdrawn its motion in writing. However, as the hearing officer has not actually received a copy of the withdrawal, and the SHO has been unable to locate same, the hearing officer has included a ruling on the motion, *infra*, in the Discussion and Conclusions of Law section of this determination.

4

hearing neared its end, Petitioner made an oral motion to make closing arguments in writing, in light of the complexity of the case. DCPS opposed the motion, stating that it did not want to make closing argument in writing. The hearing officer ruled that closing arguments would be made orally, but that the hearing officer would accept written Proposed Findings of Facts if either party or both parties wished to submit them after the hearing concluded. As it turned out, however, DCPS did not have sufficient time to fully present its case before the hearing ended. DCPS made an oral motion for a continuance, the hearing officer granted the motion, the parties agreed on July 23, 2007 at 9:00 a.m. as the final hearing date, and after confirming the date and time with the SHO, the hearing officer stated that an appropriate interim Order would follow. The hearing was thereafter adjourned.

The hearing was reconvened on July 23, 2007. As a preliminary issue, Petitioner's counsel made an oral motion for permission to call a rebuttal witness, Mr. Jonathan Krell, the guardian ad litem, to rebut the testimony of DCPS witness, Ms. Pheadra Smith, who had testified at the hearing held on July 18, 2007. DCPS opposed the motion, on grounds that Petitioner was attempting "back door" in the testimony of Mr. Krell and should have given notification of the rebuttal witness at the end of the July 18th hearing. The hearing officer ruled that, time permitting, Petitioner would be allowed to call its rebuttal witness, but the witness would be limited to rebutting the testimony of Ms. Smith. Thereafter, the hearing proceeded, and after DCPS rested its case, Petitioner was allowed to call Mr. Krell as a rebuttal witness.

After all testimony had been received, Petitioner once again requested that the parties be allowed to present closing argument in written, "bullet-like" form, given the complexity of the case. This time, DCPS did not disagree, and the hearing officer granted Petitioner's request. The parties were given five calendar days to submit their written closing arguments, any Proposed Findings of Fact, and their briefs concerning the hearing officer's authority to adjudicate Petitioner's § 504 claims. The hearing officer then asked for a brief extension of time to issue the Hearing Officer Decision ("HOD") in this case, pointing out the voluminous documents and extensive testimony that had been received into evidence. The hearing officer suggested Monday, August 6, 2007, as the HOD due date, instead of the normal ten-day deadline of Thursday, August 2, 2007. Both parties agreed to the hearing officer's request for an extension, and the hearing was thereafter concluded.

On July 24, 2007, Petitioner filed Plaintiff's Opposition to Defendant's Motion to Dismiss for Lack of Jurisdiction, setting forth its arguments and supporting authorities concerning the hearing officer's authority to adjudicate Petitioner's § 504 claims. On July 25, 2007, Petitioner submitted Plaintiff's Proposed Findings of Fact and Legal Notes.

According to the SHO as late as Friday, August 3, 2007, no documents were submitted by DCPS subsequent to the conclusion of the final due process hearing in this case.

**WITNESSES**

**For Petitioner:**
1. Margot Richters, Ph.D., Clinical Psychologist (by telephone)
2. Kristen Rhinehart Totten, Esq., Staff Attorney, Children's Law Center (by telephone)
3. Ms. Lauren Russell, Investigator, Children's Law Center
4. Mrs. Linda Tomonia, Parent
5. Jaren Van Den Heuvel, Ph.D., Director, Oak Valley Center (by telephone)
6. Mr. Jonathan Krell, Esq., Student's Guardian Ad Litem (by telephone)

**For DCPS:**
1. Ms. Pheadra Smith, Special Education Coordinator, Payne Elementary School (by telephone)
2. Ms. Marcia S. Parker, Principal, Turner Elementary School (by telephone)
3. Ms. Vanessa Craig, Special Education Coordinator, Turner Elementary School (by telephone)

**FINDINGS OF FACT**

1. Student was born on January 3, 1995, and he is presently twelve years old.[3]

2. Parent has always been very involved in Student's educational career. Parent holds a Bachelor of Science degree from Virginia Commonwealth University. She has also worked internships in drugs and alcoholism and taught daycare.[4]

3. In 1997, Student was enrolled in a youth enrichment program for infants and toddlers at a private school in Silver Spring, Maryland. Student remained in this program through 2000.[5]

4. For kindergarten, Parent enrolled Student in Bridges Academy, a private school in the District of Columbia. The school experienced difficulty with Student's behavior throughout the year, but did not tell Parent until approximately April. The school personnel advised Parent that Student's academics were superb, but they would not consider reenrolling Student for the following school year because of his defiant behavior and aggression, which included talking back, hitting other kids, and not staying in his seat and doing as he was told.[6]

5. During the summer following his attendance at Bridges Academy, Student was evaluated at Kaiser Permanente ("Kaiser") and diagnosed with ADHD, impulsivity, and oppositional/defiant behavior.[7]

---

[3] *See* Complaint, p.1.
[4] Testimony of Parent.
[5] *Id.*
[6] *Id.*
[7] Testimony of Parent; *See* Petitioner's Exhibit RT-8 (at 68-69).

6

6. In 2001, Parent enrolled Student in Community Academy Public Charter School, a DCPS school located in northwest Washington, D.C. Based on Kaiser's diagnoses of Student, Community Academy developed a § 504 Plan for him. Student attended Community Academy for first and second grade, but he left at the end of the second grade because the school asked that he not return. The school personnel stated that Student's disruptive behavior resulted in their inability to give attention to other students. They stated that if Parent did not remove Student voluntarily, they would expunge him. They recommended that Parent try The School for Arts In Learning ("SAIL"), a DCPS school that deals with special education children and children who have physical disabilities.[8]

7. Parent applied to SAIL on Student's behalf, Student was accepted, and he began attending SAIL in the third grade. SAIL revised the § 504 Plan Student brought with him from Community Academy. The revised § 504 Plan was implemented and team meetings were held, but no progress was seen. At the end of Student's fourth grade year, SAIL requested that he not return because of his behavior. Parent was told that she could withdraw Student, or he would be expunged.[9]

8. For the 2005/2006 school year, Parent enrolled Student at Takoma Educational Center ("Takoma"), Student's neighborhood school. Parent also took Student's § 504 Plan to Takoma. Student's behavior did not improve at Takoma, which is an open space setting. The school personnel constantly called Parent at work to report that Student was talking back, hitting other children, getting out of his seat, walking out of the classroom, yelling into other classes, and otherwise interfering with other classes. Initially, Student's teacher would call Parent and ask her to redirect Student. After approximately one month, however, Parent began receiving calls from the school office to come and pick up Student. This change began at or about the end of October and lasted through May. On some of these occasions, Student was suspended, but not all of the suspensions were documented.[10]

9. While Student was attending Takoma, Parent requested a special education evaluation and for implementation of Student's § 504 Plan. Student was on ADHD medication at the time, and Takoma felt that his medications were not lasting long enough. Parent asked Kaiser to allow the school to administer an additional dose of medicine to Student, and the request was granted. Takoma administered ADHD medication to Student at approximately noon each day, but the additional dose of medication did not eliminate Student's behavior problems. In DCPS standardized assessments administered at Takoma on April 24, 2006, Student performed at the "Below Basic" level in Reading and Mathematics. In May, Takoma suspended Student for the rest of the school year. Takoma also retained Student in the fifth grade.[11]

---

[8] Testimony of Parent; Petitioner's Exhibit RT-8 (at 48-49).
[9] Testimony of Parent; Petitioner's Exhibit RT-8 (at 44-47).
[10] Testimony of Parent; Petitioner's Exhibits RT-5, RT-7.
[11] Testimony of Parent; Petitioner's Exhibits RT-3, RT-5, RT-6, RT-7.

10.  On March 30, 2006, a Child Psychiatrist at Kaiser diagnosed Student with Attention Deficit Disorder and Depression.[12]

11.  On May 15, 2006, Student was placed in St. Ann's Infant and Maternity Home ("St. Ann's"), which is a group home.  Student's behavioral problems did not relent while he was at St. Ann's.  To the contrary, a series of incident reports reveals that he repeatedly fought with other children, he absconded on more than one occasion, he hit and/or kicked various staff members, and threatened himself and others.  The staff at St. Ann's recommended Student's removal from their residential program due to his anger, aggressive behavior, and non-compliance.  On May 25, 2006, Alberta M. Vallis, M.D., a Child Psychiatrist at St. Ann's evaluated Student, gave a diagnosis of ADHD, and determined that Student was an at risk, angry, aggressive boy who required close monitoring.  The psychiatrist recommended, *inter alia*, a more restricted special education placement for Student, weekly therapy, a therapeutic foster home, and hospitalization for stabilization of Student's E.D.  On or about June 4, 2006, several St. Ann's staff members took Student to Children's National Medical Center ("Children's"), where he was admitted to the psychiatric unit.[13]

12.  Student also was evaluated by Margot L. Richters, Ph.D., Clinical Psychologist, in May and June of 2006.  In her evaluation report, Dr. Richters indicated as follows[14]:

> [Student] is currently functioning in the average range of intelligence.  While he demonstrates ample capacity for learning, there was some variability in his mental abilities . . . Educational testing reveals average academic skills across all domains . . . Given [Student's] intellectual potential, his academic achievement is slightly below what would be expected.  It is clear that fluctuations in attention, concentration and motivation are impairing [his] ability to learn effectively . . . Consistent with school reports and medical records, the results of this evaluation indicate that behaviorally, [Student] continues to demonstrate significant problems with attention, hyperactivity, impulsivity, and conduct . . . [Student] has troubled peer relationships, limited social skills and inadequate coping strategies . . . Emotionally, [he] is a guarded, angry boy who is experiencing unresolved sadness, grief and guilt around the recent loss of his father.  Furthermore, he exhibits feelings of disappointment, confusion, anger, loneliness, abandonment and inadequacy, particularly with regard to his troubled relationships with significant adults.

Dr. Richters concluded that:

---

[12] Petitioner's Exhibit RT-11.
[13] Petitioner's Exhibits RT-8 (at 57-59), RT-18.
[14] Petitioner's Exhibit RT-19.

8

[T]he results of this clinical evaluation provide ample
evidence to confirm the diagnoses of Attention
Deficit/Hyperactivity Disorder and Oppositional Defiant
Disorder. In addition, . . . the diagnosis of Tourette's
Disorder cannot be ruled out . . . [Student] also exhibits
symptoms of unresolved grief surrounding the death of his
father. These symptoms support the diagnosis of
Bereavement. Finally, the current problems between
[Student] and his mother warrant the diagnosis of Parent-
Child Relational problem. *It is extremely important to
recognize that the cumulative effect of these diagnoses
place [Student] at high risk for a number of poor outcomes
. . . Without immediate, intensive, long term intervention, it
is highly likely that he will continue to deteriorate
academically, behaviorally and emotionally.* (emphasis in
original)

13. At the beginning of the 2006/2007 school year, Student began attending Turner
Elementary School, where his behavior problems continued. By this time, he had been
placed in a foster home. Although Student's foster parent was called on at least seven
occasions to come pick him up from school, no formal record was made that Student had
been sent home. The staff at Turner was unaware of Student's existing § 504 Plan until
October of 2006, when Petitioner's counsel advised the Principal at Turner, Ms. Marcia
Parker, of Student's § 504 Plan. Then, in November of 2006, Turner developed a revised
§ 504 Plan for Student. At the initial Plan meeting on November 7, 2006, the teacher in
charge of the "learning centers" in Student's classroom stated that Student tended to
spend most of his time with other children, repeatedly got out of his seat, gravitated to the
bad children, and had poor focus on his work. At the follow up Plan meeting on
November 14, 2006, Student's general education teacher stated that Student caused basic
class disruptions that prevented the teacher from teaching, and that Student's disruptive
behavior included getting out of his seat, taking across the room, being disrespectful to
adults, not staying on task, beating on his desk as if playing drums, being defiant and
disobedient, and using curse words. Student's § 504 Plan called for an extremely large
number of accommodations for Student in the areas of physical arrangement of the
classroom, lesson presentation, assignments/worksheets, test taking, organization,
behavior, computer/assistive technology, special considerations, and medication. The
Plan also included thirty minutes per week each of individual counseling, group
counseling, and ADHD adaptability coaching. Student's behavior initially improved
under the revised § 504 Plan, as reflected in progress reports for the weeks of December
8, 2006, December 22, 2006, January 12, 2007, and January 26, 2007 that were sent to
Petitioner's counsel, and Student's second advisory report card. On January 25, 2007,
Turner convened a 504 Plan Meeting to review and revise Student's Plan, and several
additional accommodations were added to Student's Plan. Nevertheless, in or about
February, Student's behavior began to deteriorate. He was suspended at least twice in

9

February, and Parent found Student roaming the halls on at least two occasions when she went to visit the school. Student was also allowed to spend time in the Principal's office when he got off task.[15]

14. In the meantime, in or about October of 2006, Parent had requested a special education evaluation for Student. Parent believed that Student needed special education services because his behavior problems had been in existence since the beginning of his school career. DCPS conducted psychological, speech and language, and occupational therapy evaluations of Student on November 21, 2006, December 5, 2006, and January 19, 2007, respectively. The report of Psychological Evaluation, prepared by Leslie A. Arthur, Ph.D., DCPS Certified School Psychologist, stated as follows:

> Cognitive testing revealed that [Student's] cognitive ability falls within the Average range (CIX = 93). Achievement testing revealed that [his] overall reading (SS = 97) and math (SS = 91) skills fall within the Average range. Because there is no severe discrepancy between [Student's] cognitive and academic functioning, he does not appear to be eligible to receive special education services as a student with a Learning Disability.

The Speech and Language Evaluation report, prepared by Tanyna Saxton, MA-SLP, DCPS, similarly stated as follows:

> [Student's] performance on the CELF-4 indicates above average skills in overall language, with exceptional skills in his oral expression and his short-term memory for language. The CREVT-2 was used to assess his vocabulary. The resulting General Vocabulary score indicates average skills in receptive and expressive vocabulary. He showed no articulation errors, no voice problems, and no dysfluency . . . According to DCPS eligibility criteria, [Student] does not qualify for speech-language intervention. His communication skills appear to be a definite strength that can be exploited to enhance his overall academic achievement.

The Occupational Therapy report, prepared by Nikia Brocks, OTR/L, stated as follows:

> [Student] demonstrated average scores in fine motor skills . . . He demonstrated below average visual motor integration skills when tested by the school psychologist, but scored average with this therapist when given the supplemental assessments for visual perception and motor coordination.

---

[15] Testimony of Parent; Testimony of Ms. Totten; Testimony of Ms. Parker; Petitioner's Exhibits RT-7 (at 36), RT-8 (at 38, 43), RT-9, RT-12, RT-13, RT-22, RT-23, RT-37, RT-39, RT-51.

> This therapist believes that . . . [he] has average abilities in that area. . . In addition, [Student] demonstrated average to above average abilities in all 7 subtests areas of visual perception . . . It is felt that [Student] is not a candidate for occupational therapy services at this time.

The results of the psychological and speech and language evaluations were presented by the respective evaluators at a January 9, 2007 MDT eligibility meeting for Student.  (The occupational therapy evaluation was not conducted until ten days after the meeting.)  There was no discussion of Student's classroom performance at the meeting, and Student's classroom teacher was not present.  The DCPS MDT team determined that Student was not eligible for special education services as a learning disabled student.[16]  Student's GAL at the time, Ms. Totten, asked DCPS to consider whether Student was eligible for special education based on his ED, but DCPS refused to do so.  Petitioner's GAL and Petitioner's counsel[17] refused to sign the meeting notes.[18]

15.  In or about March of 2007, Student transferred to Payne Elementary School when he was moved to a new foster home.  For the first week of class, Student's new teacher, Ms. Johnson, was basically unable to keep him in class.  On March 12, 2007, Ms. Johnson and a counselor met concerning Student and decided to use daily progress report as a way to help Student remain in and participate in class.  However, from March 19, 2007 through April 3, 2007, Student was suspended from Payne for walking the halls and not attending class.  Upon Student's return to school, Ms. Johnson began sending daily progress reports home for the signature of Student's foster parent.  Student did not receive a DCPS report card for the third advisory because he was enrolled at Payne for only eighteen days of the third advisory, and he was suspended for ten of those eighteen days.  Student's report card from Payne for the end of the school year reflected that he had received grades of "2-" in Reading/English Language Arts, Mathematics, and Social Studies, "2" in Arts, and "1" in Science, and that he was being promoted to seventh grade for the 2007/2008 school year.  The report card indicates that 1 equals "Below Basic" and 2 equals "Basic."[19]

16.  Student's behavior problems did not cease while he was attending Payne.  In addition to Student's suspension in March, the Metropolitan Police Department ("MPD") was called to Payne on two occasions due to Student's behavior.  In the beginning of May 2007, the MPD was called to the school after Student was accused of pulling up a female student's skirt.  On or about Friday, June 1, 2007, the MPD was called to the school because Student had been involved in two incidents where he 1) hit a girl with a wire and

---

[16] Indeed, Turner's Special Education Coordinator, Ms. Vanessa Craig, who took the official Meeting Notes and produced the Notice of Ineligibility, stated at the due process hearing in this case that Student "is very intelligent." She feels that he needs to be challenged a little more, but noted that he holds a very intelligent conversation and reads very well.

[17] Petitioner's counsel had also been appointed Student's educational advocate pursuant to a Magistrate's Order. *See* Petitioner's Exhibit RT-8 (at 38).

[18] Testimony of Parent; Testimony of Ms. Totten; Testimony of Ms. Craig; Petitioner's Exhibits RT-17, RT-42.

[19] Testimony of Ms. Totten; Testimony of Parent; Petitioner's Exhibits RT-40, RT-49, RT-52.

2) kicked another child. Student was taken to a detention center, and after a June 16, 2007 youth court hearing, a jury of his peers made Student apologize to the girl he hit with the wire and to Parent. Also, Student's daily progress reports indicate that although he had some good days, he continued to talk in class, blurting out comments at any time and "joning" on other students.[20]

17. The Complaint in this case was filed on April 19, 2007, and the resolution session was held on May 7, 2007. Ms. Phaedra Smith, the Special Education Coordinator ("SEC") at Payne scheduled the resolution meeting. Ms. Smith had arranged for all members of the MDT team to be present at the meeting so that a special education eligibility determination could be made regarding Student. However, Petitioner's counsel objected to the presence of the team members because they were not listed in the letter of invitation to the meeting. Petitioner's counsel also refused to allow the MDT team to proceed with an eligibility meeting, so DCPS announced that it would stand upon its previous determination of ineligibility. When questioned, Student's teacher, Ms. Johnson, did not seem to be aware of Student's § 504 Plan.[21]

18. At the due process hearing in this case, Dr. Richters testified that Student's ED problems are now trumping his ADHD problems. On or about June 13, 2007, Dr. Richters interviewed Student again, as well as interviewing Parent, Student's mental health worker and caseworker. Student has told Dr. Richters that other children do not like him and that nobody likes him. She believes Student knows he is having trouble learning and having social success, so school makes him feel bad and his ED problems are at the forefront. He runs the halls as an escape mechanism, puts his head down in class – basically shuts down because it feels so bad to be in school. Student's § 504 Plans clearly have not been enough to meet Student's needs. They contain no real strategies to help Student manage his behaviors. Student already takes serious medications with significant side effects that are given to children only as a last resort, and even the medications are not enough to help him cope. Dr. Richters opined that Student requires a special education setting because he has demonstrated that he can't function in a regular educational setting. She stated that Student needs a free-standing special education setting that has small classes with two teachers to no more than ten children, a highly structured behavioral management plan, a behavioral management specialist, trained teachers who know how to work with ADHD and LD issues, social skills assistance and group therapy, multi-sensory presentation of material, and tutoring. Dr. Richters is of the opinion that Oak Valley Center would be an appropriate placement for Student.[22]

19. Parent has visited three special education schools, including Oak Valley Center, and would like for Student to attend Oak Valley Center. Parent feels that Student mastered nothing from DCPS's curriculum during the 2006/2007 school year, because he spent his time roaming the halls, sleeping in class, and/or under suspension from school. Although Student has been promoted to the seventh grade, he needs some work on his addition

---

[20] Testimony of Ms. Russell; Petitioner's Exhibits RT-35, RT-40, RT-41 (at 5).
[21] Testimony of Ms. Smith; Testimony of Mr. Krell; Petitioner's Exhibit RT-41.
[22] Testimony of Dr. Richters.

skills, he cannot multiply three-digit numbers, and although he can read words with some stumbling, he doesn't comprehend, retain or visualize what he has read.[23]

20.  Student visited the three special education schools with Parent, and has stated a preference for attending Oak Valley Center.[24]

21.  The staff at Oak Valley Center has reviewed Student's application package, interviewed Student, spoken with Parent, and administered a wide range achievement test to Student. The director of Oak Valley believes Oak Valley can meet Student's needs and would be happy to accept Student, because Student's major problem appears to be emotional, and Oak Valley is a school for students with emotional challenges, learning disabilities, and ADHD (other health impaired). The related services provided at Oak Valley include intensive academic remediation, speech and language therapy, individual and social/life skills groups, and an intensive reading program.[25]

## DISCUSSION AND CONCLUSIONS OF LAW

As the party seeking relief, Petitioner bears the burden of proof in this case with respect to all claims alleged in the Complaint. *See* 5 D.C.M.R. § 3030.3; *Schaffer v. Weast*, 546 U.S. 49, 126 S.Ct. 528 (2005).

### 1.  DCPS's Oral Motion to Dismiss Petitioner's § 504 Claims for Lack of Jurisdiction

At the due process hearing in this case, DCPS asserted that the hearing officer lacked authority to adjudicate any portion of this dispute concerning § 504. Under 34 C.F.R. § 104.36, an implementing regulation for § 504, DCPS is required to establish and implement, with respect to actions regarding the identification, evaluation or educational placement of handicapped persons believed to need special instruction or related services, a system of procedural safeguards that includes notice and an impartial hearing. The regulation further states that compliance with the procedural safeguards of IDEIA's predecessor, the Education of the Handicapped Act, is one means of meeting this requirement. As Petitioner points out in its opposition brief, DCPS has failed to create a separate procedural structure for the handling of impartial due process hearings for § 504 actions. Moreover, in a previous § 504 due process proceeding initiated by Petitioner's counsel on Parent's behalf and concerning Student, the presiding hearing officer determined, after consideration of post-hearing briefs filed by both Petitioner and DCPS, that DCPS impartial due process hearing officers have jurisdiction to consider § 504 claims. *See* Petitioner's Exhibit RT-25. Under these circumstances, and considering that DCPS has failed to present legal arguments and citations of authority demonstrating otherwise, the hearing officer concludes that jurisdiction exists over Petitioner's § 504 claims in this case. Accordingly, the hearing officer denies DCPS's oral motion to dismiss Petitioner's § 504 claims for lack of jurisdiction.

---

[23] Testimony of Parent.
[24] Testimony of Parent.
[25] Testimony of Dr. Van Den Heuvel.

## 2. DCPS's Alleged Failure to Provide Parent Access to Student's Educational Records during School Year 2006/2007

Petitioner alleged in its Complaint that, "[f]rom October 2006 forward, DCPS declined to provide the parent access to this student's educational records, as required by FERPA, Section 504 of the Rehabilitation Act, the Individuals with Disabilities Education Act, as amended, and D.C. Municipal Regulations." Complaint at p.5. Petitioner also presented evidence that DCPS failed to provide Petitioner with requested educational records for Student in the 2006/2007 school year, especially in connection with the various § 504 Plan and IDEIA eligibility meetings that were held for Student.

On June 19, 2007, the hearing officer issued an Order Granting Petitioner's Motion to Compel Production of Educational Records, pursuant to which Parent and Petitioner's counsel visited Payne ES on Friday, June 22, 2007, for purposes of reviewing and copying Student's educational records. At a subsequent due process hearing in this case, Petitioner's counsel represented that DCPS failed to comply with the Order because all of Student's educational records were not provided during the visit to Payne, whereas DCPS's counsel represented its client had advised that the visit proceeded as planned and copies of records had been provided.

After careful consideration of the representations of counsel and the evidence in this case, the hearing officer concludes that DCPS did not fail to comply with the hearing officer's June 19, 2007 Order. The hearing officer acknowledges that DCPS may not have provided Parent and Petitioner's counsel with all of the educational records they sought to review, in the nature of class logs, classroom work, homework grades, and the like. However, in light of the evidence in this case, which details DCPS's repeated inability to supply requested educational records for Student, the hearing officer concludes that it is more likely than not that DCPS failed to supply Parent and Petitioner's counsel with all requested records during their visit to Payne because the records either did not exist or were not in Student's file, and not because DCPS was intentionally withholding access to Student's educational records. As a result, the hearing officer concludes that there has been no violation of the June 19, 2007 Order issued in this case, and the hearing officer declines to order DCPS to produce educational records that it should, but apparently does not, have in its possession.

## 3. DCPS's Determination that Student is Ineligible for Special Education Services

Petitioner alleged in its Complaint that "DCPS conducted an MDT meeting on January 9, 2007 to consider the student's eligibility for special education services" and that "DCPS improperly determined that this student was not eligible for special education services." Complaint at p.5. Petitioner's evidence in this case proves that Student repeatedly has been diagnosed with ADHD, he has also been diagnosed with oppositional/defiant disorder, depression, and bereavement, and at least one psychologist has determined that a diagnoses of Tourette's disorder cannot be ruled out. Petitioner's evidence further demonstrates that DCPS determined at a January 9, 2007 MDT meeting that Student was

14

ineligible for special education services as a learning disabled Student, and DCPS refused to consider whether Student may have been eligible for special education services under IDEIA as an emotionally disturbed Student.

Under IDEIA, a "child with a disability" includes a child who has a serious emotional disturbance and/or an other health impairment, and who, by reason thereof, needs special education and related services. 34 C.F.R. § 300.8; 20 U.S.C. § 1401(3)(A). "Other health impairment" is defined to include children having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that (i) is due to chronic or acute health problems such as attention deficit disorder, attention deficit hyperactivity disorder, or Tourette's syndrome, and (ii) adversely affects a child's educational performance. 34 C.F.R. § 300.8(c)(9). "Emotional disturbance" is defined as a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance: an inability to learn that cannot be explained by intellectual, sensory, or health factors; an inability to build or maintain satisfactory interpersonal relationships with peers and teachers; inappropriate types of behavior or feelings under normal circumstances; a general pervasive mood of unhappiness or depression; or a tendency to develop physical symptoms or fears associated with personal or school problems. 34 C.F.R. § 300.8(c)(4)(i); *See also* D.C.M.R. § 3003.2.

IDEIA further provides that as part of an initial evaluation, the MDT team **must** review existing evaluation data on the child, including evaluations and information provided by the parents of the child. 34 C.F.R. § 300.305(a)(1) (emphasis supplied). Upon completion of administrative assessments and other evaluation measures, a group of qualified professionals and the parent of the child determines whether the child is a child with a disability. 34 C.F.R. § 300.306(a)(1).

In *Mr. I. et al., v. Maine School Administrative District No. 55*, 480 F.3d 1 (1st Cir. 2007), the student at issue was an honor roll student, who was considered by her teacher to be "a very bright young girl with strong language and math skills," but who had begun experiencing sadness, anxiety, and difficulty with peer relationships that eventually led to a diagnosis of Asperger's syndrome and adjustment disorder with depressed mood. Defendant school district refused to offer the student special education services, on the ground that there had been no significant adverse effect on her education, and instead determined that the student qualified for an array of services under § 504 of the Rehabilitation Act. In administrative proceedings initiated by the student's parents, the school district prevailed. On appeal by the parents, however, a district court ruled that the student was eligible for special education and related services, noting that the school district had agreed to provide the student with a number of accommodations under § 504, including one-on-one tutoring and instruction in social pragmatics, that fit the definition of special education. The district court ordered the school district to convene a meeting to develop an IEP for the student. On further appeal by the school district, the U.S. Court of Appeals for the First Circuit affirmed the district court's decision.

15

Furthermore, in *Independent School Dist. No. 284, Wayzata Area Schools, Wayzata, Minnesota, v. A.C.*, Civil Action No. 00-2346MN (8th Cir. August 3, 2001), the court noted there was no dispute that a child who had social and emotional problems, but no learning disability, was a child with a disability within the meaning of IDEA. *See also, Honig v. Doe, et al.*, 484 U.S. 305, 320 (1988) (noting, with regard to an emotionally disturbed student, that it was the student's "very inability to conform his conduct to socially acceptable norms that render[ed] him 'handicapped' within the meaning of [IDEIA's predecessor, the Education of the Handicapped Act]").

In the instant case, Student has, from the very beginning of his academic career, suffered from a long history of behavioral and emotional problems that resulted in his proposed expulsion from at least three schools, the imposition of repeated formal and informal suspensions of varying duration, and his retention in the fifth grade. Although at least two psychologists have determined that Student is of Average intelligence, his grades are less than what would be expected of him. Indeed, he scored at the "Below Basic" level in both Reading and Mathematics on DCPS standardized assessments administered in April of 2006. Student has repeatedly been diagnosed with ADHD and oppositional/defiant disorder, and at least two of his evaluators, Dr. Vallis and Dr. Richters, have recommended a special education setting for Student. Student's initial guardian ad litem, his educational advocate, and Parent are also of the opinion that Student requires a special education setting to progress academically. Although DCPS has determined that Student is ineligible for special education and related services under IDEIA, Student's most recent § 504 Plan includes a number of accommodations that fit the definition of special education, including individual counseling, group counseling, and ADHD adaptability coaching. Under these circumstances, the hearing officer concludes that Petitioner has met its burden of demonstrating that DCPS improperly determined that Student was not eligible for special education and related services under IDEIA. The hearing officer further concludes that DCPS's improper ineligibility determination constituted a denial of a FAPE to Student. *See* 34 C.F.R. § 300.513(a).

4. DCPS's Suspensions of Student in School Year 2006/2007

Petitioner alleged in its Complaint that "DCPS in February and March 2007 suspended this student for behavior arising out of his disability." Complaint at p.5. Petitioner presented evidence that Student has repeatedly been diagnosed with ADHD, and that the purpose of his § 504 Plan is to counter negative behaviors that result from that disability. Petitioner also presented undisputed evidence proving that Turner suspended Student from February 6 through February 8, 2007, and from February 13 through February 16, 2007 (to return on February 19, 2007), that Payne suspended Student from March 19 through April 3, 2007, and that all three suspensions were due to Student's behavior problems. As a result, the hearing officer concludes that Petitioner has met its burden of proving that DCPS suspended Student in February and March of 2007 for behavior arising out of his disability. The hearing officer further concludes that such suspensions constituted a violation of § 504 of the Rehabilitation Act of 1973, which prohibits a student's exclusion from participation in a program or activity conducted by a local educational

agency solely by reason of his or her disability. *See* 29 U.S.C. § 794; 34 C.F.R. § 104.33(d).

### 5. DCPS's Alleged Failure to Implement Student's § 504 Plan in School Year 2006/2007

Petitioner alleged in its Complaint that "DCPS failed to carry out the requirements of the Section 504 Plan that DCPS created for this student." Complaint at p.5. Petitioner's undisputed evidence in this case shows that the staff at Turner ES was unaware of Student's existing § 504 Plan until October of 2006, when Petitioner's counsel advised Turner's principal of the Plan. Additional evidence presented by Petitioner proves that it is more likely than not that Turner did not begin to implement a § 504 Plan for Student until after November 14, 2007, when the staff at Turner developed a revised Plan for Student and Student's general education teacher began sending weekly progress reports to Petitioner's counsel. Finally, there is evidence tending to prove (1) that the staff at Turner abandoned their efforts to implement Student's § 504 Plan in early February of 2007, when Student began once again receiving suspensions due to his behavior problems, and (2) that the staff at Payne was totally unaware that Student had a § 504 Plan until they were advised of the Plan at the May 7, 2007 resolution meeting, at which point the school year was nearing its end. Based on this evidence, the hearing officer concludes that Petitioner has proven that, for approximately seven months of the 2006/2007 school year, DCPS failed to implement Student's § 504 Plan. The hearing officer further concludes that such failure to implement Student's Plan constituted a violation of § 504 of the Rehabilitation Act of 1973. *See* 29 U.S.C. § 794; 34 C.F.R. § 104.33(b)(1).

In consideration of the foregoing, the hearing officer makes the following

### ORDER

1. DCPS's oral motion to dismiss Petitioner's § 504 claims for lack of jurisdiction is **Denied**.

2. Within five business days of the issuance of this Order, DCPS shall convene an MDT/IEP/Placement meeting to (1) review all of Student's evaluations, including the independent evaluations that have been secured by Parent, and determine whether additional evaluations are necessary; (2) develop an appropriate IEP for Student; (3) discuss and determine an appropriate placement for Student, giving due consideration to the preference of Student and Parent for a placement at Oak Valley Center; and (4) discuss and determine the form, amount and delivery of compensatory education services to Student.

17

08/06/2007  11:57   2026983825   STUDENT HEARING

3. In the event DCPS fails to provide a suitable placement for Student by the beginning of the 2007/2008 school year, Student is to be placed at Oak Valley Center, at DCPS's expense, on an interim basis until DCPS complies with the provisions of this Order.

4. All communications and scheduling in connection with the execution of this Order shall be made through Petitioner's counsel. For every day of delay caused by Parent and/or Petitioner's Counsel, the deadlines established herein for DCPS shall be extended by one day. Any disputes under this paragraph will be resolved based upon the documentation of the parties.

**This is the FINAL ADMINISTRATIVE DECISION in this matter. Any party aggrieved by the findings and decision may APPEAL to a State court of competent jurisdiction or a district court of the United States, without regard to the amount in controversy, within 90 days from the date of the decision pursuant to 20 U.S.C. § 1415(i)(2).**

Kimm H. Massey, Esq.
Impartial Hearing Officer

8/6/2007
Date

Issued: 8|6|07
Student Hearing Office, DCPS

18

# Keeping Our Promise to the District's Children

Highlights of the Proposed FY 2006 Operating Budget
District of Columbia Public Schools
*December 16, 2004*













# To the Citizens and School Board of the District of Columbia:

Our public school system promises every child a quality education. When I came to this city my goal was to make sure that we keep that promise for all of our children.

I know that our schools have long struggled with challenges ranging from poor test scores to aging buildings, inadequate materials and outdated equipment. With the goal of successful education for all, however, I intend to bring something new to the table: the expectation that we can — and will — do better. As we clearly have demonstrated by adopting the highly praised Massachusetts standards of learning, this is a new day for DCPS. This budget represents both my commitment to meeting this goal and a clear plan for how I intend to achieve it.

For my first proposed budget, I have focused our efforts on three key areas:

- **Academic Standards and Achievement.** We will adopt clear and challenging academic standards across the district and shape a new core curriculum for reading, math, science and other subjects. We will provide tests that tell us how well we're doing and professional development programs that help teachers teach the more demanding material. We also will provide extra challenges and extra help for students who need them.

- **Physical Facilities.** We will make sure that buildings are safe, clean and in good repair. Children cannot learn in classrooms that have no heat or air conditioning, leaky roofs, or broken equipment. We will move quickly to address problems caused by our aging structures, deferred maintenance projects and delayed improvements.

- **Instructional Technology.** We will upgrade and update our inadequate systems. By investing in people and equipment that can get the job done, we can provide greater accountability, better customer service, increased reliability and more overall transparency throughout the school system.

As you will see, while improvements to our physical facilities and technology are covered under this year's basic funding commitment from the D.C. City Council, many of our key academic proposals are as yet unfunded and fall into the category of Unmet Needs. Some of these needs require immediate attention; others are multiyear projects. Overall, however, each of these academic initiatives represents an important component of our strategic planning and deserves funding support as a necessary investment in the future of our children. In the coming months and years, I will be working with our School Board, Mayor and City Council, parents, and other partners to set priorities among these initiatives and develop strategies for making them happen.

I look forward to a continued collaboration with you and all of our community stakeholders to begin a new era of excellence in our public schools.

Clifford B. Janey, Ed.D.
Superintendent

# Putting Promises into Action

Our proposed budget for FY 2006 will let us address, in a systematic way, many of the long-term challenges in our schools and allow us to move forward in our quest for academic excellence. To show you how this will happen, we are presenting our discussion in two parts:

- On pages 3–5, Budgeting for the Basics, you will see the anticipated operating revenue, which reflects what we expect our operating budget to be, including a 1.9 percent funding increase from the city. This part of the budget includes funding for building and technology improvements that are necessary to support children's learning.

- On pages 5–7 is a list of additional immediate and long-term programs and improvements related to the development of our comprehensive educational strategy that were not addressed in the projected budget. We believe these Unmet Needs are essential to our goal of a first-class school system in our nation's capital.

## A New Beginning

Our FY 2006 budget differs in some important ways from previous approaches.

**It is performance–based.**
Spending is tied directly to initiatives that will raise student achievement. Programs that do not contribute to improved student learning are being cut or changed. Where new interventions are needed, this budget identifies them.

**It is collaborative.**
To the extent possible, our budget proposal reflects the community's priorities. It builds directly on the 11 priorities that we have identified as key levers for achieving broad and systemic change for our schools (see the sidebar on page 3).

Building on a two-day retreat in November 2004, community leaders and citizens are now fleshing out these levers for change, which will become the foundation for our strategic plan, the D.C. Education Compact. We expect to finalize the strategic plan — after additional community input — in early March. This budget proposal and strategic plan are moving forward together and reinforce each other.

**It establishes a new level of accountability.**
Citizens expect us to spend their money wisely — and we will. Through brochures such as this, along with extensive public outreach, we will be doing everything we can to make sure the public understands where the money is going and what results we expect for the spending. No secrets. This way, the community can hold us accountable for results.

Just as important, children and families have a right to hold all of the adults in the community accountable for providing the resources our children need to succeed. This goes for the adults inside the school system and the adults who support the schools through taxes, volunteer efforts and in other ways. *This budget makes the case for why all the adults of our community must work together for the benefit of our children.*

## LEVERS OF CHANGE

Hundreds of representatives from throughout the community, organized by the D.C. Education Compact, are now preparing action plans to improve the city's school system in 11 key, overlapping areas. This budget addresses each of these strategic priorities.

- Prepare students for college and work.
- Help principals and teachers become better instructors.
- Use data to improve teaching.
- Hold ourselves accountable at all levels.
- Align standards, tests, curriculum, professional development, materials and instructional practices.
- Engage and involve parents and community members.
- Improve adult literacy.
- Nurture healthy children and families.
- Repair facilities.
- Manage efficiently.
- Create a culture of collaboration, inclusiveness and effectiveness.

## BUDGETING FOR THE BASICS: WHERE THE MONEY COMES FROM

According to the preliminary "budget mark," we expect to receive $1.02 billion in funds from multiple sources, which we will use to fund basic operations.

| Funding Source | FY 2006 (projected budget in millions) | FY 2005 (board–approved budget in millions) | % change |
|---|---|---|---|
| **Local** (Mayor and City Council) | $775.5 | $760.5 | 1.97 |
| **Federal** (U.S. Dept. of Education and other federal funds that are earmarked for programs such as Head Start and Title 1) | $173.3 | $117.5 | 47.59 |
| **Private** (foundation funds, usually earmarked for specific programs such as early childhood programs) | $4.7 | $3.7 | 27.13 |
| **Other** (usage fees for leasing buildings, etc.) | $7.9 | $7.3 | 7.94 |
| **Intra-District** (fees for services, such as Medicaid, food services and driver's education, we provide for other government agencies) | $62.4 | $54.4 | 14.65 |
| **TOTAL** | **$1,023.8** | **$943.4** | **8.53** |

*Highlights*

We expect this year's basic budget to be 8.5 percent higher than last year's — including a nearly 50 percent increase in federal funds and a 30 percent increase in private foundation funds. It is important to note, though, that a sizable share of the federal and private funds allocated to DCPS, as both a local and state entity, are ear-marked for specific program deliverables. The substantial increase in federal funds is a result of the anticipated $28.2 million in FY 2005 carryover dollars that will be rolled into FY 2006.

# Budgeting for the Basics: Where the Local Money Goes

Of the $775.5 million in local funds, the vast majority will be spent at the school level or to support instructional programs.

Unlike other school districts, DCPS carries out the responsibilities of a city school district, plus the functions of a state education agency, such as special education and teacher certification. About one-fifth of the projected overall budget ($212.2 million) will cover these state functions.



**Projected FY 2006 funding level**
(% of total)

State Functions 25.7%

Central Administration 3.7%

Central Operations Support 3.5%

Central Instructional Support 1.8%

Direct School Allocation/Weighted Student Formula 51.2%

School-Based Instruction 4.0%

School-Based Operations Support 10.2%

**Direct School Allocation/Weighted School Formula** includes teachers and aides, principals, librarians, and school supplies.

**School-Based Instruction** includes substitute teachers, summer school, targeted assistance programs, athletics and computers.

**School-Based Operations Support** includes security, facilities and utilities.

**Central Administration** includes Superintendent's office, public information, parent affairs and human resources.

**Central Instructional Support** includes offices for aca-demic programs, professional development, instructional technology and student services (such as violence and drug prevention programs).

**Central Operations Support** includes technology, man-agement information systems, facilities management, mail, print shop and food service.

**State Functions** include special education, charter schools, transportation, administration of SAT-9, teacher credentialing and grants administration.

*Highlights*

School-level allocations and personnel costs will account for 69 percent of local revenues when state functions are excluded — up about 3 percent. The proposed budget increases school level allocations by $4 million to raise the base foundation amount by 10 percent.

Only about 3.7 percent of local revenues will support central administrative functions.

We've allocated $4.6 million in our Operations and Maintenance budget to begin to address the backlog of repair, maintenance and improvement needs of our aging school buildings, representing a 20 percent increase in funding. In addition, we will be conducting a comprehensive review of the Facilities Master Plan that guides the Capital Improvement budget, which is approved separately.

To help direct more resources to the classroom, we have identified about $31 million in potential cost savings in several areas. In special education, we will start reducing our reliance on expensive nonpublic placements that currently serve approximately 20 percent of our students, as well as on other outside contractors who provide services such as transportation and evaluation. Other planned efficiencies include reduced outside legal fees, continued reductions in central office staff, streamlined and consolidated procurement of materials and supplies, and new performance guidelines for all contractors.

In addition, we expect that an audit of the district's long-troubled payroll system will uncover additional savings. On the revenue side, we will be more proactive in taking advantage of additional federal grants.

Anticipated collective bargaining settlements will result in increased labor costs in 2006. As local schools cannot afford to absorb these costs within their basic budgets, we are seeking additional local funds to address this need.

Proposed new programs to raise academic achievement, including adopting new academic standards, are not currently funded with the city's local revenues. A discussion of these proposed programs follows in Addressing Unmet Needs.

## ADDRESSING UNMET NEEDS

Even with the projected increases in operating revenue, the proposed FY 2006 budget is inadequate to keep our promise of a quality education for every child in the District of Columbia. We must do much more, especially in areas that directly affect academic achievement.

Many of these initiatives are multiyear. We will be asking community stakeholders to help us develop a strategy for prioritizing, funding and implementing these programs. These efforts represent a long-term investment in our children. We hope the community is willing to make a significant down payment this year.

### For All Grade Levels

**Adopting first-class standards of learning and tests ($3.0M).** We have adopted Massachusetts' learning standards — the best in the nation — in the critical subjects of reading/English/language arts and mathematics. Now we must customize them for D.C.'s classrooms and develop new tests that meet the requirements of the federal No Child Left Behind law.

**Extending the school year by 10 days ($11.7M).** Extra time will help teachers and students master the challenging curriculum called for by our new standards.

**Before-school, after-school and summer programs ($53.5M).** Out-of-school-time programs promote learning and expose students to cultural, social, recreational and life-skill building opportunities that are unavailable during the school day.

**Neighborhood Parent Resource Centers ($5M).** These one-stop sources of information, services and outreach will help parents help their children become better learners and plan for their futures.

**Up-to-date library media centers with full-time staff ($13.5M).** Every school needs a library media center with a full-time certified library media specialist. All schools also should have mandated minimum funds for print and nonprint materials and related equipment.

**More help in reading and math for students who need it ($5.5M).** We need to be more proactive in identifying students who need extra support, diagnosing what they need, and providing that help in timely and effective ways.

**A more effective school improvement initiative ($8.5M).** Replacing the Transformation Model, our newly designed program will reach more schools with additional support and resources to meet the expectations of No Child Left Behind.

**Upgrading school science facilitites and strengthening the skills of science teachers ($6.2M).** To prepare for the No Child Left Behind science test in 2007, we propose installing science labs in schools that currently have no facilities, refurbishing or replenishing curriculum materials, and partnering with a local university to establish a Masters of Science Education degree program for teachers.

## For Elementary and Middle Schools

**Art and music in all elementary, middle and junior high schools ($13.1M).** This investment will provide teachers, equipment and supplies to make art, music and other arts part of the core curriculum in all levels throughout the district.

## For High Schools

**Raising high school graduation course and credit requirements ($2.8M).** Increasing the number of credits required, from 23.5 credit hours to 27.5, will better prepare our graduates to enter college or the workplace.

**Offering more Advanced Placement (AP) courses ($640K).** To help increase our pass rate on AP exams, we will offer a minimum of two AP courses in every high school, as well as additional preparation for students and teachers.

**Expanding our International Baccalaureate (IB) degree ($72K).** To support our IB program at Bannecker Academic Senior High School, we will offer IB programs at an elementary school, a middle school and a neighborhood high school.

**Creating a challenging Technical Career program ($3.1M).** Challenging academic requirements — combined with the opportunity to gain advanced technical skills in technology, engineering or other fields — will better prepare students for today's jobs.

**Smoothing the transition to high school with a Summer Bridges program ($3.2M).** Rising 9th- and 10th-grade students will become acquainted with the high school campus, gain learning and study skills to meet the challenging high school curriculum, and develop individualized academic progress plans.

*For Staff*

**An instructional leader in every school ($1.0M).** We will make a focused, sustained effort to attract effective principals to D.C., and to develop leadership skills among principals and teachers already at work in our system.

**Recruiting and retaining excellent teachers ($1.1M).** To achieve excellent schools, we will more proactively reach out to great teachers who share our high expectations for students.

**Bringing our community together to start our children off right ($11.5M).** Our proposed Professional Development Institute will bring teachers and other early childhood professionals together to share skills and support the learning, health, social, family and other needs of children along the birth to age 8 continuum.

## DISTRICT OF COLUMBIA BOARD OF EDUCATION

Peggy Cooper Cafritz, President
Mirian Saez (At Large), Vice President

Julie Mikuta, District One
Dwight E. Singleton, District Two
Tommy Wells, District Three
William Lockridge, District Four

Carolyn Graham, At Large
Robin Martin, At Large
Carrie Thornhill, At Large
TaKeyia M. Dickens, Student Representative
Reginald Williams, Student Representative

Clifford B. Janey, Ed.D., Superintendent

## LET US HEAR FROM YOU

We will be modifying this proposed budget based on public comments through January 12, 2005. After that, citizens will have additional chances to be heard as the City Council and mayor discuss the school budget throughout the spring. The City Council is scheduled to approve the final budget during April/May.

These are your schools and your community's children. Speak out.

**Send your comments.**
*Write to:*
District of Columbia Public Schools
825 North Capitol Street, NE
Washington, D.C. 20002

*Or call:*
(202) 724-4222
Fax (202) 442-5418
E-mail: CallCenter@k12.dc.us